# **Exhibit 9**

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 95066 / June 8, 2022**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4309 / June 8, 2022**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20891**

| | |
|---|---|
| **In the Matter of**<br><br>**COHNREZNICK LLP**<br><br>**Respondent.** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted against CohnReznick LLP ("Respondent" or "CohnReznick") pursuant to Sections 4C[1] and 21C of the

---

[1]     Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(ii) of the Commission's Rules of Practice.[2]

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C And 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules Of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-And-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[3] that:

**A.    SUMMARY**

This matter involves improper professional conduct by CohnReznick in connection with the 2017 third quarter review and 2017 annual audit of Sequential Brands Group, Inc. ("Sequential") and the 2017 annual audit of Longfin Corp. ("Longfin"). For both the Sequential and Longfin engagements, deficiencies in CohnReznick's system of quality controls led to auditing failures, including some failures that were identified by national office quality control reviewers but were not appropriately addressed by the engagement teams, thereby resulting in the issuance of audit reports that were inaccurate. During the course of these engagements, CohnReznick's violations of numerous professional standards were a cause of Sequential's and Longfin's filings of materially misstated financial statements with the Commission.

In the third quarter of 2017, Sequential conducted goodwill impairment testing in response to indicators of impairment and concluded that goodwill was not impaired based on a valuation analysis that relied heavily on assertions posited by Sequential's management regarding the market's mispricing of Sequential's stock that were not supported by relevant and reliable audit

---

[2]    Rule 102(e)(1)(ii) provides, in pertinent part, that:

> The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

[3]    The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

evidence.  During CohnReznick's interim review process, the internal valuation specialists, the assigned engagement quality control review ("EQCR") partner from CohnReznick's national office, and its National Director of SEC Services expressed concerns that Sequential's fair value estimates were not adequately supported by the evidence.  As a result, CohnReznick paused its interim review process.  Confronted with these disagreements and concerns of insufficient evidence to support Sequential's assertions, the engagement partner, with the concurrence of the engagement quality review ("EQR") partner and the Managing Partner of Assurance, nonetheless ultimately accepted Sequential's conclusion that goodwill was not impaired without obtaining sufficient relevant and reliable evidence in support of management's assertions or performing sufficient additional contemporaneous procedures.

After Sequential issued its third quarter 2017 Form 10-Q, CohnReznick documented its third quarter conclusions in the work papers for the third quarter interim review and as part of the annual audit, but failed to recognize the deficiencies of the engagement team's analysis and the continuing lack of evidential matter in support of Sequential's conclusions.  Due to deficiencies in CohnReznick's system of quality control, the firm failed to adequately consider and address concerns raised by its national office staff and the firm's internal valuation specialists.  As a result, CohnReznick failed to conduct its interim review and year-end audit for 2017 in accordance with Public Company Accounting Oversight Board ("PCAOB") standards.  In addition, CohnReznick's statement in its audit report accompanying Sequential's 2017 Form 10-K, filed with the Commission on March 16, 2018, that it had conducted the audit in accordance with PCAOB standards, was inaccurate.  Moreover, CohnReznick was a cause of Sequential's violation of the reporting and books and records provisions of the Exchange Act.

CohnReznick also audited the 2017 financial statements of Longfin and engaged in similar quality control and audit failures, as set forth in an Order of the Commission issued on September 27, 2021 (the "Longfin Engagement Order").[4]  The Longfin Engagement Order found that the engagement partner did not comply with multiple PCAOB standards, resulting in audit failures in critical areas including audit planning, revenue and receivables, related party transactions, and intangible assets.  The Longfin Engagement Order also found that the EQR partner on the audit did not adequately conduct his review in accordance with the applicable PCAOB standards.  The audit failures concerned, among other things, aspects of related party commodity transactions, which were a key component of Longfin's fraudulent scheme.  As with Sequential, these audit deficiencies were compounded by shortcomings in CohnReznick's system of quality controls, which were insufficient to ensure that CohnReznick performed its audit in accordance with professional standards.  Prior to issuing the audit report, a director and a senior manager from CohnReznick's national office conducted two independent reviews of the Longfin audit engagement.  One review raised a question about a specific related party transaction, while the other circulated a list of matters that needed to be "discussed, documented, and concluded upon," including whether there were related party transactions, and if there were "any special terms with them."  Ultimately, the firm failed to apply appropriate professional skepticism or perform audit procedures appropriate to the identified risk.  As a result,

---

[4]    *See* Accounting and Auditing Enforcement Release No. 4258, dated September 27, 2021.

3

CohnReznick inaccurately stated in its audit report accompanying Longfin's 2017 Form 10-K, filed with the Commission on April 2, 2018, that it had conducted the audit in accordance with PCAOB standards.

## B.    RESPONDENT

1.    **CohnReznick LLP**, a New Jersey limited liability partnership, is a public accounting firm in the United States with over 3,000 employees in 25 cities and offers services in three segments – accounting, tax and advisory. CohnReznick registered with the PCAOB in October 2003.   CohnReznick became the independent auditor for Sequential in 2013 and issued reports on Sequential's financial statements through the year-end 2020 financial statement audit. CohnReznick served as the independent auditor for Longfin between February 7, 2018 and April 5, 2018, when it resigned from the Longfin engagement.

## C.    RELEVANT ENTITIES

2.    **Sequential Brands Group, Inc.**, is a Delaware corporation headquartered in New York, New York. Sequential owns a portfolio of consumer brands and promotes, markets, and licenses those brands through retailers, wholesalers and distributors in the United States and abroad. Sequential's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the Nasdaq Capital Market under the ticker symbol "SQBG" at all times during the relevant period.  On August 31, 2021, Sequential filed for Chapter 11 bankruptcy relief and on September 27, 2021, the Nasdaq Stock Market LLC delisted Sequential for failing to meet listing requirements.[5]

3.    **Longfin Corp.** is a Delaware corporation that, at relevant times, purported to be headquartered in New York, New York and Lyndhurst, New Jersey. Longfin's Class A common stock was previously registered with the Commission pursuant to Section 12(b) of Exchange Act. Between December 13, 2017 and its voluntary delisting from NASDAQ in May 2018, Longfin's Class A common stock traded on NASDAQ under the symbol "LFIN." On May 24, 2018, Longfin's Class A common began trading over the counter. On November 21 and November 27, 2018, Longfin filed Forms 8-K announcing that the company had entered into an Assignment for

---

[5]    To settle the Commission's litigation against Sequential alleging failure to timely impair goodwill, Sequential agreed to the entry of a final judgment permanently enjoining it from future violations of the antifraud provision of Section 17(a)(3) of the Securities Act of 1933 and certain reporting, books and records, and internal control provisions under the Securities Exchange Act of 1934. The U.S. District Court for the Southern District of New York entered the final judgment against Sequential on December 1, 2021. See Accounting and Auditing Enforcement Release No. 4277, dated December 15, 2021.

the Benefit of Creditors on November 14, 2018 in New Jersey state court and, as a result, had terminated all of its employees and disbanded its Board of Directors.[6]

## D.    FACTS

### COHNREZNICK'S REVIEW AND AUDIT OF SEQUENTIAL'S 2017 GOODWILL IMPAIRMENT TESTING

#### CohnReznick Identified Goodwill Impairment as an Area of Significant Risk

4.    Throughout the audit planning process in 2017, CohnReznick identified goodwill impairment testing to be an area of significant risk, as it had done in the previous year's audit. Sequential's goodwill constituted over 20% of the company's assets and the likelihood of its impairment increased as the company's stock price, and therefore its market capitalization, continued its decline in 2017.

