# **Exhibit 10**

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 95067 / June 8, 2022**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4310 / June 8, 2022**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-20892**

| | |
|---|---|
| **In the Matter of** | **ORDER INSTITUTING PUBLIC ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTIONS 4C AND 21C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e) OF THE COMMISSION'S RULES OF PRACTICE, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER** |
| **STEPHEN M. WYSS, CPA,** **STEPHEN H. JACKSON, CPA,** **and** **ROBERT G. HILBERT, CPA,** | |
| **Respondents.** | |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Sections 4C[1] and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 102(e)(1)(ii) of

---

[1]    Section 4C provides, in relevant part, that:

> The Commission may censure any person, or deny, temporarily or permanently, to any person the privilege of appearing or practicing before the Commission in any way, if that person is found . . . (1) not to possess the requisite qualifications to represent others; (2) to be lacking in character or integrity, or to have engaged in unethical or improper professional conduct; or (3) to have willfully violated, or willfully aided and abetted the violation of, any provision of the securities laws or the rules and regulations issued thereunder.

the Commission's Rules of Practice[2] against Respondents Stephen M. Wyss, CPA ("Wyss"), Stephen H. Jackson, CPA ("Jackson") and Robert G. Hilbert, CPA ("Hilbert") (collectively, "Respondents").

## II.

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement (the "Offers") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondents consent to the entry of this Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Sections 4C and 21C of the Securities Exchange Act of 1934 and Rule 102(e) of the Commission's Rules of Practice, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order (the "Order"), as set forth below.

## III.

On the basis of this Order and Respondents' Offers, the Commission finds[3] that:

## A.    SUMMARY

This matter involves improper professional conduct by three CohnReznick LLP ("CohnReznick") partners, in connection with the firm's interim reviews and audits of the financial statements of Sequential Brands Group, Inc. ("Sequential") – in particular, the goodwill impairment testing performed by the company in 2016 and 2017.  Deficiencies in CohnReznick's system of quality controls, together with improper professional conduct by engagement partner Stephen M. Wyss ("Wyss"), engagement quality review ("EQR") partner Stephen H. Jackson ("Jackson"), and Managing Partner of Assurance and National Director of Accounting, Robert G. Hilbert ("Hilbert") led to auditing and interim review failures.  During the course of the Sequential engagement, Wyss, Jackson, and Hilbert violated numerous professional standards, which were a cause of Sequential's filing of materially misstated financial statements with the Commission.

As the engagement partner, Wyss was primarily responsible for the performance of the audits and the interim reviews of Sequential's financial statements, including its goodwill

---

[2]    Rule 102(e)(1)(ii) provides, in pertinent part, that:

> The Commission may censure a person or deny, temporarily or permanently, the privilege of appearing or practicing before it . . . to any person who is found . . . to have engaged in unethical or improper professional conduct.

[3]    The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

impairment testing, in accordance with PCAOB standards.  On multiple occasions, he accepted management's assertions that goodwill was not impaired, despite the presence of strong indicators that goodwill was at least likely impaired and that additional impairment testing by Sequential was required under Generally Accepted Accounting Principles ("GAAP"), as well as additional procedures by the engagement team.  At year-end 2016, Wyss understood that, if management conducted a goodwill impairment test in a similar manner to the company's most recent annual impairment test, and consistent with its current policy, the testing would indicate that Sequential's goodwill was likely impaired.  Yet, despite management's omission of that fact from its impairment assessment, Wyss nevertheless accepted management's conclusion that goodwill was not impaired at year-end.  He similarly accepted management's conclusion that goodwill was not impaired in the first two quarters of 2017, despite multiple contrary indicators.

In the third quarter of 2017, Sequential conducted goodwill impairment testing in response to indicators of impairment and concluded that goodwill was not impaired based on a valuation analysis that relied heavily on assertions posited by Sequential's management regarding the market's mispricing of Sequential's stock that were not supported by relevant and reliable audit evidence.  During CohnReznick's interim review process, the internal valuation specialists, the assigned engagement quality control  review ("EQCR") partner from CohnReznick's national office, and its National Director of SEC Services expressed concerns that Sequential's fair value estimates were not adequately supported by the evidence.  As a result, CohnReznick paused its interim review process.  Confronted with these disagreements and concerns of insufficient evidence to support Sequential's assertions, Wyss, with the concurrence of Jackson and Hilbert, nonetheless ultimately accepted Sequential's conclusion that goodwill was not impaired without obtaining sufficient relevant and reliable evidence in support of management's assertions or performing sufficient  additional contemporaneous procedures.

After Sequential issued its third quarter 2017 Form 10-Q, Wyss, Jackson, and Hilbert documented the engagement team's third quarter conclusions in the work papers for the third quarter interim review and as part of the annual audit but failed to recognize the deficiencies of the engagement team's analysis and the continuing lack of evidential matter in support of Sequential's conclusions.  Moreover, Wyss, Jackson, and Hilbert failed to adequately consider and address concerns raised by the EQCR partner, the National Director of SEC Services, and the firm's internal valuation specialists.

As a result of their failure to appropriately consider the indicators of impairment and conduct appropriate additional audit procedures, Wyss, Jackson, and Hilbert caused CohnReznick, in violation of the Exchange Act, to inaccurately state in its audit report accompanying Sequential's 2017 Form 10-K, filed with the Commission on March 16, 2018, that it had conducted the audit in accordance with Public Company Accounting Oversight Board ("PCAOB") standards.  Moreover, their failures were a cause of Sequential's violations of the reporting and books and records provisions of the Exchange Act.

## B.    RESPONDENTS

1.    **Stephen M. Wyss** ("Wyss"), age 50, is a Certified Public Accountant ("CPA"), licensed to practice in New York.  Wyss served as the CohnReznick engagement partner on the 2016 and 2017 audits of Sequential and the interim reviews between the audits.

2.    **Stephen H. Jackson** ("Jackson"), age 58, is a CPA licensed to practice in Connecticut.  Jackson served as the CohnReznick engagement quality review partner for the third quarter 2017 review and 2017 annual audit of Sequential.

3.    **Robert G. Hilbert** ("Hilbert"), age 53, is a CPA licensed to practice in New York and Texas.  Hilbert served as CohnReznick's Managing Partner of Assurance and National Director of Accounting during the third quarter 2017 review and 2017 annual audit of Sequential. He also served as the liaison between CohnReznick's auditors and its internal group of valuation specialists.

