# Exhibit 12

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PETER D'ARCY, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> YEHUDA SHMIDMAN, KAREN MURRAY, GARY KLEIN, ANDREW COOPER, CHAD WAGENHEIM, PETER LOPS, DAVID CONN, DANIEL HANBRIDGE, LORRAINE DISANTO, WILLIAM SWEEDLER, AARON HOLLANDER, AL GOSSETT, STEWART LEONARD, JR., COHNREZNICK LLP, STEPHEN WYSS, STEPHEN JACKSON, and ROBERT HILBERT, <br><br> Defendants. | Case No.: 1:21-cv-07296 <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.    SUMMARY OF THE ACTION ................................................................................ 1

II.    JURISDICTION AND VENUE ............................................................................... 8

III.    PARTIES AND RELEVANT NON-PARTIES ...................................................... 8

    A.    Plaintiff ........................................................................................................ 8

    B.    The Company ................................................................................................ 9

    C.    The Company Defendants ........................................................................... 10

    D.    The Auditor Defendants .............................................................................. 16

IV.    COMPANY BACKGROUND ............................................................................... 18

V.    APPLICABLE ACCOUNTING RULES AND REGULATIONS.................................... 20

    A.    GAAP and SEC Rules and Regulations, in General..................................... 20

    B.    GAAP and SEC Rules and Regulations Relating to Goodwill..................... 23

    C.    GAAP and SEC Rules and Regulations Relating to Internal Controls........................ 25

VI.    THE COMPANY'S GAAP VIOLATIONS ............................................................ 27

    A.    The Company's Goodwill Was Impaired From At Least 4Q16. ................... 27

    B.    Failure to Account for the Company's Stock Price Declines in 4Q16 in its Goodwill Impairment Testing Violated GAAP. .......................................... 29

    C.    The Company Maintained Deficient Disclosure Controls and Internal Control Over Financial Reporting Throughout the Class Period................................ 36

    D.    The Sequential Defendants' GAAP Violations Exposed it to the Filing of an SEC Complaint Against It. ........................................................................ 40

VII.    THE SEQUENTIAL DEFENDANTS ISSUED AND CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS ............................................... 43

VIII.    THE COHNREZNICK DEFENDANTS WERE BOUND TO COMPLY WITH APPLICABLE AUDITING STANDARDS........................................................................ 76

IX. THE COHNREZNICK DEFENDANTS KNOWINGLY AND/OR RECKLESSLY FAILED TO COMPLY WITH AUDITING STANDARDS IN ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS TO THE INVESTING PUBLIC ...................................... 82

A. CohnReznick's Audit of Sequential's 2016 Goodwill Impairment Testing ............... 82

    1. CohnReznick and Its Engagement Team Identified Goodwill Impairment as an Area of Significant Risk. ................................................................. 82

    2. Wyss Failed to Audit Sequential's 2016 Goodwill Assessment According to Professional Standards. ...................................................................... 83

    3. Wyss's Deficient Reviews of Sequential's Q1 and Q2 2017 Interim Goodwill Impairment Assessments ...................................................... 84

B. Cohnreznick's 3Q Review and Audit of Sequential's 2017 Goodwill Impairment Testing ...................................................................................................... 85

    1. Wyss and Jackson Identified Goodwill Impairment as an Area of Significant Risk. ............................................................................................ 85

    2. In 3Q17, Wyss and Jackson Reviewed Sequential's Interim Goodwill Impairment Test and Concluded that Goodwill Was Not Impaired Solely Based on Assertions from Sequential's Management. ........................................ 86

    3. CohnReznick's Internal Valuation Specialist Raised Concerns with Wyss, Jackson and Hilbert Concerning Sequential's Goodwill Impairment Testing Methodology. ........................................................................................ 87

    4. In Response to CohnReznick's Comments, Sequential Prepared a Quantitative Reconciliation That Again Relied Heavily on Its Management's Unsubstantiated Assertions that It Was Undervalued by the Market. ............................................................................................... 88

    5. CohnReznick's Valuation Specialist Raised Concerns Regarding the Reasonableness of Sequential's Fair Value Assessment .................................... 89

    6. Sequential Issued Its 3Q17 Earnings Release, despite CohnReznick's National Office Quality Control Review Remaining Incomplete, Relying on Wyss's Assurances That Changes to the Financial Statements Were Unlikely. .............................................................................................. 90

    7. After Sequential Published Its 3Q17 Earnings Release, But Before Filing its Quarterly Report on Form 10-Q, Disagreements Among the Engagement Team and Members of the National Office Arose Within CohnReznick. .......... 92

ii

8.     CohnReznick Resolved the Disagreement in Favor of Its Engagement Team Without Performing Sufficient Audit Procedures. ............................... 93

9.     Wyss Prepared an Inaccurate Consultation Memorandum, Which Jackson and Hilbert Concurred with, Purporting to Document the Engagement Team's Analysis, Months After the 3Q17 Interim Review was Complete. ........ 93

10.     Jackson Failed In His Role as EQCR. .................................................. 94

C.     CohnReznick Knowingly and/or Recklessly Failed to Require Sequential to Restate its Previously Issued Financial Statements to Impair Its Goodwill in the Appropriate Periods Despite Knowing the Risk of a Material SEC Investigation. ..... 95

X.     THE FOREGOING KNOWLEDGE SUPPORTS A STRONG INFERENCE THAT THE COHNREZNICK DEFENDANTS INTENTIONALLY AND/OR RECKLESSLY VIOLATED THE STANDARDS THEY WERE BOUND TO FOLLOW. ................................................................................................. 96

XI.     BY INTENTIONALLY AND/OR RECKLESSLY VIOLATING THE PCAOB STANDARDS, THE COHNREZNICK DEFENDANTS ISSUED AUDIT OPINIONS THAT CONTAINED FALSE AND MISLEADING STATEMENTS ............................ 99

A.     Fiscal Year 2016 ...................................................................................... 100

B.     Fiscal Year 2017 ...................................................................................... 105

C.     Fiscal Year 2018 ...................................................................................... 111

D.     Fiscal Year 2019 ...................................................................................... 116

XII.     THE TRUTH SLOWLY EMERGED ............................................................. 122

XIII.     LOSS CAUSATION ....................................................................................... 124

XIV.     PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET ................................ 125

XV.     INAPPLICABILITY OF SAFE HARBOR ....................................................... 126

XVI.     CLASS ALLEGATIONS .............................................................................. 127

XVII.     CLAIMS FOR RELIEF .................................................................................. 128

XVIII.     PRAYER FOR RELIEF .................................................................................. 136

XIX.     JURY TRIAL DEMANDED ............................................................................ 136

Lead Plaintiff CJD Finance Company, LLC ("Plaintiff" or "CJD"), by its attorneys, on behalf of itself and all others similarly situated, makes these allegations against Yehuda Shmidman ("Shmidman"), Karen Murray ("Murray"), Gary Klein ("Klein"), Andrew Cooper ("Cooper"), Chad Wagenheim ("Wagenheim"), Peter Lops ("Lops"), David Conn ("Conn"), Daniel Hanbridge ("Hanbridge"), Lorraine DiSanto ("DiSanto"), William Sweedler ("Sweedler"), Aaron Hollander ("Hollander"), Al Gossett ("Gossett"), Stewart Leonard, Jr. ("Leonard"), CohnReznick LLP ("CohnReznick"), Stephen Wyss ("Wyss"), Stephen Jackson ("Jackson"), and Robert Hilbert ("Hilbert") (collectively, "Defendants") based upon personal knowledge as to its own acts and on information and belief as to all other matters. Plaintiff bases this information and belief on, among other things, the investigation conducted by counsel, which includes a review and analysis of: the complaint filed in *S.E.C. v. Sequential Brands Group, Inc.*, Case No. 1:20-cv-10471 (S.D.N.Y. Dec. 11, 2020) (the "SEC Complaint"), United States ("U.S.") Securities and Exchange Commission ("SEC") filings by Sequential Brands Group, Inc. ("Sequential" or the "Company"); press releases, analyst reports, public statements, news articles and other publications disseminated by or concerning Sequential; independent interviews with former Sequential employees conducted by investigators on behalf of Plaintiff; and other publicly available information. Counsel's investigation into the matters alleged herein is ongoing and indicates substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Many relevant facts are known only to Defendants or are exclusively within their custody or control.

## I. SUMMARY OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Sequential securities between November 9, 2016 and December 11, 2020, inclusive (the "Class Period"), seeking to recover compensable damages

caused by Defendants' violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (the "Class").

2. Founded in 1982, Sequential owns and manages a diversified portfolio of consumer brands in the active and lifestyle categories. During the Class Period, the brands under which the Company operated included Martha Stewart, Emeril Lagasse, Jessica Simpson, and Gaiam.

3. Beginning in 2015, the retail industry saw a continuous decrease in in-store sales due to the rise of online shopping and correspondingly, retail stocks saw a decrease in their share price. Indeed, just before the Class Period began, Sequential saw its stock price fall over 41%, or over $138 a share, in the fourth quarter of 2016 ("4Q16"). The majority of that loss occurred when the Company announced its third quarter 2016 ("3Q16") financial results and revealed slashed guidance for its 2016 full-year earnings, which caused its stock price to fall **$123.60 a share** – from $289.20 a share on November 2, 2016 to $165.60 on November 4.

4. In reviewing the over $307 million in goodwill on its balance sheet for fiscal year 2016 ("FY16"), Sequential knew or should have known that that goodwill was impaired by at least $100 million based on the material decline in its stock price during 4Q16. Indeed, the Company had conducted two internal calculations as of mid-December 2016 and year-end 2016 that had shown that its goodwill was likely impaired. Instead of writing down the impaired goodwill, or at least notifying investors of that likely impaired goodwill due to the Company's material share price declines, Defendants changed the date of its annual goodwill testing to before the November stock drop – October 1 – and reported over $307 million in goodwill for FY16 on March 2, 2017, assuring investors that the Company's disclosure controls and procedures and internal control over financial reporting were effective as of December 31, 2016.

5. But that was not the case. Despite knowing that Sequential's goodwill was likely

impaired at the end of 2016, and despite its share price continuing to be depressed and indeed falling below its 2016 year-end level, the Company failed to perform a quantitative impairment test of its goodwill during each of the first two quarters of 2017. Instead, the Company falsely stated that "[n]o events or circumstances have been identified to indicate an impairment [of goodwill] has occurred subsequent to the Company's October 1, 2016 impairment testing."

6. In the third quarter of 2017 ("3Q17"), Sequential could no longer avoid or delay the quantitative assessment of its goodwill. But in performing an impairment test as of September 30, 2017 instead of waiting for its annual October 1 impairment test, the Company changed the methodology it used to determine the fair value of its reporting unit from the market capitalization approach, which primarily relied on its stock price ("Market Approach"), to an income approach, which used estimates of discounted future cash flows ("Income Approach").

7. The Market Approach indicated that goodwill was likely impaired in FY16 as a result of the Company's significant share price decline in 4Q16, but the Income Approach, did not because the Company used high, unrealistic projections of future cash flows. Accordingly, in order to conceal that its goodwill was impaired, Defendants relied on the Income Approach until they were forced to switch back to the Market Approach after December 31, 2017, when the results of the Income Approach could no longer be reasonably reconciled with the Company's market capitalization. Based on that analysis, Sequential was forced to write-off $304.1 million in the fourth quarter of 2017 ("4Q17").

8. When this news was disclosed before markets opened on February 28, 2018, Sequential's stock price fell $12.00 per share, or over 13%, to close at $79.20 per share that day on unusually heavy volume, damaging investors.

9. By not writing down at least $100 million of Sequential's goodwill in FY16, or at

least notifying the investing public of that likely impaired goodwill, Defendants exposed unwitting investors to the risk of the SEC investigating and bringing suit against the Company. Even after the SEC initiated an investigation and began interviewing former and/or current Company employees in the third quarter of 2019 ("3Q19"), and the departures of Defendant Murray as CEO in October 2020 and of Defendant Lops as CFO in January 2021 during the ongoing investigation, the Company said nothing to investors.

10. Before markets opened on March 31, 2020, the Company finally disclosed that "[i]n the late third quarter and the fourth quarter of 2019, the SEC began interviewing witnesses in connection with" its "controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017." On this news, Sequential's stock price fell $5.20 per share, or over 48%, to close at $6.80 per share on April 1, 2020, further damaging investors.

11. By July 17, 2020, the Company had "received a 'Wells Notice' from the SEC related to this investigation." And yet the Company continued to assure investors that its disclosure controls and procedures and internal control over financial reporting were effective and that the SEC investigation was not material.

12. Investors were thus stunned when on December 11, 2020, the SEC filed a complaint against the Company ("SEC Complaint"), alleging that it had failed "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill in the fourth quarter of 2016 and the first three quarters of 2017 (the 'Relevant Period')." The SEC Complaint detailed how the Company had "conducted two internal calculations as of mid-December 2016 and year-end 2016 that showed that its goodwill was likely impaired," but "ignored this clear, objective, quantitative evidence of likely impairment." The SEC Complaint further noted that "[b]y avoiding an impairment to its goodwill

4

in 2016, Sequential's financial statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets" and "created a false impression of its financial health and ability to execute on its business plan." And according to the SEC Complaint, if the Company "had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by over $100 million, a material amount[,]" and "Sequential had in its possession facts and information tending to show that its statement that goodwill was not impaired was materially false and misleading."

13. On this news, Sequential's stock price fell $2.03 per share, or over 11%, to close at $16.20 per share on December 11, 2020, further damaging investors.

14. In addition to charging Sequential for failing to timely impair its goodwill, the SEC specifically charged Defendants Klein, CohnReznick, Wyss, Jackson and Hilbert. The SEC ultimately settled charges against Defendant Klein "for causing Sequential's reporting, books and records, and internal controls violations related to the Company's failure to impair goodwill in a timely manner." The SEC further settled with Defendants CohnReznick for its "improper professional conduct … in connection with the 2017 third quarter review and 2017 annual audit of Sequential" which "were a cause of Sequential's … filings of materially misstated financial statements with the" SEC. And the SEC settled with Defendants Wyss, Jackson, and Hilbert for their "improper professional conduct … in connection with the firm's interim reviews and audits of the financial statements of Sequential … in particular, the goodwill impairment testing performed by the [C]ompany in 2016 and 2017… which were a cause of Sequential's filing of materially misstated financial statements with the" SEC. The SEC investigation thus was far from "not material."

15.     In sum, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and internal controls. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's goodwill was likely impaired by the end of 2016 in light of its 4Q16 share price declines; (2) the Company's internal calculations in December 2016 confirmed that its goodwill was likely impaired; (3) the Company avoided and delayed addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, by changing the date of the annual impairment test to October 1 in 3Q16 and then using the Income Approach and dismissing the results of the Market Approach for its impairment testing in 3Q17; (4) as a result, the Company failed to write off any of its impaired goodwill until 4Q17 and overstated its income from operations, pre-tax income, net income, goodwill, and assets from 4Q16 through 3Q17; (5) the Company's internal controls were deficient; (6) the Company's failure to timely write down goodwill exposed it to having the SEC file a lawsuit against it; and (7) as a result, Defendants' statements about the Company's business, operations, and internal controls, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

16.     Moreover, the CohnReznick Defendants (defined below) acted as auditor for the Company during the Class Period. As the Company's independent auditor, CohnReznick served as the "public watchdog" to ensure the reliability of the Company's financial statements and was required to comply with applicable auditing standards when performing its audits. During the Class Period, the CohnReznick Defendants opined on the accuracy of the Company's consolidated financial statements. By so doing, the CohnReznick Defendants intentionally and/or recklessly violated the Exchange Act by failing to comply with auditing standards in issuing clean audit

reports that the CohnReznick Defendants knew and/or should have known contained false and misleading statements to the investing public. The CohnReznick Defendants issued its clean audit reports after, *inter alia*, (1) disregarding concerns raised by its own Engagement Quality Control Review ("EQCR") partner, National Director of SEC Services, and internal valuation specialists related to Sequential's unsupportable goodwill valuation; (2) abandoning CohnReznick's typical practices after its internal valuation specialists raised concerns that there was insufficient evidence to support the Company's goodwill valuation; (3) purposefully excluding the assigned EQCR from various consultations on Sequential's goodwill impairment analysis; (4) communicating with Sequential's management without notifying the EQCR, thereby prohibiting the EQCR from being able to complete his review of the goodwill impairment prior to the issuance of Sequential's earnings release; (5) advising Sequential that changes to the goodwill impairment were unlikely, despite knowledge of the ongoing internal disagreement regarding impairment and prior to the completion of its interim review of the Company's 3Q17 financial statements; (6) notifying Sequential that it had not completed its interim review of the 3Q17 financial statements, then, hours later, notifying Sequential that it had completed its interim review—without obtaining or reviewing any further evidence or performing any additional procedures—so that Sequential could file its Form 10-Q without any goodwill impairment; (7) creating a work paper that purported to describe the engagement team's conclusions prior to filing the 3Q17 Form 10-Q based on new data and justifications that were not previously documented prior to the filing of the Form 10-Q; and (8) failing to withdraw its prior reports and continuing to issue unqualified audit reports despite their knowledge of the risk of a material SEC investigation and lawsuit and likelihood that the previously issued financial statements were materially misstated.

17. As a result of Defendants' wrongful acts and omissions, and the precipitous decline

7

in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

18. The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b), § 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because this is a civil action arising under the laws of the U.S.

20. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Specifically, substantial events giving rise to the claims alleged herein occurred in this District, including that many of the: (i) false and misleading statements were made in or issued from this District; and (ii) acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, were made or issued from this District. The Company also maintains its head office in New York City, New York.

21. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications and the facilities of a national securities exchange.

## III. PARTIES AND RELEVANT NON-PARTIES

### A. Plaintiff

22. Plaintiff CJD was appointed to serve as Lead Plaintiff in this Action by Order of this Court dated June 11, 2021 (ECF No. 25). As set forth in its shareholder certification (ECF No. 14-1), which is incorporated by reference herein, CJD purchased Sequential securities at

artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's business operations and future prospects were disclosed and the artificial inflation was removed from the price of Sequential securities.

### B.      The Company

23.      Relevant Non-Party Sequential was incorporated in Delaware and its head office was located at 601 West 26th Street, 9th Floor, New York, NY 10001. Sequential securities traded on the NASDAQ Exchange ("NASDAQ") under the ticker symbol "SQBG." On August 31, 2021, Sequential filed for Chapter 11 bankruptcy relief[1] and on September 27, 2021, the NASDAQ delisted Sequential for failing to meet listing requirements.

24.      To settle the SEC Complaint, Sequential agreed to the entry of a final judgment permanently enjoining it from future violations of the antifraud provision of § 17(a)(3) of the Securities Act of 1933 and certain reporting, books and records, and internal control provisions under the Securities Exchange Act of 1934. The U.S. District Court for the Southern District of New York entered the final judgment against Sequential on December 1, 2021.[2]

25.      On February 22, 2022, the U.S. Bankruptcy Court for the District of Delaware entered an order[3] confirming Sequential's *First Amended Joint Plan of Liquidation of Sequential Brands Group, Inc. and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* ("Plan of Liquidation").[4] The effective date of the Plan was March 3, 2022.[5] Upon information and belief, Sequential's liquidation is ongoing.[6]

---

[1] *See In re: Sequential Brands Group, Inc.*, U.S. Bankruptcy Court for the District of Delaware, Case No. 21-bk-11194 ("Bankruptcy Proceeding").

[2] *See* Accounting and Auditing Enforcement Release No. 4277, dated December 15, 2021.

[3] Bankruptcy Proceeding, ECF No. 486.

[4] Bankruptcy Proceeding, ECF No. 380.

[5] Bankruptcy Proceeding, ECF No. 498.

[6] Since Sequential's business has not been fully wound up, all references to Sequential will be in the present tense.

### C.      The Company Defendants

26.      Defendant Shmidman served as the Company's Chief Executive Officer ("CEO") and as a Director on its Board from November 2012 to March 2017. Before joining Sequential, he spent seven years with Iconix Brand Group, Inc. ("Iconix"), where he had held multiple positions of increasing responsibility, ranging from head of global business development to direct involvement with corporate initiatives related to mergers & acquisitions, global joint ventures, corporate finance, and investor relations, which led to his promotion to Chief Operating Officer ("COO") in 2010. He had graduated magna cum laude from Yeshiva University with a Bachelor's degree in Political Science.

27.      Defendant Murray served as the Company's CEO and as a Director on its Board from April 2017 to October 2019. Before joining Sequential, she had been the president of VF Sportswear, where she oversaw the $1.2 billion global brand, Nautica, as well as Kipling since 2008, after joining in 2007 as president of its Nautica Men's Sportswear and Nautica Jeans Company businesses. She began her career at Gant, remaining there for nine years before transitioning to Liz Claiborne, assuming a myriad of roles, including President from 1998 to 2007.

28.      Defendant Klein served as the Company's Chief Financial Officer ("CFO") from December 2012 to August 2017. He previously served as Vice President ("VP") of Finance at Iconix, where he joined in 2005 and during his seven-year tenure, was regularly involved in all areas of finance, including financial planning and analysis, reporting and accounting, corporate finance, investor relations, mergers and acquisitions and management information systems. Prior to Iconix, he held finance-related positions at TV Guide Publishing Group, Columbia House and Office.com. His career began at a public accounting firm after receiving a bachelor's degree in accounting from the University at Albany.

29.     While Klein was Sequential's CFO, Sequential acquired consumer brands, which created substantial goodwill on its balance sheet. On August 9, 2021, the SEC announced settled charges against Klein for causing Sequential's reporting, books and records, and internal controls violations related to the Company's failure to impair goodwill in a timely manner.[7] In its announcement of the settled charges, which are fully set forth in the Klein Order, incorporated by reference as if fully set forth herein, the SEC stated:

> [F]rom the fourth quarter of 2016 through his departure from Sequential on August 31, 2017, Klein oversaw Sequential's assessments of whether its goodwill should be impaired. Although Sequential's annual goodwill impairment test on October 1, 2016 did not indicate impairment, the Company lowered its earnings guidance on November 3, 2016 and its already declining stock price dropped by approximately 40 percent. According to the order, Sequential subsequently conducted two internal fair value calculations, which showed that the Company's market capitalization (including a control premium) had declined below its carrying amount. Sequential, however, did not appropriately consider this quantitative evidence of likely impairment and instead performed a qualitative analysis, which omitted consideration of its internal fair value calculations and did not give sufficient consideration to other negative factors relevant to the Company's business. The SEC's order finds that, as a consequence, Klein was aware of information indicating that Sequential's goodwill was more likely than not impaired and should have known that Sequential's financial disclosures and books and records did not accurately reflect its goodwill. The SEC's order also finds that Klein caused Sequential's failure to implement and maintain adequate internal accounting controls regarding interim assessments of goodwill impairment.

