# Exhibit 3

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**

Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934

Date of Report (Date of Earliest Event Reported): October 7, 2019 (October 1, 2019)

# SEQUENTIAL BRANDS GROUP, INC.

(Exact name of registrant as specified in its charter)

| **Delaware** | **001-37656** | **47-4452789** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**601 West 26th Street, 9th Floor, New York, NY 10001**
(Address of Principal Executive Offices/Zip Code)

**(646) 564-2577**
(Registrant's telephone number, including area code)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐　Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐　Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐　Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐　Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|:---:|:---:|:---:|
| Common stock, par value $0.01 per share | SQBG | NASDAQ Capital Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers; Compensatory Arrangement of Certain Officers.**

On October 1, 2019, Ms. Karen Murray resigned from her positions as Chief Executive Officer, Secretary and Director of Sequential Brands Group, Inc. ("Sequential"). Per the transition agreement between Sequential and Ms. Murray dated October 1, 2019 (the "Transition Agreement"), Ms. Murray will receive a bonus for 2019 based on actual achievement of the Board-established financial goals for the year, payable at the time in 2020 that such bonus would have been paid had Ms. Murray's employment with Sequential not terminated. In addition, the unvested portion of Ms. Murray's restricted stock units granted upon her commencement of employment with Sequential, representing 33,334 shares of common stock, will fully vest upon the end of the revocation period as defined in the Transition Agreement. Under the Transition Agreement, Ms. Murray also has agreed to act as a consultant to the Company for a period of one year, for which she will be paid a total of $650,000. The Transition Agreement includes customary terms and conditions, including a release of claims. A copy of the Transition Agreement is attached hereto as Exhibit 10.1 is incorporated herein by reference.

Also, effective October 7, 2019, Chad Wagenheim, age 43, who has been employed by the Company since November 2014 and most recently as Executive Vice President Strategic Development and Operations, was appointed as President and, in such capacity, will act as principal executive officer of the Company.

**Item 7.01. Regulation FD Disclosure.**

On October 7, 2019, Sequential issued a press release with respect to a strategic review and the matters discussed in Item 5.02. A copy of the press release is furnished as Exhibit 99.1 and is incorporated herein by reference.

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Transition agreement between the Company and Ms. Murray, dated October 1, 2019. |
| 99.1 | Press release. |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Sequential Brands Group, Inc.

Date: October 7, 2019

By: /s/ Peter Lops

Name: Peter Lops
Title: Chief Financial Officer

**TRANSITION AGREEMENT**

SEQUENTIAL BRANDS GROUP, INC. (the "Company"), and Karen Murray (including your successors, assigns, estate, heirs, executors and, administrators, which shall be collectively hereinafter referred to as "you") understand that you have resigned your employment with the Company effective as of the date set forth on the attached Schedule "A" (the "Termination Date"), and agree to the following (the "Agreement") in full and final resolution of all matters between them. Reference is made to your employment agreement dated as of May 4, 2017 by and between you and the Company (the "Employment Agreement"). Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth in the Employment Agreement.

1. Following receipt of this signed Agreement and expiration of the revocation period set forth below and subject to your compliance with the terms of this Agreement, You and the Company hereby agree that, from October 1, 2019 through September 30, 2020 (or such earlier date as you violate your obligations hereunder) (the "Consulting Period"), you shall serve as a Senior Advisor and shall provide such transition and other consulting services as reasonably requested by the Company from time-to-time. You will be an independent contractor of the Company in providing such services during the Consulting Period, and the Company shall not have the right to direct or control your performance of such services. In consideration of such services, the Company shall pay you as follows: (i) $200,000 on the day following the expiration of the revocation period set forth below; (ii) $150,000 on January 2, 2020; (iii) $150,000 on April 1, 2020; and (iv) $150,000 on July 1, 2020, for a total fee of up to $650,000 (the "Consulting Fee") during the Consulting Period. You shall not be eligible to actively participate in any Company benefit plan after the Termination Date, and you shall be solely responsible for all taxes payable with respect to the Consulting Fee. Section 5(j)(viii) of the Employment Agreement is incorporated by reference into this Agreement, provided that any and all references to "Section 5" of the Employment Agreement within Section 5(j)(viii) of the Employment Agreement shall be replaced with "Section 1 of this Agreement".