5.    The engagement team understood that in the immediately preceding quarters Sequential had disclosed its goodwill impairment testing policy, which relied exclusively on the company's market capitalization, as adjusted by a control premium (the "Market Approach"), to estimate the company's fair value. Under this policy, Sequential was required to recognize an impairment charge for the amount by which its carrying value exceeded its fair value. The continuing stock price decline, therefore, increased the likelihood that the company's goodwill impairment test would indicate that goodwill was impaired.

#### In the Third Quarter of 2017, CohnReznick Reviewed Sequential's Interim Goodwill Impairment Test and Conclusion that Goodwill Was Not Impaired

6.    Following the identification of impairment indicators arising from the impairment of five of its brands in the third quarter, Sequential determined that an interim quantitative impairment test of goodwill was necessary as of the end of the third quarter. It accelerated by one day the company's annual impairment test scheduled for first day of the fourth quarter, October 1st to September 30th. Based on the then current stock price and the number of shares outstanding, the engagement team understood that the Market Approach would indicate that Sequential's goodwill was impaired.

---

[6]    In April 2018, the Commission filed a complaint against Longfin and several individuals alleging, among other things, that the defendants illegally distributed and sold Longfin stock in unregistered transactions. In June 2019, the court ordered disgorgement and penalties against the defendants. On June 5, 2019, the Commission filed another complaint against Longfin and its CEO alleging that they engaged in a scheme to obtain a NASDAQ listing through a fraudulent public offering and perpetrated an accounting fraud by reporting fictitious revenue from commodity transactions. On September 26, 2019, a federal court in New York entered a default judgment against Longfin. In December 2019, Longfin's CEO agreed to pay disgorgement and penalties to resolve the Commission's fraud action against him.

7.    Approximately a week before Sequential was required to file its third quarter Form 10-Q, and before the company had released its earnings, the engagement team received a draft valuation report from Sequential.  That report, which had been prepared by Sequential's third party valuation specialist, based on information and guidance provided by Sequential, departed from the company's previously disclosed Market Approach to goodwill impairment testing and instead incorporated two different valuation methodologies: the income approach using a discounted cash flow ("DCF") model and the Market Approach.  Specifically, this report relied on a weighted average between the fair values obtained by the Market Approach (approximately $245 million) and the DCF (approximately $650 million), which it compared to Sequential's carrying value of approximately $444 million, and concluded that the company's goodwill was not impaired.

8.    To explain the wide discrepancy in the fair value estimates, Sequential's report cited three assertions by Sequential's management, which in management's view, supported the conclusion that public markets had mispriced Sequential's stock: (1) the company's stock price was low because Sequential was unfairly grouped with other out-of-favor companies in the retail industry with business models incomparable to Sequential; (2) the market was undervaluing the tax amortization benefit of its brands, which it believed would become significant in future periods when the company was more profitable; and (3) the company's high leverage ratio created a "perception overhang."

**CohnReznick's Internal Valuation Specialists Raised Concerns with Sequential's Goodwill Impairment Testing Methodology**

9.    Upon receiving Sequential's goodwill impairment analysis from the engagement team, CohnReznick's assigned internal valuation specialist assessed the report and identified several concerns suggesting that the company might fail the impairment test.  He furnished his written comments to the engagement team, a second valuation specialist at the firm, as well as the firm's Managing Partner of Assurance, who served as the liaison between CohnReznick's internal valuation group and CohnReznick's auditors.

10.    In his comments, the internal valuation specialist observed that "[w]hile the DCF implies that impairment is not present, the trading price approach implies impairment" and that "[t]he difference in estimated values is significant and implies that one or both require adjustment." He also added, after applying additional potential valuation methods to the analysis, which he included in his written comments, "the implication from the sensitivities is that the Step 1 test may fail."

11.    The next day, a second CohnReznick valuation specialist sent an email to the engagement team and the Managing Partner of Assurance noting "troubling facts" in Sequential's impairment analysis, including that Sequential's market capitalization was equal to 50% of book value and that there was a "large disparity in equity value conclusions between the DCF and the Market…2.68x…??? too big of a difference."

6

**In Response to CohnReznick's Comments, Sequential Prepared a Quantitative Reconciliation That Relied Heavily on Management Assertions that Sequential Was Undervalued by the Market**

12.    The engagement partner, the EQR partner, and the Managing Partner of Assurance did not believe that the wide disparity in estimated values obtained from the Market Approach and the DCF supported a finding that the DCF-based valuation was inaccurate.  Rather, the engagement partner, the EQR partner, and the Managing Partner of Assurance concluded that the company could rely on the DCF-based valuation estimate if (i) Sequential management believed the DCF valuation represented the best estimate of the company's fair value, and (ii) it supplemented its valuation report with a quantitative reconciliation to the Market Approach.  In a follow-up conference call attended by Sequential's management and these partners, among others, CohnReznick communicated these conclusions to Sequential's management and its third party valuation specialist.  In response, Sequential's third party valuation specialist, working at the direction of Sequential's management, prepared a revised valuation analysis quantifying the reconciling factors.

13.    The revised report, which Sequential forwarded to CohnReznick hours after the conference call, exclusively utilized the DCF valuation to estimate fair value and incorporated a quantitative reconciliation to Sequential's estimated fair value under the Market Approach.  This reconciliation analysis relied heavily on two assertions of the company's management: (1) that the stock market failed to properly incorporate the potential tax amortization value of the company's intangible indefinite-lived assets (primarily, its brands) to an acquirer; and (2) that the stock market was not correctly pricing Sequential's stock in relation to the company's revenues because of misperceptions of the company's industry.  These management assertions were not supported by sufficient objective evidence or analysis to justify management's view that the market was undervaluing the company.

**CohnReznick's Valuation Specialist Raised Concerns Regarding the Reasonableness of Sequential's Fair Value Assessment**

14.    CohnReznick's internal valuation specialist reviewed the revised report and raised concerns about whether there was sufficient evidentiary support for management's assertions.  Specifically, he did not believe the evidential matter provided by management supported the magnitude of the quantitative reconciliation between the results of the DCF model and Market Approach valuation.  He communicated his concerns and conclusion to the engagement team and the Managing Partner of Assurance, including his unwillingness to opine as to the reasonableness of the fair value analysis.