## C.    RELEVANT ENTITIES

4.    **Sequential Brands Group, Inc.** is a Delaware corporation headquartered in New York, New York. Sequential owns a portfolio of consumer brands and promotes, markets, and licenses those brands through retailers, wholesalers and distributors in the United States and abroad. Sequential's common stock was registered with the Commission under Section 12(b) of the Exchange Act and traded on the Nasdaq Capital Market under the ticker symbol "SQBG" at all times during the relevant period.  On August 31, 2021 Sequential filed for Chapter 11 bankruptcy relief and on September 27, 2021, the Nasdaq Stock Market LLC delisted Sequential for failing to meet listing requirements.[4]

5.    **CohnReznick LLP**, a New Jersey limited liability partnership, is a public accounting firm in the United States with over 3,000 employees in 25 cities and offers services in three segments – accounting, tax and advisory. CohnReznick registered with the PCAOB in

---

[4]    To settle the Commission's litigation against Sequential alleging failure to timely impair goodwill, Sequential agreed to the entry of a final judgment permanently enjoining it from future violations of the antifraud provision of Section 17(a)(3) of the Securities Act of 1933 and certain reporting, books and records, and internal control provisions under the Securities Exchange Act of 1934. The U.S. District Court for the Southern District of New York entered the final judgment against Sequential on December 1, 2021. *See* Accounting and Auditing Enforcement Release No. 4277, dated December 15, 2021.

October 2003.   CohnReznick became the independent auditor for Sequential in 2013 and issued reports on Sequential's financial statements through the year-end 2020 financial statement audit.

D.      **FACTS**

**COHNREZNICK'S AUDIT OF SEQUENTIAL'S
2016 GOODWILL IMPAIRMENT TESTING**

**The Engagement Team Identified Goodwill Impairment as an Area of Significant Risk**

6.      In planning the 2016 audit of Sequential, the engagement team identified goodwill impairment testing as an area of significant risk.  Sequential's goodwill constituted over 20% of the company's assets, and the likelihood of its impairment increased as the company's stock price, and therefore its market capitalization, declined.

7.      Wyss understood that Sequential had disclosed its goodwill impairment testing policy in its quarterly reports filed earlier in 2016 on Form 10-Q, which relied exclusively on the company's market capitalization, as adjusted by a control premium, to estimate the company's fair value (the "Market Approach"), and that the disclosed policy had not changed during 2016.  In fact, Sequential utilized this methodology to perform its 2016 annual goodwill impairment test as of October 1, 2016.

8.      As Sequential's stock price continued to decline after its October 1st annual impairment test, it was increasingly likely that a goodwill impairment test performed using the Market Approach would indicate impairment.  Further, additional facts and circumstances arose relevant to Sequential's 2016 interim goodwill testing that increased the likelihood of impairment at year-end, including the declining performance of its key consumer brands and downward revisions to the company's earnings guidance.

9.      In light of these facts and circumstances, PCAOB standards required that Wyss develop substantive audit procedures and an appropriate audit plan to address this risk of material misstatement, including procedures reasonably designed to obtain sufficient audit evidence and assess whether more persuasive audit evidence was needed.  Wyss failed to do so.

**Wyss Failed to Audit Sequential's 2016 Goodwill Assessment in Accordance with Professional Standards**

10.      Wyss received Sequential's year-end 2016 goodwill impairment memo ("Goodwill Memorandum") as part of CohnReznick's audit work.  The Goodwill Memorandum described the company's methodology and basis for its conclusion that there was no goodwill impairment as of its annual testing date, October 1, 2016.  The Goodwill Memorandum also evaluated whether events had occurred or circumstances had arisen during the fourth quarter of 2016 that indicated

that it was more likely than not that a goodwill impairment existed at the company's year-end financial reporting date, December 31, 2016.

11.     Sequential's conclusion that its goodwill was not impaired as of October 1 was supported by a valuation report, prepared by its third party valuation specialist, utilizing the Market Approach.  Between October 1 and year-end, Sequential's stock price declined from $8.00 per share to $4.68 per share.  Based on the significant decline in the company's stock price, Wyss understood that the company's estimated fair value at year-end, based on the Market Approach, was well below the company's carrying value.

12.     Wyss therefore should have known that, if Sequential were to perform a quantitative goodwill impairment test as of year-end using the Market Approach, that calculation would have indicated that goodwill was at least likely impaired.  This and other negative trends in the company's sales and performance were events and circumstances indicating that goodwill was at least likely impaired and therefore a further quantitative goodwill impairment test was required by GAAP.

13.     The Goodwill Memorandum reflected that Sequential had identified the decline in the company's stock price as a triggering event.  However, the company's Goodwill Memorandum omitted any consideration of the Market Approach in reaching its conclusion as to year-end.  It also did not adequately address other indicia of likely impairment in reaching its conclusion that the company's goodwill was not impaired as of year-end.  In relying on the Goodwill Memorandum as a primary basis for his conclusion, Wyss failed to consider other relevant and objective evidence indicating impairment of goodwill  Nevertheless, Wyss approved CohnReznick's issuance of its audit report regarding Sequential's 2016 financial statements.

### WYSS'S DEFICIENT REVIEWS OF SEQUENTIAL'S Q1 AND Q2 2017 INTERIM GOODWILL IMPAIRMENT ASSESSMENTS

14.     During the first two quarters of 2017, Sequential experienced additional adverse changes concerning the company's business that Wyss should have recognized as indicators of goodwill impairment.  Among those developments, Sequential's board of directors fired the company's chief executive officer, the company continued to revise its earnings guidance downward, and Sequential's stock price continued its decline.

15.     Despite the presence of these impairment indicators, Sequential failed to document that it considered them or any other negative or positive indicators in its interim assessments of whether goodwill was likely impaired.  Through CohnReznick's first and second quarter interim reviews, Wyss should have known that Sequential had not documented its consideration of these impairment indicators.

16.     Given these facts and circumstances, together with the information from Sequential's year-end 2016 impairment analysis, Sequential's interim goodwill assessments should

6

have concluded that goodwill was at least likely impaired and therefore further testing was required.  However, Wyss again accepted management's assertions that goodwill was likely not impaired without obtaining sufficient and relevant evidence to support management's assertions.