> The SEC's order finds that Klein caused Sequential's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934, and Rules 12b-20, 13a-1, 13a-11 and 13a-13 promulgated thereunder. Without admitting or denying the allegations, Klein agreed to cease and desist from committing or causing violations of any of these provisions and to pay a penalty of $20,000.

> The SEC's investigation was conducted by Ellen Bortz, Richard Johnston, Paul Gunson, with support from Christopher Bruckmann under the supervision of Jennifer Leete, Paul Pashkoff, Frederick Block and Melissa Hodgman.[8]

---

[7] *SEC Charges Former CFO with Causing Brand-Management Company's Accounting Violations*, U.S. SEC (Aug. 9, 2021) ("Klein Announcement"), https://www.sec.gov/enforce/34-92611-s (last visited Nov. 14, 2022); *see In re Gary S. Klein*, Exchange Act Release No. 92611, Accounting & Auditing Enforcement Release No. 4241, Administrative Proceeding File No. 3-20456 (August 9, 2021) ("Klein Order").

[8] *SEC Charges Former CFO with Causing Brand-Management Company's Accounting Violations*, U.S. SEC (Aug. 9, 2021), https://www.sec.gov/enforce/34-92611-s (last visited Nov. 14, 2022)

30. Defendant Cooper served as the Company's President from August 2016 to June 2019 and as the Interim CFO from September 2017 to February 2018 after being recruited for the new role through a process conducted by private equity firm Tengram Capital Partners ("Tengram"). He graduated from University of Pennsylvania's Wharton School of Business and magna cum laude from Duke University.

31. Defendant Wagenheim has served as the Company's President from October 2019 to November 2021, and previously served as its CEO from October 2019 to January 2020. He had been with the Company since 2014 and holds a B.S. in Accounting from Monmouth University.

32. Defendant Lops served as the Company's CFO from February 2018 to January 2020 and was responsible for its financial operations. In announcing his appointment, Defendant Murray had touted, "Peter [Lops] has a robust skill set, including extensive public company experience in finance and operations."[9] Prior to Sequential, he served as the CFO and COO for the Distribution and Business Development division of Viacom Media Networks ("Viacom") after being promoted from Senior Vice President ("SVP") of Financial Planning and Analysis. Before joining Viacom, he was VP of Finance for Fox Television Stations, Inc. and for nine years before that, he held financial roles at the National Football League, serving as VP of Financial Planning and Analysis, Finance Director and Controller. Early in his career, he worked at Andersen LLP, where he led the IPO of Martha Stewart Living Omnimedia.

33. Defendant Conn served as the Company's CEO and as a director from January 6, 2020 to October 2020. Prior to Sequential, he had served as CEO of ThreeSixty Brands, CEO and board member of True Religion, and President of VF Corporation's retail licensed brands division.

---

[9] *Sequential Brands Group Appoints Peter Lops as CFO*, Source: SEQUENTIAL BRANDS GROUP, INC., GLOBENEWSWIRE (February 28, 2018, 07:45 ET), https://www.globenewswire.com/news-release/2018/02/28/1401191/0/en/Sequential-Brands-Group-Appoints-Peter-Lops-as-CFO.html (last visited Nov. 14, 2022).

From 2004 to 2008, he served as Executive Vice President of Iconix. After graduating from Boston University, he served in various roles at BMG Columbia House and Candie's Inc.

34.  Defendant Hanbridge served as the Company's CFO from January 2020 to November 2020 and as its SVP of Finance from January 2017 to November 2020. Prior to Sequential, he served as VP, Controller of AdvantageCare Physicians where he was responsible for the monthly financial close, entity-wide budgeting and forecasting for 50+ departments, supporting the annual external audit, and overall entity-wide financial reporting and analysis. Prior to AdvantageCare Physicians, he was VP, Head of Technical Accounting and SEC Reporting for Cowen Group, Inc, where he prepared and reviewed its filings and various other financial reporting activities. Earlier in his career, he was a Senior Accountant, Financial Reporting for L-3 Communications and a Supervisory Senior Associate in the Consumer Products Division at KPMG LLP. He has a B.S. in Accounting from Lehigh University.

35.  Defendant Sweedler served as the Company's Executive Chairman of the Board, Principal Executive Officer from October 2020 to May 2021 and Chairman of the Board from 2012 to October 2020. In addition to being Sequential's longtime executive chairman, director of its Board and de facto CEO, he is a general partner and co-founder of Tengram.

36.  Defendant Hollander served as a director of the Company's Board from September 2013 to October 2021. During his time with the Company, he served on the Audit Committee (as its Chairman), Compensation Committee and the Nominating Governance Committee. Earlier, he worked for the Boston Consulting Group, and as a CPA and CMA with Arthur Young & Company (now Ernst & Young). He received his B.S. in Economics from the Wharton School, University of Pennsylvania, and earned an MBA with distinction from Harvard Business School.

37.  Defendant Gossett served as a director of the Company's Board from 2011 to

March 2021. During his time with the Company, he served on the Audit Committee. He attended Northwestern University.

38.     Defendant Leonard served as a director of the Company's Board from May 2013 to March 2021. During his time with the Company, he served on the Audit Committee. He earned a B.S. degree from Ithaca College and an MBA from UCLA.

39.     Defendant DiSanto has served as the Company's CEO, CFO, Chief Accounting Officer and Chair of the Board since October 2020. She has over 30 years of accounting, finance, and operations experience. Prior to joining Sequential, she was CFO of Herman Miller Group's retail segment; and prior to the Herman Miller acquisition in 2014, she was CFO of Design Within Reach Inc. She held CFO/COO roles at Totsy.com, as well as at V2V Holdings Inc. She also held accounting and finance related roles at IBM and Time Warner Cable.

40.     Defendants Shmidman, Murray, Klein, Cooper, Wagenheim, Lops, Conn, Hanbridge, Sweedler, Hollander, Gossett, Leonard, and DiSanto are sometimes referred to herein as the "Sequential Defendants."

41.     The Sequential Defendants, because of their positions with Sequential, had access to non-public information about its business operations and prospects, financial condition, markets, and meetings and communications with its auditor, the SEC and other third-parties *via* access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and *via* reports and other information provided to them in connection therewith. Because of their professional achievements, education, and relevant industry expertise, the Sequential Defendants were aware of the applicable accounting and regulatory requirements and had access to industry standards and protocols for the accounting of goodwill.

42.     As such, the Sequential Defendants had access to material adverse non-public information concerning Sequential's goodwill, internal controls, and the subsequent SEC investigation into that goodwill. Because of their possession of such information, the Sequential Defendants knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

43.     The Sequential Defendants are liable as direct participants in the wrongs complained of herein. The Sequential Defendants participated in drafting, preparing, and/or approving the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Each of the Sequential Defendants had access to the adverse undisclosed information about Sequential's goodwill, internal controls, and the subsequent SEC investigation into that goodwill as specified herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about Sequential and its business, which were issued or adopted by the Company, materially false and misleading.

44.     In addition, the Sequential Defendants, by reason of their positions with Sequential, were "controlling persons" within the meaning of § 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Sequential Defendants were able to, and did, directly or indirectly, control the conduct of Sequential's business.

45.     As control persons of a publicly traded company whose securities was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Sequential Defendants had a duty to promptly

15

disseminate accurate and truthful information with respect to Sequential's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Sequential securities would be based upon truthful and accurate information. The Sequential Defendants' material misrepresentations and omissions of material facts during the Class Period violated these specific requirements and obligations.

46. The Sequential Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Sequential's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public concerning Sequential's goodwill, internal controls and the subsequent SEC investigation into that goodwill, causing Plaintiff and other Class members to purchase Sequential securities at artificially inflated prices.

47. The Company is liable for the acts of the Sequential Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

48. The scienter of the Sequential Defendants and other employees and agents of Sequential is similarly imputed to the Company under *respondeat superior* and agency principles.

**D.     The Auditor Defendants**

49. Defendant CohnReznick, a New Jersey limited liability partnership, is a public accounting firm in the U.S. with over 3,000 employees in 25 cities and offers services in three segments – accounting, tax and advisory. CohnReznick registered with the Public Company Accounting Oversight Board ("PCAOB") in October 2003. CohnReznick became the independent auditor for Sequential in 2013 and issued reports on Sequential's financial statements through the

year-end 2020 financial statement audit. Various individuals who were partners of CohnReznick participated in the audits of Sequential from 2013 through 2020, and prepared, reviewed, approved, and directed the production of financial statements, reports and releases issued or disclosed by Sequential throughout the Class Period.

50. Throughout the Class Period, CohnReznick served as Sequential's "independent auditor" and issued clean and unqualified audit opinion letters in connection with Sequential's financial statements, which were incorporated with CohnReznick's approval in Sequential's public filings. CohnReznick and various individual partners of the firm (including Defendants Wyss, Jackson, and Hilbert) participated in the audits of Sequential from 2013 through 2020, and prepared, reviewed, approved, and directed the production of financial statements, reports and releases issued or disclosed by Sequential throughout the Class Period.

51. At all relevant times, CohnReznick was the purported "independent" auditor of and provided other tax and accounting services to Sequential. CohnReznick audited Sequential's materially false and misleading financial statements during the Class Period and issued materially false and misleading opinions on these financial statements. CohnReznick also consented to the use of its unqualified opinion on Sequential's financial statements and reports filed with the SEC and otherwise disseminated to the investing public during the Class Period. These financial statements were incorporated into and made a part of the Company's public filings and offering memoranda with the knowledge and express consent of CohnReznick.

52. CohnReznick, under the direction of audit partners and Defendants Wyss, Jackson, Hilbert, and others, audited Sequential's materially false and misleading financial statements during the Class Period and issued materially false and misleading opinions on those financial statements. CohnReznick reviewed, prepared, directed and controlled all public financial

17

disclosures, including public filings, statements to the press and investing public, earnings releases, and press releases relating to financial issues of Sequential, made by the Company during the Class Period. CohnReznick thus participated in the scheme, plan and common course of conduct described herein.

53. Defendant Wyss is a Certified Public Accountant ("CPA"), licensed to practice in New York. Wyss served as the CohnReznick engagement partner on the 2016 and 2017 audits of Sequential and the interim reviews between the audits.

54. Defendant Jackson is a CPA licensed to practice in Connecticut. Jackson served as the CohnReznick engagement quality control review ("EQCR") partner for the 3Q17 review and 2017 annual audit of Sequential.

55. Defendant Hilbert is a CPA licensed to practice in New York and Texas. Hilbert served as CohnReznick's Managing Partner of Assurance and National Director of Accounting during the 3Q17 review and 2017 annual audit of Sequential. He also served as the liaison between CohnReznick's auditors and its internal group of valuation specialists.

56. CohnReznick, Wyss, Jackson, and Hilbert shall be referred to collectively as the "CohnReznick Defendants."

## IV. COMPANY BACKGROUND

57. Founded in 1982, Sequential, together with its subsidiaries, owns and manages a diversified portfolio of consumer brands in the active and lifestyle categories. During the Class Period, the brands under which the Company operated included Martha Stewart, Emeril Lagasse, and Jessica Simpson, and Heely. The Company licenses its brands for a range of product categories, including apparel, footwear, fashion accessories, and home goods. The Company promotes, markets, and licenses its brands through various distribution channels, including to retailers, wholesalers, and distributors.

58.     From 2014 through 2016, Sequential made seven acquisitions, including of the Martha Stewart brand. As part of those acquisitions, the Company recorded goodwill which was still on its balance sheet at the end of 2016:

| Acquisition | Date | Balance as of 12/31/16 | % of Total Goodwill |
|---|---|---|---|
| *Old goodwill* | 12/31/13 | $1,225,000 | 0.4% |
| Galaxy Brand Holdings, Inc. ("Galaxy Brand") | 8/15/14[10] | $168,561,000 | 54.8% |
| With You LLC ("Jessica Simpson") | 4/8/15[11] | $3,480,000 | 1.1% |
| Joe's Jeans | 9/8/15[12] | $1,060,000 | 0.3% |
| Martha Stewart Living Omnimedia, Inc. ("Martha Stewart") | 12/4/15[13] | $128,713,000 | 41.8% |
| Gaiam, Inc. | 7/1/16 | $4,705,000 | 1.5% |
| **Total** | | **$307,744,000** | **100.0%** |

59.     That $307 million in goodwill "represents the excess of the purchase price over the fair value of net assets acquired under the acquisition method of accounting."[14] Those assets are the intangible assets Sequential acquired in its acquisitions, including proprietary or intellectual property and brand recognition, which account for the excess purchase price.[15] The Company is required to review the value of goodwill on its financial statements at least once a year and record any impairments. *Id*.

60.     In 2015, the retail industry began seeing a continuous decrease in in-store sales due

---

[10] *Sequential Brands Group Announces Closing of Galaxy Brand Holdings Acquisition*, Source: SEQUENTIAL BRANDS GROUP, INC., GLOBENEWSWIRE (Aug. 18, 2014, 08:00 ET), https://www.globenewswire.com/news-release/2014/08/18/659308/10095003/en/Sequential-Brands-Group-Announces-Closing-of-Galaxy-Brand-Holdings-Acquisition.html (last visited Nov. 10, 2022).

[11] Lisa Lockwood, *Jessica Simpson Brand Acquired by Sequential Brands Group*, WWD (Apr. 8, 2015), https://wwd.com/business-news/mergers-acquisitions/jessica-simpson-brand-acquired-by-sequential-brands-group-10109308/ (last visited Nov.10, 2022).

[12] Teresa Novellino, *Sequential Brands Group to acquire Joe's jeans brand*, NY BUSINESS JOURNAL (Sept. 9, 2015, 12:55 PM), https://www.bizjournals.com/newyork/news/2015/09/09/sequential-brands-group-to-acquire-joe-s-jeans.html (last visited Nov.10, 2022).

[13] *Sequential Brands Group Announces Closing of Martha Stewart Living Omnimedia Merger*, TENGRAM CAPITAL PARTNERS (Dec. 4, 2015), https://tengramcapital.com/pressArticles/portfolioNews/tengram-capital-partners-press-120415_SBG.html (last visited Nov.10, 2022).

[14] Sequential Brands Group, Inc., Quarterly Report (Form 10-Q) p. 17 (Nov. 9, 2016) ("3Q16 10Q").

[15] Marshall Hargrave, *Goodwill*, INVESTOPEDIA (Apr. 10, 2021), https://www.investopedia.com/terms/g/goodwill.asp (last visited Nov.10, 2022).

to the rise of online shopping, leading to a decrease in retail stocks' share price.[16] Indeed, just before the Class Period began, Sequential saw its stock price fall over 41%, or over $138 a share, in 4Q16. Most of that loss occurred when the Company announced its 3Q16 financial results and revealed slashed guidance for its 2016 full-year earnings, causing its stock price to fall $123.60 a share – from $289.20 a share on November 2, 2016 to $165.60 on November 4.

61. Just a few months later, Defendant Shmidman announced that after being at the helm for five years, he was stepping down as Sequential's CEO and as a member of its Board.[17] At that time, he knew or recklessly disregarded that the Company's goodwill was likely impaired.

## V. APPLICABLE ACCOUNTING RULES AND REGULATIONS

### A. GAAP and SEC Rules and Regulations, in General

62. Generally Accepted Accounting Principles ("GAAP") constitute those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time, and are the common set of accounting principles, standards, and procedures that U.S. companies use to prepare their financial statements.

63. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board ("FASB"). The SEC Rules and interpretive releases and the FASB Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants.[18]

64. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading

---

[16] Quinn Foley, *Sequential Brands: Major Business Risk, But Not As Much Risk To Investors At The Current Valuation*, SEEKING ALPHA (Mar. 29, 2018, 9:20 AM ET), https://seekingalpha.com/article/4159877-sequential-brands-major-business-risk-not-much-risk-to-investors-current-valuation (last visited Nov.10, 2022).

[17] Tomi Kilgore, *Sequential Brands CEO Yehuda Shmidman Steps Down*, MARKETWATCH PULSE, FOX BUSINESS (Updated on March 22, 2017, 11:05 AM ET), https://www.foxbusiness.com/markets/sequential-brands-ceo-yehuda-shmidman-steps-down (last visited Nov.10, 2022).

[18] *FASB Accounting Standards Codification,* Topic 105, Sub-topic 10, § 5, ¶ 1.

and inaccurate. Regulation S-X also requires that interim financial statements comply with GAAP; they only need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

65.     FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting. As stated in FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8"), the "objective of general-purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." CON 8, ¶ OB2.

66.     CON 8 provides that financial reports play an important role when individuals and firms make financial decisions:

> General purpose financial reports provide … information about the entity's economic resources and the claims against the reporting entity. Financial reports also provide information about the effects of transactions and other events that change a reporting entity's economic resources and claims. Both types of information provide useful input for decisions about providing resources to an entity. CON 8, ¶ OB12.

67.     A primary quality that renders financial information useful is faithful representation, which requires that information be complete, neutral, and free from error. CON 8, ¶ QC12. To be complete, the financial information must include all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. CON 8, ¶ QC13. To be neutral, the financial information must be without bias in the selection or presentation of financial information. CON 8, ¶ QC14). To be free from error means that there are no errors or omissions in the description of the phenomenon and the process used to produce the reported information was selected and applied with no errors. CON 8, ¶ QC15.

68.     The other key characteristic of financial information is relevance, which requires that information be capable of making a difference in the decisions made by users. CON 8, ¶

QC6. Information is capable of making a difference if it has predictive value, confirmative value, or both. CON 8, ¶ QC7. "Relevance and materiality are defined by what influences or makes a difference to an investor or other decision maker; however, the two concepts can be distinguished from each other. Relevance is a general notion about what type of information is useful to investors. Materiality is entity specific. **The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item**." CON 8, ¶ QC11.

69. GAAP requires any material error in the financial statements of a prior period discovered after the financial statements are issued to be reported as an error correction by restating the prior-period financial statements. *See* ASC 250-10-45-23; ASC 105-10-05-6.

70. SEC Staff Accounting Bulletin: No. 99 - Materiality ("SAB 99") offers the most comprehensive guidance on determining the materiality of misstatements of financial statements, bringing together guidance from financial accounting standards, auditing standards, and U.S. Supreme Court decisions. SAB 99 addresses misstatements or omissions of amounts, classifications, manner of presentation and disclosures in financial statements. SAB 99 provides that materiality must be assessed on all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. SAB 99 sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (*e.g.*, 5 %) could be material. "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

71. In summary, evaluating whether a misstatement or omission in financial statements

is material should be viewed from the standpoint of a reasonable person relying on the financial statements and the likelihood that a misstatement or omission would have significantly altered that person's decisions, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements.

### B.  GAAP and SEC Rules and Regulations Relating to Goodwill

72.  ASC 350-20 addresses GAAP as it applies to accounting and financial reporting for goodwill, defining it as "an asset representing the future economic benefits arising from other assets acquired in a business combination." ASC 350-20-20. Goodwill is created in an acquisition and is initially measured as the excess of the purchase price over the value of identifiable assets acquired and liabilities assumed in a business combination. ASC 805-30-30-1.

73.  Goodwill is not amortized (*i.e.*, periodically lowered over a set time-period[19]); instead, it is tested for impairment at the reporting unit level. ASC 350-20-35-1. "Impairment" as it relates to goodwill is "the condition that exists when the carrying amount of a reporting unit that includes goodwill exceeds its fair value." ASC 350-20-35-2.

74.  Once a year, at the same time each year, a company must evaluate goodwill for impairment. ASC 350-20-35-28.

75.  In addition, GAAP requires that the "goodwill of a reporting unit [] be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair values of a reporting unit below its carrying amount." ASC 350-20-35-30. A company must assess "qualitative factors," known as triggering events, to determine if it should perform an interim analysis. ASC 350-20-35-30; ASC 350-20-35-3C. The "totality" of events and circumstances, including a non-exclusive list of factors included in GAAP, also must be evaluated.

---

[19] Amy Fontinelle, *Amortization*, INVESTOPEDIA (Updated Aug. 30, 2022), https://www.investopedia.com/terms/a/amortization.asp (last visited Nov. 10, 2022).

23

ASC 350-20-35-3C, ASC 350-20-35-3E.

76. GAAP provides the following examples of events and circumstances which could trigger an interim goodwill impairment test:

a. Macroeconomic conditions such as a deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets

b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development

c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows

d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods

e. **Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation**

f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing of all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit.

g. **If applicable, a sustained decrease in share price** (consider in both absolute terms and relative to peers).

ASC 350-20-35-3C.

77. A goodwill impairment test consists of qualitative and/or quantitative assessments. A company has an option to first perform (or bypass) a qualitative assessment to determine whether a quantitative assessment is necessary. ASC 350-20-35-3-3B. The factors to consider in a qualitative analysis are the same as the above events and circumstances which could trigger an interim goodwill impairment test. ASC 350-20-35-3C.

78. If, after assessing the totality of events or circumstances, a company determines that it is not more likely than not (that is, a likelihood of not more than 50 percent) that the fair

24

value of a reporting unit is less than its carrying amount, then quantitative goodwill impairment tests are unnecessary. ASC 350-20-35-3D. If, however, it is more likely than not that the fair value is less than the carrying amount, quantitative impairment tests must be performed to identify and measure the goodwill impairment. ASC 350-20-35-3.

79.     The SEC has interpreted a decline in market capitalization below book value as indicating that goodwill and other intangible assets should be tested for impairment under Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets."[20] SFAS 142, which was codified as part of ASC 350 when the FASB adopted the Accounting Standards Codification in July 2009, requires goodwill be tested for impairment annually, and also when events occur that indicate an impairment or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. *Id*. One indicator of a potential impairment is a significant adverse change in the business climate, which may be reflected in a sustained drop in market capitalization below book value. *Id*.

**C.      GAAP and SEC Rules and Regulations Relating to Internal Controls**

80.     Management plays a critical role in the operation and growth of companies, like Sequential, including establishing the internal control environment within which employees function. The Committee of Sponsoring Organizations of the Treadway Commission Report ("COSO Report") defines internal control as a process "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. COSO Report, Executive Summary. Sequential indicated in its public Class Period filings that it and its auditor evaluated its internal controls according to the standards of the COSO Report.