2. Following receipt of this signed Agreement and expiration of the revocation period set forth below and subject to your compliance with the terms of this Agreement, in lieu of any pay and benefits specified in Section 5(j)(ii) of the Employment Agreement or otherwise, the Company will pay you your Annual Bonus (as defined in the Employment Agreement) for 2019 based on actual achievement of the adjusted EBITDA target in the 2019 budget approved by the board of directors, paid in accordance with Section 4(b) of the Employment Agreement at the time the Annual Bonus would have been paid in 2020 if your employment had not terminated. In addition, all of your 33,334 outstanding time-based restricted stock units shall vest upon the date this Agreement becomes irrevocable and be settled promptly thereafter. You will also be entitled to your 291,883 of unvested performance-based restricted stock units (the "Unvested PSUs") to the extent that such Unvested PSUs vest in accordance with the performance metrics set forth in the grant letters for such Unvested PSUs. To the extent that such performance metrics set forth in the grant letters for such Unvested PSUs are not achieved, then such Unvested PSUs shall not vest and you shall have no further rights with respect thereto.

3. All of your benefits coverage (which includes your dependents) shall end as set forth on the attached Schedule A. Note that under COBRA, you have the option to extend your health care coverage for up to eighteen months or any greater period required by state law. To the extent that you elect under COBRA to extend certain benefits, you shall be responsible for paying for

1

the entire premium for such benefits directly. Further information regarding COBRA and the applicable forms shall be provided under separate cover. If you have a Flexible Spending Account, you shall have ninety (90) days from your Termination Date to claim eligible expenses incurred on or prior to your Termination Date; provided that you may have an opportunity to elect under COBRA to continue to make contributions to your health Flexible Spending Account through the remainder of the calendar year in which the Termination Date occurs, in which case (and provided you made such contributions) you would be able, for a period of ninety (90) days from the end of such calendar year, to claim eligible expenses incurred through the end of such calendar year. Regardless of whether you sign this Agreement, you will be paid out for the number of days of accrued, unused vacation set forth on the attached Schedule A.

4. Your ability to contribute to the Company's 401(k) plan will cease effective the Termination Date. Further information and important tax information will be provided under separate cover.

5. Effective as of the Termination Date, except as provided in paragraph 1, you hereby resign from all positions with the Company and its affiliates (including, without limitation, as a member of the boards of directors of the Company and its subsidiaries).

6. You agree to direct all prospective employers seeking employment references to contact in writing the Human Resources Department, or such other person as the Company may designate from time to time. When contacted in such manner, consistent with Company policy, the Company shall only provide your dates of employment and title to such prospective employers.

7. In consideration of the Company's agreements set forth in this Agreement, subject to paragraph 8 below, you release and forever discharge the Company and its current and former subsidiaries and affiliates, the current and former officers, directors, agents, and employees of each of the foregoing and the successors and assigns of each of the foregoing (which shall be collectively hereinafter referred to as the "Representatives") from any and all causes of action, claims, demands, damages, liabilities, liens, costs and expenses (including without limitation attorneys' fees) (collectively, "Claims") of every kind and nature whatsoever, whether known or unknown, related in any way to any acts, failures to act, omissions, facts or circumstances occurring on or prior to the date of this Agreement, including but not limited to any and all Claims (i) arising out of or in any way related to your employment with the Company and/or the termination of such employment, including without limitation Claims in connection with the Employment Agreement or for additional salary, bonus, incentive, commission, benefits, expenses, vacations, back pay or front pay; (ii) in tort, including but not limited to wrongful or retaliatory discharge in violation of public policy, emotional distress, slander, defamation, and interference with contractual relations; (iii) in contract, whether express or implied; (iv) under any Company policy, procedure, benefit plan or other agreement; or (v) under any and all federal, state or local laws or ordinances, including but not limited to Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, the Age Discrimination in Employment Act of 1967 ("ADEA"), the Employee Retirement Income Security Act (excluding those involving vested benefits in the Company's 401(k) plan), the Federal Family and Medical Leave Act, the Sarbanes-Oxley Act, the New York State Human Rights Law, the New York Labor Law, the New York City Human Rights Law, the New Jersey Law Against Discrimination, and the New Jersey Conscientious Employee Protection Act, the , for harassment or discrimination on the basis of any protected classification, whistle blowing, or

2

retaliation of any kind; or any other cause of action. You represent and warrant that you are the sole and lawful owner of all right, title and interest in and to every Claim and other matter that you are releasing hereby and that no other party has received any assignment or other right of substitution or subrogation to any such Claim or matter. You also represent that you have the full power and authority to execute this Agreement on behalf of yourself and the other parties that may be included in the definition of "you" above. However, notwithstanding the foregoing, you are not releasing, and for the avoidance of doubt Claims do not include, your rights, if any (i) to payment of any authorized but unreimbursed business expenses incurred prior to the termination of your employment with the Company or any of its subsidiaries in accordance with Section 4(e) of the Employment Agreement, (ii) under any employee pension or welfare plan or program in which you participate or participated, and (iii) to be indemnified pursuant to Section 8 of the Employment Agreement or pursuant to any other agreements to which you may be entitled to indemnification.