15.    The engagement partner and the Managing Partner of Assurance did not agree with the valuation specialist's concerns regarding the magnitude of the reconciliation.  Instead, they viewed the reconciliation between the estimated fair values obtained by the DCF and the Market Approach as an accounting consideration and outside the scope of the specialist's expertise, despite

7

his extensive experience in assessing fair value assessments similar to Sequential's impairment testing in prior engagements. They also determined that the internal valuation specialist's concern with inadequate evidence in support of the wide gap between the values yielded by the DCF model and the Market Approach was not a valuation issue appropriate for his consideration. Rather, they believed that the sufficiency of the evidence on the issue was solely an auditing issue for the engagement team's consideration.

16.    Contrary to the typical practice at CohnReznick, wherein the internal valuation specialist would opine as to the reasonableness of an audit client's overall fair value measurement, in this case the engagement team assumed responsibility for assessing the reasonableness of the determination, as a result of the specialist's unwillingness to do so and based on the engagement team's and Managing Partner of Assurance's conclusion that the sufficiency of evidential matter to support the reconciliation between two fair value estimates presented an audit (rather than a valuation) question.

**Sequential Issued Its Earnings Release, Even Though CohnReznick's National Office Quality Control Review Remained Incomplete, in Reliance on the Engagement Team's Assurances That Changes to the Financial Statements Were Unlikely**

17.    As part of CohnReznick's documented quality control system, an EQCR review, in addition to the EQR review, was to be performed for each public company audit.[7] The firm's national office assigned a partner or director from its Quality Control group to serve as the EQCR reviewer. In addition to being a required sign-off for all public company reviews and audits, under CohnReznick's procedures, the EQCR was also required to be involved in the evaluation of significant engagement team judgments and the evaluation of engagement documentation related to areas deemed significant.

18.    Despite the requirement that the EQCR be involved in the evaluation of significant engagement team judgments, the Sequential engagement team did not include the assigned EQCR partner in their initial consultations with the Managing Partner of Assurance on Sequential's goodwill impairment analysis. Moreover, without notifying the EQCR, CohnReznick informed Sequential's management, as management was finalizing the company's third quarter earnings release, that additional changes to the financial statements in the Form 10-Q were unlikely. As a result, the EQCR was unable to complete his review or provide input to the engagement team regarding Sequential's goodwill impairment testing prior to the issuance of Sequential's earnings release.

19.    Sequential's third quarter earnings release was furnished as an exhibit to the company's Form 8-K and did not incorporate an impairment to goodwill. The EQCR promptly

---

[7]    CohnReznick's procedures and system of quality control required quality reviews conducted by national office directors or partners for certain engagements. These EQCR reviews were distinct from EQR reviews, which are required by PCAOB audit standards.

questioned the engagement team as to how the goodwill issue had been resolved without his involvement and also alerted CohnReznick's Chief Risk Officer and its National Director of SEC Services.

**After the Publication of the Third Quarter Earnings Release, But Before the Filing of the Quarterly Report on Form 10-Q, Disagreements Among the Engagement Team and Members of the National Office Arose Within CohnReznick**

20.     After evaluating Sequential's third party fair valuation analysis, the EQCR partner and the National Director of SEC Services (with whom the EQCR partner had shared Sequential's analysis) reached a mutual view that, based on the information they were provided, there was insufficient evidence to support Sequential management's assertions that the market was undervaluing Sequential, and without more, the company needed to record goodwill impairment.

21.     The EQCR partner and the National Director of SEC Services communicated their views to the engagement partner, the EQR, the Managing Partner of Assurance, as well as members of the firm's senior management.  Among other concerns, they expressed the view that the engagement team was not exercising appropriate professional skepticism with regard to Sequential's goodwill impairment testing.

22.     Although CohnReznick had previously notified Sequential that changes to the financial statements were unlikely, due to the internal disagreement at CohnReznick, CohnReznick notified Sequential that it had not completed its interim review of the financial statements, which prevented Sequential from filing its Form 10-Q.  In light of the fact that Sequential had already issued its earnings release, Sequential's management urged CohnReznick to resolve its concerns as soon as possible, requesting "minute by minute" status updates and stating in an email to the engagement partner: "[t]here is no choice but to resolve tonight."

**CohnReznick Resolved the Disagreement in Favor of the Engagement Team Without Performing Sufficient Audit Procedures**

23.     To resolve the disagreement, CohnReznick convened multiple meetings among the disagreeing staff to review the information provided, as well as an external conference call between Sequential management, the engagement team, and the dissenting CohnReznick partners. None of these calls assisted in resolving the disagreement, as the EQCR partner and National Director of SEC Services continued to assert that the engagement team had not gathered sufficient evidence to support Sequential management's assertions regarding the reconciling factors and the engagement team's conclusions.

24.     Notwithstanding the insufficient evidence supporting the engagement team's conclusions and the unresolved disagreement, CohnReznick's senior management decided, after internal discussion but without directing the engagement team to obtain or review further evidence or perform additional procedures, that the engagement team could authorize Sequential to file its

quarterly report on Form 10-Q. CohnReznick further determined that, in the event that the pending disagreement over the reasonableness of Sequential's goodwill impairment test could not be resolved with the dissenting partners, the disagreement should be documented in the work papers, consistent with PCAOB standards. Accordingly, the firm told Sequential it had completed its interim review and that the company could file its Form 10-Q.

### CohnReznick Prepared an Inaccurate Consultation Memorandum, Which Purported to Document the Engagement Team's Analysis, Months After the Third Quarter Interim Review was Complete

25.    In January 2018, months after the third quarter interim review was completed, the engagement team supplemented the third quarter review file with a work paper entitled "Analysis of Goodwill and Intangibles – CohnReznick memo." This work paper purported to describe Sequential's goodwill impairment analyses and conclusions throughout 2017, as well the engagement team's views of those analyses, and its own internal analyses, to conclude that management's goodwill impairment conclusion for the third quarter of 2017 was reasonable. It also purported to memorialize a consultation with the Managing Partner of Assurance and reflected his concurrence, as well as the concurrence of the EQR partner.

26.    This work paper, while purportedly describing the engagement team's analysis and conclusions prior to the filing of the third quarter Form 10-Q, incorporated new data and justifications for the engagement team's impairment conclusions, which were not previously documented prior to the filing of the Form 10-Q. This memo did not include sufficient and accurate information to enable an experienced auditor to understand the timing, extent, and results of the procedures performed and the evidence obtained.