**COHNREZNICK'S THIRD QUARTER REVIEW AND AUDIT OF SEQUENTIAL'S 2017 GOODWILL IMPAIRMENT TESTING**

**Wyss and Jackson Identified Goodwill Impairment as an Area of Significant Risk**

17.     Throughout the audit planning process in 2017, the engagement team identified goodwill impairment testing to be an area of significant risk, as it had done in the previous year's audit.  Sequential's goodwill still constituted over 20% of the company's assets and the likelihood of its impairment increased as the company's stock price, and therefore its market capitalization, continued its decline in 2017.

**In the Third Quarter of 2017, Wyss and Jackson Reviewed Sequential's Interim Goodwill Impairment Test and Conclusion that Goodwill Was Not Impaired**

18.     Following the identification of impairment indicators arising from the impairment of five of its brands in the third quarter, Sequential determined that an interim quantitative impairment test of goodwill was necessary as of the end of the third quarter.  It accelerated by one day the company's annual impairment test scheduled for first day of the fourth quarter, from October 1st to September 30th.  Based on the then current stock price and the number of shares outstanding, Wyss and Jackson understood that the Market Approach would indicate that Sequential's goodwill was impaired.

19.     Approximately a week before Sequential was required to file its third quarter Form 10-Q, and before the company had released its earnings, Wyss received a draft valuation report from Sequential.  That report, which had been prepared by Sequential's third party valuation specialist, based on information and guidance provided by Sequential, departed from the company's previously disclosed Market Approach to goodwill impairment testing and instead incorporated two different valuation methodologies: the income approach using a discounted cash flow ("DCF") model and the Market Approach.  Specifically, this report relied on a weighted average between the fair values obtained by the Market Approach (approximately $245 million) and the DCF (approximately $650 million), which it compared to Sequential's carrying value of approximately $444 million, and concluded that the company's goodwill was not impaired.

20.     To explain the wide discrepancy in the fair value estimates, Sequential's report cited three assertions by Sequential's management, which in management's view, supported the conclusion that public markets had mispriced Sequential's stock:  (1) the company's stock price was low because Sequential was unfairly grouped with other out-of-favor companies in the retail industry with business models incomparable to Sequential; (2) the market was undervaluing the tax amortization benefit of its brands, which it believed would become significant in future periods

7

when the company was more profitable; and (3) the company's high leverage ratio created a "perception overhang."

**CohnReznick's Internal Valuation Specialist Raised Concerns with Wyss, Jackson and Hilbert Concerning Sequential's Goodwill Impairment Testing Methodology**

21.    Upon receiving Sequential's goodwill impairment analysis from the engagement team, CohnReznick's assigned internal valuation specialist assessed the report and identified several concerns suggesting that the company might fail the impairment test.  He furnished his written comments to Wyss and Hilbert, and a second valuation specialist at the firm.  Wyss shared the report with Jackson later the same day.

22.    In his comments, the internal valuation specialist observed that "[w]hile the DCF implies that impairment is not present, the trading price approach implies impairment" and that "[t]he difference in estimated values is significant and implies that one or both require adjustment." He also added, after applying additional potential valuation methods to the analysis, which he included in his written comments, "the implication from the sensitivities is that the Step 1 test may fail."

23.    The next day, a second CohnReznick valuation specialist sent an email to Wyss, Hilbert and others noting "troubling facts" in Sequential's impairment analysis, including that Sequential's market capitalization was equal to 50% of book value and that there was a "large disparity in equity value conclusions between the DCF and the Market…2.68x…??? too big of a difference."

**In Response to CohnReznick's Comments, Sequential Prepared a Quantitative Reconciliation That Relied Heavily on Management Assertions that Sequential Was Undervalued by the Market**

24.    Wyss, Jackson, and Hilbert did not believe that the wide disparity in estimated values obtained from the Market Approach and the DCF supported a finding that the DCF-based valuation was inaccurate.  Rather, Wyss, Jackson, and Hilbert concluded that the company could rely on the DCF-based valuation estimate if (i) Sequential management believed the DCF valuation represented the best estimate of the company's fair value, and (ii) it supplemented its valuation report with a quantitative reconciliation to the Market Approach.  In a follow-up conference call attended by Sequential's management and these partners, among others, CohnReznick communicated these conclusions to Sequential's management and its third party valuation specialist.  In response, Sequential's third party valuation specialist, working at the direction of Sequential's management, prepared a revised valuation analysis quantifying the reconciling factors.

25.    The revised report, which Sequential forwarded to CohnReznick hours after the conference call, exclusively utilized the DCF valuation to estimate fair value and incorporated a

quantitative reconciliation to Sequential's estimated fair value under the Market Approach. This reconciliation analysis relied heavily on two assertions of the company's management: (1) that the stock market failed to properly incorporate the potential tax amortization value of the company's intangible indefinite-lived assets (primarily, its brands) to an acquirer; and (2) that the stock market was not correctly pricing Sequential's stock in relation to the company's revenues because of misperceptions of the company's industry. These management assertions were not supported by sufficient objective evidence or analysis to justify management's view that the market was undervaluing the company.

### CohnReznick's Valuation Specialist Raised Concerns Regarding the Reasonableness of Sequential's Fair Value Assessment

26.    CohnReznick's internal valuation specialist reviewed the revised report and raised concerns about whether there was sufficient evidentiary support for management's assertions. Specifically, he did not believe the evidential matter provided by management supported the magnitude of the quantitative reconciliation between the results of the DCF model and Market Approach valuation. He communicated his concerns and conclusion to the engagement team and Hilbert, including his unwillingness to opine as to the reasonableness of the fair value analysis.

27.    Wyss and Hilbert did not agree with the valuation specialist's concerns regarding the magnitude of the reconciliation. Instead, they viewed the reconciliation between the estimated fair values obtained by the DCF and the Market Approach as an accounting consideration and outside the scope of the specialist's expertise, despite his extensive experience in assessing fair value assessments similar to Sequential's impairment testing in prior engagements. They also determined that the internal valuation specialist's concern with inadequate evidence in support of the wide gap between the values yielded by the DCF model and the Market Approach was not a valuation issue appropriate for his consideration. Rather, they believed that the sufficiency of the evidence on the issue was solely an auditing issue for the engagement team's consideration.