---

[20] *Client Alert: Declining Market Capitalizations and the Impairment of Goodwill*, LATHAM & WATKINS, No. 806 (Feb. 10, 2009), https://www.lw.com/thoughtLeadership/declining-market-capitalizations-and-the-impairment-of-goodwill (last visited Nov. 10, 2022).

81. Generally Accepted Auditing Standards ("GAAS") outline the responsibilities of an auditor of an entity's financial statements (among other things), but explains that management is responsible for the preparation of those financial statements. It states, in relevant part:

> The financial statements are management's responsibility. The auditor's responsibility is to express an opinion on the financial statements. ***Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control*** that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. The auditor's knowledge of these matters and internal control is limited to that acquired through the audit. Thus, ***the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility***. (Auditing Standard ("AS") 1001.03.)

82. Management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rule 13a-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

83. The term "reliable," as used in the COSO Report, requires that financial statements prepared for external purposes be fairly presented in conformity with GAAS and regulatory requirements. The requirement of reliable financial reporting applies to published financial statements, including interim and consolidated financial statements, and selected financial data, such as earnings releases, derived from these financial statements.

84. Internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act, is a process designed by, or under the supervision of, the CEO and CFO and is effected by the Board of Directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with U.S. GAAP. Internal control over

26

financial reporting includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with US GAAP, and that the receipts and expenditures of the Company are being made only in accordance with appropriate authorization of management and the board of directors; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

85.     A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

86.     The COSO Report recognizes that the chief executive officer sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system …. The influence of the CEO on an entire organization cannot be overstated." COSO Report, Chapter 8, p. 84. The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business.

## VI.    THE COMPANY'S GAAP VIOLATIONS

### A.    The Company's Goodwill Was Impaired From At Least 4Q16.

87.     Just before the Class Period began, Sequential saw its stock price fall over 41%, or over $138 a share, in 4Q16. Most of that loss occurred when the Company announced its 3Q16 financial results and revealed slashed guidance for its 2016 full-year earnings, causing its stock price to fall $123.60 a share—from $289.20 a share on November 2, 2016, to $165.60 on

November 4, 2016:



88.     Thus, in reviewing its goodwill at the end of 2016, which related primarily to the acquisitions of Galaxy Brand and Martha Stewart, the Sequential Defendants knew or should have known that the Company's goodwill was impaired based on the material declines in its stock price in 4Q16. A sustained decrease in stock price is an indicator of impairment under ASC 350. *See* ASC 350-20-35-3C.

89.     Sequential's stock price was a particularly important consideration in its goodwill impairment testing since the Company's goodwill impairment testing policy expressly stated that Sequential considered its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) to represent its estimated fair value.[21]

90.     In addition to the consistent decline in Sequential's stock price leading up to and throughout 4Q16, the Company's management, senior accounting and finance personnel, and Board of Directors, including Defendants Shmidman, Klein, Cooper, Hollander, Sweedler, Gossett and Leonard, were aware that the retail sector in which Sequential's licensees and brands operated,

---

[21] A "control premium" represents the amount that a buyer would be willing to pay over the current market price of a publicly traded company to acquire a controlling share in that company.

was struggling. Specifically, during this time period, the Company: (i) received reports that significant retailers were experiencing declines in business, directly affecting its licensees; (ii) was on notice of increases in accounts receivable collection issues; (iii) received a request from one of its most significant licensees, seeking relief from its contractual minimums; and (iv) identified nearly $10 million in expenses from an acquired brand, which Sequential had not anticipated at the time of acquisition, less than 12 months prior.[22]

### B. Failure to Account for the Company's Stock Price Declines in 4Q16 in its Goodwill Impairment Testing Violated GAAP.

91. Yet, while assessing its goodwill impairment testing for FY16, the Company chose to deviate from its customary analysis, utilized for years prior.

92. Instead of analyzing Sequential's annual goodwill impairment as of December 31—requiring it to account for this material decrease in share price in its evaluation—Sequential changed its annual impairment evaluation date to October 1, just before the Company's share price plummeted. The Company informed investors of the date change on November 9, 2016, specifically stating in its 3Q16 10Q that "this change in accounting principle is not material to its financial statements, in part because the change does not delay, accelerate or avoid an impairment charge."[23]

93. The Company also provided that its goodwill impairment testing would begin with a qualitative test, or alternatively, skip the qualitative test and move directly to a two-step quantitative test in which the second step would be pursued if the first step indicated that the estimated fair value of the reporting unit was less than its carrying amount:

> Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. In evaluating goodwill

---

[22] *See* SEC Complaint at 23-24.
[23] *See* 3Q16 10Q at 12.

for impairment, *the Company first assesses qualitative factors* to determine whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. Qualitative factors considered include, for example, macroeconomic and industry conditions, overall financial performance and other relevant entity-specific events. If the Company bypasses the qualitative assessment, *or concludes that it is more likely than not that the fair value of a reporting unit is less than its carrying value,* it then performs a two-step goodwill impairment test to identify potential goodwill impairment and measure the amount of goodwill impairment to be recognized, if any.

In the first step, the Company will compare the estimated fair value of the reporting unit with its carrying value. *The Company has determined it has a single reporting unit and considers its market capitalization* (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor) *to represent its estimated fair value.*

If the estimated fair value of the reporting unit exceeds its carrying amount, no further analysis is needed. *If, however, the estimated fair value of the reporting unit is less than its carrying amount, the Company will proceed to the second step and calculate the implied fair value of the reporting unit goodwill to determine whether any impairment is required.* The implied fair value of the reporting unit goodwill is calculated by allocating the estimated fair value of the reporting unit to all of the unit's assets and liabilities as if the unit had been acquired in a business combination. If the carrying value of the reporting unit's goodwill exceeds the implied fair value of the goodwill, an impairment loss is recognized in the amount of that excess.[24]

94.     Under the applicable accounting standards that Sequential was required to follow through the end of 2016, any quantitative goodwill impairment test that it was conducting consisted of two steps. First, it was to identify any potential impairment by comparing the fair value of a reporting unit with its carrying amount, also known as the net book value, including goodwill ("Step 1"). *See* ASC 350-20-35-4. At the end of 2016, Sequential disclosed that it had a single reporting unit. If the carrying amount of that reporting unit exceeded its fair value, the next step was to measure the amount of impairment loss, if any ("Step 2"). *See* ASC 350-20-35-8. Step 2 consisted of determining the implied goodwill value in a hypothetical purchase price allocation for the reporting unit by assigning values to the "acquired" assets and liabilities. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is the implied fair

---

[24] *See* 3Q16 10Q at 12.

value of goodwill. *See* ASC 350-20-35-14-17. An impairment loss is recognized if the carrying amount of goodwill exceeds its implied fair value in the amount equal to that excess. *See* ASC 350-20-35-9-11.

95. Despite the Sequential Defendants understanding of the requirements set by ASC 350 for annual impairment testing, as well as for interim assessments between annual tests; despite their understanding of the steps and mechanics for determining fair value based on a market capitalization methodology pursuant to ASC 350; and despite understanding that a failure to pass Step 1 would require additional quantitative analysis under Step 2, the Sequential Defendants deceptively chose to bypass any qualitative assessment and set its market capitalization, as of October 1, 2016, as representative of the Company's estimated fair value.

96. In connection with its annual goodwill impairment testing, Sequential retained an external valuation consultant to conduct a quantitative assessment of its fair value, using its market capitalization.[25]

97. On December 6, 2016, the external valuation consultant provided Sequential with a report, which showed that, using this quantitative methodology of market capitalization plus control premium, the Company passed the test and that its goodwill therefore was not impaired as of October 1, 2016.[26]

98. Shortly after receiving the external valuation consultant's report, Defendant Klein forwarded the report to Defendant Hollander, chair of Sequential's Audit Committee, and the Company's independent auditor, Defendant CohnReznick.[27]

99. On receipt, Defendant Hollander asked Defendant Klein, "Do we meet the test

---

[25] *See* SEC Complaint at 19; Klein Order at ¶11.
[26] *See* SEC Complaint at 19; Klein Order at ¶11, 11 n.2.
[27] *See* SEC Complaint at 20.

today?"[28] At the time of the inquiry on December 14, 2016, Sequential's stock price had fallen approximately 37% in the two months that had passed since the October 1, 2016 annual goodwill testing date.[29]

100.    In response to Defendant Hollander's inquiry, and at the direction of Defendant Klein, Sequential's senior accounting and finance personnel conducted an analysis to determine its valuation as of December 14, 2016, using the same quantitative methodology as used by the external valuation consultant in connection with its annual goodwill impairment testing, but applying its stock price as of December 14.[30] This analysis showed that Sequential's estimated fair value had fallen below its carrying amount by approximately *$63 million*, a material amount.[31]

101.    A subsequent analysis conducted by Sequential's senior accounting and finance personnel, at the direction of Defendant Klein, and again using the same methodology as used in connection with the Company's annual goodwill impairment testing, showed that, as of December 31, 2016, Sequential's estimated fair value was approximately *$96 million* below its carrying amount, an increase of over 50% from the calculation as of December 14.[32]

102.    As a result of these internal calculations, Defendants Shmidman, Klein, Cooper, Hollander, Sweedler, Gossett, and Leonard knew or recklessly disregarded that it was "more likely than not that the fair value of [Sequential's single] reporting unit [was] less than its carrying amount."[33] Under ASC 350, the Company could not reasonably ignore this objective, quantitative, observable evidence that goodwill was more likely than not impaired as of December 2016. Yet, despite the clear language of ASC 350, its SEC disclosures, and its internal accounting controls,

---

[28] *See* SEC Complaint at 20.
[29] *See* SEC Complaint at 20.
[30] *See* SEC Complaint at 20.
[31] *See* SEC Complaint at 20; Klein Order at ¶14.
[32] *See* SEC Complaint at 20; Klein Order at ¶15.
[33] Sequential Brands, Inc., Annual Report (Form 10-K) p. 27 (March 14, 2017) ("2016 10K").

policies, and procedures, Sequential did, in fact, choose to ignore this objective evidence of impairment.

103.    Thus, the Company unreasonably violated GAAP and the federal securities laws in 4Q16 by knowingly failing to perform a quantitative assessment to identify and measure goodwill impairment, as it was required to do so.

104.    Sequential further violated GAAP and the federal securities laws by failing to consider the internal calculations conducted in December 2016 as objective evidence in a qualitative assessment. Instead, Sequential's senior accounting and finance personnel, under the direction of Defendant Klein, conducted a subjective, qualitative assessment to conclude that the market was unfairly undervaluing the Company and that its goodwill was not impaired.[34]

105.    In other words, rejecting the objective evidence in the Sequential Defendants' possession as of December 14 and December 31, 2016, demonstrating that it was more likely than not that the Company's goodwill was impaired, Sequential undertook a qualitative assessment to answer the same exact question.[35]

106.    Under the oversight of Defendant Klein, Sequential's senior accounting and finance personnel operated on the understanding that if the Company passed goodwill impairment testing, then they could move on, *but* if the Company was likely to fail, then "more work" needed to be done.[36]

107.    Beginning in early February 2017, the Company's senior accounting and finance personnel conducted and documents a qualitative analysis to "supplement" the Company's

---

[34] *See* SEC Complaint at 21.
[35] *See* SEC Complaint at 21-22.
[36] *See id.* at 22.

33

memorandum memorializing its annual goodwill impairment testing as of October 1, 2016 (the "Goodwill Memorandum").[37]

108.  On February 3, 2017, Defendant Hanbridge, the Company's SVP of Finance, emailed Defendant Klein, stating that the team would "work on some qualitative talking points *to support our company value* as it related to goodwill at 12/31/16" and that the external valuation consultant had been engaged to gather quantitative facts "*to bolster our argument*."[38]

109.  In internal email communications, collected by the SEC, the Company's senior accounting and finance personnel showed concern that they might need to record a goodwill impairment.[39] For example, on February 16, 2017, Defendant Hanbridge emailed Defendant Klein, stating, "[Defendant CohnReznick] did not seem concerned or think that we should have an impairment, *but that could change if/when they take a deeper look*."[40]

110.  When conducting this qualitative analysis, the Company's senior accounting and finance personnel selected only the evidence most favorable to Sequential and ignored other ASC 350 factors that would have let to a conclusion that goodwill was likely impaired.[41] Specifically, with respect to the previously identified continuous decline in the Company's stock price, Defendant Hanbridge stated, "*Our stance* is that the *drop in stock price does not constitute an impairment event* that would necessitate an interim impairment test. In order *to take that stance*, we *have to state that we believe an impairment is not more likely* if we would perform that test."[42]

111.  According to the SEC Complaint, "Sequential performed a strained, biased, and outcome-driven qualitative analysis—which omitted any consideration of its internal fair value

---

[37] *See* SEC Complaint at 22.
[38] *See* SEC Complaint at 22.
[39] *See* SEC Complaint at 22.
[40] *See* SEC Complaint at 22.
[41] *See* SEC Complaint at 22-24.
[42] *See* SEC Complaint at 22-23.

calculations, as well as other significant negative developments in the Company's business—and unreasonably concluded that goodwill was not impaired" and "[i]f Sequential had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by over $100 million, a material amount."[43]

112.   In deciding whether to write off the potentially impaired goodwill, the Sequential Defendants were well aware that investors and analysts were concerned about the over $600 million in debt (approximately 45% of its assets) on Sequential's balance sheet at the end of 3Q16 as a result of its strategy of growing via acquisitions.[44] If the Company wrote down the impaired goodwill in 4Q16, there was a real risk that a large stock drop would occur when that impairment became public. Alternatively, by not writing down the likely impaired goodwill, Sequential would be able to understate its operating expenses and net loss, overstate its income from operations, goodwill, and total assets, and as a result, present a false and materially misleading picture of its financial health and operational and strategic success. Defendants chose the latter—reporting on March 14, 2017, $307,744,000 in goodwill, or 21.4% of Sequential's total assets, for 4Q16.[45]

113.   As a result of the Sequential Defendants failure to conduct additional goodwill impairment testing in 4Q16 and to timely impair goodwill, Sequential materially understated operating expenses and overstated income from operation by at least $100 million and understated the reported net loss by at $42 million in its 2016 Form 10K.[46] Had the Company timely recorded the impairment to goodwill for 4Q16, its reported annual net loss would have been 54x larger and the impairment would have equaled 33% of recorded goodwill, or 7% of total assets.[47]

---

[43] SEC Complaint at 2, 5.

[44] Timothy Green, *Why Shares of Sequential Brands Tumbled Today,* THE MOTLEY FOOL (Nov. 3, 2016, 12:16 PM), https://www.fool.com/investing/2016/11/03/why-shares-of-sequential-brands-tumbled-today.aspx (last visited Nov. 10, 2022)

[45] *See* 2016 10K at 17.

[46] *See* SEC Complaint at 25-26.

[47] *See id.* at 26.

114. The Sequential Defendants maintained this deception throughout the first three quarters of 2017, materially understating accumulated deficit and overstating goodwill, total assets, and stockholders' equity in its financial statements and SEC filings. Further, the Sequential Defendants provided assurances to investors that the Company's disclosure controls and procedures and internal control over financial reporting were effective as of December 31, 2016 and maintained that these controls were effective throughout the rest of the Class Period.

## C. The Company Maintained Deficient Disclosure Controls and Internal Control Over Financial Reporting Throughout the Class Period.

115. In January 2017, FASB issued Accounting Standards Update No 2017-04 which simplified the quantitative test for goodwill impairment. In its 2016 10K filed on March 14, 2017, the Company disclosed that it was evaluating the impact of adopting the new goodwill impairment standard would have on its consolidated financial statements, if any. Sequential then adopted the new accounting standard during the first quarter of 2017 ("1Q17").

116. The new standard, which the Company was required to follow beginning in 2017, eliminated Step 2 and compared the fair value of a reporting unit with its carrying amount, including goodwill (*e.g.*, same as in Step 1), in the quantitative goodwill impairment. ASC 350-20-35-4. If the carrying amount (*i.e.*, the amount recorded on the books) exceeded the fair value of the reporting unit, then goodwill was considered impaired and an impairment loss would need to be recognized in an amount equal to that excess, up to the amount of goodwill allocated to that reporting unit. ASC 350-20-35-6; ASC 350-20-35-8.

117. Despite the updated accounting standard, despite knowing that its goodwill was likely impaired at the end of 2016, and despite its share price continuing to be depressed and indeed falling below its 2016 year-end level, Sequential failed to perform a quantitative impairment test of its goodwill during each of the first two quarters of 2017, carrying over $300 million of goodwill

36

on its financial statements.

118. Indeed, during 1Q17, Sequential's stock price fell another 20%, from $195.60 on January 3 to $155.60 on March 31. And that decrease was sustained through the second quarter of 2017 ("2Q17"), with the Company's stock price closing at $159.60 on June 30:



119. ASC 350 requires entities to conduct interim goodwill impairment testing when certain indicators, or "triggering events," are present, such as adverse changes in the business climate or market that might negatively affect the value of a reporting unit. Interim goodwill impairment testing is therefore required "if an event occurs or circumstances exist that indicate that it is more likely than not that a goodwill impairment exists." *See* ASC 350-20-35-30.

120. In addition to the decline in stock price, during 1Q17 and 2Q17, additional indicators, or triggering events, suggested that the Company's goodwill was more likely than not impaired, including but not limited to, the Company's issuance of downward revised earnings guidance for a second time in a period of three months and removal of Defendant Shmidman.[48]

121. Again, despite knowing that its goodwill was likely impaired at the end of 2016, and despite these other triggering events occurring in the first half of 2017, the Company falsely

---

[48] *See* SEC Complaint at 30.

stated in its Form 10-Q, filed with the SEC, for 1Q17 and 2Q17, that "[n]o events or circumstances have been identified to indicate an impairment [of goodwill] has occurred subsequent to the Company's October 1, 2016 impairment testing."[49]

122.    Because of the continued decline in Sequential's stock price and other triggering events, the Sequential Defendants were forced to face the reality that the Company would not pass its annual goodwill impairment test as of October 1, 2017, using its disclosed market capitalization methodology (the "Market Approach"). Instead of conducting goodwill impairment testing to confirm and measure the impairment, however, the Sequential Defendants pivoted once again, performing a goodwill impairment test for the third quarter of 2017 ("3Q17") utilizing a different methodology. Under the direction of the Company's President and interim CFO, Defendant Cooper, Sequential worked with the external valuation consultant to develop a new methodology using estimates of discounted cash flow (the "Income Approach") to determine the Company's fair value, reconciling the results achieved using the prior Market Approach.[50]

123.    While the Market Approach indicated that goodwill was likely impaired, the Income Approach did not because the Company used high, unrealistic projections of future cash flows. Thus, to avoid recognizing a goodwill impairment, the Sequential Defendants utilized the Income Approach as yet another deceptive mechanism to produce a favorable fair value estimate, reporting goodwill of $304.1 million, total assets of $1.381 billion, and accumulated deficit of $62.48 million. To the investing public, the Company justified the change to the Income Approach by falsely claiming that the Market Approach did not give "full value" to its fully reserved deferred tax assets totaling $11.0 million. In truth, the Company itself valued those assets as worthless. Moreover, in its goodwill impairment testing, the Company intentionally or recklessly failed to

---

[49] 1Q17 10 Q at 17; 2Q17 10 Q at 17.
[50] *See* SEC Complaint at 35.

consider the internal results of its fair value calculations performed as of mid-December 2016 and year-end 2016.

124. Accordingly, the Sequential Defendants concealed the Company's impaired goodwill, relying on the Income Approach until they were forced to switch back to the Market Approach after December 31, 2017, when the results of the Income Approach could no longer be reasonably reconciled with the Company's market capitalization.

125. Having failed, to properly perform goodwill impairment tests during the first three quarters of 2017, in violation of GAAP and federal securities laws, Sequential had no choice but to perform a goodwill impairment test as of December 31, 2017. Unable to reconcile the vast difference between the fair values derived using estimated future cash flows (Income Approach) versus its market capitalization (Market Approach), Sequential finally acknowledged in its Form 10-K for fiscal year ending December 31, 2017 ("2017 10K") that the Income Approach produced erroneous results and that it should use the Market Approach to determine the fair value of its reporting unit. The Market Approach resulted in recognizing a $304.1 million impairing charge for the full value of the Company's goodwill:

> At December 31, 2017, after comparing the results of the Income Approach to the market capitalization approach, **the Company noted it could no longer corroborate the results of the Income Approach by reconciling to within a reasonable range of the Company's market capitalization,** including an assumed control premium. As discussed above, **the two primary differences between the market approach and income approach were determined to be the Company's fully reserved tax assets, for which the market may not have been giving full value** and depressed market multiples experienced by all entities within the brand licensing peer group. The reconciliation was significantly impacted by the decreased market capitalization, as well as the enactment in December 2017 of the Tax Cuts and Jobs Act, which reduced the aforementioned reconciling item for fully reserved tax assets. As such, **the Company determined that the value indicated by the market capitalization approach, calculated using the December 31, 2017 closing stock price of $1.78 and an estimated control premium factor of 20%, was the most appropriate measure of the fair value of the Company as of December 31, 2017.** Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an

impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill.[51]

126.     Sequential's goodwill balance was $307.7 million as of December 31, 2016 and March 31, 2017 and $304.1 million as of June 30, 2017, September 30, 2017, and December 31, 2017, when it was finally fully written-off. As a result of the Sequential Defendants' intentional failure to perform a proper goodwill impairment assessment during the Class Period, the Company's reported goodwill balance was overstated by at least $100 million as of December 31, 2016 and March 31, June 30, and September 30, 2017.

**D.     The Sequential Defendants' GAAP Violations Exposed it to the Filing of an SEC Complaint Against It.**

127.     By not writing down at least $100 million of Sequential's goodwill in FY16, or at least notifying the investing public of that likely impaired goodwill, Defendants exposed unwitting investors to the risk of the SEC investigating and bringing suit against it. Indeed, as a result of the Company's failure to timely impair goodwill, the SEC investigated (and ultimately determined) that:

> [Sequential's] financial statements for 2016 contained several material accounting errors, including: (i) an overstatement of income from operations; (ii) an understatement of operating expenses; (iii) an understatement of net loss; (iv) an overstatement of goodwill; and (v) an overstatement of total assets.
>
> [] Sequential carried these errors forward into the first two quarters of 2017. Its financial statements for the first two quarters of 2017 contained several material accounting errors, including: (i) an overstatement of goodwill; (ii) an overstatement of total assets; (iii) an understatement of accumulated deficit; and (iv) an overstatement of stockholders' equity.
>
> [] Sequential made additional misstatements and omissions related to its goodwill impairment testing in its periodic and current reports. These included its failure to disclose that it had conducted objective market capitalization analyses for the fourth quarter of 2016, using the same methodology as used in connection with its annual testing, which showed that its carrying amount likely exceeded fair value. Sequential also failed to disclose that it omitted the unfavorable results of these calculations from its qualitative goodwill impairment assessment conducted at year-end 2016.