8.    You are not waiving any rights you may have to: (a) your own vested accrued employee benefits under the Company's health, welfare, or retirement benefit plans as of the Termination Date; (b) benefits and/or the right to seek benefits under applicable workers' compensation and/or unemployment compensation statutes; (c) pursue claims which by law cannot be waived by signing this Agreement; (d) enforce this Agreement; and/or (e) challenge the validity of this Agreement.

Nothing in this Agreement prohibits or prevents you from filing a charge with or participating, testifying, or assisting in any investigation, hearing, or other proceeding before the U.S. Equal Employment Opportunity Commission, the National Labor Relations Board or a similar agency enforcing federal, state or local anti-discrimination laws. However, to the maximum extent permitted by law, you agree that if such an administrative claim is made to such an anti- discrimination agency, you shall not be entitled to recover any individual monetary relief or other individual remedies.

In addition, nothing in this Agreement, including but not limited to the release of Claims nor the confidentiality and non-disparagement clauses, prohibits you from: (1) reporting possible violations of U.S. law or regulations, including any possible securities laws violations, to any governmental agency or entity, including but not limited to the U.S. Department of Justice, the
U.S. Securities and Exchange Commission, the U.S. Congress, or any agency Inspector General; (2) making any other disclosures that are protected under the whistleblower provisions of law or regulations in the U.S.; or (3) otherwise fully participating in any U.S. governmental whistleblower programs, including but not limited to any such programs managed by the U.S. Securities and Exchange Commission and/or the Occupational Safety and Health Administration or from receiving individual monetary awards or other individual relief by virtue of participating in such whistleblower programs.

9.    You understand, subject to the narrow limitations in paragraph 8 above, and agree that this Agreement extinguishes all claims you may have against the Company and its Representatives, whether such claim is currently known or unknown, vested or contingent, foreseen or unforeseen. You understand that if any fact concerning any matter covered by this Agreement is found hereafter to be other than or different from the facts you now believe to be true, you expressly accept and assume that this Agreement shall be and remain effective, notwithstanding such difference in the facts.

3

10. You affirm, by signing this Agreement, that you have no potential or actual claims against the Company or its Representatives regarding any issues relating to or arising out of your employment, directorship, or the termination thereof, and agree not to file any such actions in court against the Company in any court, tribunal or other forum, except for any action which may be necessary to enforce the terms of this Agreement or a challenge to the validity of the waiver under the ADEA. You further affirm that you have been paid and/or have received all compensation, wages, bonuses, commissions, and/or benefits to which you may be entitled. You also affirm that you have been granted any leave to which you were entitled under the Family and Medical Leave Act or related state or local leave or disability accommodation laws. You further affirm that you have no known workplace injuries or occupational diseases and that you have not been retaliated against for reporting any allegations of wrongdoing by the Company or its officers, including any allegations of corporate fraud.

11. In exchange for the consideration provided for in this Agreement, the Company, its parents, subsidiaries, affiliates, directors, shareholders, officers, representatives, agents, successors and assigns, irrevocably and unconditionally releases you of and from all claims, demands, causes of actions, fees and liabilities of any kind whatsoever, which they had, now have or may have against you, as of the date of this Agreement, by reason of any actual or alleged act, omission, transaction, practice, conduct, statement, occurrence, or any other matter, within the reasonable scope of your employment. This release does not include any willful acts of misconduct or fraud which the Company may not have knowledge of as of the date of this Agreement. The Company represents that, as of the date of this Agreement, there are no known claims relating to you. For the avoidance of doubt, the covenants in Sections 6 and 7 of the Employment Agreement shall continue in effect in accordance with their terms, unless specifically and expressly modified by this Agreement.

12. Section 7(a) of the Employment Agreement is hereby incorporated by reference, provided, however, the Company agrees that the "Restricted Period" for purposes of Section 7(a) shall be limited to a period of six (6) months following the Termination Date.