### COHNREZNICK'S 2017 LONGFIN AUDIT

27.    In February 2018, CohnReznick commenced its first audit of Longfin. CohnReznick's audit of Longfin incorporated multiple levels of quality review, including by the firm's national office, but due to deficiencies in the firm's system of quality control, the firm failed to address adequately the concerns and issues raised by the reviewers outside of the engagement team. The Longfin Engagement Order describes the failures by CohnReznick's engagement partner and EQR on the 2017 audit and finds that the engagement partner did not comply with multiple PCAOB standards, including, but not limited to AS 2110, AS 2301, AS 1101, AS 2410, AS 2310, AS 1201, and AS 1105.

28.    As detailed in the Longfin Engagement Order, these violations, which are incorporated by reference herein, resulted in failures in four critical audit areas.

29.    First, CohnReznick failed appropriately to design the audit plan and address the risk of material misstatements, including risks associated with material weaknesses in Longfin's Internal Control over Financial Reporting; Longfin's precarious financial position; the nature of

10

Longfin's purported commodity sales, which occurred on the high seas, could not be physically verified, and lacked reliable documentation; and Longfin's practice of entering into transactions in which related parties were involved in both sides of the purchase and sale of commodities.

30.    Second, CohnReznick failed to identify undisclosed related parties and appropriately audit disclosed related party transactions.  CohnReznick missed indications that Longfin engaged in significant transactions with at least three undisclosed related parties that accounted for more than 10% of Longfin's 2017 revenues.  CohnReznick also failed to perform required audit procedures with respect to transactions involving disclosed related parties.  In those transactions, which accounted for almost 20% of Longfin's commodity revenue, Longfin purportedly bought commodities from one related party and instantly sold them to a second related party.

31.    Third, CohnReznick failed to appropriately audit revenues and accounts receivable.  In its audit testing of revenues and accounts receivables, CohnReznick did not appropriately evaluate whether the objectives of the procedures were achieved and the results of the work adequately supported the conclusions reached.  Nor did it ensure that adequate audit procedures were planned and performed to obtain sufficient appropriate audit evidence.  In performing its audit, CohnReznick primarily relied on third party confirmations of commodity revenues and related receivables as audit evidence.  Many of the confirmations came from unknown and unverified sources, yet CohnReznick relied on them as audit evidence to support approximately one third of Longfin's revenue without obtaining other sufficient appropriate evidence.

32.    Fourth, CohnReznick failed to appropriately audit Longfin's "developed technology" asset.  In June 2017, Longfin acquired a company in which Longfin ascribed a $32 million fair value to a "Developed Technology" intangible asset that it obtained in the acquisition.  The audit work papers identified the acquisition as a significant risk and material event and as a complex or troublesome engagement area, and also identified the valuations related to the acquisition as a significant estimate.  CohnReznick also should have been highly skeptical of management's assumptions and projections used in the valuation of the developed technology asset.  However, CohnReznick did not adequately evaluate the reasonableness of accounting estimates made by management for the intangible asset, obtain sufficient appropriate evidential matter, or adequately evaluate the sufficiency and competence of the audit evidence obtained from auditing fair value measurements and disclosures.

**CohnReznick's National Office Senior Manager Review of the Longfin Audit Work Papers Failed to Reasonably Assure Compliance with Applicable Professional Standards**

33.    On March 29, 2018, days before the scheduled issuance of Longfin's Form 10-K, CohnReznick's audit engagement team learned for the first time that, a few weeks earlier, Longfin had received a document request from the Commission's Division of Enforcement.  In response to this development, three senior partners in CohnReznick's national office asked that a

senior manager assigned to CohnReznick's national office review the Longfin audit file, asking her simply to "go through [Longfin's work papers] with a PCAOB eye and see if there is enough there."

34.     In the course of her review, the senior manager identified two specific related party sale and purchase commodity transactions and asked the engagement partner whether the engagement team understood their substance.  Unbeknownst to the senior manager, she had identified one of many fraudulent related party commodity transactions recorded by Longfin.  In response to her questions, the engagement team failed to obtain sufficient evidence necessary to evaluate the substance or business purpose of the transactions.  Moreover, the audit work papers do not refer to or otherwise document the nature or results of the senior manager's review.  In addition, the engagement partner had no knowledge of the scope of the senior manager's review, and the EQR partner and the EQCR director assigned to the Longfin engagement were not aware of what the senior manager reviewed.  As a result of the lack of clear policies and procedures for performing this type of review by the national office personnel, the fraudulent commodity transaction – and many other transactions like it at Longfin – went undetected by the auditors.

**CohnReznick Failed to Respond to "Critical Matters" Identified by the Engagement Quality Control Review Director**

35.     In accordance with firm quality control policies, a director in CohnReznick's quality control department was assigned to the Longfin audit as an EQCR reviewer, whose role is to provide an additional layer of quality assurance.  The Longfin engagement was classified as a "Tier I" EQCR, the most comprehensive review, which per firm policy was "effectively an equivalent of an engagement quality review . . . ."  A Tier I EQCR on a public company audit required, among other things, involvement in the planning meeting and evaluation of significant engagement judgments and evaluation of engagement documentation including, at a minimum, areas which are deemed significant.

36.     In a March 30, 2018 email to the engagement and EQR partners, among others, the EQCR reviewer communicated a list of eighteen "critical matters that need to be discussed, documented and concluded upon."  The critical matters raised by the EQCR reviewer included, "any commodity transaction with related parties as counterparties and are there any special terms with them" and "given all of the [material weaknesses] identified by management have we reassessed our planning materiality and our overall risk assessment and concluded we have done appropriate testing?"

37.     After the EQCR raised these issues, the engagement partner, the EQR, the EQCR, and a partner from CohnReznick's national office, conducted a call with Longfin's Audit Committee, Longfin management, and multiple outside advisors, including Longfin's outside SEC counsel and GAAP accounting advisor, to discuss, among other things, the SEC Enforcement document request and the EQCR's list of "critical matters." During this call, Longfin's management made oral representations about the related party transactions, but the representations

were inconsistent with other information contained in the audit file and on their own did not constitute relevant and reliable audit evidence.

**Due to CohnReznick's Deficient System of Quality Controls, the Reviews Conducted by the National Office Failed to Ensure that the Audit Met Professional Standards**

38.     The relevant PCAOB quality control standard requires a CPA firm to have a system of quality control for its auditing practice.  The standard requires the firm to adopt policies and procedures that provide the firm with reasonable assurance that "the work performed by engagement personnel meets applicable professional standards, regulatory requirements, and the firm's standards of quality."  Firm policies and procedures should also provide reasonable assurance that the policies and procedures established for the elements of quality control described in the standard are "suitably designed and are being effectively applied."

39.     The two reviews of the Longfin audit engagement performed by CohnReznick national office personnel failed to ensure that the audit was performed in accordance with the relevant professional standards:

- Both reviews identified related party commodity transactions as an area that required further follow-up by the engagement team, but the engagement team did not exercise appropriate professional skepticism, especially with respect to management representations, nor did the engagement team undertake sufficient audit procedures when presented with additional audit risks, and the EQCR did not take adequate steps to follow up with the engagement team.