28.    Contrary to the typical practice at CohnReznick, wherein the internal valuation specialist would opine as to the reasonableness of an audit client's overall fair value measurement. in this case the engagement team, including Wyss and Jackson, assumed responsibility for assessing the reasonableness of the determination, as a result of the specialist's unwillingness to do so and based on Wyss, Jackson, and Hilbert's conclusion that the sufficiency of evidential matter to support the reconciliation between two fair value estimates presented an audit (rather than a valuation) question.

9

**Sequential Issued Its Earnings Release, Even Though CohnReznick's National Office Quality Control Review Remained Incomplete, in Reliance on Wyss's Assurances That Changes to the Financial Statements Were Unlikely**

29.     As part of CohnReznick's documented quality control system, an EQCR review, in addition to the EQR review, was to be performed for each public company audit.[5]  The firm's national office assigned a partner or director from its Quality Control group to serve as the EQCR reviewer.  In addition to being a required sign-off for all public company reviews and audits, under CohnReznick's procedures, the EQCR was also required to be involved in the evaluation of significant engagement team judgments and the evaluation of engagement documentation related to areas deemed significant.

30.     Despite the requirement that the EQCR be involved in the evaluation of significant engagement team judgments, the Sequential engagement team did not include the assigned EQCR partner in their initial consultations with Hilbert on Sequential's goodwill impairment analysis.  Moreover, without notifying the EQCR, Wyss informed Sequential's management, as management was finalizing the company's third quarter earnings release, that additional changes to the financial statements in the Form 10-Q were unlikely.  As a result, the EQCR was unable to complete his review or provide input to the engagement team regarding Sequential's goodwill impairment testing prior to the issuance of Sequential's earnings release

31.      Sequential's third quarter earnings release was furnished as an exhibit to the company's Form 8-K and did not incorporate an impairment to goodwill.  The EQCR promptly questioned Wyss, Jackson, and Hilbert as to how the goodwill issue had been resolved without his involvement and also alerted CohnReznick's Chief Risk Officer and its National Director of SEC Services.

**After the Publication of the Third Quarter Earnings Release, But Before the Filing of the Quarterly Report on Form 10-Q, Disagreements Among the Engagement Team and Members of the National Office Arose Within CohnReznick**

32.     After evaluating Sequential's third party fair valuation analysis, the EQCR partner and the National Director of SEC Services (with whom the EQCR partner had shared Sequential's analysis) reached a mutual view that, based on the information they were provided, there was insufficient evidence to support Sequential management's assertions that the market was undervaluing Sequential, and without more, the company needed to record goodwill impairment.

33.     The EQCR partner and the National Director of SEC Services communicated their views to Wyss, Jackson, and Hilbert, as well as members of the firm's senior management.

---

[5]     CohnReznick's procedures and system of quality control required quality reviews conducted by national office directors or partners for certain engagements.  These EQCR reviews were distinct from EQR reviews, which are required by PCAOB audit standards.

Among other concerns, they expressed the view that the engagement team was not exercising appropriate professional skepticism with regard to Sequential's goodwill impairment testing.

34.    Although CohnReznick had previously notified Sequential that changes to the financial statements were unlikely, due to the internal disagreement at CohnReznick, Wyss notified Sequential that it had not completed its interim review of the financial statements, which prevented Sequential from filing its Form 10-Q.  In light of the fact that Sequential had already issued its earnings release, Sequential's management urged CohnReznick to resolve its concerns as soon as possible, requesting "minute by minute" status updates and stating in an email to the engagement partner: "[t]here is no choice but to resolve tonight."

**CohnReznick Resolved the Disagreement in Favor of the Engagement Team Without Performing Sufficient Audit Procedures**

35.    To resolve the disagreement, CohnReznick convened multiple meetings among the disagreeing staff to review the information provided, as well as an external conference call between Sequential management, Wyss, Hilbert, Jackson, and the dissenting CohnReznick partners.  None of these calls assisted in resolving the disagreement, as the EQCR partner and National Director of SEC Services continued to assert that the engagement team had not gathered sufficient evidence to support Sequential management's assertions regarding the reconciling factors and the conclusions of Wyss and Jackson.

36.    Notwithstanding the insufficient evidence supporting the conclusions of Wyss, Jackson, and Hilbert and the unresolved disagreement, CohnReznick's senior management decided, after internal discussion but without directing the engagement team to obtain or review further evidence or perform additional procedures, that the engagement team could authorize Sequential to file its quarterly report on Form 10-Q.  CohnReznick further determined that, in the event that the pending disagreement over the reasonableness of Sequential's goodwill impairment test could not be resolved with the dissenting partners, the disagreement should be documented in the work papers, consistent with PCAOB standards.  Accordingly, Wyss told Sequential it had completed its interim review and that the company could file its Form 10-Q.

**Wyss Prepared, and Jackson and Hilbert Concurred with, an Inaccurate Consultation Memorandum, Which Purported to Document the Engagement Team's Analysis, Months After the Third Quarter Interim Review was Complete**

37.    In January 2018, months after the third quarter interim review was completed, the engagement team supplemented the third quarter review file with a work paper entitled "Analysis of Goodwill and Intangibles – CohnReznick memo."  This work paper purported to describe Sequential's goodwill impairment analyses and conclusions throughout 2017, as well the engagement team's views of those analyses, and its own internal analyses, to conclude that management's goodwill impairment conclusion for the third quarter of 2017 was reasonable.  It

also purported to memorialize a consultation with Hilbert and reflected his concurrence, as well as the concurrence of the Jackson.

38.    This work paper, while purportedly describing the engagement team's analysis and conclusions prior to the filing of the third quarter Form 10-Q, incorporated new data and justifications for the engagement team's impairment conclusions, which were not previously documented prior to the filing of the Form 10-Q.  This memo did not include sufficient and accurate information to enable an experienced auditor to understand the timing, extent, and results of the procedures performed and the evidence obtained.

### Jackson Failed In His Role as EQR

39.    Jackson was obligated by professional standards to affirmatively evaluate the significant judgments and related conclusions of the engagement team.  However, despite the vigorous disagreements that arose between the viewpoint of Wyss and Hilbert, on the one hand, and the viewpoint of the EQCR partner, the internal valuation specialists, and the National Director of SEC Services, on the other hand, Jackson failed to reasonably evaluate whether appropriate consultations had taken place on difficult and contentious matters.