---

[51] 2017 10K at 35.

[] These material misstatements and omissions occurred in Sequential's 2016 annual report on Form 10-K, filed on March 14, 2017, its current reports on Form 8-K reporting its earnings results for 2016 and the first two quarters of 2017, furnished on March 2, May 4 and July 27, 2017, respectively, and its quarterly reports on Form 10-Q for the first two quarters of 2017, filed May 10 and August 9, 2017, respectively. Except for the Form 8-K furnished on July 27, 2017, [Klein] also signed each of these reports as Sequential's CFO.[52]

128.  The risk of an SEC investigation began to materialize at least by 3Q19 when "the SEC began interviewing witnesses in connection with" the Company's "controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017." The SEC's investigation was being conducted by Ellen F. Bortz, Richard E. Johnston and Paul C. Gunson, and supervised by Jennifer S. Leete.[53]

129.  But Defendants disclosed nothing about the SEC investigation until the Company filed its annual report for FY 2019 on Form 10-K on March 31, 2020 ("2019 10K"). Instead, while the SEC was interviewing witnesses which include its current/former employees in 4Q19, Sequential announced via press release on October 7, 2019 ("10.7.19 Press Release") that Defendant Murray had stepped down as Director and CEO of the Company – without a replacement lined up. The Board had just "begun a search to identify the Company's new CEO" and was considering "strategic alternatives" which "include[d] the divestiture of one or more existing brands, the acquisition of one or more new brands, a stock buyback program, and other initiatives."[54] Then, just a few months later, on January 9, 2020, the Company announced the resignation of Defendant Lops on January 6, 2020.[55]

---

[52] Klein Order at ¶¶25-28.

[53] *SEC Charges Sequential Brands Group Inc. with Deceiving Investors by Failing to Timely Impair Goodwill*, U.S. SEC (Dec. 11, 2020), https://www.sec.gov/news/press-release/2020-315 (last visited Nov. 10, 2022).

[54] *Sequential Brands Group Announces Exploration of Strategic Alternatives and Leadership Transition,* Source: Sequential Brands Group, Inc., GLOBENEWSWIRE (Oct. 07, 2019) https://www.globenewswire.com/news-release/2019/10/07/1925794/0/en/Sequential-Brands-Group-Announces-Exploration-of-Strategic-Alternatives-and-Leadership-Transition.html (last visited July 26, 2021, Nov. 10, 2022)

[55] SQBG Form 8-K (Jan. 9, 2020)

130.    At the same time, Sequential ushered in Defendant Conn as Director and CEO and Defendant Hanbridge as CFO of the Company. *Id*. Under new leadership, the Company finally disclosed the SEC investigation in March 2020.

131.    By July 17, 2020, the Company had "received a 'Wells Notice' from the SEC related to this investigation." The Wells Notice informed Defendants "both of the broad nature of the violations uncovered as well as the nature of the enforcement proceedings to be initiated against [the Company]."[56] Yet the Sequential Defendants continued to assure investors that its disclosure controls and procedures and internal control over financial reporting were effective for the rest of the Class Period.

132.    Before the Company filed its quarterly report for the third quarter of 2020 on November 16, 2020 ("3Q20"), however, it announced the resignations of Defendant Conn, effective on October 30, 2020, and Defendant Hanbridge, effective November 16, 2020, on November 2, 2020.[57]

133.    Investors were thus stunned when on December 11, 2020, the SEC filed a complaint against the Company, alleging that it had failed "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill in the fourth quarter of 2016 and the first three quarters of 2017 (the 'Relevant Period')." The SEC Complaint detailed how the Company had "conducted two internal calculations as of mid-December 2016 and year-end 2016 that showed that its goodwill was likely impaired," but "ignored this clear, objective, quantitative evidence of likely impairment." The SEC Complaint further noted that "[b]y avoiding an impairment to its goodwill in 2016, Sequential's financial

---

[56] Adam Hayes, *Wells Notice*, INVESTOPEDIA (Updated April 26, 2022), https://www.investopedia.com/terms/w/wellsnotice.asp (last visited Nov. 10, 2022).
[57] SQBG Form 8-K (Nov. 2, 2020).

statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets" and "created a false impression of its financial health and ability to execute on its business plan." And according to the SEC Complaint, if the Company "had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by over $100 million, a material amount[,]" and "Sequential had in its possession facts and information tending to show that its statement that goodwill was not impaired was materially false and misleading."

## VII.  THE SEQUENTIAL DEFENDANTS ISSUED AND CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING STATEMENTS[58]

134.     On November 9, 2016, Sequential filed its 3Q16 10Q with the SEC, announcing its financial and operating results for the period ended September 30, 2016, signed by Defendant Klein. Attached to the 3Q16 10Q were certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Shmidman and Klein attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

135.     The 3Q16 10Q stated the following, in pertinent part, regarding the Company's annual impairment testing date:

> During the nine months ended September 30, 2016, the Company changed its annual impairment testing date from December 31 to October 1. The Company believes this new date is preferable because it allows for more timely completion of the annual impairment test prior to the end of its annual financial reporting period. ***The Company has concluded that this change in accounting principle is not material to its financial statements, in part because the change does not delay, accelerate or avoid an impairment charge***. The Company has determined that it will be impracticable to objectively determine projected cash flow and related valuation estimates that would have been used as of each October 1 of prior reporting periods without the use of hindsight. ***As such, the Company will apply***

---

[58] The particular parts of the statements alleged to be false and/or misleading are in bold and italicized in this section.

43

*the change in annual impairment testing date prospectively beginning October 1, 2016.*

136. The statements referenced in ¶¶134-35 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that the Company's goodwill was likely impaired in light of the November 2, 2016 share price decline and that by changing the date of the annual impairment test to October 1, they were able to avoid and delay addressing the changed circumstances involving the share price decline, including writing off a material amount of goodwill.

137. On March 2, 2017, the Company issued a press release entitled "Sequential Brands Group Announces Fourth Quarter and Full Year 2016 Financial Results" (the "3.2.17 Press Release") which listed its goodwill at $307,744,000 and its total current assets at $1,434,863,000 at the end of 2016 (unaudited).

138. The 3.2.17 Press Release also provided the following unaudited operating income, pre-tax income, and net income for 4Q16 and FY16:

| | *Three Months Ended December 31, 2016* | *Year Ended December 31, 2016* |
|---|---|---|
| Income from operations | $23,099,000 | $70,136,000 |
| Income (loss) before income taxes | $4,539,000 | $15,788,000 |
| Net income (loss) | $658,000 | $6,631,000 |

139. On March 14, 2017, Sequential filed its 2016 10K with the SEC, announcing its financial and operating results for the fiscal year ended December 31, 2016, signed by Defendants Shmidman, Klein, Sweedler, Hollander, Gossett and Leonard. Attached to the 2016 10K were SOX certifications signed by Defendants Shmidman and Klein attesting to the accuracy of

44

financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

140.    The 2016 10K listed the Company's goodwill at $307,744,000 and its total current assets at $1,434,863,000 at the end of 2016 and provided the following operating income, pre-tax income, and net income for 4Q16 and FY16 (audited):

|  | *Three Months Ended December 31, 2016* | *Year Ended December 31, 2016* |
|---|---|---|
| Income from operations | $23,099,000 | $70,136,000 |
| Income before income taxes | $4,539,000 | $15,788,000 |
| Net income (loss) | $658,000 | $6,631,000 |

141.    The statements referenced in ¶¶137-40 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down approximately $100 million in impaired goodwill in 2016 or informed investors of that likely impaired goodwill due to the Company's material 4Q16 share price declines; (3) as a result, the Company had overstated its 4Q16 and FY16 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient.

142.    The 2016 10K also stated the following, in pertinent part, regarding the Company's goodwill:

> **Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment)** on an annual basis and **between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.**

*        *        *

45

*During the year ended December 31, 2016, the Company changed its annual impairment testing date from December 31 to October 1*. The Company believes this new date is preferable because it allows for more timely completion of the annual impairment test prior to the end of its annual financial reporting period. *This change in accounting principle does not delay, accelerate or avoid an impairment charge*. The Company has determined that it will be impracticable to objectively determine projected cash flow and related valuation estimates that would have been used as of each October 1 of prior reporting periods without the use of hindsight. As such, *the Company applied the change in annual impairment testing date prospectively beginning October 1, 2016. The Company performed its annual impairment evaluation of its goodwill as of October 1, 2016. As of December 31, 2016 and 2015, no impairment of goodwill has been identified*.

143. In addition, the 2016 10K stated the following, in pertinent part, regarding the Company's internal controls:

Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of the end of the period covered by this report. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*, as issued in 2013. ***Based on our management's assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2016, based on those criteria***.

144. The statements referenced in ¶¶142-43 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the 4Q16 share price declines, including writing off a material amount of goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down approximately $100 million in impaired goodwill or informed investors of that likely impaired goodwill due to the Company's material 4Q16 share price declines; and (4) the Company's internal controls were deficient.

46

145. Furthermore, while the 2016 10K discussed several "Risk Factors," the Defendants failed to adequately warn investors that the following risk had already materialized at the time of the Annual Report:

> We have a significant amount of goodwill and other intangible assets, including our trademarks, recorded on our balance sheet. *As a result of changes in market conditions and declines in the estimated fair value of these assets, we may, in the future, be required to write-down a portion of this goodwill and other intangible assets and such write-down would adversely affect our results of operations.As of December 31, 2016, goodwill represented $307.7 million, or 21.4% of our total consolidated assets, and intangible assets represented $1.0 billion, or 71.8% of our total consolidated assets.* Under current accounting principles generally accepted in the United States ("GAAP"), goodwill and indefinite-lived intangible assets are not amortized, but instead are subject to impairment evaluation based on related estimated fair values, with such testing to be done at least annually. ... *Any write-down of goodwill or intangible assets resulting from future periodic evaluations would, as applicable, either decrease our net income or increase our net loss and those decreases or increases could be material*.

146. The statements referenced in ¶145 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) changes in market conditions had already occurred, as reflected in the Company's 4Q16 share price declines, that decreased the estimated fair value of its goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired by at least $100 million; and (3) since Defendants were not writing down any goodwill associated with the 4Q16 share price declines, they were exposing the Company to the risk of the SEC filing a lawsuit against it.

147. On May 4, 2017, the Company issued a press release entitled "Sequential Brands Group Announces First Quarter 2017 Financial Results" (the "5.4.17 Press Release"). The 5.4.17 Press Release listed the Company's goodwill at $307,744,000 and its total current assets at

$1,426,639,000 for the period ended March 31, 2017 (unaudited) and provided the following operating income, pre-tax income, and net income for 1Q17 (unaudited):

| | Three Months Ended March 31, 2017 |
|---|---|
| Income from operations | $15,992,000 |
| Income before income taxes | $1,540,000 |
| Net income | $955,000 |

148.     On May 10, 2017, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period year ended March 31, 2017 (the "1Q17 10Q"), signed by Defendant Klein. Attached to the 1Q17 10Q were SOX certifications signed by Defendants Murray and Klein attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

149.     The 1Q17 10Q listed the Company's goodwill at $307,744,000 and its total current assets at $1,426,639,000 as of March 31, 2017 and provided the following operating income, pre-tax income, and net income for 1Q17 (audited):

| | Three Months Ended March 31, 2017 |
|---|---|
| Income from operations | $15,992,000 |
| Income before income taxes | $1,540,000 |
| Net income | $955,000 |

150.     The statements referenced in ¶¶147-49 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 1Q17 due to the sustained share price decline

48

beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the Company had overstated its 1Q17 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient.

151. The 1Q17 10-Q also stated the following, in pertinent part, regarding the Company's goodwill:

> ***Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment)*** on an annual basis and ***between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.***

152. The statement referenced in ¶151 *supra* was materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the share price decline since 3Q16, including writing off goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 1Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; and (4) the Company's internal controls were deficient.

153. On July 27, 2017, the Company issued a press release entitled "Sequential Brands Group Announces Second Quarter 2017 Financial Results" (the "7.27.17 Press Release"). The 7.27.17 Press Release listed the Company's goodwill at $304,123,000 and its total current assets at $1,422,242,000 for the period ended June 30, 2017 (unaudited) and provided the following operating income, pre-tax income, and net income for 2Q17 and the first half of 2017 (unaudited):

| | Three Months Ended June 30, 2017 | Six Months Ended June 30, 2017 |
|---|---|---|
| Income from operations | $24,244,000 | $40,236,000 |
| Income before income taxes | $7,566,000 | $9,106,000 |
| Net income | $4,451,000 | $5,406,000 |

154. On August 9, 2017, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period year ended June 30, 2017, signed by Defendant Klein (the "2Q17 10Q"). Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Murray and Klein attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

155. The 2Q17 10Q listed the Company's goodwill at $304,123,000 and its total current assets at $1,422,242,000 as of June 30, 2017 and provided the following operating income, pre-tax income, and net income for 2Q17 and the first half of 2017 ("1H17") (audited):

| | Three Months Ended June 30, 2017 | Six Months Ended June 30, 2017 |
|---|---|---|
| Income from operations | $24,244,000 | $40,236,000 |
| Income before income taxes | $7,566,000 | $9,106,000 |
| Net income | $4,451,000 | $5,406,000 |

156. The statements referenced in ¶¶153-55 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 2Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the

Company had overstated its 2Q17 and 1H17 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient.

157. The 2Q17 10Q also stated the following, in pertinent part, regarding the Company's goodwill:

> ***Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment)*** on an annual basis and ***between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value***.

158. The statement referenced in ¶157 *supra* was materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the 4Q16 share price declines, including writing off impaired goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 2Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; and (4) the Company's internal controls were deficient.

159. On November 9, 2017, the Company issued a press release entitled "Sequential Brands Group Announces Third Quarter 2017 Financial Results" (the "11.9.17 Press Release"). The 11.9.17 Press Release listed the Company's goodwill at $304,123,000 and its total current assets at $1,381,329,000 for the period ended September 30, 2017 (unaudited) and provided the following operating income, pre-tax income, and net income for 3Q17:

51

| | *Three Months Ended September 30, 2017* |
|---|---|
| (Loss) income from operations | ($13,551,000) |
| (Loss) Income before income taxes | ($28,574,000) |
| Net (loss) income | ($24,732,000) |

160.    On November 13, 2017, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended September 30, 2017, signed by Defendant Cooper (the "3Q17 10Q"). Attached to the 3Q17 10Q were SOX certifications signed by Defendants Murray and Cooper attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

161.    The 3Q17 10Q listed the Company's goodwill at $304,123,000 and its total current assets at $1,381,329,000 as of September 30, 2017 and provided the following operating income, pre-tax income, and net income for 3Q17 (audited):

| | *Three Months Ended September 30, 2017* |
|---|---|
| (Loss) income from operations | ($13,551,000) |
| (Loss) Income before income taxes | ($28,574,000) |
| Net (loss) income | ($24,732,000) |

162.    The statements referenced in ¶¶159-61 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the

52

Company had overstated its 3Q17 operating income, pre-tax income, net income, goodwill, and

assets; and (4) the Company's internal controls were deficient.

163.    The 3Q17 10Q also stated the following, in pertinent part, regarding the Company's

goodwill:

> **Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment)** on an annual basis and **between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value**.
>
> * * *
>
> **During the quarter ended September 30, 2017, as a result of its qualitative assessment of the likelihood of goodwill impairment, the Company identified potential impairment indicators and determined that a quantitative assessment was necessary**. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows (the "DCF Method"). The DCF Method relies on assumptions such as the Company's projected future earnings and appropriate discount rates. The Company corroborated the results of the DCF Method by reconciling to within a reasonable range of its market capitalization (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor). Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market capitalization may not be giving full value. **Based on the results of the quantitative assessment, the Company determined goodwill was not impaired for the period ended September 30, 2017**.

164.    The statements referenced in ¶163 *supra* were materially false and/or misleading

because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's

business, operational and financial results, which were known to Defendants or recklessly

disregarded by them. Specifically, Defendants made false and/or misleading statements and/or

failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16,

Defendants were able to avoid and delay addressing the changed circumstances involving the

sustained share price decline beginning in 4Q16, including writing off a material amount of

goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill

was likely impaired; (3) the Company should have written down at least $100 million in impaired

goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or

53

informed investors of that likely impaired goodwill; (4) by using the Income Approach instead of the Market Approach for its impairment testing in 3Q17, Defendants were able to continue avoiding and delaying addressing the changed circumstances involving the sustained share price decline beginning in 4Q16; and (5) the Company's internal controls were deficient.

165. On February 28, 2018, before trading hours, the Company issued a press released entitled "Sequential Brands Group Announces Fourth Quarter and Full Year 2017 Financial Results" (the "2.28.18 Press Release"). The 2.28.18 Press Release announced, in pertinent part, a "*goodwill adjustment represent[ing] a one-time, non-cash charge of $304.1 million that was driven by the Company's stock price during the fourth quarter – as well as the increase in the Company's book value related to tax reform – which resulted in an assessed fair value of equity that was significantly below its net book value*."

166. Later that day, during Sequential's 4Q17 Earnings Call, Defendant Cooper reiterated that *"[t]he goodwill adjustment represents a one-time, non-cash charge of $304.1 million that was driven by the company's stock price during the fourth quarter, as well as the increase in the company's book value related to tax reform, which resulted in an assessed fair value of equity that was below its net book value*. This adjustment is unrelated to the carrying value of the company's trademark which have not been impaired and it is not in our view reflective of the underlying value of our brands."

167. Analyst Dave King of Roth Capital Partners ("Roth Capital") followed up later during the 4Q17 Earnings Call, asking "in terms of the goodwill write-down in the quarter was that associated with any brands in particular?" Defendant Cooper confirmed that:

> No. So it's an important distinction that you're making there. *The goodwill impairment really was a result of our stock price in the fourth quarter which resulted in a market cap that was well below our book value of the equity.* So that's just let us to reevaluate the goodwill and ultimately determine to write-down the goodwill, but the goodwill is unrelated completely unrelated to the strength of

our brands, unrelated to any impairments or anything like that on our brands which we did not have this quarter.

So no it does not reflect that all on the value or the trademarks, it's not associated with any of the trademark, and doesn't reflect at all on -- as our positive view on the strength of the brands going forward.

168. The statements referenced in ¶¶165-67 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $304.1 impairment charge was driven by the Company's share price declines which began in 4Q16; (2) the Company's internal controls were deficient; and (3) because they delayed writing off goodwill in the face of the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it.

169. On March 13, 2018, Sequential filed its annual report on Form 10-K with the SEC, announcing its financial and operating results for the fiscal year ended December 31, 2017, signed by Defendants Murray, Cooper, Sweedler, Hollander, Gossett and Leonard ("2017 10K"). Attached to the 2017 10K were SOX certifications signed by Defendants Murray and Cooper attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

170. The 2017 10K stated the following, in pertinent part, regarding goodwill as part of the Company's "Critical Accounting Policies, Judgments and Estimates":

> **Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1[st]) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.**

* * *

55

> *Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017.*
>
> *During the year ended December 31, 2016, we changed our annual impairment testing date from December 31 to October 1.* We believe this new date is preferable because it allows for more timely completion of the annual impairment test prior to the end of our annual financial reporting period. *This change in accounting principle did not delay, accelerate or avoid an impairment charge.* We have determined that it would be impracticable to objectively determine projected cash flow and related valuation estimates that would have been used as of each October 1 of prior reporting periods without the use of hindsight. As such, *we applied the change in annual impairment testing date prospectively beginning October 1, 2016.*

171. The 2017 10K similarly stated, in pertinent part, regarding goodwill in the

"Summary of Significant Accounting Policies":

> On an annual basis and *as needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models.*
>
> * * *
>
> *Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017.* See Notes 3, 7 and 8 for further details.
>
> *During the year ended December 31, 2016, the Company changed its annual impairment testing date from December 31 to October 1.* The Company believes this new date is preferable because it allows for more timely completion of the annual impairment test prior to the end of its annual financial reporting period. *This change in accounting principle did not delay, accelerate or avoid an impairment charge.* The Company has determined that it would be impracticable to objectively determine projected cash flow and related valuation estimates that would have been used as of each October 1 of prior reporting periods without the use of hindsight. As such, *the Company applied the change in annual impairment testing date prospectively beginning October 1, 2016.*

172. In the section entitled "Comparison of the Years Ended December 31, 2017 and

2016", the 2017 10K further stated regarding impairment charges, in pertinent part, that:

> *During the year ended December 31, 2017 we recorded non-cash impairment charges of $304.1 related to our goodwill* . . . *The goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization.* During the fourth quarter of 2017, our stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in our

sector.

173.    In addition, the 2017 10K's "Notes to Consolidated Financial Statements" included the following "Note 8 – Goodwill," in pertinent part:

> As discussed below, *during the current year, due to impairment indicators noted in between annual tests, the Company performed impairment testing at September 30, 2017, which replaced its October 1st annual test.*
>
> * * *
>
> *Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company, with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1st annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows (the "Income Approach"),* The Income Approach relies on assumptions such as the Company's projected future earnings and appropriate discount rates.
>
> Significant assumptions used in the Income Approach were as follows: (i) discount rates; (ii) projected annual revenue growth rates; and (iii) projected long-term growth rates. Our estimates also factor in economic conditions and expectations of management which may change in the future based on period-specific facts and circumstances. The Company corroborated the results of the Income Approach by reconciling to within a reasonable range of the Company's market capitalization , (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor). The control premium was estimated based upon control premiums observed in comparable market transactions. *Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017.*
>
> *Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017.* During the fourth quarter of 2017, the Company's stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in the Company's sector. *The Company evaluated the fair value of its reporting unit under the Income Approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting that the fair value of its reporting unit indicated by the Income Approach at December 31, 2017 was no longer in excess of its carrying value.*
>
> At December 31, 2017, after comparing the results of the Income Approach to the market capitalization approach, the Company noted it could no longer corroborate the results of the Income Approach by reconciling to within a reasonable range of the Company's market capitalization, including an assumed control premium. As

57

discussed above, the two primary differences between the market approach and income approach were determined to be the Company's fully reserved tax assets, for which the market may not have been giving full value and depressed market multiples experienced by all entities within the brand licensing peer group. The reconciliation was significantly impacted by the decreased market capitalization, as well as the enactment in December 2017 of the Tax Cuts and Jobs Act, which reduced the aforementioned reconciling item for fully reserved tax assets. As such, the Company determined that the value indicated by the market capitalization approach, calculated using the December 31, 2017 closing stock price of $1.78 and an estimated control premium factor of 20%, was the most appropriate measure of the fair value of the Company as of December 31, 2017. ***Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill.***

174. The 2017 10K also stated the following, in pertinent part, regarding the Company's internal controls:

Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of the end of the period covered by this report. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*, as issued in 2013. ***Based on our management's assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2017, based on those criteria***.