13. Section 7(d) of the Employment Agreement is hereby incorporated by reference. To the extent of any conflict or inconsistency between the provisions of this paragraph 13 and Section 7(d) of the Employment Agreement, Section 7(d) of the Employment Agreement shall govern. You agree that you shall immediately turn over to the Company any property, material, documents and/or equipment furnished to and/or maintained by you, in whatever form of media (including in printed form or stored magnetically, optically or electronically) in connection with your employment with the Company (including but not limited to books, laptop computer, cell phone, personal digital assistant, identification card, product, merchandise, catalogs, samples, employee handbook, customer records, price lists, accounts receivable and accounts payable records, computer records and printouts, supplier records, data analysis and any and all Company-related records on your home computers, cell phones and personal digital assistants) unless the Company otherwise agrees in writing to allow you to retain any such property, material, documents and/or equipment. You shall promptly submit to the Company a reimbursement request, with appropriate supporting documentation, for any outstanding expenses that may be reimbursable under the Company's regular policy. You shall promptly pay any expenses that you incurred with respect to which the Company could be liable (e.g., expenses incurred on the Company's corporate credit card); if those expenses were properly incurred in connection with the Company's business, you shall submit those expenses with appropriate supporting documentation to the Company and the Company shall reimburse you therefor.

4

14. You agree that you will not disclose or use for any purpose any trade secrets or proprietary or confidential information about the Company or its Representatives, whether or not marked as being confidential and irrespective of the form of communication, including oral as well as written and electronic communication, acquired by you during your employment; provided, however, that you shall not be held liable under federal or state trade secret law or this or any other agreement for making a disclosure of a trade secret or other confidential information in confidence to an attorney or government official for the purpose of investigating or reporting a suspected violation of law or in a court filing under seal. As used in this Agreement, "confidential information" shall, without limitation, include:

   a. Information relating to the Company's or any of its subsidiaries' or affiliates' business, products, markets, condition (financial or other), operations, assets, liabilities, results of operations, cash flows, earnings, assets, debts, prices, pricing structure, volume of sales, prospects of the Company, royalty rates, terms of license agreements, or other financial data;

   b. Supply and service information, such as the names and addresses of suppliers of goods and services, terms of supply or service or of particular transactions, related information about potential suppliers to the extent that such information is not generally known to the public, and to the extent that the combination of suppliers or use of a particular supplier though generally known or available, yields advantages to the Company, the details of which are not generally known;

   c. Marketing and pricing information, such as details about ongoing or proposed marketing programs, agreements by or on behalf of the Company, sales forecasts, results of marketing efforts, and information about impending transactions;

   d. Customer information, such as any compilation of past, or existing or prospective retail or wholesale customers' names, addresses or backgrounds, records of purchases and prices, proposals or agreements between customers and the Company (or its affiliates), status of customers' accounts or credit, or related information about actual or prospective customers; or

   e. Notes, analyses, compilations, studies, forecasts, interpretations or other documents relating to the foregoing in this Section 12(a)-(d).

15. In addition, you agree for a period of 2 years following the Termination Date, that you will not, in any way (i) defame or maliciously disparage the Company or any Representative or make or solicit any comments, statements or the like, to the media, to current, future or former employees or to others, that may be considered to be derogatory or detrimental to the good name or business reputation of the Company or any Representative, or (ii) take any direct action against the Company, or any action directly related to the Company, that could reasonably be expected to harm the Company. You understand that any unauthorized disclosure or disparagement by you or by anyone to whom you disclose such information will be considered a breach of this Agreement. This restriction shall not apply to any good faith communications with government agencies or truthful testimony required by law or legal process. The Company agrees for a period of 2 years following the Termination Date that it will not, in any way (i) defame or maliciously disparage you or make or solicit any comments, statements or the like, to the media, to current, future or former employers of yours or to others, that may be considered to be derogatory or detrimental to your good name or your business reputation, or (ii) take any direct action against you, or any action directly related to you, that could reasonably be expected to harm you. This restriction shall not apply to any good faith communications with government agencies or truthful testimony required by law or legal process.