- The national office review was performed on a highly compressed timetable that was not commensurate with the scope and complexity of its review.

- The national office senior manager's review was not conducted with adequate guidance or documented in a way that ensured the issues it identified were adequately addressed prior to issuance of the audit opinion.

- Pursuant to internal guidance, the EQCR Tier 1 review was supposed to be effectively the equivalent to an EQR.  Firm procedures, however, did not require the EQCR to, among other things, evaluate the engagement team's assessment of and audit response to identified risks.

E.     **VIOLATIONS**

**RULE 102(e) AND SECTION 4C OF THE EXCHANGE ACT**

40.     Section 4C of the Exchange Act and Rule 102(e)(1)(ii) provide, in part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in improper professional conduct.  With respect to persons licensed to practice as accountants,

13

"improper professional conduct" includes either of the following two types of negligent conduct: (1) a single instance of highly unreasonable conduct that results in a violation of applicable professional standards in circumstances in which an accountant knows, or should know, that heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission. Rule 102(e)(1)(iv)(B). As a result of the conduct described above, CohnReznick engaged in "improper professional conduct" within the meaning of Exchange Act Section 4C(a)(2) and Rule 102(e)(1)(ii).

41. As set forth above, CohnReznick should have known, that Sequential's goodwill was fully impaired by the 2017 third quarter and that Sequential's financial statements were, as a result, materially misstated and not presented in accordance with Generally Accepted Accounting Principles ("GAAP"). Further, CohnReznick should have known there was not relevant and reliable audit evidence to support Sequential's accounting conclusion and in particular the underlying assertions of management. Additionally, in the course of its 2017 year-end audit of Sequential, CohnReznick should have known that Sequential's impairment charge should have been recorded as a third quarter event and that Sequential's third quarter financial statements therefore materially overstated the company's assets and earnings. CohnReznick's failures violated its obligation to adhere to professional auditing standards.

42. The two pre-issuance reviews of the Longfin audit engagement performed by CohnReznick's national office personnel failed to ensure that the audit was performed in accordance with professional standards, resulting in CohnReznick issuing an unsupported audit report that did not comply with PCAOB standards. Both reviews identified related party commodity transactions as an area that required further follow-up by the engagement team, but the engagement team did not apply additional appropriate scrutiny or engage in additional audit procedures, and neither the national office senior manager nor the EQCR took steps to follow up. Both reviews were also conducted without adequate guidance, and the national office review was conducted on a highly compressed timetable that was not commensurate with the scope and complexity of the review.

Due Professional Care in the Performance of
Work (AS § 1015)

43. AS § 1015 provides that auditors are to exercise due professional care in the planning and performance of audits and the preparation of audit reports.

44. AS § 1015.07 provides that auditors must maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." In addition, AS § 1015.08 states the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."

14

45.     As a result of CohnReznick's conduct described above, CohnReznick failed to exercise due professional care and an attitude of professional skepticism in the Sequential and Longfin engagements.

## Audit Risk (AS § 1101)

46.     AS § 1101 discusses the auditor's consideration of audit risk and provides that the objective of the auditor is to conduct the audit of financial statements in a manner that reduces audit risk to an appropriately low level.

47.     AS § 1101.03 requires the auditor to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud."  It further requires the auditor to apply "due professional care, including obtaining sufficient appropriate audit evidence."

48.     As a result of CohnReznick's conduct described above, CohnReznick failed to perform auditing steps sufficient to reduce audit risk to an appropriate level in the Sequential and Longfin engagements.

## Audit Evidence (AS § 1105)

49.     AS § 1105 establishes "requirements regarding designing and performing audit procedures to obtain sufficient appropriate audit evidence."  It provides that audit evidence "consists of both information that supports and corroborates management's assertions regarding the financial statements or internal control over financial reporting and information that contradicts such assertions."

50.     AS § 1105.04 requires the auditor to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion."

51.     AS § 1105.08 provides that the "reliability of evidence depends on the nature and source of the evidence and the circumstances under which it is obtained," including consideration of its source and the manner in which the evidence is obtained by the auditor.

52.     As a result of CohnReznick's conduct described above, CohnReznick failed to obtain sufficient audit evidence to support its opinions in the Sequential and Longfin engagements.

<u>Reviews of Interim Financial Information (AS § 4105)</u>

53.    AS § 4105.01 "establish[es] standards and provide[s] guidance on the nature, timing, and extent of the procedures to be performed by an independent accountant when conducting a review of *interim financial information...*"

54.    Specifically, AS § 4105.22 requires an auditor to make additional inquiries or perform additional procedures when the accountant becomes aware of information indicating that the interim financials may not conform to GAAP.  AS § 4105.28 requires that an auditor refrain from completing a review and issuing a review report if it is unable to perform necessary review procedures of the interim financial statements.

55.    As a result of CohnReznick's conduct described above, CohnReznick failed to comply with standards applicable to a review of interim financial statements, specifically AS §§ 4105.22 and 4105.28, in the Sequential matter, including by failing to adequately address contradictory views expressed during the interim review process.

<u>Identifying and Assessing Risks of Material Misstatement (AS § 2110)</u>

56.    AS § 2110 establishes requirements regarding the process of identifying and assessing risks of material misstatement of the financial statements.

57.    As § 2110.05 provides that "[r]isks of material misstatement can arise from a variety of sources, including external factors, such as conditions in the company's industry and environment, and company-specific factors, such as the nature of the company, its activities, and internal control over financial reporting."  It further requires auditors to perform procedures "necessary to identify and appropriately assess the risks of material misstatement," including "consideration of both external factors and company-specific factors."

58.    As a result of CohnReznick's conduct described above, CohnReznick failed to perform sufficient procedures to identify and assess risks of material misstatement arising from Longfin's business, particularly in light of its related party transactions and lack of sufficient documentation relating thereto.

<u>The Auditor's Responses to the Risks of Material Misstatement (AS § 2301)</u>

59.    AS § 2301 requires that auditors implement appropriate responses to the risk of material misstatements.

60.    Specifically, AS § 2301.42 provides "[t]he necessary extent of a substantive audit procedure depend on the materiality of the account or disclosures, the assessed risk of material misstatement, and the necessary degree of assurance from the procedure."  It goes on to explain that "increasing the extent of an audit procedure cannot adequately address an assessed risk of

material misstatement unless the evidence to be obtained from the procedure is reliable and relevant."

61.    As a result of CohnReznick's conduct described above, CohnReznick failed to appropriately respond to risks of material misstatement in the Sequential and Longfin engagements.

The Confirmation Process (AS § 2310)

62.    AS § 2310 provides guidance about the confirmation process in audits performed in accordance with the standards of the PCAOB, and addresses "certain factors that affect the reliability of confirmations."

63.    AS § 2310.26 requires the auditor to "direct the confirmation request to a third party who the auditor believes is knowledgeable about the information to be confirmed."