40.    Although present, and aware of the concerns and indicators of impairment, Jackson did not adequately participate in key discussions at important meetings and decision points. Although Sequential's goodwill accounting issue for the third quarter of 2017 generated emails raising substantive questions about the accounting, as well as a series of meetings in which there were ongoing concerns on the part of the EQCR partner and the National Director of SEC Services, Jackson failed to reasonably evaluate the engagement team's assessment of the company's annual goodwill impairment test, which the engagement team had identified as an area of significant risk.  In so doing Jackson failed to exercise due professional care, including appropriate professional skepticism.

### E.    VIOLATIONS

### RULE 102(e) AND SECTION 4C OF THE EXCHANGE ACT

41.    Section 4C of the Exchange Act and Rule 102(e)(1)(ii) provide, in part, that the Commission may censure or deny, temporarily or permanently, the privilege of appearing or practicing before the Commission to any person who is found by the Commission to have engaged in improper professional conduct.  With respect to persons licensed to practice as accountants, "improper professional conduct" includes either of the following two types of negligent conduct: (1) a single instance of highly unreasonable conduct that results in a violation of applicable professional standards in circumstances in which an accountant knows, or should know, that heightened scrutiny is warranted; or (2) repeated instances of unreasonable conduct, each resulting in a violation of applicable professional standards, that indicate a lack of competence to practice before the Commission.  Rule 102(e)(1)(iv)(B).  As a result of the conduct described above, Wyss,

Jackson and Hilbert engaged in "improper professional conduct" within the meaning of Exchange Act Section 4C(a)(2) and Rule 102(e)(1)(ii).

42.    As set forth above, Wyss, Jackson, and Hilbert should have known, that Sequential's goodwill was fully impaired by the 2017 third quarter and that Sequential's financial statements were, as a result, materially misstated and not presented in accordance with Generally Accepted Accounting Principles ("GAAP"). Wyss, Jackson, and Hilbert also should have known there was not relevant and reliable audit evidence to support Sequential's accounting conclusion and in particular the underlying assertions of management. Additionally, in the course of its 2017 year end audit of Sequential, Wyss, Jackson, and Hilbert should have known that Sequential's impairment charge should have been recorded as a third quarter event and that Sequential's third quarter financial statements therefore materially overstated the company's assets and earnings. Wyss, Jackson, and Hilbert's unreasonable conduct violated their obligation to adhere to professional auditing standards.

Due Professional Care in the Performance of
Work (AS § 1015)

43.    AS § 1015 provides that auditors are to exercise due professional care in the planning and performance of audits and the preparation of audit reports.

44.    AS § 1015.07 provides that auditors must maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." In addition, AS § 1015.08 states the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."

45.    As a result of their conduct described above, Wyss, Jackson, and Hilbert failed to exercise due professional care and an attitude of professional skepticism in the Sequential engagement.

Audit Risk (AS § 1101)

46.    AS § 1101 discusses the auditor's consideration of audit risk and provides that the objective of the auditor is to conduct the audit of financial statements in a manner that reduces audit risk to an appropriately low level.

47.    AS § 1101.03 requires the auditor to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud." It further requires the auditor to apply "due professional care, including obtaining sufficient appropriate audit evidence."

13

48.    As a result of Wyss's conduct described above, he failed to perform auditing steps sufficient to reduce audit risk to an appropriate level in the Sequential engagement.

### Audit Evidence (AS § 1105)

49.    AS § 1105 establishes "requirements regarding designing and performing audit procedures to obtain sufficient appropriate audit evidence."  It provides that audit evidence "consists of both information that supports and corroborates management's assertions regarding the financial statements or internal control over financial reporting and information that contradicts such assertions."

50.    AS § 1105.04 requires the auditor to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion."

51.    AS § 1105.08 provides that the "reliability of evidence depends on the nature and source of the evidence and the circumstances under which it is obtained," including consideration of its source and the manner in which the evidence is obtained by the auditor.

52.    As a result of Wyss's conduct described above, he failed to obtain sufficient audit evidence to support his opinions in the Sequential engagement.

### Reviews of Interim Financial Information (AS § 4105)

53.    AS § 4105.01 "establish[es] standards and provide[s] guidance on the nature, timing, and extent of the procedures to be performed by an independent accountant when conducting a review of interim financial information…"

54.    Specifically, AS § 4105.22 requires an auditor to make additional inquiries or perform additional procedures when the accountant becomes aware of information indicating that the interim financials may not conform to GAAP.  AS § 4105.28 requires that an auditor refrain from completing a review and issuing a review report if it is unable to perform necessary review procedures of the interim financial statements.

55.    As a result of Wyss's conduct described above, he failed to comply with standards applicable to a review of interim financial statements, specifically AS §§ 4105.22 and 4105.28, including by failing to adequately address contradictory views expressed during the interim review process.

14

The Auditor's Responses to the Risks of Material Misstatement (AS § 2301)

56.      AS § 2301 requires that auditors implement appropriate responses to the risk of material misstatements.

57.      Specifically, AS § 2301.42 provides "[t]he necessary extent of a substantive audit procedure depend on the materiality of the account or disclosures, the assessed risk of material misstatement, and the necessary degree of assurance from the procedure."  It goes on to explain that "increasing the extent of an audit procedure cannot adequately address an assessed risk of material misstatement unless the evidence to be obtained from the procedure is reliable and relevant."

58.      As a result of Wyss's conduct described above, he failed to obtain reliable and relevant audit evidence when appropriate and thereby violated this standard.

Auditing Accounting Estimates (AS § 2501)

59.      AS § 2501 provides guidance to auditors "on obtaining and evaluating sufficient appropriate evidential matter to support significant  accounting estimates in an audit of  financial statements in accordance with the standards of the PCAOB."

60.      AS § 2501.07 requires the auditor to obtain "sufficient appropriate evidential matter to provide reasonable assurance that… [t]he accounting estimates are presented in conformity with applicable accounting principles and are properly disclosed."

61.      As a result of Wyss's conduct described above, he failed to adequately evaluate the reasonableness of management's fair value estimates and thereby violated the foregoing standards.

Evaluating Audit Results (AS § 2810)

62.      AS § 2810.03 requires that "[i]n forming an opinion on whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial

15

reporting framework, the auditor should take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."

63.     As a result of Wyss's conduct described above, he failed to sufficiently evaluate the audit results in the Sequential audit and thereby violated this standard.