175. The statements referenced in ¶¶169-71 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in

58

4Q16 or informed investors of that likely impaired goodwill; (4) by using the Income Approach instead of the Market Approach for its impairment testing in 3Q17, Defendants were able to continue avoiding and delaying addressing the changed circumstances involving the sustained share price decline beginning in 4Q16 until 4Q17; (5) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (6) the Company's internal controls were deficient.

176. On May 10, 2018, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended March 31, 2018 (the "1Q18 10Q"), signed by Defendant Lops. Attached to the 1Q18 10Q were SOX certifications signed by Defendants Murray and Lops attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

177. The 1Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of "[t]he changes in goodwill."

178. On August 9, 2018, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended June 30, 2018 (the "2Q18 10Q"), signed by Defendant Lops. Attached to the 2Q18 10Q were SOX certifications signed by Defendants Murray and Lops attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

179. The 2Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of "[t]he changes in goodwill."

180. On November 9, 2018, Sequential filed a quarterly report on Form 10-Q with the

59

SEC, announcing its financial and operating results for the period ended September 30, 2018 (the "3Q18 10Q"), signed by Defendant Lops. Attached to the 3Q18 10Q were SOX certifications signed by Defendants Murray and Lops attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

181. The 3Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of "[t]he changes in goodwill."

182. The statements referenced in ¶¶176-81 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (1) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it, and (2) the Company's internal controls were deficient.

183. On March 14, 2019, Sequential filed its annual report on Form 10-K with the SEC, announcing its financial and operating results for the fiscal year ended December 31, 2018, signed by Defendants Murray, Lops, Sweedler, Hollander ("2018 10K"). Attached to the 2018 10K were SOX certifications signed by Defendants Murray and Lops attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

184. The 2018 10K stated the following, in pertinent part, regarding goodwill as part of

the Company's "Critical Accounting Policies, Judgments and Estimates":

> *Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.*
>
> * * *
>
> *Due to the identification of impairment indicators during the quarter ended September 30, 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, we performed impairment testing of our goodwill and indefinite-lived assets at September 30, 2017, which replaced our October 1 annual test.* As a result of our testing, we recorded a non-cash impairment charge of $36.5 million relating to our indefinite-lived intangible assets during the quarter ended September 30, 2017.
>
> *Due to the identification of impairment indicators during the year ended December 31, 2017, we performed impairment testing of our goodwill and indefinite-lived assets during the fourth quarter of 2017. As a result of our testing, we recorded a noncash goodwill impairment charge of $304.1 million during the fourth quarter of 2017.*

185. The 2018 10K similarly stated, in pertinent part, regarding goodwill in the "Summary of Significant Accounting Policies":

> On an annual basis and *as needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models.*
>
> * * *
>
> *Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017.* See Notes 3, 7 and 8 for further details.

186. In the section entitled "Comparison of the Years Ended December 31, 2017 and 2016", the 2018 10K further stated, in pertinent part, that "*[t]he goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization*. During the fourth quarter of 2017, our stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in our sector."

187. In addition, the 2018 10K's "Notes to Consolidated Financial Statements" included

61

the following "Note 3 – Fair Value of Financial Instruments," in pertinent part:

ASC 820-10 requires that assets and liabilities recorded at fair value be classified and disclosed in one of the following three categories:

- Level 1 - inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access.

- Level 2 - inputs utilize other-than-quoted prices that are observable, either directly or indirectly. Level 2 inputs include quoted prices for similar assets and liabilities in active markets, and inputs such as interest rates and yield curves that are observable at commonly quoted intervals.

- Level 3 - inputs are unobservable and are typically based on the Company's own assumptions, including situations where there is little, if any, market activity. Both observable and unobservable inputs may be used to determine the fair value of positions that are classified within the Level 3 classification.

\* \* \*

***During the year ended December 31, 2017, the Company recorded a non-cash goodwill impairment charge of $304.1 million. The quantitative evaluation of goodwill impairment included an assessment of fair value under the income approach using estimates of future discounted cash flows, a Level 3 measure within the fair value hierarchy.*** See Note 9 for further details.

188. The 2018 10K's "Notes to Consolidated Financial Statements" also included the

following "Note 9 – Goodwill," in pertinent part:

As discussed below, ***during 2017, due to impairment indicators noted in between annual tests, the Company performed impairment testing at September 30, 2017, which replaced its October 1st annual test.***

\* \* \*

***Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company , with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1 annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows.*** The income approach relies on assumptions such as the Company's projected future earnings and appropriate discount rates. Significant assumptions used in the income approach were as follows: (i) discount rates; (ii) projected annual revenue growth rates; and (iii) projected long-term growth rates. The Company's estimates also factor in economic conditions and expectations of management which may change in the future based on period-specific facts and circumstances. The Company corroborated the results of the income approach by reconciling to within a reasonable range of the Company's market capitalization, (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor). The control premium was estimated based upon control premiums observed in comparable market transactions. ***Reconciling items identified included the benefit of the Company's fully reserved tax assets***

*for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017.*

*Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017.* During the fourth quarter of 2017, the Company's stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in the Company's sector. *The Company evaluated the fair value of its reporting unit under the income approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting that the fair value of its reporting unit indicated by the income approach at December 31, 2017 was no longer in excess of its carrying value.*

At December 31, 2017, after comparing the results of the income approach to the market capitalization approach, *the Company noted it could no longer corroborate the results of the income approach by reconciling to within a reasonable range of the Company's market capitalization, including an assumed control premium.* As discussed above, the two primary differences between the market approach and income approach were determined to be the Company's fully reserved tax assets, for which the market may not have been giving full value and depressed market multiples experienced by all entities within the brand licensing peer group. The reconciliation was significantly impacted by the decreased market capitalization, as well as the enactment in December 2017 of the Tax Cuts and Jobs Act, which reduced the aforementioned reconciling item for fully reserved tax assets. As such, the Company determined that the value indicated by the market capitalization approach, calculated using the December 31, 2017 closing stock price of $1.78 and an estimated control premium factor of 20%, was the most appropriate measure of the fair value of the Company as of December 31, 2017. *Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill.*

189. Lastly, the 2018 10K stated the following, in pertinent part, regarding the

Company's internal controls:

Our management, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of the end of the period covered by this report. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*, as issued in 2013. *Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2018, based on those criteria*.

190. The statements referenced in ¶¶183-89 *supra* were materially false and/or

misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (5) the Company's internal controls were deficient.

191. In its 10.7.19 Press Release, Sequential announced that its Board was "***conducting a broad review of strategic alternatives focused on maximizing shareholder value***. Such strategic alternatives may include the divestiture of one or more existing brands, the acquisition of one or more new brands, a stock buyback program, and other initiatives."

192. In addition, the Company announced in its 10.7.19 Press Release "that ***Karen Murray has stepped down as Director and Chief Executive Officer of the Company***. Ms. Murray will continue to serve as Senior Advisor and assist the Company on strategic opportunities. ***The Board has begun a search to identify the Company's new CEO***."

193. The statements referenced in ¶¶191-93 *supra* were materially false and/or

misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company.

194. On November 12, 2019, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended September 30, 2019 (the "3Q19 10Q"), signed by Defendant Lops. Attached to the 3Q19 10Q were SOX certifications signed by Defendants Wagenheim and Lops attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

195. The 3Q19 10Q stated the following regarding "General Legal Matters" as part of the Company's "Commitments and Contingencies":

> From time to time, the Company is involved in legal matters arising in the ordinary course of business. While *the Company believes that such matters are currently not material,* there can be no assurance that matters arising in the ordinary course of business for which the Company is, or could be, involved in litigation, will not have a material adverse effect on its business, financial condition or results of operations. Contingent liabilities arising from potential litigation are assessed by management based on the individual analysis of these proceedings and on the opinion of the Company's lawyers and legal consultants.

196. The 3Q19 10Q also stated the following regarding "Legal Proceedings":

> From time to time, we are involved in legal matters arising in the ordinary course of business. We record a liability for litigation when we believe that it is probable that a loss has been incurred and the amount can be reasonably estimated. If we determine that a loss is reasonably possible and the loss or range of loss can be

65

estimated, we disclose the possible loss. Significant judgment is required to determine both likelihood of there being and the estimated amount of a loss related to such matters.

***With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations.*** However, the outcome of such legal matters is inherently unpredictable and subject to significant uncertainties. Further, regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

197. The statements referenced in ¶¶194-95 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company.

198. On January 9, 2020, Sequential filed a Form 8-K with the SEC ("1.9.2020 8K"), announcing the departure of Defendant Lops and the appointment of Defendants Conn and Hanbridge, signed by Hanbridge. The 1.9.20 8K stated, in pertinent part, regarding Lops' departure:

***On January 6, 2020, Mr. Peter Lops resigned from his position as Chief Financial Officer of Sequential***, as a result of which Mr. Lops ceased to be its principal financial and accounting officer. Per a transition agreement between Sequential and Mr. Lops dated January 6, 2020 (the "Transition Agreement"), Mr. Lops has agreed to act as a consultant to the Company through March 31, 2020, for which he will be paid a total of $112,500.

199. The statement referenced in ¶198 *supra* was materially false and/or misleading

66

because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company.

200. On March 31, 2020, Sequential filed its 2019 10K with the SEC, announcing its financial and operating results for the fiscal year ended December 31, 2019, signed by Defendant Conn. Attached to the 2018 10K were SOX certifications signed by Defendants Conn and Hanbridge attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

201. The 2019 10K stated the following, in pertinent part, regarding goodwill as part of the Company's "Critical Accounting Policies, Judgments and Estimates":

> ***Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value.***
>
> * * *
>
> ***Due to the identification of impairment indicators during the quarter ended September 30, 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, we performed impairment testing of our goodwill and indefinite-lived assets at September 30, 2017, which replaced our October 1 annual test.*** As a result of our testing, we recorded a non-cash impairment charge of $36.5 million relating to our indefinite-lived intangible assets during the quarter ended September 30, 2017.
>
> ***Due to the identification of impairment indicators during the year ended December 31, 2017, we performed impairment testing of our goodwill and***

67

*indefinite-lived assets during the fourth quarter of 2017. As a result of our testing, we recorded a noncash goodwill impairment charge of $304.1 million during the fourth quarter of 2017.*

202. The 2019 10K similarly stated, in pertinent part, regarding goodwill in the "Summary of Significant Accounting Policies":

On an annual basis and *as needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models.*

\* \* \*

*Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017.* See Notes 3, 7 and 8 for further details.

203. In the section entitled "Comparison of the Years Ended December 31, 2018 and 2017", the 2019 10K further stated, in pertinent part, that "*[t]he goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization*. During the fourth quarter of 2017, our stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in our sector."

204. In addition, the 2019 10K's "Notes to Consolidated Financial Statements" included the following "Note 3 – Fair Value of Financial Instruments," in pertinent part:

ASC 820-10 requires that assets and liabilities recorded at fair value be classified and disclosed in one of the following three categories:

- Level 1 - inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities that the Company has the ability to access.

- Level 2 - inputs utilize other-than-quoted prices that are observable, either directly or indirectly. Level 2 inputs include quoted prices for similar assets and liabilities in active markets, and inputs such as interest rates and yield curves that are observable at commonly quoted intervals.

- Level 3 - inputs are unobservable and are typically based on the Company's own assumptions, including situations where there is little, if any, market activity. Both observable and unobservable inputs may be used to determine the fair value of positions that are classified within the Level 3 classification.

\* \* \*

68

*During the year ended December 31, 2017, the Company recorded a non-cash goodwill impairment charge of $304.1 million. The quantitative evaluation of goodwill impairment included an assessment of fair value under the income approach using estimates of future discounted cash flows, a Level 3 measure within the fair value hierarchy.* See Note 8 for further details.

205. The 2019 10K's "Notes to Consolidated Financial Statements" also included the

following "Note 8 – Goodwill," in pertinent part:

As discussed below, *during 2017, due to impairment indicators noted in between annual tests, the Company performed impairment testing at September 30, 2017, which replaced its October 1st annual test.*

\* \* \*

*Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company , with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1 annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows.* The income approach relies on assumptions such as the Company's projected future earnings and appropriate discount rates. Significant assumptions used in the income approach were as follows: (i) discount rates; (ii) projected annual revenue growth rates; and (iii) projected long-term growth rates. The Company's estimates also factor in economic conditions and expectations of management which may change in the future based on period-specific facts and circumstances. The Company corroborated the results of the income approach by reconciling to within a reasonable range of the Company's market capitalization, (calculated as total common shares outstanding multiplied by the common equity price per share, as adjusted for a control premium factor). The control premium was estimated based upon control premiums observed in comparable market transactions. *Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017.*

*Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017.* During the fourth quarter of 2017, the Company's stock price and market capitalization declined approximately 41%, consistent with the decline in market capitalization of similar companies in the Company's sector. *The Company evaluated the fair value of its reporting unit under the income approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting that the fair value of its reporting unit indicated by the income approach at December 31, 2017 was no longer in excess of its carrying value.*

At December 31, 2017, after comparing the results of the income approach to the market capitalization approach, *the Company noted it could no longer corroborate the results of the income approach by reconciling to within a reasonable range*

69

*of the Company's market capitalization, including an assumed control premium*. As discussed above, the two primary differences between the market approach and income approach were determined to be the Company's fully reserved tax assets, for which the market may not have been giving full value and depressed market multiples experienced by all entities within the brand licensing peer group. The reconciliation was significantly impacted by the decreased market capitalization, as well as the enactment in December 2017 of the Tax Cuts and Jobs Act, which reduced the aforementioned reconciling item for fully reserved tax assets. As such, the Company determined that the value indicated by the market capitalization approach, calculated using the December 31, 2017 closing stock price of $1.78 and an estimated control premium factor of 20%, was the most appropriate measure of the fair value of the Company as of December 31, 2017. *Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill.*

206.     Lastly, the 2019 10K stated the following, in pertinent part, regarding the Company's internal controls:

Our management, under the supervision and with the participation of our Chief Executive Officer and Interim Chief Financial Officer, evaluated the effectiveness of our internal control over financial reporting as of the end of the period covered by this report. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in *Internal Control-Integrated Framework*, as issued in 2013. *Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2019, based on those criteria*.

207.     The statements referenced in ¶¶200-206 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) because they delayed writing off

70

any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (5) the Company's internal controls were deficient.

208. The 2019 10K also stated the following, in pertinent part, regarding "Legal Matters" as part of the Company's "Commitments and Contingencies":

> We have been cooperating with an investigation by the Securities and Exchange Commission (the "SEC") into the Company's controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017. In the late third quarter and the fourth quarter of 2019, the SEC began interviewing witnesses in connection with this matter. ***We believe we complied with generally accepted accounting principles during such periods in all financial matters including goodwill and intangible assets but can provide no assurance that the SEC will agree.*** We cannot predict the duration or outcome of this matter. Costs related to this matter may be significant.

209. Regarding "General Legal Matters", the 2019 10K stated the following, in pertinent part:

> From time to time, we are involved in legal matters arising in the ordinary course of business. While ***we believe that such matters are currently not material***, there can be no assurance that matters arising in the ordinary course of business for which we are, or could be, involved in litigation, will not have a material adverse effect on our business, financial condition or results of operations. Contingent liabilities arising from potential litigation are assessed by management based on the individual analysis of these proceedings and on the opinion of our lawyers and legal consultants.
>
> ***With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations or cash flows.*** However, the outcome of such legal matters is inherently unpredictable and subject to significant uncertainties. Further, regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

210. The statements referenced in ¶¶208-09 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements

71

and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company.

211. On May 20, 2020, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended March 31, 2020 (the "1Q20 10Q"), signed by Defendant Hanbridge. Attached to the 1Q20 10Q were SOX certifications signed by Defendants Conn and Hanbridge attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

212. The 1Q20 10Q also stated the following, in pertinent part, regarding "Legal Matters" as part of the Company's "Commitments and Contingencies":

> We have been cooperating with an investigation by the Securities and Exchange Commission (the "SEC") into the Company's controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017. In the late third quarter and the fourth quarter of 2019, the SEC began interviewing witnesses in connection with this matter. ***We believe we complied with GAAP during such periods in all financial matters including goodwill and intangible assets but can provide no assurance that the SEC will agree.*** We cannot predict the duration or outcome of this matter. Costs related to this matter may be significant.

213. Regarding "General Legal Matters", the 1Q20 10Q stated the following, in pertinent part:

> ***With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations.***

214. The statements referenced in ¶¶211-13 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or

recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company.

215.    On August 14, 2020, Sequential filed a quarterly report on Form 10-Q with the SEC, announcing its financial and operating results for the period ended June 30, 2020 (the "2Q20 10Q"), signed by Defendants Hanbridge and DiSanto. Attached to the 1Q20 10Q were SOX certifications signed by Defendants Hanbridge, DiSanto and Sweedler attesting to the accuracy of financial reporting and the disclosure of any material changes to the Company's internal control over financial reporting and of all fraud.

216.    The 2Q20 10Q also stated the following, in pertinent part, regarding "Legal Matters" as part of the Company's "Commitments and Contingencies":

> The Company has been cooperating with an investigation by the Securities and Exchange Commission (the "SEC") into the Company's controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017. On July 17, 2020, the Company received a "Wells Notice" from the SEC related to this investigation. A Wells Notice is neither a formal charge of wrongdoing nor a final determination that the recipient has violated any law. The Wells Notice informed the Company that the SEC staff has made a preliminary determination to recommend that the SEC file an enforcement action against the Company that would allege certain civil violations of the federal securities laws under Section 17 of the Securities Act of 1933 and Section 13 of the Securities Exchange Act of 1934 related to its goodwill impairment actions in 2016 and 2017. ***The Company believes that it has complied with GAAP and SEC rules during such periods in all financial matters including goodwill*** and intangible assets but can provide no assurance that the SEC will agree ultimately. The Company intends to pursue the Wells Notice process and has responded to the SEC staff's position with a Wells submission. The Company cannot predict the duration or outcome of this matter. Costs related to this matter may be significant.

217.    Regarding "General Legal Matters", the 2Q20 10Q stated the following, in pertinent part:

> ***With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either***

73

*individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations.*

218.  The statements referenced in ¶¶215-17 *supra* were materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company.

219.  On November 2, 2020, Sequential filed a Form 8-K with the SEC ("11.2.2020 8K"), announcing the departure of Defendant Conn and anticipated departure of Defendant Hanbridge, signed by Hanbridge. The 1.9.20 8K stated, in pertinent part, regarding their departures:

> Ms. DiSanto will serve along with Daniel Hanbridge, the Company's Senior Vice President of Finance and former Interim CFO, as the Company's co-principal financial and accounting officer until ***Mr. Hanbridge's departure, anticipated to be effective November 16, 2020.*** Upon Mr. Hanbridge's effective date of resignation, Ms. DiSanto will serve as the sole principal financial and accounting officer. Mr. Hanbridge will continue to serve as Senior Vice President of Finance of the Company until his departure date.

220.  The statement referenced in ¶219 *supra* was materially false and/or misleading because they misrepresented and/or failed to disclose adverse facts pertaining to Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December

74

2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC

investigation was material as the SEC would be bringing a suit against the Company.

221. On November 16, 2020, Sequential filed a quarterly report on Form 10-Q with the

SEC, announcing its financial and operating results for the period ended September 30, 2020 (the

"3Q20 10Q"), signed by Defendants Hanbridge and DiSanto. Attached to the 1Q20 10Q were SOX

certifications signed by Defendants Hanbridge, DiSanto and Sweedler attesting to the accuracy of

financial reporting and the disclosure of any material changes to the Company's internal control

over financial reporting and of all fraud.

222. The 3Q20 10Q also stated the following, in pertinent part, regarding "Legal

Matters" as part of the Company's "Commitments and Contingencies":

> The Company has been cooperating with an investigation by the Securities and
> Exchange Commission (the "SEC") into the Company's controls and practices
> surrounding impairment analyses of goodwill and intangible assets in 2016 and
> 2017. On July 17, 2020, the Company received a "Wells Notice" from the SEC
> related to this investigation. A Wells Notice is neither a formal charge of
> wrongdoing nor a final determination that the recipient has violated any law. The
> Wells Notice informed the Company that the SEC staff has made a preliminary
> determination to recommend that the SEC file an enforcement action against the
> Company that would allege certain civil violations of the federal securities laws
> under Section 17 of the Securities Act of 1933 and Section 13 of the Securities
> Exchange Act of 1934 related to its goodwill impairment actions in 2016 and 2017.
> ***The Company believes that it has complied with GAAP and SEC rules during
> such periods in all financial matters including goodwill*** and intangible assets but
> can provide no assurance that the SEC will agree ultimately. The Company intends
> to pursue the Wells Notice process and has responded to the SEC staff's position
> with a Wells submission. The Company cannot predict the duration or outcome of
> this matter. Costs related to this matter may be significant.

223. Regarding "General Legal Matters", the 1Q20 10Q stated the following, in

pertinent part:

> ***With respect to our outstanding legal matters, based on our current knowledge,
> we believe that the amount or range of reasonably possible loss will not, either
> individually or in the aggregate, have a material adverse effect on our business,
> financial condition or results of operations.***

224. The statements referenced in ¶¶221-23 *supra* were materially false and/or

misleading because they misrepresented and/or failed to disclose adverse facts pertaining to

75

Sequential's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company.

## VIII.  THE COHNREZNICK DEFENDANTS WERE BOUND TO COMPLY WITH APPLICABLE AUDITING STANDARDS

225.    Public investors, creditors and others rely on independent, registered public accounting firms to audit a public company's financial statements and assess internal controls when deciding whether to invest in, or to do business with, that company. As such, the Supreme Court has described the role of an independent auditor as that of a "public watchdog," established to improve the reliability of financial statements, enhance the credibility of those statements and thereby, support the capital markets. *United States v. Arthur Young & Co.,* 465 U.S. 805 (1984).