16. You agree to reasonably cooperate with the Company, together and all of their respective past and present subsidiaries, affiliates, predecessors, successors and assigns, their legal counsel and designees regarding any current or future Claim, investigation (internal or otherwise), inquiry or litigation relating to this matter with which you were involved or had knowledge or which occurred during your employment, with such assistance including, but not limited to, meetings and other consultations, signing affidavits and documents that are factually accurate, attending depositions and providing truthful testimony (in each case, without requiring a subpoena); provided, however, that the Company will reimburse you for your reasonable expenses (including attorneys' fees and travel expenses) actually incurred by you in connection with such cooperation (it being understood that if any such expenses are expected to exceed $5,000, you shall inform the Company prior to incurring such expenses to provide the Company with an opportunity to either agree to reimburse you for such expenses or advise you not to provide such cooperation necessitating the incurrence of such expenses). In the event your cooperation is required during the Consulting Period, then if such cooperation is in excess of 8 hours per week (excluding travel time and lunch and inclusive of consulting time), then the Company shall pay you a fee of $250 per hour for each hour in excess of 8 hours during such week. In the event your services are required after the expiration or termination of the Consulting Period, the Company shall pay you a fee of $2,000 for each day your services are required by the Company after the Consulting Period.

17. You agree to notify the Company within a reasonable period of time should you learn of a subpoena or other court order requiring your participation in any legal proceeding relating to or stemming from your employment with the Company. "Reasonable period of time" means sufficiently in advance of the date on which you must respond to such subpoena or other court order so that the Company can intervene to challenge or quash such subpoena or other court order.

18. Section 7(e) of the Employment Agreement is hereby incorporated by reference. You understand that if you should violate any provision of this Agreement, the Company may take legal action to enforce the Agreement and may be entitled to any and all other equitable and legal remedies which may be available to it including monetary damages. You acknowledge that your compliance with paragraphs 11 through 17 of this Agreement is necessary to protect the business and goodwill of the Company, and that a breach will result in irreparable and continuing damage to the Company, for which money damages may not provide adequate relief. Consequently, you agree that, in the event you breach, or threaten, or attempt to breach these provisions of the Agreement, the Company shall be entitled to seek temporary restraining orders and preliminary or permanent injunctions in order to prevent the occurrence of continuation of such harm and money damages insofar as they can be determined, and you further agree that in connection with any such request for relief by the Company, the Company shall not be required to prove that the Company's remedies at law are inadequate and the Company shall not be required to post any bond or other security, unless required by law. You acknowledge that these provisions are reasonably and properly required for the protection of the Company.

6

19. The parties acknowledge that this Agreement is not an admission on either of their parts. Accordingly, this Agreement may not be admissible in any forum as an admission of any kind; provided that this sentence shall not prohibit either party from admitting into evidence the terms of this Agreement for the sole purpose of enforcing such terms. The parties further agree that questions regarding the interpretation of the language of the Agreement shall not be presumptively interpreted against the drafter as the Agreement is a product of negotiations between the parties.

20. You acknowledge and understand that:

    a.  the above-referenced consideration represent the total payments you will receive from the Company in return for signing this Agreement and exceeds that to which you would otherwise be entitled;

    b.  you shall no longer be considered an employee of the Company after the Termination Date, and therefore, that the benefits of employment, other than those specifically referenced in this Agreement, will not be available after such date;

    c.  you are not entitled to any additional payments under the Company's policies, benefit or commission plans, or any expressed or implied agreement with the Company other than as set forth in this Agreement;

    d.  it is in exchange for the good and sufficient consideration provided in this Agreement that you agree to the provisions herein; and

    e.  you have received and agree to Schedule A attached hereto.

21. You acknowledge that you have the right, and have been advised by the Company, to consult with an attorney, and that you have done so to the extent you desired prior to executing this Agreement. You understand that you are entitled to fully consider this Agreement for a period of up to twenty-one (21) days. In the event you sign the Agreement prior to the expiration of the time to consider this Agreement, the remaining time shall be waived. Further, this Agreement shall not become effective or enforceable, nor shall any consideration be paid, until after both parties have signed it and eight days have elapsed from you executing it, providing you have not revoked your Agreement in writing before that date as you may revoke this Agreement for up to seven (7) days following its execution by sending written notice to the attention of Liz Nissen at the Company and personally delivering it or postmarking it prior to the end of such seven (7) day period.

22. Should any provision of this Agreement be held to be illegal, void or unenforceable, such provision shall be of no force and effect. However, the illegality or unenforceability of any such provision shall have no effect upon, and shall not impair the enforceability of, any other provision of this Agreement.