64.    AS § 2310.27 further provides that the auditor should exercise professional skepticism and "consider whether there is sufficient basis for concluding that the confirmation request is being sent to a respondent from whom the auditor can expect the response will provide meaningful and appropriate evidence."

65.    As a result of CohnReznick's conduct described above, CohnReznick failed to adhere to the requirements of this standard in the Longfin engagement when it directed confirmation requests to third parties in a manner that compromised their reliability.

Related Parties (AS § 2410)

66.    AS § 2410 sets forth "requirements regarding the auditor's evaluation of a company's identification of, accounting for, and disclosure of relationships and transactions between the company and its related parties."

67.    In particular, AS § 2410.03 requires the auditor to "perform procedures to obtain an understanding of the company's relationships and transactions with its related parties that might reasonably be expected to affect the risks of material misstatement of the financial statements in conjunction with performing risk assessment procedures in accordance with AS 2110, *Identifying and Assessing Risks of Material Misstatement.*"

68.    AS § 2410.11 further requires the auditor to design and perform "audit procedures in a manner that addresses the risks of material misstatement associated with related parties and

17

relationships and transactions with related parties."

69.    As a result of CohnReznick's conduct described above, CohnReznick failed to perform sufficient procedures with respect to Longfin's relationships and transactions with related parties.

### Auditing Accounting Estimates (AS § 2501)

70.    AS § 2501 provides guidance to auditors "on obtaining and evaluating sufficient appropriate evidential matter to support significant  accounting estimates in an audit of  financial statements in accordance with the standards of the PCAOB."

71.    AS § 2501.07 requires the auditor to obtain "sufficient appropriate evidential matter to provide reasonable assurance that… [t]he accounting estimates are presented in conformity with applicable accounting principles and are properly disclosed."

72.    As a result of CohnReznick's conduct described above, in the Sequential and Longfin matters, CohnReznick failed to adequately evaluate the reasonableness of management's fair value estimates and thereby violated the foregoing standards.

### Auditing Fair Value Measurements (AS § 2502)

73.    AS § 2502 establishes "standards and provide guidance on auditing fair value measurements and disclosures contained in financial statements."

74.    AS § 2502.26 requires the auditor to evaluate whether "[m]anagement's assumptions are reasonable and reflect, or are not inconsistent with, market information," whether the fair value measurement "was determined using an appropriate model, if applicable" and whether "[m]anagement used relevant information that was reasonably available at the time."

75.    Further, AS § 2502.39 specifies that the auditor should evaluate "whether the data on which the fair value measurements are based, including the data used in the work of a specialist, is accurate, complete, and relevant; and whether fair value measurements have been properly determined using such data and management's assumptions."

76.    As a result of CohnReznick's conduct described above, CohnReznick failed to properly audit the fair value measurements in the Longfin engagement and thereby CohnReznick violated the foregoing standards.

### Evaluating Audit Results (AS § 2810)

77.    AS § 2810.03 requires that "[i]n forming an opinion on whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial

18

reporting framework, the auditor should take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."

78.     As a result of CohnReznick's conduct described above, in the Sequential engagement CohnReznick violated this standard.

### Audit Documentation (AS § 1215)

79.     AS § 1215.06 requires that an "auditor must document the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions. Audit documentation must clearly demonstrate that the work was in fact performed."

80.     As a result of CohnReznick's conduct described above, CohnReznick violated this standard in the Sequential engagement.

### PCAOB Quality Control Standards (QC §§ 20 and 30)

81.     PCAOB Quality Control Standards, specifically QC § 20.01, provides that a "CPA firm shall have a system of quality control for its accounting and auditing practice."  QC § 20.03 broadly defines a system of quality control "as a process to provide the firm with reasonable assurance that its personnel comply with applicant professional standards and the firm's standards of quality."

82.     QC § 20.10 requires firms to "maintain objectivity" and remain impartial and intellectually honest.  In addition, QC § 20.17 requires a firm to have policies and procedures to provide reasonable assurance that work performed by engagement personnel complies with professional standards and the firm's own standards of quality.  QC § 20.18 provides that these procedures should cover, among other things, appropriately supervising and documenting each engagement.

83.     QC § 20.19 requires engagement personnel to consult, on a timely basis, with individuals within or outside the firm "when appropriate (for example, when dealing with complex, unusual, or unfamiliar issues.)"

84.     QC § 20.20 also imposes requirements on firms to properly monitor whether the firm's quality control policies and procedures are suitably designed and are being effectively applied.

85.     PCAOB Quality Control Standard Section 30, *Monitoring a CPA Firm's Accounting and Auditing Practice* provides guidance on how a CPA firm implements the monitoring element of a quality control system in its accounting and auditing practice.  Monitoring procedures taken as a whole should enable the firm to obtain reasonable assurance that its system

of quality control is effective. A firm's monitoring procedures may include pre-issuance or post-issuance review of selected engagements.

86.     As a result of CohnReznick's conduct described above, CohnReznick violated QC § 20 and § 30 in the Sequential and Longfin engagements.

## COHNREZNICK WAS A CAUSE OF VIOLATIONS OF SECTIONS 13(a) AND 13(b)(2)(A) OF THE EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11 AND 13a-13 THEREUNDER

87.     Section 13(a) of the Exchange Act requires all issuers with securities registered under Section 12 of the Exchange Act to file periodic and other reports with the Commission containing such information as the Commission's rules prescribe.  Pursuant to Section 13(a), the Commission promulgated Rules 13a-1, 13a-11, and 13a-13, which require issuers to file annual, current, and quarterly reports, respectively.

88.     Section 13(b)(2)(A) of the Exchange Act requires all issuers with securities registered under Section 12 to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. In addition, Exchange Act Rule 12b-20 requires that reports contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading. Scienter is not an element of these reporting provisions.

89.     In administrative proceedings, the Commission may impose sanctions upon any person that is, was, or would be a cause of a violation, due to an act or omission the person knew or should have known would contribute to such violation.  In order to establish that a person caused a non-scienter based violation, a showing of negligence will suffice.

90.     Sequential's failure to record goodwill impairment in a timely manner rendered its books, records and accounts materially inaccurate.  Similarly, the financial statements that were included in Sequential's third quarter 2017 Form 10-Q, 2017 Form 10-K, and its third quarter earnings release furnished on Form 8-K were materially misleading.  CohnReznick's failure to abide by applicable PCAOB standards and perform appropriate audit and review procedures was a cause of Sequential's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

91.     Longfin filed a materially false annual report on its 2017 Form 10-K.  By not conducting the audit of Longfin's financial statements in accordance with applicable PCAOB standards, and by allowing the issuance of an audit report, included in Longfin's annual report, falsely stating that it had conducted the audit in accordance with PCAOB standards, CohnReznick was a cause of Longfin's violation of Exchange Act Section 13(a) and Rule 13a-1 thereunder.