### Audit Documentation (AS § 1215)

64.     AS § 1215.06 requires that an "auditor must document the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions. Audit documentation must clearly demonstrate that the work was in fact performed."

65.     As a result of Wyss's conduct described above, he failed to properly and timely document the steps taken in reaching its audit conclusions and thereby violated this standard.

### Engagement Quality Review (AS § 1220)

66.     §§ AS 1220.17 and 1220.12 state the EQR "may provide concurring approval of issuance" of review or audit "only if, after performing with due professional care the review required by this standard, he or she is not aware of a significant engagement deficiency."

67.     AS § 1220.14 requires the EQR "evaluate the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement" in a review.

68.     AS § 1220.11 requires an EQR, in an audit, to "evaluate whether the engagement documentation that he or she reviewed…indicates that the engagement team responded appropriately to significant risks, and supports the conclusions reached by the engagement team with respect to the matters reviewed."

69.     As a result of Jackson's conduct described above, he failed to act with due professional care and improperly provided his concurrence on both the 2017 third quarter Form 10-Q and 2017 annual report filed on Form 10-K, thereby violating this standard.

### WYSS, JACKSON AND HILBERT WERE A CAUSE OF COHNREZNICK'S VIOLATION OF RULE 2-02(b)(1) OF REGULATION S-X

70.     During the time period at issue herein, Rule 2-02(b)(1) of Regulation S-X required an accountant's report to state "whether the audit was made in accordance with generally accepted auditing standards" ("GAAS").  "[R]eferences in Commission rules and staff guidance and in the federal securities laws to GAAS or to specific standards under GAAS, as they relate to issuers,

should be understood to mean the standards of the PCAOB plus any applicable rules of the Commission." See SEC Release No. 34-49708 (May 14, 2004).

71.    Through their conduct described above, Wyss, Jackson and Hilbert caused CohnReznick to violate Regulation S-X Rule 2-02(b)(1) when CohnReznick issued its audit report dated March 16, 2018, stating that CohnReznick had conducted its audit of Sequential's 2017 financial statements in accordance with PCAOB standards when it had not.

**WYSS, JACKSON, AND HILBERT WERE A CAUSE OF SEQUENTIAL'S
VIOLATIONS OF SECTIONS 13(a) AND 13(b)(2)(A) OF THE
EXCHANGE ACT AND RULES 12b-20, 13a-1, 13a-11 AND 13a-13 THEREUNDER**

72.     Section 13(a) of the Exchange Act requires all issuers with securities registered under Section 12 of the Exchange Act to file periodic and other reports with the Commission containing such information as the Commission's rules prescribe.  Pursuant to Section 13(a), the Commission promulgated Rules 13a-1, 13a-11, and 13a-13, which require issuers to file annual, current, and quarterly reports, respectively.

73.     Section 13(b)(2)(A) of the Exchange Act requires all issuers with securities registered under Section 12 to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer. In addition, Exchange Act Rule 12b-20 requires that reports contain such further material information as may be necessary to make the required statements, in light of the circumstances under which they were made, not misleading. Scienter is not an element of these reporting provisions.

74.     In administrative proceedings, the Commission may impose sanctions upon any person that is, was, or would be a cause of a violation, due to an act or omission the person knew or should have known would contribute to such violation.  In order to establish that a person caused a non-scienter based violation, a showing of negligence will suffice.

75.     Sequential's failure to record goodwill impairment in a timely manner rendered its books, records and accounts materially inaccurate.  Similarly, the financial statements that were included in Sequential's third quarter 2017 Form 10-Q, 2017 Form 10-K, and its third quarter earnings release furnished on Form 8-K were materially misleading.  The failures by Wyss, Jackson, and Hilbert to abide by applicable PCAOB standards and perform appropriate audit and review procedures were a cause of Sequential's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

## F.     FINDINGS

76.     Based on the foregoing, the Commission finds that Respondents engaged in improper professional conduct pursuant to Sections 4C(a)(2) of the Exchange Act and Rule 102(e)(1)(ii).

77.     Based on the foregoing, the Commission finds that Respondents caused CohnReznick's violations of Rule 2-02(b)(1) of Regulation S-X.

78.     Based on the foregoing, the Commission finds that Respondents caused Sequential's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder.

## IV.

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondents' Offers.

Accordingly, it is hereby ORDERED, effective immediately, that**:**

A.  Respondents Wyss, Jackson and Hilbert shall cease and desist from committing or causing any violations and any future violations of Rule 2-02(b)(1) of Regulation S-X and Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 promulgated thereunder.

B.  Respondent Wyss is denied the privilege of appearing or practicing before the Commission as an accountant.

1.   After three years from the date of the Order, Respondent Wyss may request that the Commission consider his reinstatement by submitting an application to the attention of the Office of the Chief Accountant.

2.   In support of any application for reinstatement to appear and practice before the Commission as a preparer or reviewer, or a person responsible for the preparation or review, of financial statements of a public company to be filed with the Commission, other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, Respondent Wyss shall submit a written statement attesting to an undertaking to have Respondent Wyss's work reviewed by the independent audit committee of any public company for which Respondent Wyss works or in some other manner acceptable to the Commission, as long as Respondent Wyss practices before the Commission in this capacity and will comply with any Commission or other requirements related to the appearance and practice before the Commission as an accountant.

3.   In support of any application for reinstatement to appear and practice before the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, as a preparer or reviewer, or as a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission, Respondent Wyss shall submit a statement prepared by the audit committee(s) with which Respondent Wyss will be associated, including the following information:

19

a.  A summary of the responsibilities and duties of the specific audit committee(s) with which Respondent Wyss will be associated;

b.  A description of Respondent Wyss's role on the specific audit committee(s) with which Respondent Wyss will be associated;

c.  A description of any policies, procedures, or controls designed to mitigate any potential risk to the Commission by such service;

d.  A description relating to the necessity of Respondent Wyss's service on the specific audit committee; and

e.  A statement noting whether Respondent Wyss will be able to act unilaterally on behalf of the Audit Committee as a whole.