226.    To oversee independent auditors, SOX established the PCAOB. The PCAOB is given the responsibility to establish professional standards applicable to audits and reviews of certain publicly-traded companies, including Sequential (the "PCAOB Standards"). These standards are referred to with an "AS" prefix.

227.    PCAOB Standards state that the objective of a financial statement audit is the expression of an opinion on the fairness with which the audited financial statements present, in all material respects, the financial position, results of operations, and the cash flows of the reporting entity, in conformity with GAAP. *See* AS 1001.01.

228.    To achieve this objective, the CohnReznick Defendants were responsible for planning and performing its financial statement audit to obtain "reasonable assurance" about

76

whether Sequential's consolidated financial statements were free of material misstatement under GAAP, including misstatements caused by error or fraud. *See* AS 1001.02-03.

229.    When performing an audit of internal control over financial reporting which is integrated with an audit of financial statements, AS § 2201 provides that "[t]he auditor's objective in an audit of internal control over financial reporting is to express an opinion on the effectiveness of the company's internal control over financial reporting. Because a company's internal control cannot be considered effective if one or more material weaknesses exist, to form a basis for expressing an opinion, the auditor must plan and perform the audit to obtain appropriate evidence that is sufficient to obtain reasonable assurance about whether material weaknesses exist as of the date specified in management's assessment. A material weakness in internal control over financial reporting may exist even when financial statements are not materially misstated."

230.    AS § 1015 provides that auditors are to exercise due professional care in the planning and performance of audits and the preparation of audit reports.

231.    AS § 1015.07 provides that auditors must maintain an attitude of professional skepticism, which includes "a questioning mind and a critical assessment of audit evidence." In addition, AS § 1015.08 states the auditor should "consider the competency and sufficiency of the evidence. Since evidence is gathered and evaluated throughout the audit, professional skepticism should be exercised throughout the audit process."

232.    AS § 1101 discusses the auditor's consideration of audit risk and provides that the objective of the auditor is to conduct the audit of financial statements in a manner that reduces audit risk, *i.e.*, the risk that the auditor expresses an inappropriate audit opinion when the financial statements are materially misstated, to an appropriately low level.

233. AS § 1101.03 requires the auditor to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud." It further requires the auditor to apply "due professional care, including obtaining sufficient appropriate audit evidence."

234. AS § 1105 establishes "requirements regarding designing and performing audit procedures to obtain sufficient appropriate audit evidence." It provides that audit evidence "consists of both information that supports and corroborates management's assertions regarding the financial statements or internal control over financial reporting and information that contradicts such assertions."

235. AS § 1105.04 requires the auditor to "plan and perform audit procedures to obtain sufficient appropriate audit evidence to provide a reasonable basis for his or her opinion."

236. AS § 1105.08 provides that the "reliability of evidence depends on the nature and source of the evidence and the circumstances under which it is obtained," including consideration of its source and the manner in which the evidence is obtained by the auditor.

237. The SEC requires a registrant to engage an independent accountant to review the registrant's interim financial information, in accordance with AS § 4105, before the registrant files its quarterly report on Form 10-Q or Form 10-QSB.[59]

238. AS § 4105.01 "establish[es] standards and provide[s] guidance on the nature, timing, and extent of the procedures to be performed by an independent accountant when conducting a review of interim financial information…" AS § 4105.23 notes that "[t]he accountant performing the review of interim financial information ordinarily will also be engaged to perform an audit of the annual financial statements of the entity." Therefore, "[c]ertain auditing procedures

---

[59] The SEC requirement is set forth in Rule 10-01(d) of Regulation SX for Form 10-Q and item 310(b) of Regulation S-B for Form 10-QSB.

may be performed concurrently with the review of interim financial information."

239. AS § 4105.22 requires an auditor to make additional inquiries or perform additional procedures when the accountant becomes aware of information indicating that the interim financials may not conform to GAAP.

240. AS §§ 4105.28-31 require that an auditor refrain from completing a review if it is unable to perform necessary review procedures of the interim financial statements. Furthermore, an auditor is required to communicate such matters to the appropriate level of management or audit committee prior to the filing of the periodic report with the SEC and consider resigning from the engagement if auditor's concerns are not responded to appropriately.

241. AS § 2110 requires an auditors to "perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying and assessing the risks of material misstatement, whether due to error or fraud, and designing further audit procedures." Moreover, AS §§ 2110.59 and 2110.70 – 71 require auditors to determine whether any of the identified and assessed risks of material misstatement are significant risks because of the nature of the risk or the likelihood and potential magnitude of misstatement related to the risk. Significant risks require special audit consideration. A fraud risk is always a significant risk.

242. AS § 2301 requires that auditors implement appropriate responses to the risk of material misstatements. Specifically, AS § 2301.42 provides "[t]he necessary extent of a substantive audit procedure depend on the materiality of the account or disclosures, the assessed risk of material misstatement, and the necessary degree of assurance from the procedure." It goes on to explain that "increasing the extent of an audit procedure cannot adequately address an assessed risk of material misstatement unless the evidence to be obtained from the procedure is reliable and relevant."

243. AS § 2110.72 provides that "[w]hen the auditor has determined that a significant risk, including a fraud risk, exists, the auditor should evaluate the design of the company's controls that are intended to address fraud risks and other significant risks and determine whether those controls have been implemented." Furthermore, AS § 2301.11 requires auditors to perform substantive procedures, including tests of details, that are specifically responsive to significant risks.

244. AS § 2501 provides guidance to auditors "on obtaining and evaluating sufficient appropriate evidential matter to support significant accounting estimates in an audit of financial statements in accordance with the standards of the PCAOB."

245. AS § 2501.07 requires the auditor to obtain "sufficient appropriate evidential matter to provide reasonable assurance that… [t]he accounting estimates are presented in conformity with applicable accounting principles and are properly disclosed."

246. AS § 2810.03 requires that "[i]n forming an opinion on whether the financial statements are presented fairly, in all material respects, in conformity with the applicable financial reporting framework, the auditor should take into account all relevant audit evidence, regardless of whether it appears to corroborate or to contradict the assertions in the financial statements."

247. AS § 1215.06 requires that an "auditor must document the procedures performed, evidence obtained, and conclusions reached with respect to relevant financial statement assertions. Audit documentation must clearly demonstrate that the work was in fact performed."

248. AS § 1201.03 states that "[t]he engagement partner is responsible for the engagement and its performance." AS §§ 1201.02 and 1210.05 further provide that the auditor's objective is to supervise the audit engagement team members, including specialists employed by the auditor's firm, so that the work is performed as directed and supports the conclusions reached.

80

249.     §§ AS 1220.17 and 1220.12 state the EQR "may provide concurring approval of issuance" of review or audit "only if, after performing with due professional care the review required by this standard, he or she is not aware of a significant engagement deficiency."

250.     AS §§ 1220.14 and 1220.09 require the EQR to "evaluate the significant judgments made by the engagement team and the related conclusions reached in forming the overall conclusion on the engagement" in a review or audit.

251.     AS § 1220.11 requires an EQR, in an audit, to "evaluate whether the engagement documentation that he or she reviewed…indicates that the engagement team responded appropriately to significant risks, and supports the conclusions reached by the engagement team with respect to the matters reviewed."

252.     During the Class Period, Rule 2-02(b)(1) of Regulation S-X required an accountant's report to state "whether the audit was made in accordance with generally accepted auditing standards" ("GAAS"). "[R]eferences in Commission rules and staff guidance and in the federal securities laws to GAAS or to specific standards under GAAS, as they relate to issuers, should be understood to mean the standards of the PCAOB plus any applicable rules of the Commission." *See* SEC Release No. 34-49708 (May 14, 2004).

253.     AS §§ 2901 and 2905 provide that when an auditor concludes that auditing procedures considered necessary at the time of the audit were not performed, the auditor should attempt to apply the omitted procedures to provide satisfactory basis for the previously expressed opinion on financial statements. If it is determined that facts existed at the date of the auditor's report that would have affected the report, the auditor should take the necessary steps to prevent future reliance on the previously issued report.

## IX. THE COHNREZNICK DEFENDANTS KNOWINGLY AND/OR RECKLESSLY FAILED TO COMPLY WITH AUDITING STANDARDS IN ISSUING CLEAN AUDIT REPORTS THAT CONTAINED MATERIALLY FALSE AND MISLEADING STATEMENTS TO THE INVESTING PUBLIC

### A. CohnReznick's Audit of Sequential's 2016 Goodwill Impairment Testing

#### 1. CohnReznick and Its Engagement Team Identified Goodwill Impairment as an Area of Significant Risk.

254. "In planning the 2016 audit of Sequential, [CohnReznick's] engagement team identified goodwill impairment testing as an area of significant risk. Sequential's goodwill constituted over 20% of the company's assets, and the likelihood of its impairment increased as the company's stock price, and therefore its market capitalization, declined."[60]

255. Defendant "Wyss understood that Sequential had disclosed its goodwill impairment testing policy in its quarterly reports filed earlier in 2016 on Form 10-Q, which relied exclusively on the company's market capitalization, as adjusted by a control premium, to estimate the company's fair value (the "Market Approach"), and that the disclosed policy had not changed during 2016. In fact, Sequential utilized this methodology to perform its 2016 annual goodwill impairment test as of October 1, 2016."[61]

256. "As Sequential's stock price continued to decline after its October 1st annual impairment test, it was increasingly likely that a goodwill impairment test performed using the Market Approach would indicate impairment. Further, additional facts and circumstances arose relevant to Sequential's 2016 interim goodwill testing that increased the likelihood of impairment at year-end, including the declining performance of its key consumer brands and downward revisions to the company's earnings guidance."[62]

---

[60] *In the Matter of Stephen M. Wyss, CPA, Stephen H. Jackson, CPA, and Robert G. Hilbert, CPA, Respondents.*, Release No. 4310 (S.E.C. Release No. June 8, 2022 ("CohnReznick Partner Order") at ¶6.
[61] CohnReznick Partner Order at ¶7
[62] CohnReznick Partner Order at ¶8.

257.    "In light of these facts and circumstances, PCAOB standards required that Wyss develop substantive audit procedures and an appropriate audit plan to address this risk of material misstatement, including procedures reasonably designed to obtain sufficient audit evidence and assess whether more persuasive audit evidence was needed. Wyss failed to do so."[63]

### 2.    Wyss Failed to Audit Sequential's 2016 Goodwill Assessment According to Professional Standards.

258.    Defendant "Wyss received Sequential's year-end 2016 goodwill impairment memo ("Goodwill Memorandum") as part of CohnReznick's audit work. The Goodwill Memorandum described the company's methodology and basis for its conclusion that there was no goodwill impairment as of its annual testing date, October 1, 2016. The Goodwill Memorandum also evaluated whether events had occurred or circumstances had arisen during the fourth quarter of 2016 that indicated that it was more likely than not that a goodwill impairment existed at the company's year-end financial reporting date, December 31, 2016.[64]

259.    "Sequential's conclusion that its goodwill was not impaired as of October 1 was supported by a valuation report, prepared by its third party valuation specialist, utilizing the Market Approach. Between October 1 and year-end, Sequential's stock price declined from $8.00 per share to $4.68 per share. Based on the significant decline in the company's stock price, Wyss understood that the company's estimated fair value at year-end, based on the Market Approach, was well below the company's carrying value."[65]

260.    Defendant "Wyss therefore should have known that, if Sequential were to perform a quantitative goodwill impairment test as of year-end using the Market Approach, that calculation would have indicated that goodwill was at least likely impaired. This and other negative trends in

---

[63] CohnReznick Partner Order at ¶9.
[64] CohnReznick Partner Order at ¶10.
[65] CohnReznick Partner Order at ¶11.

the company's sales and performance were events and circumstances indicating that goodwill was at least likely impaired and therefore a further quantitative goodwill impairment test was required by GAAP."[66]

261.    "The Goodwill Memorandum reflected that Sequential had identified the decline in the company's stock price as a triggering event. However, the company's Goodwill Memorandum omitted any consideration of the Market Approach in reaching its conclusion as to year-end. It also did not adequately address other indicia of likely impairment in reaching its conclusion that the company's goodwill was not impaired as of year-end. In relying on the Goodwill Memorandum as a primary basis for his conclusion, Wyss failed to consider other relevant and objective evidence indicating impairment of goodwill Nevertheless, Wyss approved CohnReznick's issuance of its audit report regarding Sequential's 2016 financial statements."[67]

### 3.    Wyss's Deficient Reviews of Sequential's Q1 and Q2 2017 Interim Goodwill Impairment Assessments.

262.    "During the first two quarters of 2017, Sequential experienced additional adverse changes concerning the company's business that Wyss should have recognized as indicators of goodwill impairment. Among those developments, Sequential's board of directors fired the company's chief executive officer, the company continued to revise its earnings guidance downward, and Sequential's stock price continued its decline.[68]

263.    "Despite the presence of these impairment indicators, Sequential failed to document that it considered them or any other negative or positive indicators in its interim assessments of whether goodwill was likely impaired. Through CohnReznick's first and second

---

[66] CohnReznick Partner Order at ¶12.
[67] CohnReznick Partner Order at ¶13.
[68] CohnReznick Partner Order at ¶14.

quarter interim reviews, Wyss should have known that Sequential had not documented its consideration of these impairment indicators."[69]

264.     "Given these facts and circumstances, together with the information from Sequential's year-end 2016 impairment analysis, Sequential's interim goodwill assessments should have concluded that goodwill was at least likely impaired and therefore further testing was required. However, Wyss again accepted management's assertions that goodwill was likely not impaired without obtaining sufficient and relevant evidence to support management's assertions."[70]

265.     Further, in violation of PCAOB Standards, CohnReznick failed to carry out additional appropriate tests of goodwill as part of its audits of Sequential's 2016 financial statements or in the subsequent periods when it was presented with additional evidence of goodwill impairment which may have existed as of December 31, 2016.

**B.      Cohnreznick's 3Q Review and Audit of Sequential's 2017 Goodwill Impairment Testing**

     1.      <u>Wyss and Jackson Identified Goodwill Impairment as an Area of Significant Risk.</u>

266.     Throughout the audit planning process in 2017, CohnReznick and its engagement team "identified goodwill impairment testing to be an area of significant risk, as it had done in the previous year's audit. Sequential's goodwill constituted over 20% of the company's assets and the likelihood of its impairment increased as the company's stock price, and therefore its market capitalization, continued its decline in 2017."[71]

---

[69] CohnReznick Partner Order at ¶15.
[70] CohnReznick Partner Order at ¶16.
[71] CohnReznick Partner Order at ¶17; *In the Matter of Cohnreznick LLP Respt.*, Release No. 4309 (S.E.C. Release No. June 8, 2022) ("CohnReznick Order") at ¶4.

267.    "The engagement team understood that in the immediately preceding quarters Sequential had disclosed its goodwill impairment testing policy, which relied exclusively on the company's market capitalization, as adjusted by a control premium (the "Market Approach"), to estimate the company's fair value. Under this policy, Sequential was required to recognize an impairment charge for the amount by which its carrying value exceeded its fair value. The continuing stock price decline, therefore, increased the likelihood that the company's goodwill impairment test would indicate that goodwill was impaired."[72]

### 2. In 3Q17, Wyss and Jackson Reviewed Sequential's Interim Goodwill Impairment Test and Concluded that Goodwill Was Not Impaired Solely Based on Assertions from Sequential's Management.

268.    "Following the identification of impairment indicators arising from the impairment of five of its brands in the third quarter, Sequential determined that an interim quantitative impairment test of goodwill was necessary as of the end of the third quarter. It accelerated by one day the company's annual impairment test scheduled for first day of the fourth quarter, from October 1st to September 30th. Based on the then current stock price and the number of shares outstanding, Wyss and Jackson understood that the Market Approach would indicate that Sequential's goodwill was impaired."[73]

269.    "Approximately a week before Sequential was required to file its third quarter Form 10-Q, and before the company had released its earnings, Wyss received a draft valuation report from Sequential. That report, which had been prepared by Sequential's third party valuation specialist, based on information and guidance provided by Sequential, departed from the company's previously disclosed Market Approach to goodwill impairment testing and instead incorporated two different valuation methodologies: the income approach using a discounted cash

---

[72] CohnReznick Order at ¶5.
[73] CohnReznick Partner Order at ¶ 18; *see* CohnReznick Order at ¶6.

flow ("DCF") model and the Market Approach. Specifically, this report relied on a weighted average between the fair values obtained by the Market Approach (approximately $245 million) and the DCF (approximately $650 million), which it compared to Sequential's carrying value of approximately $444 million, and concluded that the company's goodwill was not impaired."[74]

270.    "To explain the wide discrepancy in the fair value estimates, Sequential's report cited three assertions by Sequential's management, which in management's view, supported the conclusion that public markets had mispriced Sequential's stock: (1) the company's stock price was low because Sequential was unfairly grouped with other out-of-favor companies in the retail industry with business models incomparable to Sequential; (2) the market was undervaluing the tax amortization benefit of its brands, which it believed would become significant in future periods when the company was more profitable; and (3) the company's high leverage ratio created a 'perception overhang.'"[75]

### 3. CohnReznick's Internal Valuation Specialist Raised Concerns with Wyss, Jackson and Hilbert Concerning Sequential's Goodwill Impairment Testing Methodology.

271.    "Upon receiving Sequential's goodwill impairment analysis from the engagement team, CohnReznick's assigned internal valuation specialist assessed the report and identified several concerns suggesting that the company might fail the impairment test. He furnished his written comments to the engagement team [Wyss], a second valuation specialist at the firm, as well as the firm's Managing Partner of Assurance [Hilbert], who served as the liaison between CohnReznick's internal valuation group and CohnReznick's auditors."[76] Wyss shared the report with Jackson later the same day.[77]

---

[74] CohnReznick Partner Order at ¶19; *see* CohnReznick Order at ¶7.
[75] CohnReznick Partner Order at ¶20; *see* CohnReznick Order at ¶8.
[76] CohnReznick Partner Order at 21, CohnReznick Order at ¶9.
[77] CohnReznick Partner Order at 21.

272.    "In his comments, the internal valuation specialist observed that '[w]hile the DCF implies that impairment is not present, the trading price approach implies impairment' and that '[t]he difference in estimated values is significant and implies that one or both require adjustment.' He also added, after applying additional potential valuation methods to the analysis, which he included in his written comments, "the implication from the sensitivities is that the Step 1 test may fail."[78]

273.    "The next day, a second CohnReznick valuation specialist sent an email to Wyss, Hilbert, and others noting 'troubling facts' in Sequential's impairment analysis, including that Sequential's market capitalization was equal to 50% of book value and that there was a 'large disparity in equity value conclusions between the DCF and the Market…2.68x…??? too big of a difference.'"[79]

    4.    <u>In Response to CohnReznick's Comments, Sequential Prepared a Quantitative Reconciliation That Again Relied Heavily on Its Management's Unsubstantiated Assertions that It Was Undervalued by the Market.</u>

274.    Defendants "Wyss, Jackson, and Hilbert did not believe that the wide disparity in estimated values obtained from the Market Approach and the DCF supported a finding that the DCF-based valuation was inaccurate. Rather, Wyss, Jackson, and Hilbert concluded that the company could rely on the DCF-based valuation estimate if (i) Sequential management believed the DCF valuation represented the best estimate of the company's fair value, and (ii) it supplemented its valuation report with a quantitative reconciliation to the Market Approach. In a follow-up conference call attended by Sequential's management and these partners, among others, CohnReznick communicated these conclusions to Sequential's management and its third party

---

[78] CohnReznick Partner Order at ¶22; CohnReznick Order at ¶10.
[79] CohnReznick Partner Order at ¶23; *see* CohnReznick Order at ¶11.

valuation specialist. In response, Sequential's third party valuation specialist, working at the direction of Sequential's management, prepared a revised valuation analysis quantifying the reconciling factors.[80]

275.　"The revised report, which Sequential forwarded to CohnReznick hours after the conference call, exclusively utilized the DCF valuation to estimate fair value and incorporated a quantitative reconciliation to Sequential's estimated fair value under the Market Approach. This reconciliation analysis relied heavily on two assertions of the company's management: (1) that the stock market failed to properly incorporate the potential tax amortization value of the company's intangible indefinite-lived assets (primarily, its brands) to an acquirer; and (2) that the stock market was not correctly pricing Sequential's stock in relation to the company's revenues because of misperceptions of the company's industry. These management assertions were not supported by sufficient objective evidence or analysis to justify management's view that the market was undervaluing the company."[81]

### 5.　CohnReznick's Valuation Specialist Raised Concerns Regarding the Reasonableness of Sequential's Fair Value Assessment.

276.　"CohnReznick's internal valuation specialist reviewed the revised report and raised concerns about whether there was sufficient evidentiary support for management's assertions. Specifically, he did not believe the evidential matter provided by management supported the magnitude of the quantitative reconciliation between the results of the DCF model and Market Approach valuation. He communicated his concerns and conclusion to the engagement team and Hilbert, including his unwillingness to opine as to the reasonableness of the fair value analysis."[82]

---

[80] CohnReznick Partner Order at ¶24; CohnReznick Order at ¶12.
[81] CohnReznick Partner Order at ¶25; CohnReznick Order at ¶13.
[82] CohnReznick Partner Order at ¶26; CohnReznick Order at ¶14.

277. Defendants "Wyss and Hilbert did not agree with the valuation specialist's concerns regarding the magnitude of the reconciliation. Instead, they viewed the reconciliation between the estimated fair values obtained by the DCF and the Market Approach as an accounting consideration and outside the scope of the specialist's expertise, despite his extensive experience in assessing fair value assessments similar to Sequential's impairment testing in prior engagements. They also determined that the internal valuation specialist's concern with inadequate evidence in support of the wide gap between the values yielded by the DCF model and the Market Approach was not a valuation issue appropriate for his consideration. Rather, they believed that the sufficiency of the evidence on the issue was solely an auditing issue for the engagement team's consideration."[83]

278. "Contrary to the typical practice at CohnReznick, wherein the internal valuation specialist would opine as to the reasonableness of an audit client's overall fair value measurement. In this case the engagement team, including Wyss and Jackson, assumed responsibility for assessing the reasonableness of the determination, as a result of the specialist's unwillingness to do so and based on Wyss, Jackson, and Hilbert's conclusion that the sufficiency of evidential matter to support the reconciliation between two fair value estimates presented an audit (rather than a valuation) question."[84]

   6. Sequential Issued Its 3Q17 Earnings Release, despite CohnReznick's National Office Quality Control Review Remaining Incomplete, Relying on Wyss's Assurances That Changes to the Financial Statements Were Unlikely.