7

23.   This Agreement contains the complete understanding between the Company and you related to the subject matter hereto, and supersedes all prior agreements and understandings between the Company and you related to the subject matter of this Agreement. Each party agrees that it is not relying on any representations, whether written or oral, not set forth in this Agreement, in determining to execute this Agreement. This Agreement may not be modified, changed or altered by any oral promise or statement, nor shall any written modification of this Agreement be binding on the Company until such modification is approved in writing by an officer of the Company. In signing this Agreement, the parties are not relying on any fact, statement or assumption not set forth in this Agreement.

24.   You may not assign any of your rights or obligations under this Agreement without obtaining the express written consent of the Company. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of each party's respective successors and permitted assigns. This Agreement is made under, and shall be governed by and construed under, the laws of the State of New York, without reference to principles of choice of law that might call for application of the substantive law of another jurisdiction. The federal and state courts located in New York County, New York, shall have sole and exclusive jurisdiction over any dispute arising out of or relating to this Agreement, and each party hereby expressly consents to the jurisdiction of such courts and waives any objection (whether on grounds of venue, residence, domicile, inconvenience of forum or otherwise), to such a proceeding brought before such a court.

8

**By signing below, the Company and you indicate that they have carefully read and understood the terms of this Agreement and the attached Schedules, enter into this Agreement knowingly, voluntarily and of their own free will, understand its terms and significance and intend to abide by its provisions without exception.**

SEQUENTIAL BRANDS GROUP, INC.

By: /s/ William Sweedler                          10/1/19
    William Sweedler                              Date: 10/1/19
    Chairman of the Board of Directors


    /s/ Karen Murray                              10/1/19
    Karen Murray                                  Date: 10/1/19

9

**Schedule A**

**Name:** Karen Murray

Termination Date: October 1, 2019

**Consideration subject to your compliance with the Agreement:**

Consulting Fee specified in paragraph 1
Payments specified in paragraph 2, less applicable withholdings

**Benefits:**

Last day of benefits coverage:

Medical, Dental, Vision – N/A
401k – Termination Date – October 1, 2019

*Note: Certain benefits such as health insurance may be continued at your own expense pursuant to COBRA and state law*

**By signing this Agreement, I confirm that I do not have any accrued but unused vacation days.**

| /s/ Karen Murray | 10/1/19 |
|---|---|
| Signature | Date: 10/1/19 |

10

EXHIBIT 99.1

**Sequential Brands Group Announces Exploration of Strategic Alternatives and Leadership Transition**

New York, New York — October 7, 2019— Sequential Brands Group, Inc. ("Sequential" or the "Company") (NASDAQ:SQBG) today announced that its Board of Directors is conducting a broad review of strategic alternatives focused on maximizing shareholder value. Such strategic alternatives may include the divestiture of one or more existing brands, the acquisition of one or more new brands, a stock buyback program, and other initiatives. The Board has engaged Stifel to serve as its exclusive financial advisor to assist in this process.

"After having received unsolicited interest for several of our brands from multiple parties, Sequential's Board of Directors is engaging in this formal process to ensure that we are evaluating all alternatives to best further the interest of our shareholders," said William Sweedler, Chairman of Sequential.

The Company has not set a timetable for the conclusion of its review of strategic alternatives and does not expect to comment further or update the market with any additional information on this matter unless and until the Board of Directors has approved a specific transaction or otherwise deems disclosure necessary or appropriate. There is no certainty that the review of strategic alternatives will result in the Company pursuing a particular transaction or completing any such transaction.

The Company also announced today that Karen Murray has stepped down as Director and Chief Executive Officer of the Company.  Ms. Murray will continue to serve as Senior Advisor and assist the Company on strategic opportunities. The Board has begun a search to identify the Company's new CEO. Chad Wagenheim, EVP of Strategic Development and Operations, has been promoted to President and will assist the Company during this transition period.

William Sweedler, Chairman of Sequential, said, "Chad has been and continues to be an integral part of our executive team. With his demonstrated operating expertise, strategic leadership and focus on results, we're confident in his ability to help lead Sequential through this next phase."

Mr. Sweedler added, "I'd like to thank Karen Murray for her leadership and the contributions she has made during her tenure with the Company as CEO."

President Chad Wagenheim said, "I'm looking forward to serving as President and assisting Sequential during this transformative time. We have a strong portfolio of brands, blue chip base of licensees, and solid lender relationships. With our recently restructured lending agreement and no upcoming debt maturities, we are fully focused on executing against our plan to drive growth and right-size our expense structure given the current size of the Company."