## COHNREZNICK VIOLATED RULE 2-02(b)(1) OF REGULATION S-X

92.     Rule 2-02(b)(1) of Regulation S-X requires an accountant's report to state "whether the audit was made in accordance with generally accepted auditing standards" ("GAAS"). "[R]eferences in Commission rules and staff guidance and in the federal securities laws to GAAS or to specific standards under GAAS, as they relate to issuers, should be understood to mean the standards of the PCAOB plus any applicable rules of the Commission." *See* SEC Release No. 34-49708 (May 14, 2004).

93.     Through the conduct described above, CohnReznick violated Regulation S-X Rule 2-02(b)(1) when CohnReznick issued (i) its audit report dated March 16, 2018, stating that CohnReznick had conducted its audit of Sequential's 2017 financial statements in accordance with PCAOB standards when it had not, and (ii) its audit report dated April 2, 2018, stating that CohnReznick had conducted its audit of Longfin's 2017 financial statements in accordance with PCAOB standards when it had not.

## F.    <u>FINDINGS</u>

94.     Based on the foregoing, the Commission finds that Respondent committed violations of Rule 2-02(b)(1) of Regulation S-X.

95.     Based on the foregoing, the Commission finds that Respondent caused (i) violations Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder by Sequential, and (ii) violations of Section 13(a) and Rule 13a-1 thereunder by Longfin.

96.     Based on the foregoing, the Commission finds that Respondent engaged in improper professional conduct pursuant to Sections 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii).

## G.    <u>UNDERTAKINGS</u>

### Client Acceptance

97.     Between the date of entry of this Order and the date on which  CohnReznick provides a copy of the Certification of Compliance to the Commission staff (the "Independent

Consultant Review Period"), pursuant to Paragraph 99.C.4 below, CohnReznick will not accept any New Audit Client[8], if any of the following criteria apply to such potential client:

(i)      the new engagement would begin after September 30 of the year under audit for December 31 year-ends, or more than nine (9) months after the prior fiscal year-end date for entities with fiscal year-ends other than December 31;

(ii)     the New Audit Client conducts the majority of its operations from outside of the United States, unless such foreign operations of the New Audit Client are audited by a PCAOB-registered firm serving as a component auditor;

(iii)    the New Audit Client has an un-remediated material weakness in its internal controls over financial reporting (a "MWICFR"); or

(iv)     the New Audit Client has received an audit report containing an explanatory paragraph indicating that a substantial doubt about its ability to continue as going concern existed as of the end of the past fiscal year.

98.      During the Independent Consultant Review Period, following CohnReznick's client acceptance process and prior to the Firm signing an engagement letter with any New Audit Client, the independent consultant ("Independent Consultant") retained pursuant to these undertakings, shall determine, in its discretion, whether it approves CohnReznick's decision to accept the New Audit Client, taking into consideration the following factors:  (i) whether the proposed engagement partner, EQR, and engagement team members at the level of manager and above possess the requisite competence, experience, and technical proficiency to conduct the engagement in accordance with PCAOB auditing standards; (ii) whether, as of the date the proposed new engagement is considered, CohnReznick's policies, procedures, and quality control system, as known or observed by the Independent Consultant at the time of acceptance are sufficient for CohnReznick to conduct the engagement in accordance with such standards; (iii) whether the staffing resources proposed to be dedicated to the engagement are sufficient to conduct the engagement in accordance with such standards; and (iv) whether the New Audit Client has reported a remediated MWICFR as of the previous fiscal year-end, and its impact on the client acceptance decision. In the event the Independent Consultant disapproves the acceptance of a New Audit Client, CohnReznick shall not accept the client.

**Independent Consultant**

99.      Respondent CohnReznick has undertaken to retain, within 120 days after the entry of this Order, an Independent Consultant, not unacceptable to the Commission staff.  CohnReznick shall provide to the Commission staff a copy of the engagement letter detailing the scope of the

---

[8] A New Audit Client is defined as an entity: (a) to which the Firm (including any future acquired or merged firm), in the immediately prior financial reporting period, did not provide audit or review services, including any predecessor to the entity; and (b) that is (i) an "Issuer," as that term is defined in Section 2(a)(7) of the Sarbanes-Oxley Act of 2002 or (ii) is seeking an audit for the purpose of registering an offering with the Commission.

Independent Consultant's responsibilities.  The Independent Consultant's compensation and expenses shall be borne exclusively by CohnReznick.

     A.    <u>Independence</u>

        1.    To ensure the independence of the Independent Consultant, CohnReznick (1) shall not have the authority to terminate the Independent Consultant or substitute another independent consultant for the initial Independent Consultant, without the prior written approval of the Commission staff; and (2) shall compensate the Independent Consultant and persons engaged to assist the Independent Consultant for services rendered pursuant to this Order at their reasonable and customary rates.

        2.    CohnReznick will require the Independent Consultant to enter into an agreement that provides that, for the period of engagement and for a period of two years from completion of the engagement, the Independent Consultant shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with CohnReznick, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such.  The agreement will also provide that the Independent Consultant will require that any firm with which he/she is affiliated or of which he/she is a member, and any person engaged to assist the Independent Consultant in the performance of his/her duties under this Order shall not, without prior written consent of the Division of Enforcement, enter into any employment, consultant, attorney-client, auditing or other professional relationship with CohnReznick, or any of its present or former affiliates, directors, officers, partners, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

     B.    <u>Scope of Independent Consultant's Review</u>.  Within the time periods specified below, the Independent Consultant will review and evaluate CohnReznick's audit, review, and quality control policies and procedures applicable to Issuers regarding:

        1.    The exercise of due professional care and professional skepticism (See AS 1015 and AS 2401.13);

        2.    Obtaining appropriate audit evidence that is sufficient to support the opinion expressed in the auditor's report, including using the

conclusions of the company's valuation specialist as audit evidence and audit evidence in support of the footnotes to the audited financial statements (See AS 1105);

3. Identifying and assessing, and designing and implementing appropriate responses to the risks of material misstatement of the financial statements, including significant and fraud risks (See AS 2110 and AS 2301);

4. The consideration of fraud in a financial statement audit (See AS 2401);

5. The audit confirmation process (See AS 2310);

6. Auditing related party transactions (See AS 2410);

7. Evaluating reliance upon management representations (See AS 2805);

8. Audit procedures concerning accounting estimates, including fair value measurements and the impairment of goodwill (See AS 2501);

9. The role and consideration of the findings of CohnReznick valuation specialists when assisting engagement team with impairment testing under ASC 350 (See AS 1210);

10. The adequacy of interim review procedures in light of changes to engagement team's knowledge about entity's business and significant financial accounting and reporting issues identified in the proceeding interim review or audit (See AS 4105);

11. The adequacy of audit documentation that clearly demonstrates that audit steps and procedures contained within CohnReznick's audit programs were in fact performed (See AS 1215);