4.  In support of any application for reinstatement to appear and practice before the Commission as an independent accountant (auditor) before the Commission, Respondent Wyss must be associated with a public accounting firm registered with the Public Company Accounting Oversight Board (the "PCAOB") and Respondent Wyss shall submit the following additional information:

a.  A statement from the public accounting firm (the "Firm") with which Respondent Wyss is associated, stating that the firm is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002;

b.  A statement from the Firm with which the Respondent Wyss is associated that the Firm has been inspected by the PCAOB and that the PCAOB did not identify any criticisms of or potential defects in the Firm's quality control system that would indicate that Respondent Wyss will not receive appropriate supervision; and

c.  A statement from Respondent Wyss indicating that the PCAOB has taken no disciplinary actions against Respondent Wyss since seven (7) years prior to the date of the Order other than for the conduct that was the basis for the Order.

5.  In support of any application for reinstatement, Respondent Wyss shall provide documentation showing that Respondent Wyss is currently licensed as a certified public accountant ("CPA") and that Respondent Wyss has resolved all other disciplinary issues with any applicable state boards of accountancy.  If Respondent Wyss is not currently licensed as a CPA,

Respondent Wyss shall provide documentation showing that Respondent Wyss's licensure is dependent upon reinstatement by the Commission.

6.    In support of any application for reinstatement, Respondent Wyss shall also submit a signed affidavit truthfully stating, under penalty of perjury:

a.  That Respondent Wyss has complied with the Commission suspension Order, and with any related orders and undertakings, including any orders in In the Matter of CohnReznick LLP, or any related Commission proceedings, including any orders requiring payment of disgorgement or penalties;

b.  That Respondent Wyss undertakes to notify the Commission immediately in writing if any information submitted in support of the application for reinstatement becomes materially false or misleading or otherwise changes in any material way while the application is pending;

c.  That Respondent Wyss, since the entry of the Order, has not been convicted of a felony or a misdemeanor involving moral turpitude that would constitute a basis for a forthwith suspension from appearing or practicing before the Commission pursuant to Rule 102(e)(2);

d.  That Respondent Wyss, since the entry of the Order:

1)  has not been charged with a felony or a misdemeanor involving moral turpitude as set forth in Rule 102(e)(2) of the Commission's Rules of Practice, except for any charge concerning the conduct that was the basis for the Order;

2)  has not been found by the Commission or a court of the United States to have committed a violation of the federal securities laws, and has not been enjoined from violating the federal securities laws, except for any finding or injunction concerning the conduct that was the basis for the Order;

3)  has not been charged by the Commission or the United States with a violation of the federal securities laws, except for any charge concerning the conduct that was the basis for the Order;

4)  has not been found by a court of the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, or any bar thereof to have committed an offense (civil or criminal) involving moral

21

turpitude, except for any finding concerning the conduct that was the basis for the Order; and

5) has not been charged by the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, civilly or criminally, with having committed an act of moral turpitude, except for any charge concerning the conduct that was the basis for the Order.

e. That Respondent Wyss's conduct is not at issue in any pending investigation of the Commission's Division of Enforcement, the PCAOB's Division of Enforcement and Investigations, any criminal law enforcement investigation, or any pending proceeding of a State Board of Accountancy, except to the extent that such conduct concerns that which was the basis for the Order.

f. That Respondent Wyss has complied with any and all orders, undertakings, or other remedial, disciplinary, or punitive sanctions resulting from any action taken by any State Board of Accountancy, or other regulatory body.

7. Respondent Wyss shall also provide a detailed description of:

a. Respondent Wyss's professional history since the imposition of the Order, including:

1) all job titles, responsibilities and role at any employer;

2) the identification and description of any work performed for entities regulated by the Commission, and the persons to whom Respondent Wyss reported for such work; and

b. Respondent Wyss's plans for any future appearance or practice before the Commission.

8. The Commission may conduct its own investigation to determine if the foregoing attestations are accurate.

9. If Respondent Wyss provides the documentation and attestations required in this Order and the Commission (1) discovers no contrary information therein, and (2) determines that Respondent Wyss truthfully and accurately attested to each of the items required in Respondent Wyss's affidavit, and the Commission discovers no information, including under Paragraph B.8,

22

indicating that Respondent Wyss has violated a federal securities law, rule or regulation or rule of professional conduct applicable to Respondent Wyss since entry of the Order (other than by conduct underlying Respondent Wyss's original Rule 102(e) suspension), then, unless the Commission determines that reinstatement would not be in the public interest, the Commission shall reinstate Respondent Wyss for cause shown.

10.    If Respondent Wyss is not able to provide the documentation and truthful and accurate attestations required in this Order or if the Commission has discovered contrary information, including under Paragraph B.8, the burden shall be on the Respondent Wyss to provide an explanation as to the facts and circumstances pertaining to the matter setting forth why Respondent Wyss believes cause for reinstatement nonetheless exists and reinstatement would not be contrary to the public interest.  The Commission may then, in its discretion, reinstate Respondent Wyss for cause shown.

11.    If the Commission declines to reinstate Respondent Wyss pursuant to Paragraphs B.9 and B.10, it may, at Respondent Wyss's request, hold a hearing to determine whether cause has been shown to permit Respondent Wyss to resume appearing and practicing before the Commission as an accountant.

C.    Respondent Jackson is denied the privilege of appearing or practicing before the Commission as an accountant.

1.    After one year from the date of the Order, Respondent Jackson may request that the Commission consider his reinstatement by submitting an application to the attention of the Office of the Chief Accountant.

2.    In support of any application for reinstatement to appear and practice before the Commission as a preparer or reviewer, or a person responsible for the preparation or review, of financial statements of a public company to be filed with the Commission, other than as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, Respondent Jackson shall submit a written statement attesting to an undertaking to have Respondent Jackson's work reviewed by the independent audit committee of any public company for which Respondent Jackson works or in some other manner acceptable to the Commission, as long as Respondent Jackson practices before the Commission in this capacity and will comply with any Commission or other requirements related to the appearance and practice before the Commission as an accountant.

3.    In support of any application for reinstatement to appear and practice before the Commission as a member of an audit committee, as that term is defined in Section 3(a)(58) of the Exchange Act, as a preparer or reviewer, or as a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission, Respondent Jackson shall submit a statement prepared by the audit committee(s) with which Respondent Jackson will be associated, including the following information:

a.    A summary of the responsibilities and duties of the specific audit committee(s) with which Respondent Jackson will be associated;

b.    A description of Respondent Jackson's role on the specific audit committee(s) with which Respondent Jackson will be associated;

c.    A description of any policies, procedures, or controls designed to mitigate any potential risk to the Commission by such service;

d.    A description relating to the necessity of Respondent Jackson's service on the specific audit committee; and

e.    A statement noting whether Respondent Jackson will be able to act unilaterally on behalf of the Audit Committee as a whole.