279. "As part of CohnReznick's documented quality control system, an EQCR review,

---

[83] CohnReznick Partner Order at ¶27; *see* CohnReznick Order at ¶15.
[84] CohnReznick Partner Order at ¶28; *see* CohnReznick Order at ¶16.

in addition to the EQR review, was to be performed for each public company audit."[85] "The firm's national office assigned a partner or director from its Quality Control group to serve as the EQCR reviewer. In addition to being a required sign-off for all public company reviews and audits, under CohnReznick's procedures, the EQCR was also required to be involved in the evaluation of significant engagement team judgments and the evaluation of engagement documentation related to areas deemed significant.[86]

280.    "Despite the requirement that the EQCR be involved in the evaluation of significant engagement team judgments, the Sequential engagement team did not include the assigned EQCR partner in their initial consultations with Hilbert on Sequential's goodwill impairment analysis. Moreover, without notifying the EQCR, Wyss informed Sequential's management, as management was finalizing the company's third quarter earnings release, that additional changes to the financial statements in the Form 10-Q were unlikely. As a result, the EQCR was unable to complete his review or provide input to the engagement team regarding Sequential's goodwill impairment testing prior to the issuance of Sequential's earnings release."[87]

281.    "Sequential's third quarter earnings release was furnished as an exhibit to the company's Form 8-K and did not incorporate an impairment to goodwill. The EQCR promptly questioned Wyss, Jackson, and Hilbert as to how the goodwill issue had been resolved without his involvement and also alerted CohnReznick's Chief Risk Officer and its National Director of SEC Services."[88]

---

[85] "CohnReznick's procedures and system of quality control required quality reviews conducted by national office directors or partners for certain engagements. These EQCR reviews were distinct from EQR reviews, which are required by PCAOB audit standards." CohnReznick Partner Order at ¶29 n. 5; CohnReznick Order at ¶17 n. 7.
[86] CohnReznick Partner Order at ¶29; *see* CohnReznick Order at ¶17.
[87] CohnReznick Partner Order at ¶30; *see* CohnReznick Order at ¶18.
[88] CohnReznick Partner Order at ¶31; CohnReznick Order at ¶19.

       7.        **After Sequential Published Its 3Q17 Earnings Release, But Before Filing its Quarterly Report on Form 10-Q, Disagreements Among the Engagement Team and Members of the National Office Arose Within CohnReznick.**

282.    "After evaluating Sequential's third party fair valuation analysis, the EQCR partner and the National Director of SEC Services (with whom the EQCR partner had shared Sequential's analysis) reached a mutual view that, based on the information they were provided, there was insufficient evidence to support Sequential management's assertions that the market was undervaluing Sequential, and without more, the company needed to record goodwill impairment."[89]

283.    "The EQCR partner and the National Director of SEC Services communicated their views to Wyss, Jackson, and Hilbert, as well as members of the firm's senior management. Among other concerns, they expressed the view that the engagement team was not exercising appropriate professional skepticism with regard to Sequential's goodwill impairment testing."[90]

284.    "Although CohnReznick had previously notified Sequential that changes to the financial statements were unlikely, due to the internal disagreement at CohnReznick, Wyss notified Sequential that it had not completed its interim review of the financial statements, which prevented Sequential from filing its Form 10-Q. In light of the fact that Sequential had already issued its earnings release, Sequential's management urged CohnReznick to resolve its concerns as soon as possible, requesting "minute by minute" status updates and stating in an email to the engagement partner: '[t]here is no choice but to resolve tonight.'"[91]

---

[89] CohnReznick Partner Order at ¶32; CohnReznick Order at ¶20.
[90] CohnReznick Partner Order at ¶33; *see* CohnReznick Order at ¶21.
[91] CohnReznick Partner Order at ¶34; *see* CohnReznick Order at ¶22.

### 8. CohnReznick Resolved the Disagreement in Favor of Its Engagement Team Without Performing Sufficient Audit Procedures.

285. "To resolve the disagreement, CohnReznick convened multiple meetings among the disagreeing staff to review the information provided, as well as an external conference call between Sequential management, Wyss, Hilbert, Jackson, and the dissenting CohnReznick partners. None of these calls assisted in resolving the disagreement, as the EQCR partner and National Director of SEC Services continued to assert that the engagement team had not gathered sufficient evidence to support Sequential management's assertions regarding the reconciling factors and the conclusions of Wyss and Jackson."[92]

286. "Notwithstanding the insufficient evidence supporting the conclusions of Wyss, Jackson, and Hilbert and the unresolved disagreement, CohnReznick's senior management decided, after internal discussion but without directing the engagement team to obtain or review further evidence or perform additional procedures, that the engagement team could authorize Sequential to file its quarterly report on Form 10-Q. CohnReznick further determined that, in the event that the pending disagreement over the reasonableness of Sequential's goodwill impairment test could not be resolved with the dissenting partners, the disagreement should be documented in the work papers, consistent with PCAOB standards. Accordingly, Wyss told Sequential it had completed its interim review and that the company could file its Form 10-Q."[93]

### 9. Wyss Prepared an Inaccurate Consultation Memorandum, Which Jackson and Hilbert Concurred with, Purporting to Document the Engagement Team's Analysis, Months After the 3Q17 Interim Review was Complete.

287. "In January 2018, months after the third quarter interim review was completed, the engagement team supplemented the third quarter review file with a work paper entitled 'Analysis

---

[92] CohnReznick Partner Order at ¶35; see CohnReznick Order at ¶23.
[93] CohnReznick Partner Order at ¶36; *see* CohnReznick Order at ¶24.

of Goodwill and Intangibles – CohnReznick memo.' This work paper purported to describe Sequential's goodwill impairment analyses and conclusions throughout 2017, as well the engagement team's views of those analyses, and its own internal analyses, to conclude that management's goodwill impairment conclusion for the third quarter of 2017 was reasonable. It also purported to memorialize a consultation with Hilbert and reflected his concurrence, as well as the concurrence of Jackson.[94]

288.    "This work paper, while purportedly describing the engagement team's analysis and conclusions prior to the filing of the third quarter Form 10-Q, incorporated new data and justifications for the engagement team's impairment conclusions, which were not previously documented prior to the filing of the Form 10-Q. This memo did not include sufficient and accurate information to enable an experienced auditor to understand the timing, extent, and results of the procedures performed and the evidence obtained."[95]

### 10.    Jackson Failed In His Role as EQCR.

289.    Defendant "Jackson was obligated by professional standards to affirmatively evaluate the significant judgments and related conclusions of the engagement team. However, despite the vigorous disagreements that arose between the viewpoint of Wyss and Hilbert, on the one hand, and the viewpoint of the EQCR partner, the internal valuation specialists, and the National Director of SEC Services, on the other hand, Jackson failed to reasonably evaluate whether appropriate consultations had taken place on difficult and contentious matters."[96]

290.    "Although present, and aware of the concerns and indicators of impairment, Jackson did not adequately participate in key discussions at important meetings and decision

---

[94] CohnReznick Partner Order at ¶37; *see* CohnReznick Order at ¶25.
[95] CohnReznick Partner Order at ¶38.
[96] CohnReznick Partner Order at ¶39.

points. Although Sequential's goodwill accounting issue for the third quarter of 2017 generated emails raising substantive questions about the accounting, as well as a series of meetings in which there were ongoing concerns on the part of the EQCR partner and the National Director of SEC Services, Jackson failed to reasonably evaluate the engagement team's assessment of the company's annual goodwill impairment test, which the engagement team had identified as an area of significant risk. In so doing Jackson failed to exercise due professional care, including appropriate professional skepticism.[97]

    **C.    CohnReznick Knowingly and/or Recklessly Failed to Require Sequential to Restate its Previously Issued Financial Statements to Impair Its Goodwill in the Appropriate Periods Despite Knowing the Risk of a Material SEC Investigation.**

291.    Even after Sequential reported a goodwill impairment in 4Q17, the CohnReznick Defendants remained aware that (1) Sequential's goodwill was impaired by 3Q17 and thus, its financial statements were materially misstated and not presented in accordance with GAAP, (2) there was no relevant and reliable audit evidence to support Sequential's accounting conclusion, and in particular, the underlying assertions of its management, and (3) Sequential's impairment charge of $100M should have been recorded as a 3Q17 event and therefore, its 3Q17 financial statements materially overstated the Company's assets and earnings. As a direct result of this knowledge, CohnReznick knew or recklessly disregarded that Sequential's delay in writing off any goodwill until 4Q17 exposed the Company to the risk of a material SEC investigation resulting in a suit against the Company (and CohnReznick).

292.    In light of this knowledge, the CohnReznick Defendants also knew or should have known that, for Fiscal Years 2018 and 2019, Sequential's consolidated financial statements were not free of material misstatements under prior GAAP violations, as detailed *supra*.

---

[97] CohnReznick Partner Order at ¶40.

X.    **THE FOREGOING KNOWLEDGE SUPPORTS A STRONG INFERENCE THAT THE COHNREZNICK DEFENDANTS INTENTIONALLY AND/OR RECKLESSLY VIOLATED THE STANDARDS THEY WERE BOUND TO FOLLOW.**

293.    Despite knowledge of the foregoing, the CohnReznick Defendants issued opinions regarding Sequential's financial statements representing that it had conducted its audits in accordance with PCAOB standards.

294.    In reality, the CohnReznick Defendants intentionally and/or recklessly ignored PCAOB standards, as detailed more fully above. *See* ¶¶255-93.

295.    Of particular note, though not exhaustive, the CohnReznick Defendants intentionally, knowingly, and/or recklessly:

a.    Disregarded concerns raised by the EQCR partner, National Director of SEC Services, and internal valuation specialists related to Sequential's unsupportable goodwill valuation;

b.    Acted contrary to CohnReznick's typical practice in assuming responsibility for opining on Sequential's overall fair value measurement – after CohnReznick's internal valuation specialist raised concerns that there was insufficient evidence to make a determination;

c.    Excluded the assigned EQCR from various consultations on Sequential's goodwill impairment analysis;

d.    Communicated with Sequential's management without notifying the EQCR, thereby prohibiting the EQCR from being able to complete his review of the goodwill impairment prior to the issuance of Sequential's earnings release;

96

e. Advised Sequential that changes to the goodwill impairment were unlikely, despite knowledge of the ongoing internal disagreement at CohnReznick regarding impairment and prior to the completion of its interim review of the Company's financial statements;

f. Notified Sequential that it had not completed its interim review of the financial statements, then, hours later, notified Sequential that it had completed its interim review—without obtaining or reviewing any further evidence or performing any additional procedures—so that Sequential could filed its Form 10-Q without any goodwill impairment;

g. Created a work paper that purported to describe the engagement team's conclusions prior to filing the 3Q17 Form 10-Q based on new data and justifications that were not previously documented prior to the filing of the Form 10-Q;

h. Failed to withdraw previously issued opinions; and

i. Continued to issue unqualified audit reports despite their knowledge of the potential misstatement in the previously issued financial statements and the material risk of an SEC investigation and lawsuit.

296. Put another way, in an attempt to cover up their initial intentional and/or reckless failure to follow applicable PCAOB Standards in auditing Sequential's goodwill impairment (which led to the release of the Company's earnings report without any impairment), the CohnReznick Defendants intentionally and recklessly "completed"—without resolving the internal dispute, without obtaining any further evidence, and without performing any additional auditing procedures—its interim review of Sequential's financial statements so that the Company could filed its 3Q17 Form 10-Q. Then, in an attempt to cover up their intentional and/or reckless failure to follow applicable PCAOB Standards related to the filing of the Form 10-Q, the

CohnReznick Defendants intentionally and/or recklessly created and/or consented to a workpaper that purported to support the goodwill impairment based on inaccurate and insufficient evidence. Finally, in an attempt to minimize the seriousness of the SEC investigation into misstatements which arose from their own intentional and/or reckless violations of PCAOB Standards, the CohnReznick Defendants intentionally and/or recklessly violated the auditing standards by not disputing Sequential's repeated representations that the SEC investigation was not "material"

297.     As a result of the CohnReznick Defendants' conduct, described *supra*, they intentionally and/or recklessly failed to exercise due professional care and an attitude of professional skepticism. *See* AS § 1015.

298.     As a result of Wyss's conduct, described *supra*, he intentionally and/or recklessly failed to:

   a.     Supervise the audit and review engagements to ensure that they were performed in accordance with PCAOB Standards (AS § 1201);

   b.     Perform auditing steps sufficient to reduce audit risk to an appropriate level (AS § 1101);

   c.     Obtain sufficient audit evidence to support his opinions in the Sequential engagement (AS § 1105);

   d.      Comply with standards applicable to a review of interim financial statements, specifically AS §§ 4105.22 and 4105.28, including by failing to adequately address contradictory views expressed during the interim review process (AS § 4105);

   e.     Obtain reliable and relevant audit evidence when appropriate (AS § 2301);

   f.     Adequately evaluate the reasonableness of management's fair value estimates (AS § 2501);

g.  Sufficiently evaluate the audit results in the Sequential audit (AS § 2810); and

h.  Properly and timely document the steps taken to reach the audit conclusions (AS § 1215).

299.  As a result of Jackson's conduct, described *supra*, he intentionally and/or recklessly failed to act with due professional care and improperly provided his concurrence on the 3Q17 Form 10-Q and 2016 and 2017 annual reports filed on Form 10-K, thereby violating this standard. *See* AS § 1220.

300.  As a result of Hilbert's conduct, described *supra*, he intentionally and/or recklessly failed to exercise due professional care and an attitude of professional skepticism in the Sequential engagement. *See* AS § 1015.

301.  Through their conduct described *supra*, Wyss, Jackson and Hilbert caused CohnReznick to violate Regulation S-X Rule 2-02(b)(1) when CohnReznick issued its audit reports dated March 14, 2017 and March 16, 2018, stating that CohnReznick had conducted its audits of Sequential's 2016 and 2017 financial statements in accordance with PCAOB standards when it had not.

## XI.  BY INTENTIONALLY AND/OR RECKLESSLY VIOLATING THE PCAOB STANDARDS, THE COHNREZNICK DEFENDANTS ISSUED AUDIT OPINIONS THAT CONTAINED FALSE AND MISLEADING STATEMENTS

302.  Because the CohnReznick Defendants intentionally and/or recklessly failed to perform their audit of Sequential in compliance with PCAOB Standards, their clean audit opinions on the 2016 and 2017 financial statements contained false and misleading statements and allowed the Company Defendants to fraudulently misstate Sequential's goodwill and maintain or inflate its stock price during the Class Period. As a result, Plaintiff and other members of the Class purchased Sequential stock at artificially inflated prices and suffered losses when the truth was revealed.

### A. Fiscal Year 2016

303. CohnReznick included its 2016 audit opinion, dated March 14, 2017, concerning Sequential's consolidated financial statements in the Company's 2016 10K. In opining that those financial statements presented fairly, in all material respects, the financial position of Sequential as of December 31, 2016 and 2015, and were in conformity with all accounting principles generally accepted in the U.S., CohnReznick stated the following:

To the Board of Directors and Stockholders

Sequential Brands Group, Inc.

We have audited the accompanying consolidated balance sheets of Sequential Brands Group, Inc. and Subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, comprehensive income (loss), changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2016. Our audits of the consolidated financial statements included the financial statement schedule listed in the index appearing under Item 15. Sequential Brands Group, Inc. and Subsidiaries' management is responsible for these consolidated financial statements and financial statement schedule. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

**[1] We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).** Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.

**[2] We believe that our audits provide a reasonable basis for our opinion.**

**[3] In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Sequential Brands Group, Inc. and Subsidiaries as of December 31, 2016 and 2015, and the results of their operations and cash flows for each of the years in the three-year period ended December 21, 2016, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material aspects the information set forth therein.**

As discussed in Note 2 to the consolidated financial statements, in 2016 the Company adopted Accounting Standards Update No. 2015-03 – "Interest – Imputation of Interest (Subtopic 835-30): Simplifying the Presentation of Debt Issuance Costs", which changes the presentation of debt issuance costs in the consolidated financial statements.

**[4] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), Sequential Brand Group Inc. and Subsidiaries' internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control— Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)**, and our report dated March 14, 2017, expressed an unqualified opinion.

/s/ CohnReznick LLP
New York, NY
March 14, 2017

304.    The foregoing statements from the 2016 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's consolidated financial statements, were materially false and misleading statements of actual fact because:

a.    As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [1], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

b.    As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion on Sequential's financials for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

101

c.      As the CohnReznick Defendants knew or were reckless in not knowing, Sequential's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [3] that Sequential's consolidated financial statements fairly represented the financial picture of the Company was a materially false and misleading statement of an actual fact.

d.      As the CohnReznick Defendants knew or were reckless in not knowing, they did not audit Sequential's internal controls over financial reporting according to PCAOB standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [4], that they conducted their audit of the Company's internal controls in accordance with the standards of the PCAOB was a materially false and misleading statement of an actual fact.

305.    CohnReznick also included its 2016 audit opinion, dated March 14, 2017, concerning Sequential's internal controls in the Company's 2016 10K. In opining that the Company's internal controls over financial reporting were effective, as of December 31, 2015, in accordance with PCAOB Standards, CohnReznick stated the following:

> To the Board of Directors and Stockholders
> Sequential Brands Group, Inc.
>
> We have audited Sequential Brands Group, Inc. and Subsidiaries' internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). Sequential Brands Group, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit.

**[1] We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. [2] We believe that our audit provides a reasonable basis for our opinion.**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**[3] In our opinion, Sequential Brands Group, Inc. and Subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2016, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).**

**[4] We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets as of December 31, 2016 and 2015, and the related consolidated**

**statements of operations, comprehensive income (loss), changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2016, and the related financial statement schedule of Sequential Brands Group, Inc.** and our report dated March 14, 2017 expressed an unqualified opinion thereon.

/s/ CohnReznick LLP
New York, NY
March 14, 2017

306.     The foregoing statements from the 2016 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's internal controls over financial reporting, were materially false and misleading statements of actual fact because:

a.     As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's internal controls over financial resources according to applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [1] stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

b.     As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶ 249-296. Accordingly, the CohnReznick Defendants' Statement [2], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

c.     As the CohnReznick Defendants knew or were reckless in not knowing, Sequential did not maintain effective internal controls over financial reporting as of December 31, 2016, for the reasons set forth in ¶¶87-224. Accordingly, the CohnReznick

Defendants' Statement [3], stating that the Company did maintain effective internal controls was a materially false and misleading statement of an actual fact.

d.     As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [4], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

**B.     Fiscal Year 2017**

307.     CohnReznick included its 2017 audit opinion, dated March 16, 2017, concerning Sequential's consolidated financial statements in the Company's 2017 10K. In opining that those financial statements present fairly, in all material respects, the financial position of Sequential as of December 31, 2017 and 2016, and were in conformity with all accounting principles generally accepted in the U.S., CohnReznick stated the following:

> To the Board of Directors and Stockholders
> Sequential Brands Group, Inc.
>
> **Opinion on the Consolidated Financial Statements**
>
> We have audited the accompanying consolidated balance sheets of Sequential Brands Group, Inc. and Subsidiaries (the "Company") as of December 31, 2017 and 2016, and the related consolidated statements of operations, comprehensive (loss) income, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2017, and the related notes. Our audits of the consolidated financial statements included the financial statement schedule listed in the index appearing under Item 15 (collectively referred to as the consolidated financial statements). **[1] In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017, and 2016, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2017, in conformity with accounting principles generally accepted in the United States of America.**

105

**[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)**, and our report dated March 16, 2018, expressed an unqualified opinion.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

**[3] We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. [4] We believe that our audits provide a reasonable basis for our opinion.**

/s/ CohnReznick LLP

We have served as the Company's auditor since 2013.

New York, NY
March 16, 2018

308. The foregoing statements from the 2017 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's consolidated financial statements, were materially false and misleading statements of actual fact because:

a. As the CohnReznick Defendants knew or were reckless in not knowing, Sequential's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶87-224.

106

Accordingly, the CohnReznick Defendants' Statement [1] that Sequential's consolidated financial statements fairly represented the financial picture of the Company was a materially false and misleading statement of an actual fact.

b.      As the CohnReznick Defendants knew or were reckless in not knowing, they did not audit Sequential's internal controls over financial reporting according to PCAOB standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they conducted their audit of the Company's internal controls in accordance with the standards of the PCAOB was a materially false and misleading statement of an actual fact.

c.      As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d.      As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion on Sequential's financials for the reasons set forth in ¶¶249-296. Accordingly, the CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

309.    CohnReznick also included its 2017 audit opinion, dated March 16, 2018, concerning Sequential's internal controls in the Company's 2017 10K. In opining that the

107

Company's internal controls over financial reporting were effective, as of December 31, 2017, in accordance with PCAOB Standards, CohnReznick stated the following:

> To the Board of Directors and Stockholders
> Sequential Brands Group, Inc.
>
> Opinion on Internal Control over Financial Reporting
>
> We have audited Sequential Brands Group, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). **[1] In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.**
>
> **[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United Stated) (PCAOB), the consolidated balance sheets and the related consolidated statements of operations, comprehensive (loss) income, changes in equity and cash flows and the financial statement schedule listed in the index appearing under Item 15 of the Company** and our report dated March 16, 2018, expressed an unqualified opinion.
>
> Basis for Opinion
>
> The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.
>
> **[3] We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of**

**internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. [4] We believe that our audit provides a reasonable basis for our opinion.**

Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ CohnReznick LLP
New York, NY
March 16, 2018

310. The foregoing statements from the 2017 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's internal controls over financial reporting, were materially false and misleading statements of actual fact because:

a.      As the CohnReznick Defendants knew or were reckless in not knowing, Sequential did not maintain effective internal controls over financial reporting as of December 31, 2016, for the reasons set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [1], stating that the Company did maintain effective internal controls was a materially false and misleading statement of an actual fact.

b.      As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

c.      As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's internal controls over financial resources according to applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3] stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d.      As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

110

**C.     Fiscal Year 2018**

311.    CohnReznick included its 2018 audit opinion, dated March 14, 2019, concerning Sequential's consolidated financial statements in the Company's 2018 10K. In opining that those financial statements present fairly, in all material respects, the financial position of Sequential as of December 31, 2018 and 2019, and were in conformity with all accounting principles generally accepted in the U.S., CohnReznick stated the following:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders
Sequential Brands Group, Inc.