**About Sequential Brands Group, Inc.**

Sequential Brands Group, Inc. (Nasdaq:SQBG) owns, promotes, markets, and licenses a portfolio of consumer brands in the fashion and active categories. Sequential seeks to ensure that its brands continue to thrive and grow by employing strong brand management, design and marketing teams.  Sequential has licensed and intends to license its brands in a variety of consumer categories to retailers, wholesalers and distributors in the United States and around the world.  For more information, please visit Sequential's website at: www.sequentialbrandsgroup.com.

Contact:

Sequential Brands Group, Inc.
Katherine Nash
T: 512-757-2566
E: knash@sbg-ny.com

**Forward-Looking Statements**

Certain statements in this press release and oral statements made from time to time by representatives of the Company are forward-looking statements ("forward-looking statements") within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements are made as of the date hereof and are based on current expectations, estimates, forecasts and projections as well as the beliefs and assumptions of management. The Company's actual results or actual events could differ materially from those stated or implied in forward-looking statements. Forward-looking statements include statements concerning estimates of GAAP net income, non-GAAP net income, Adjusted EBITDA, revenue (including guaranteed minimum royalties), and margins, guidance, plans, objectives, goals, strategies, expectations, intentions, projections, developments, future events, performance or products, underlying assumptions and other statements that are not historical in nature, including those that include the words "subject to," "believes," "anticipates," "plans," "expects," "intends," "estimates," "forecasts," "projects," "aims," "targets," "may," "will," "should," "can," "future," "seek," "could," "predict," the negatives thereof, variations thereon and similar expressions. Such forward-looking statements reflect the Company's current views with respect to future events, based on what the Company believes are reasonable assumptions. Whether actual results will conform to expectations and predictions is subject to known and unknown risks and uncertainties, including: (i) risks and uncertainties discussed in the reports that the Company has filed with the Securities and Exchange Commission (the "SEC"); (ii) general economic, market or business conditions; (iii) the Company's ability to identify suitable targets for acquisitions and to obtain financing for such acquisitions on commercially reasonable terms; (iv) the Company's ability to timely achieve the anticipated results of recent acquisitions and any potential future acquisitions; (v) the Company's ability to successfully integrate acquisitions into its ongoing business; (vi) the potential impact of the consummation of recent acquisitions or any potential future acquisitions on the Company's relationships, including with employees, licensees, customers and competitors; (vii) the Company's ability to achieve and/or manage growth and to meet target metrics associated with such growth; (viii) the Company's ability to successfully attract new brands and to identify suitable licensees for its existing and newly acquired brands; (ix) the Company's substantial level of indebtedness, including the possibility that such indebtedness and related restrictive covenants may adversely affect the Company's future cash flows, results of operations and financial condition and decrease its operating flexibility; (x) the Company's ability to achieve its guidance; (xi) continued market acceptance of the Company's brands; (xii) changes in the Company's competitive position or competitive actions by other companies; (xiii) licensees' ability to fulfill their financial obligations to the Company; (xiv) concentrations of the Company's licensing revenues with a limited number of licensees and retail partners; (xv) risks related to the effects of the sale of the Martha Stewart brand; (xvi) uncertainties related to the timing, proposals or decisions arising from the Company's strategic review, including the divestiture of one or more existing brands; (xvii) uncertainties related to the Company's leadership changes; and (xviii) other circumstances beyond the Company's control. Refer to the section entitled "Risk Factors" set forth in the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q for a discussion of important risks, uncertainties and other factors that may affect the Company's business, results of operations and financial condition. The Company's stockholders are urged to consider such risks, uncertainties and factors carefully in evaluating the forward-looking statements and are cautioned not to place undue reliance on such forward-looking statements. Forward-looking statements are not, and should not be relied upon as, a guarantee of future performance or results, nor will they necessarily prove to be accurate indications of the times at or by which any such performance or results will be achieved. As a result, actual outcomes and results may differ materially from those expressed in forward-looking statements. The Company is not under any obligation to, and expressly disclaims any such obligation to, update or alter its forward-looking statements, whether as a result of new information, future events or otherwise. Readers should understand that it is not possible to predict or identify all risks and uncertainties to which the Company may be subject. Consequently, readers should not consider such disclosures to be a complete discussion of all potential risks or uncertainties.