12. Formal or informal consultations with the Firm's National Assurance Group or Professional Practice Leaders, or any person or group performing a similar function, concerning auditing or accounting matters and the documentation of such consultations, including but not limited to the scope of consultation, the conclusions reached and the basis for those conclusions;

13.     Performance and documentation of CohnReznick's review program or programs established in connection with the Firm's compliance with QC 20, *System of Quality Control for a CPA Firm's Accounting and Auditing Practice* (such as ones presently designated as Engagement Quality Control Reviews and, in-flight reviews), including but not limited to the scope and extent of procedures required under any review; the resolution of matters brought to the attention of the engagement team by CohnReznick personnel engaged in such reviews; and the documentation associated with the reviews, including, if applicable, documentation contained in the engagement work papers;

14.     The resolution and documentation of disputes, disagreements or differences of opinion by and among the engagement team and those consulted within the Firm;

15.     Performance and documentation of the Root Cause Analysis program, reviews of restatements, and post-issuance review programs; and

16.     The sufficiency of CohnReznick's professional development and training programs concerning the subject matters set forth in subsections 1 through 15 above.

CohnReznick shall cooperate fully with the Independent Consultant and shall provide reasonable and timely access to firm personnel, information, and records as the Independent Consultant may reasonably request for the Independent Consultant's review and evaluation described herein and the reports specified in Paragraph 99.C below.

C.     <u>Independent Consultant Reports and Certifications</u>.

1.     Within six (6) months of the Independent Consultant being retained, CohnReznick shall require the Independent Consultant to issue a detailed written report ("Report") to CohnReznick: (a) summarizing the Independent Consultant's review and evaluation of the areas identified in Paragraph 99.B above; and (b) making recommendations, where appropriate, reasonably designed to ensure that audits conducted by CohnReznick comply with Commission regulations and with PCAOB standards and rules.  CohnReznick shall require the Independent Consultant to provide a copy of the

25

Report to the Commission staff when the Report is issued.

2.  CohnReznick will adopt all recommendations of the Independent Consultant in the Report. Provided, however, that within thirty (30) days of issuance of the Report, CohnReznick may advise the Independent Consultant in writing of any recommendation that it considers to be unnecessary, unduly burdensome, or impractical. CohnReznick need not adopt any such recommendation at that time, but instead may propose in writing to the Independent Consultant and the Commission staff an alternative policy or procedure designed to achieve the same objective or purpose. CohnReznick shall provide a copy of such written proposal to the Commission staff within seven (7) days of issuance. CohnReznick and the Independent Consultant will engage in good-faith negotiations in an effort to reach agreement on any recommendations objected to by CohnReznick.

3.  In the event that the Independent Consultant and CohnReznick are unable to agree on an alternative proposal within sixty (60) days, CohnReznick either will abide by the determinations of the Independent Consultant or seek approval from the Commission staff pursuant to Paragraph 99.A.1 above to engage, at CohnReznick's expense, a qualified third party acceptable to the Commission staff to promptly resolve the issue(s).

4.  Within sixty (60) days of issuance of the Report, but not sooner than thirty (30) days after a copy of the Report is provided to the Commission staff, CohnReznick will certify to the Commission staff in writing that it has adopted and has implemented or will implement all recommendations of the Independent Consultant ("Certification of Compliance"). CohnReznick will provide a copy of the Certification of Compliance to the Commission staff.

5.  Within six (6) months of the issuance of the Report, CohnReznick shall require the Independent Consultant to complete testing of whether CohnReznick has implemented and enforced its written policies and procedures concerning the areas specified in Paragraph 99.B above and assess the effectiveness of those policies and procedures. Within thirty (30) days of the completion of this testing, CohnReznick shall require the Independent Consultant to issue a written final report summarizing the results of the Independent Consultant's testing and assessment ("Final Report") and to provide a copy of the Final Report to the Commission staff. At this time, if

the Independent Consultant determines that CohnReznick has implemented and adopted all recommendations set forth in the Report, CohnReznick shall require the Independent Consultant to certify in writing that CohnReznick has satisfied such undertakings ("Independent Consultant Certification") and provide a copy of this certification to the Commission staff.  In all events, CohnReznick must complete all undertakings concerning the implementation of the recommendations set forth in the Independent Consultant's Report and provide the Independent Consultant Certification to the Commission staff no later than nineteen (19) months after the entry of this Order.

6.    The Report, Final Report, Certification of Compliance, Independent Consultant Certification, and any related correspondence or other documents shall be submitted to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., N.E., Washington, DC 20549, with a copy to Sam Waldon, Chief Counsel, Office of Chief Counsel of the Enforcement Division.

7.    The Report and Final Report by the Independent Consultant will likely include confidential financial, proprietary, competitive business or commercial information.  Public disclosure of these reports could discourage cooperation, impede pending or potential government investigations or undermine the objectives of the reporting requirement.  For these reasons, among others, these reports and the contents thereof are intended to remain and shall remain non-public, except (1) pursuant to court order, (2) as agreed to by the parties in writing, (3) to the extent that the Commission determines in its sole discretion that disclosure would be in furtherance of the Commission's discharge of its duties and responsibilities, or (4) is otherwise required by law.

D.    CohnReznick's CEO shall also certify, in writing, compliance with the undertakings set forth above.  The certification shall identify the undertakings, provide written evidence of compliance in the form of a narrative, and be supported by exhibits sufficient to demonstrate compliance.  The Commission staff may make reasonable requests for further evidence of compliance, and CohnReznick agrees to provide such evidence.  This certification and supporting material shall be submitted to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., N.E., Washington, DC 20549, with a copy to the Office of Chief Counsel of the Enforcement Division, no later

27

than sixty (60) days from the date of the completion of the undertakings.

E.      For good cause shown, the Commission staff may extend any of the procedural dates relating to the undertakings. Deadlines for procedural dates shall be counted in calendar days, except that if the last day falls on a weekend or federal holiday, the next business day shall be considered to be the last day.

F.      CohnReznick agrees that if the Division of Enforcement believes that CohnReznick has not satisfied these undertakings, it may petition the Commission to reopen the matter to determine whether additional sanctions are appropriate.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent's Offer.

Accordingly, it is hereby ORDERED, effective immediately, that:

A.      Respondent shall cease and desist from committing or causing any violations and any future violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder; and Rule 2-02(b)(1) of Regulation S-X.

B.      Respondent is censured.

C.      Respondent shall comply with its undertakings enumerated in Paragraphs 97-99 of Section III above.

D.      Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $1.9 million to the Securities and Exchange Commission. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

E.      Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying CohnReznick LLP as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549

F.     Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraph D above and shall be combined with the Fair Fund established in the Commmission's related civil action, *SEC v. Longfin Corp., et. al.*, 18-cv-2977-DLC (S.D.N.Y.) for distribution to harmed investors in accordance with the distribution plan approved by the Court in that action. Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary

29

30