4.    In support of any application for reinstatement to appear and practice before the Commission as an independent accountant (auditor) before the Commission, Respondent Jackson must be associated with a public accounting firm registered with the PCAOB and Respondent Jackson shall submit the following additional information:

a.    A statement from the public accounting firm (the "Firm") with which Respondent Jackson is associated, stating that the firm is registered with the PCAOB in accordance with the Sarbanes-Oxley Act of 2002;

b.    A statement from the Firm with which the Respondent Jackson is associated that the Firm has been inspected by the PCAOB and that the PCAOB did not identify any criticisms of or potential defects in the Firm's quality control system that would indicate that Respondent Jackson will not receive appropriate supervision; and

c.    A statement from Respondent Jackson indicating that the PCAOB has taken no disciplinary actions against Respondent Jackson since seven

24

(7) years prior to the date of the Order other than for the conduct that was the basis for the Order.

5. In support of any application for reinstatement, Respondent Jackson shall provide documentation showing that Respondent Jackson is currently licensed as a CPA and that Respondent Jackson has resolved all other disciplinary issues with any applicable state boards of accountancy. If Respondent Jackson is not currently licensed as a CPA, Respondent Jackson shall provide documentation showing that Respondent Jackson's licensure is dependent upon reinstatement by the Commission.

6. In support of any application for reinstatement, Respondent Jackson shall also submit a signed affidavit truthfully stating, under penalty of perjury:

   a. That Respondent Jackson has complied with the Commission suspension Order, and with any related orders and undertakings, including any orders in In the Matter of CohnReznick LLP, or any related Commission proceedings, including any orders requiring payment of disgorgement or penalties;

   b. That Respondent Jackson undertakes to notify the Commission immediately in writing if any information submitted in support of the application for reinstatement becomes materially false or misleading or otherwise changes in any material way while the application is pending;

   c. That Respondent Jackson, since the entry of the Order, has not been convicted of a felony or a misdemeanor involving moral turpitude that would constitute a basis for a forthwith suspension from appearing or practicing before the Commission pursuant to Rule 102(e)(2);

   d. That Respondent Jackson, since the entry of the Order:

      1) has not been charged with a felony or a misdemeanor involving moral turpitude as set forth in Rule 102(e)(2) of the Commission's Rules of Practice, except for any charge concerning the conduct that was the basis for the Order;

      2) has not been charged with a felony or a misdemeanor involving moral turpitude as set forth in Rule 102(e)(2) of the Commission's Rules of Practice, except for any charge concerning the conduct that was the basis for the Order;

25

3) has not been found by the Commission or a court of the United States to have committed a violation of the federal securities laws, and has not been enjoined from violating the federal securities laws, except for any finding or injunction concerning the conduct that was the basis for the Order;

4) has not been charged by the Commission or the United States with a violation of the federal securities laws, except for any charge concerning the conduct that was the basis for the Order;

5) has not been found by a court of the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, or any bar thereof to have committed an offense (civil or criminal) involving moral turpitude, except for any finding concerning the conduct that was the basis for the Order; and

6) has not been charged by the United States (or any agency of the United States) or any state, territory, district, commonwealth, or possession, civilly or criminally, with having committed an act of moral turpitude, except for any charge concerning the conduct that was the basis for the Order.

e. That Respondent Jackson's conduct is not at issue in any pending investigation of the Commission's Division of Enforcement, the PCAOB's Division of Enforcement and Investigations, any criminal law enforcement investigation, or any pending proceeding of a State Board of Accountancy, except to the extent that such conduct concerns that which was the basis for the Order.

f. That Respondent Jackson has complied with any and all orders, undertakings, or other remedial, disciplinary, or punitive sanctions resulting from any action taken by any State Board of Accountancy, or other regulatory body.

7. Respondent Jackson shall also provide a detailed description of:

a. Respondent Jackson's professional history since the imposition of the Order, including:

1) all job titles, responsibilities and role at any employer;

2) the identification and description of any work performed for entities regulated by the Commission, and the persons to whom Respondent Jackson reported for such work; and

b. Respondent Jackson's plans for any future appearance or practice before the Commission.

8. The Commission may conduct its own investigation to determine if the foregoing attestations are accurate.

9. If Respondent Jackson provides the documentation and attestations required in this Order and the Commission (1) discovers no contrary information therein, and (2) determines that Respondent Jackson truthfully and accurately attested to each of the items required in Respondent Jackson's affidavit, and the Commission discovers no information, including under Paragraph C.8, indicating that Respondent Jackson has violated a federal securities law, rule or regulation or rule of professional conduct applicable to Respondent Jackson since entry of the Order (other than by conduct underlying Respondent Jackson's original Rule 102(e) suspension), then, unless the Commission determines that reinstatement would not be in the public interest, the Commission shall reinstate Respondent Jackson for cause shown.

10. If Respondent Jackson is not able to provide the documentation and truthful and accurate attestations required in this Order or if the Commission has discovered contrary information, including under Paragraph C.8, the burden shall be on the Respondent Jackson to provide an explanation as to the facts and circumstances pertaining to the matter setting forth why Respondent Jackson believes cause for reinstatement nonetheless exists and reinstatement would not be contrary to the public interest. The Commission may then, in its discretion, reinstate Respondent Jackson for cause shown.

11. If the Commission declines to reinstate Respondent Jackson pursuant to Paragraphs C.9 and C.10, it may, at Respondent Jackson's request, hold a hearing to determine whether cause has been shown to permit Respondent Jackson to resume appearing and practicing before the Commission as an accountant.

D. Respondent Hilbert is censured.

E. Respondents shall, within 10 days of the entry of this Order, pay a civil money penalty in the amounts as follows:

27

1) $30,000 for Wyss;
2) $20,000 for Jackson; and
3) $30,000 for Hilbert

to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

F.    Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Wyss, Jackson or Hilbert as Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Melissa Hodgman, Associate Director, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549.

G.    Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action"

28

means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondents, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondents under this Order or any other judgment, order, consent order, decree

or settlement agreement entered in connection with this proceeding, is a debt for the violation by Respondents of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).


By the Commission.


Vanessa A. Countryman
Secretary