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Sequential Brands Group, Inc. and Subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, comprehensive (loss) income, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2018, and the related notes and the financial statement schedule listed in the index appearing under Item 15(a) (collectively referred to as the consolidated financial statements). **[1] In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018, and  2017, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2018, in conformity with accounting principles generally accepted in the United States of America.**

**[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)**, and our report dated March 14, 2019, expressed an unqualified opinion.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to

the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

**[3] We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. [4] We believe that our audits provide a reasonable basis for our opinion.**

/s/ CohnReznick LLP

We have served as the Company's auditor since 2013.

New York, New York
March 14, 2019

312. The foregoing statements from the 2018 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's consolidated financial statements, were materially false and misleading statements of actual fact because:

a. As the CohnReznick Defendants knew or were reckless in not knowing, Sequential's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [1] that Sequential's consolidated financial statements fairly represented the financial picture of the Company was a materially false and misleading statement of an actual fact.

b. As the CohnReznick Defendants knew or were reckless in not knowing, they did not audit Sequential's internal controls over financial reporting according to PCAOB standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick

Defendants' Statement [2], that they conducted their audit of the Company's internal controls in accordance with the standards of the PCAOB was a materially false and misleading statement of an actual fact.

c.     As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d.     As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion on Sequential's financials for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

313.    CohnReznick also included its 2018 audit opinion, dated March 14, 2019, concerning Sequential's internal controls in the Company's 2018 10K. In opining that the internal controls over financial reporting were effective, as of December 31, 2018, in accordance with PCAOB standards, CohnReznick stated the following:

To the Board of Directors and Stockholders
Sequential Brands Group, Inc.

**Opinion on Internal Control over Financial Reporting**

We have audited Sequential Brands Group, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). **[1] In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on**

113

**criteria established in Internal Control—Integrated Framework (2013) issued by COSO.**

**[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets and the related consolidated statements of operations, comprehensive (loss) income, changes in equity and cash flows and the financial statement schedule listed in the index appearing under Item 15(a) of the Company** and our report dated March 14, 2019, expressed an unqualified opinion.

### Basis for Opinion

The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

**[3] We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. [4] We believe that our audit provides a reasonable basis for our opinion.**

### Definition and Limitations of Internal Control over Financial Reporting

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of

unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ CohnReznick LLP
New York, New York
March 14, 2019

314.    The foregoing statements from the 2018 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's internal controls over financial reporting, were materially false and misleading statements of actual fact because:

    a.    As the CohnReznick Defendants knew or were reckless in not knowing, Sequential did not maintain effective internal controls over financial reporting as of December 31, 2016, for the reasons set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [1], stating that the Company did maintain effective internal controls was a materially false and misleading statement of an actual fact.

    b.    As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

    c.    As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's internal controls over financial resources

115

according to applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3] stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d. As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

**D.    Fiscal Year 2019**

315.    CohnReznick included its 2019 audit opinion, dated March 31, 2020, concerning Sequential's consolidated financial statements in the Company's 2019 10K. In opining that those financial statements present fairly, in all material respects, the financial position of Sequential as of December 31, 2019 and 2020, and were in conformity with all accounting principles generally accepted in the U.S., CohnReznick stated the following:

> To the Board of Directors and Stockholders
> Sequential Brands Group, Inc.
>
> **Opinion on the Consolidated Financial Statements**
>
> We have audited the accompanying consolidated balance sheets of Sequential Brands Group, Inc. and Subsidiaries (the "Company") as of December 31, 2019 and 2018, and the related consolidated statements of operations, comprehensive loss, changes in equity, and cash flows for each of the years in the three-year period ended December 31, 2019, and the related notes and the financial statement schedule listed in the index appearing under Item 15(a) (collectively referred to as the consolidated financial statements). **[1] In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and  2018, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.**

116

**[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO)**, and our report dated March 31, 2020, expressed an unqualified opinion.

**Change in Accounting Principle**

As discussed in Notes 2 and 11 to the consolidated financial statements, the Company has changed its method of accounting for leases as of January 1, 2019 due to the adoption of Accounting Standards Codification Topic 842, *Leases*.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

**[3] We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. [4] We believe that our audits provide a reasonable basis for our opinion.**

/s/ CohnReznick LLP

We have served as the Company's auditor since 2013.

New York, New York
March 31, 2020

117

316. The foregoing statements from the 2019 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's consolidated financial statements, were materially false and misleading statements of actual fact because:

a. As the CohnReznick Defendants knew or were reckless in not knowing, Sequential's consolidated financial statements did not fairly represent the financial picture of the Company and were not in compliance with GAAP as set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [1] that Sequential's consolidated financial statements fairly represented the financial picture of the Company was a materially false and misleading statement of an actual fact.

b. As the CohnReznick Defendants knew or were reckless in not knowing, they did not audit Sequential's internal controls over financial reporting according to PCAOB standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they conducted their audit of the Company's internal controls in accordance with the standards of the PCAOB was a materially false and misleading statement of an actual fact.

c. As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d. As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion on

118

Sequential's financials for the reasons set forth in ¶¶254-92. Accordingly, the

CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit

opinion, was a materially false and misleading statement of an actual fact.

317.    CohnReznick also included its 2019 audit opinion, dated March 31, 2020,

concerning Sequential's internal controls in the Company's 2019 10K. In opining that the internal

controls over financial reporting were effective, as of December 31, 2019, in accordance with

PCAOB Standards, CohnReznick stated the following:

> To the Board of Directors and Stockholders
> Sequential Brands Group, Inc.
>
> **Opinion on Internal Control over Financial Reporting**
>
> We have audited Sequential Brands Group, Inc. and Subsidiaries' (the Company's) internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). **[1] In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control—Integrated Framework (2013) issued by COSO.**
>
> **[2] We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets and the related consolidated statements of operations, comprehensive (loss) income, changes in equity and cash flows and the financial statement schedule listed in the index appearing under Item 15(a) of the Company** and our report dated March 31, 2020, expressed an unqualified opinion.
>
> **Basis for Opinion**
>
> The Company's management is responsible for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

119

**[3] We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. [4] We believe that our audit provides a reasonable basis for our opinion.**

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ CohnReznick LLP

New York, New York
March 31, 2020

318. The foregoing statements from the 2019 audit opinion described in the immediately preceding paragraph and identified as Statements [1] – [4], concerning Sequential's internal controls over financial reporting, were materially false and misleading statements of actual fact because:

120

a.     As the CohnReznick Defendants knew or were reckless in not knowing, Sequential did not maintain effective internal controls over financial reporting as of December 31, 2016, for the reasons set forth in ¶¶87-224. Accordingly, the CohnReznick Defendants' Statement [1], stating that the Company did maintain effective internal controls was a materially false and misleading statement of an actual fact.

b.     As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's financials according to applicable PCAOB Standards for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [2], that they conducted their audit of the Company's financials in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

c.     As the CohnReznick Defendants knew or were reckless in not knowing, they did not conduct their audit of Sequential's internal controls over financial resources according to applicable PCAOB Standards or obtain the requisite reasonable assurances for the reasons set forth in ¶¶254-92. Accordingly, the CohnReznick Defendants' Statement [3] stating how they conducted their audit in accordance with applicable PCAOB Standards, was a materially false and misleading statement of an actual fact.

d.     As the CohnReznick Defendants knew or were reckless in not knowing, their audit did not provide a reasonable basis to issue their clean audit opinion for the reasons set forth in ¶¶ 249-296. Accordingly, the CohnReznick Defendants' Statement [4], that they had a reasonable basis for their audit opinion, was a materially false and misleading statement of an actual fact.

## XII. THE TRUTH SLOWLY EMERGED

319. After Sequential revealed "*[t]he goodwill adjustment represent[ing] a one-time, non-cash charge of $304.1 million that was driven by the Company's stock price during the fourth quarter*" in its 2.28.18 Press Release issued before markets opened on February 28, 2018, the Company's stock price fell $12.00 per share, or over 13%, as a result, closing at $79.20 per share that day on heavy volume and damaging investors.

320. As analyst Dave King of Roth Partners noted in his February 28, 2018 report, "Core EPS of $0.12 missed our $0.14 estimate and consensus of $0.13. Reported EPS of ($2.58) include a $2.10/share benefit related to tax reform, offset by a $4.80/share goodwill write-down attributable to Sequential's lower stock price."

321. After Sequential revealed the SEC investigation "into the Company's controls and practices surrounding impairment analyses of goodwill and intangible assets in 2016 and 2017" and that the SEC had "interview[ed] witnesses in connection with this matter" in late 3Q19 and 4Q19 in its 2019 10K before markets opened on March 31, 2020, the Company's stock price fell $5.20 per share, or over 48%, to close at $6.80 per share on April 1, 2020, further damaging investors.

322. Then, after the SEC filed its complaint on December 11, 2020, alleging that Sequential had failed "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill in the fourth quarter of 2016 and the first three quarters of 2017 (the 'Relevant Period')," the Company's stock price fell $2.03 per share, or over 11%, as a result, closing at $16.20 per share that day and further damaging investors.

323. According to the SEC Complaint, "Sequential conducted two internal calculations as of mid-December 2016 and year-end 2016 that showed that its goodwill was likely impaired.

These internal calculations used the same methodology that Sequential had disclosed in its SEC filings and had used in connection with its annual goodwill impairment testing just weeks before. Sequential ignored this clear, objective, quantitative evidence of likely impairment."

324. Further, according to the SEC Complaint, "[b]y avoiding an impairment to its goodwill in 2016, Sequential's financial statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets. This created a false impression of its financial health and ability to execute on its business plan. Sequential carried forward its material errors, resulting in material misstatements and omissions in [it]'s financial statements and SEC filings for the first three quarters of 2017. Sequential belatedly impaired all of its goodwill—$304.1 million—in the fourth quarter of 2017."

325. Indeed, the SEC Complaint alleges that "[i]f Sequential had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by over $100 million, a material amount[,]" and that "Sequential had in its possession facts and information tending to show that its statement that goodwill was not impaired was materially false and misleading. Those facts were not known to investors…"

326. Relatedly, the SEC Complaint alleges that "[d]uring the Relevant Period, Sequential's internal accounting controls relating to the assessment of goodwill impairment were deficient in design and application, and failed to provide reasonable assurance that its financial statements were materially accurate and that it accounted for goodwill in compliance with governing accounting standards."

327. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## XIII. LOSS CAUSATION

328. The three declines in Sequential's share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's share price declines on each of those days negates any inference that the losses suffered by Plaintiff and the Class was caused by changed market conditions, macroeconomic or industry factors or Sequential-specific facts unrelated to Sequential and the Sequential Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Sequential and the Sequential Defendants' fraudulent statements and the corresponding artificial inflation in Sequential's securities prices and the subsequent significant decline in the value of the securities when Sequential and the Sequential Defendants' prior acts of misconduct were revealed.

329. At all relevant times, Sequential and the Sequential Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and the putative Class. Those statements were materially false and misleading by their failure to disclose a true and accurate picture of Sequential's ability to produce and sell biofuel profitably. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Sequential securities to be artificially inflated. Plaintiff and other Class members purchased and/or acquired Sequential securities at those artificially inflated prices, causing them to suffer the damages complained of herein.

330. Sequential and the Sequential Defendants were deliberately reckless in not knowing or turning a blind eye to the fact that the Company's internal controls were deficient. Nonetheless,

Sequential and the Sequential Defendants made materially false and misleading public statements that provided false information to investors about the Company's internal controls and financial health. Thus, shares of the Company's stock continued to trade at levels artificially inflated by Sequential and the Sequential Defendants' misleading justifications for the negative information revealed on February 28, 2018 and March 31, 2020, which maintained the artificial inflation in the Company's share price until it was finally fully removed on December 11, 2020.

## XIV.    PRESUMPTION OF RELIANCE – FRAUD ON THE MARKET

331.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) Defendants made public misrepresentations or failed to disclose material facts; (b) the omissions and misrepresentations were material; (c) the Company's stock traded in an efficient market; (d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and (e) Plaintiff and the other members of the Class purchased Sequential securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

332.    At all relevant times, the market for Sequential securities was efficient for the following reasons, among others: (a) Sequential's securities met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient market; (b) during the Class Period, shares of Sequential's common stock were actively traded, demonstrating a strong presumption of efficiency; (c) as an SEC regulated issuer, Sequential filed with the SEC periodic public reports; (d) Sequential regularly communicated with public investors, including through regular disseminations of press releases on the major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting

services; and (e) unexpected material news about Sequential was rapidly reflected in and incorporated into its stock price during the Class Period.

333. As a result, the market for Sequential securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Sequential's stock. Under these circumstances, all purchasers or acquirers of Sequential securities during the Class Period suffered similar injury through their purchase or acquisition of Sequential securities at artificially inflated prices, including at a Class Period high of $238.00 per share on November 14, 2016, and a presumption of reliance applies.

334. In addition, Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon material omissions of fact that Defendants had a duty to disclose.

## XV. INAPPLICABILITY OF SAFE HARBOR

335. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. All of the specific statements pleaded herein were not identified as, and/or were not "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Company and the Sequential Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sequential named under the Exchange Act who knew that those statements were materially false and misleading when made.

126

## XVI. CLASS ALLEGATIONS

336. Plaintiff brings this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, Sequential during the Class Period, and were damaged by the conduct asserted herein. Defendants and their immediate families and legal representatives, heirs, successors or assigns and any entity in which the Defendants named herein have, or had, a controlling interest, are excluded from the Class.

337. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members of the proposed Class. Throughout the Class Period, between approximately 37 and 40 million shares of Sequential securities were outstanding, owned and/or publicly traded on the NASDAQ by hundreds, if not thousands, of persons.

338. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual class members include whether:

(a)     Defendants violated the federal securities laws;

(b)     Defendants omitted and/or misrepresented material facts;

(c)     Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     With respect to Plaintiff's Exchange Act claims, the Company and the Independent Defendants, with deliberate recklessness, disregarded or turned a blind eye toward the fact that their Class Period statements were false and misleading;

(e)     The price of Sequential securities was artificially inflated; and

127

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

339.    Plaintiff's claims are typical of those of the Class members because they each were similarly damaged by Defendants' wrongful conduct in violation of the federal securities laws.

340.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced in securities class action litigation. Plaintiff has no interests that conflict with those of the Class.

341.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulties in the management of this action that would preclude its maintenance as a class action.

## XVII.     CLAIMS FOR RELIEF

**COUNT I**
**Violations of § 10(b) of the Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**(Against the Sequential Defendants)**

342.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is brought pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against the Sequential Defendants.

343.    The Defendants in this Count, carried out a plan, scheme, and course of conduct which was intended to, and did: (a) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (b) cause Plaintiff and the other members of the Class to purchase Sequential securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Sequential Defendants took the actions set forth herein.

344.    During the Class Period, the Sequential Defendants participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew,

128

deliberately disregarded as, or turned a blind eye to, being misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

345. The Defendants in this Count: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of Sequential securities in an effort to maintain artificially high market prices for Sequential securities in violation of § 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder.

346. The Sequential Defendants, individually and together, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operation, and future prospects of Sequential as specified herein.

347. The Sequential Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Sequential's value and performance and continued substantial growth, which included the preparation of and/or dissemination or approval of untrue statements of material facts and/or omitting to state material facts necessary in order to make statements made about Sequential and its business operations and further prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers and acquirers of Sequential securities

during the Class Period.

348.    The Sequential Defendants had motive and opportunity to perpetrate the fraudulent scheme and course of conduct described herein. Sequential and the Sequential Defendants prepared and disseminated the fraudulent SEC filings to investors.

349.    The Sequential Defendants were the most high-level executives and/or directors at Sequential and members of the Company's management team or had control thereof. By virtue of their responsibilities and activities as a senior officer, the Sequential Defendants were: (i) privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections, and/or reports; (ii) engaged in significant personal conduct and familiarity with the other defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iii) aware of and/or participated in the issuing of statements and press releases on behalf of the Company, and each made false statements concerning the Company's abilities and had the opportunity to commit the fraud alleged.

350.    The Sequential Defendants had actual knowledge of the misrepresentations and/or omissions of material fact set forth herein or acted with reckless disregard for the truth in that they failed to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether the statements alleged herein, were false and/or misleading, or turned a blind eye toward the true facts that were available to them. The material misrepresentations and/or omissions of the Defendants in this Count were done knowingly or recklessly and for the purpose and effect of concealing the Company's true prospects from the investing public and supporting the artificially inflated price of Sequential securities.

351. The Sequential Defendants' misstatements and/or omissions of the Company's business, operations, financial well-being, and prospects throughout the Class Period, these Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading, or turning a blind eye toward the true facts that were available to them.

352. As a result of the dissemination of the materially false and/or misleading information and failure to disclose material facts, as set forth herein, the market price of Sequential securities was artificially inflated. In ignorance of the fact that market prices of Sequential securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by these Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or recklessly disregarded, but these Defendants, but not disclosed in public statements by Defendants, Plaintiff and the other Class members acquired Sequential securities at artificially high prices and were, or will be, damaged thereby.

353. At the time of said misrepresentation and omissions, Plaintiff and the other Class members were ignorant of their falsity and believed them to be true. Had Plaintiff and the other members of the Class, and the marketplace known the truth regarding the Company's business, which was not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or acquired Sequential securities, of if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

354. By virtue of the foregoing, the Defendants in this Count have violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

355. As a direct and proximate result of Sequential and the Sequential Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sequential securities during the Class Period.

356. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

**COUNT II**
**Violations of § 20(a) of the Exchange Act**
**(Against the Sequential Defendants)**

357. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. As members of Sequential's executive team and/or its Board of Directors, the Sequential Defendants acted as controlling persons of Sequential within the meaning of § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

358. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of Sequential's operations and/or intimate knowledge of the false information and disseminated to the investing public, the Sequential Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sequential, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Sequential Defendants were provided with, or had unlimited access to Sequential's reports, press releases, public filings and other statements, alleged by Plaintiff to have been misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

359. In particular, each of the Sequential Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control and/or influence the particular transactions giving rise to the securities violations, as alleged herein, and exercised the same.

360. As set forth above, Sequential and the Sequential Defendants each violated § 10(b) and Rule 10b-5, promulgated thereunder, by their acts and omissions as alleged in this Complaint and the Class was damaged thereby. By virtue of their positions as controlling persons, the Sequential Defendants are liable pursuant to §20(a) of the Exchange Act.

361. As a direct and proximate result of the Sequential Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sequential securities during the Class Period.

362. This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchase of securities giving rise to the cause of action.

## COUNT III
### Violation of § 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against CohnReznick)

363. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

364. CohnReznick made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading, by use of the means or instrumentalities of interstate commerce in order to maintain artificially inflated prices for Sequential securities in violation of Section 10(b) for the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5.

365. During the Class Period, CohnReznick made false and misleading statements of material fact, which were intended to and did: (a) deceive the investing public, including Plaintiff and the other members of the Class, as alleged herein; (b) artificially inflate and maintain the

133

market for and market prices of Sequential's securities; and (c) cause Plaintiff and the other members of the Class to purchase or otherwise acquire Sequential securities at artificially inflated prices.

366. During the Class Period, CohnReznick acted as independent auditor for Sequential. CohnReznick knew and understood that its opinions concerning the consolidated financial statements and reports of Sequential would be released to the investing public, and that investors would rely, and had a right to rely, on those reports and opinions. CohnReznick had access to Sequential employees and continuing access to and knowledge of Sequential's confidential corporate, financial, operating and business information. Despite this access and knowledge, CohnReznick knowingly, or with extreme recklessness, perpetrated and/or concealed the accounting manipulations undertaken, and certified without qualification and publicly represented that Sequential's financial reports were free from material misstatements, in order to fraudulently boost Sequential's reported assets and earnings.

367. CohnReznick engaged in the fraudulent activity described above knowingly, or in such a reckless manner, as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class. CohnReznick knowingly, or recklessly caused Sequential's and their own reports and statements to contain misrepresentations and omissions of material fact as alleged herein.

368. As a result of the fraudulent activities of CohnReznick described above, in conjunction with the activities of the other Defendants, the price of Sequential securities was artificially inflated during the Class Period.

369. In ignorance of Sequential's true financial condition, Plaintiff and the other members of the Class, relying upon the integrity of the market price for Sequential's securities,

and/or the statements and reports of Sequential containing false and misleading information, purchased or otherwise acquired Sequential's securities at artificially inflated prices during the Class Period.

370. The prices for Sequential's securities declined materially upon the public disclosure of the true facts which had been misrepresented or concealed as alleged herein.

371. As a direct and proximate result of the wrongful conduct of CohnReznick, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of Sequential's securities for which the Defendants are jointly and severally liable.

## COUNT IV
### Violation of § 20(a) of the Exchange Act
### (Against the Wyss, Jackson, and Hilbert)

372. Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

373. As set forth above, CohnReznick LLP committed primary violations of § 10(b) and Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this Amended Complaint. Defendants Wyss, Jackson, and Hilbert acted as controlling persons of CohnReznick LLP within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions, as alleged above, Wyss, Jackson, and Hilbert had the power to influence and control and did influence and control, directly or indirectly, the decision-making of and public statements made by CohnReznick, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Defendants Wyss, Jackson, and Hilbert were provided with or had unlimited access to copies of Sequential's internal reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements

135

were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

374. In particular, Defendants Wyss, Jackson, and Hilbert had direct involvement in CohnReznick's audits of and consulting for Sequential, and therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

375. As a direct and proximate result of the CohnReznick Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Sequential securities.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) of the on behalf of the Class defined herein;

B. Awarding Plaintiff and the members of the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' conduct, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D. Awarding such other equitable/injunctive or further relief as this Court may deem just and proper.

## XIX. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: November 14, 2022

Respectfully Submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (*pro hac vice*)
Velvel (Devin) Freedman
Constantine P. Economides
Brianna K. Pierce
1 SE 3rd Avenue, Suite 1240
Miami, Florida 33131
T: (786) 924-2900
F: (646) 392-8842
ingo@fnf.law
vel@fnf.law
ceconomides@fnf.law
bpierce@fnf.law

*Counsel for CJD Property Finance Company, LLC and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)
1880 Century Park East, Suite 404
Los Angeles, CA 90067
T: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for CJD Property Finance Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on November 14, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

By:     */s/ Ivy T. Ngo*        
            Ivy T. Ngo