# EXHIBIT 4

| Am. Compl. ¶ | Source | Alleged Misstatement/Omission | Alleged Speaker (Gibson Dunn Defendants indicated in bold) | Allegedly Misleading for Unspecified Combination of the Following: | Legal Deficiencies of Allegation |
|---|---|---|---|---|---|
| 135 | 3Q16 10Q, dated November 9, 2016 | "The Company has concluded that this change in [testing date to October 1] is not material to its financial statements, in part because the change does not delay, accelerate or avoid an impairment charge" | Defendants Shmidman and Klein | Defendants made false and/or misleading statements and/or failed to disclose that the Company's goodwill was likely impaired in light of the November 2, 2016 share price decline and that by changing the date of the annual impairment test to October 1, they were able to avoid and delay addressing the changed circumstances involving the share price decline, including writing off a material amount of goodwill. | Barred by the 5-year statute of repose as to all Defendants<br><br>This was a statement of opinion. Whether a stock price decline is an impairment event is a decision that necessarily involves judgment. |
| 135 | | "As such, the Company will apply the change in annual impairment testing date prospectively beginning October 1, 2016" | | | Barred by the 5-year statute of repose as to all Defendants<br><br>This statement is not objectively false and any alleged omission does not make this statement misleading. |
| 137-138 | March 2, 2017 Press Release | The Company's goodwill is listed at $307,744,000; total current assets are $1,434,863,000 at the end of 2016<br><br>In addition, the press release listed the Company's income from operations, income (loss) before income taxes, and net income (loss) for Q4 2016 and as of December 31, 2016. | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down approximately $100 million in impaired goodwill in 2016 or informed investors of that likely impaired goodwill due to the Company's material 4Q16 share price declines; (3) as a result, the Company had overstated its 4Q16 and FY16 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>The Amended Complaint does not specify which of the statements listed here are allegedly false or misleading.<br><br>The statement regarding income is not false or misleading and the statement regarding goodwill is a statement of opinion. |
| 140 | 2016 10K dated | The Company's goodwill is listed at $307,744,000; total current assets are $1,434,863,000 at the end of 2016 | Defendants Shmidman, Klein, **Sweedler,** | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants |

| ¶ | Date | Statement | Defendants | Allegation | Response |
|---|------|-----------|------------|------------|----------|
| | March 14, 2017 | In addition, the 10K listed the Company's income from operations, income (loss) before income taxes, and net income (loss) for Q4 2016 and as of December 31, 2016. | **Hollander, Gossett, and Leonard** | | Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>The Amended Complaint does not specify which of the statements listed here are allegedly false or misleading.<br><br>The statement regarding income is not false or misleading and the statement regarding goodwill is a statement of opinion. |
| 142 | 2016 10K dated March 14, 2017 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Shmidman, Klein, **Sweedler, Hollander, Gossett, and Leonard** | "Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the 4Q16 share price declines, including writing off a material amount of goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down approximately $100 million in impaired goodwill or informed investors of that likely impaired goodwill due to the Company's material 4Q16 share price declines; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>This statement regarding goodwill testing procedure is not false or misleading. Whether or not an impairment event has occurred is a matter of opinion. |
| 142 | | "During the year ended December 31, 2016, the Company changed its annual impairment testing date from December 31 to October 1…this change in accounting principle does not delay, accelerate or avoid an impairment charge." | | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>Alleged failure to take an earlier impairment is a matter of opinion. |
| 142 | | "[T]he Company applied the change in annual impairment testing date prospectively beginning October 1, 2016. As of December 31, 2016 and 2015, no impairment of goodwill has been identified." | | | |
| 143 | | "Based on our management's assessment, our management concluded that our | | | Barred by the 5-year statute of repose as to |

| | | | | | |
|---|---|---|---|---|---|
| | | internal control over financial reporting was effective as of December 31, 2016, based on those criteria." | | | Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>There is no evidence that the internal controls were deficient. In any event, statements regarding compliance with ethical and legal standards are not material. |
| 145 | 2016 10K dated March 14, 2017 | "As a result of changes in market conditions and declines in the estimated fair value of these assets, we may, in the future, be required to write-down a portion of this goodwill and other intangible assets and such write-down would adversely affect our results of operations. As of December 31, 2016, goodwill represented $307.7 million, or 21.4% of our total consolidated assets, and intangible assets represented $1.0 billion, or 71.8% of our total consolidated assets." | Defendants Shmidman, Klein, **Sweedler, Hollander, Gossett, and Leonard** | Defendants made false and/or misleading statements and/or failed to disclose that: (1) changes in market conditions had already occurred, as reflected in the Company's 4Q16 share price declines, that decreased the estimated fair value of its goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired by at least $100 million; and (3) since Defendants were not writing down any goodwill associated with the 4Q16 share price declines, they were exposing the Company to the risk of the SEC filing a lawsuit against it. | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>This statement reflects an opinion regarding goodwill. |
| 145 | | "Any write-down of goodwill or intangible assets resulting from future periodic evaluations would, as applicable, either decrease our net income or increase our net loss and those decreases or increases could be material." | | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>This is a truthful warning and not made materially misleading by any alleged omissions. |
| 147 | May 4, 2017 Press Release | The Company's goodwill is $307,744,000 and total current assets are $1,426,639,000.<br><br>The Press Release also included operating income, pre-tax income, and net income for 1Q17. | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 1Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the Company had overstated | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto. |
| 148-149 | 1Q17 10Q dated May 10, 2017 | The Company's goodwill is $307,744,000 and total current assets are $1,426,639,000. | Defendants Murray and Klein | | |

| | | | | | |
|---|---|---|---|---|---|
| | | The 10Q also included operating income, pre-tax income, and net income for 1Q17. | | its 1Q17 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient." | These statements reflect an opinion regarding goodwill. |
| 151 | 1Q17 10Q dated May 10, 2017 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Murray and Klein | "Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the share price decline since 3Q16, including writing off goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 1Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.

Whether or not an impairment event has occurred is a matter of opinion. |
| 153 | July 27, 2017 Press Release | The Company's goodwill is $304,123,000 and total current assets are $1,422,242,000.

The Press Release also included operating income, pre-tax income, and net income for 2Q17 and the first half of 2017. | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 2Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the Company had overstated its 2Q17 and 1H17 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to all Defendants.

The Amended Complaint does not specify which of the statements listed here are allegedly false or misleading.

The statement regarding goodwill is a statement of opinion. |
| 155 | 2Q17 10Q, dated June 30, 2017 | The Company's goodwill is $304,123,000 and total current assets are $1,422,242,000.

The 10Q also included operating income, pre-tax income, and net income for 2Q17 and the first half of 2017. | Defendants Murray and Klein | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.

The Amended Complaint does not specify which of the statements listed here are allegedly false or misleading. |

|  |  |  |  |  | The statement regarding goodwill is a statement of opinion. |
|---|---|---|---|---|---|
| 157 | 2Q17 10Q, dated June 30, 2017 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Murray and Klein | "Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the 4Q16 share price declines, including writing off impaired goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 2Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>Whether or not an impairment event has occurred is a matter of opinion. |
| 159 | November 9, 2017 Press Release | The Company's goodwill is $304,123,000 and total current assets are $1,381,329,000.<br><br>The Press Release also included operating income, pre-tax income, and net income for 3Q17. | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (2) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (3) as a result, the Company had overstated its 3Q17 operating income, pre-tax income, net income, goodwill, and assets; and (4) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>The Amended Complaint does not specify which of the statements listed here are allegedly false or misleading.<br><br>The statement regarding goodwill is a statement of opinion. |
| 161 | 3Q17 10Q, dated November 13, 2017 | The Company's goodwill is $304,123,000 and total current assets are $1,381,329,000.<br><br>The 10Q also included operating income, pre-tax income, and net income for 3Q17. | Defendants Murray and **Cooper** |  | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>The Amended Complaint does not specify which of the statements listed here |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | are allegedly false or misleading.<br><br>The statement regarding goodwill is a statement of opinion. |
| 163 | 3Q17 10Q, dated November 13, 2017 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Murray and **Cooper** | "Defendants made false and/or misleading statements and/or failed to disclose that (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) by using the Income Approach instead of the Market Approach for its impairment testing in 3Q17, Defendants were able to continue avoiding and delaying addressing the changed circumstances involving the sustained share price decline beginning in 4Q16; and (5) the Company's internal controls were deficient." | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>Whether or not an impairment event has occurred is a matter of opinion. |
| | | "During the quarter ended September 30, 2017, as a result of its qualitative assessment of the likelihood of goodwill impairment, the Company identified potential impairment indicators and determined that a quantitative assessment was necessary." | | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto.<br><br>This statement is objectively true. Any alleged omissions do not make it misleading to a reasonable investor.<br><br>Whether or not an impairment event actually occurred is a matter of opinion. |
| | | "Based on the results of the quantitative assessment, the Company determined goodwill was not impaired for the period ended September 30, 2017." | | | Barred by the 5-year statute of repose as to Gibson Dunn Defendants Sweedler, Hollander, Gossett, Leonard, Lops, Wagenheim, Hanbridge, Conn, and DiSanto. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | The statement regarding goodwill is a statement of opinion. |
| 165 | February 28, 2018 Press Release | Announcing a "goodwill adjustment represent[ing] a one-time, non-cash charge of $304.1 million that was driven by the Company's stock price during the fourth quarter – as well as the increase in the Company's book value related to tax reform – which resulted in an assessed fair value of equity that was significantly below its net book value." | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $304.1 impairment charge was driven by the Company's share price declines which began in 4Q16; (2) the Company's internal controls were deficient; and (3) because they delayed writing off goodwill in the face of the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it." | Plaintiff does not allege that Defendants did not believe their statements regarding goodwill, which is required when alleging that failure to take an earlier impairment amounts to a material misstatement. |
| 166 | 4Q17 Earnings Call | "The goodwill adjustment represents a one-time, non-cash charge of $304.1 million that was driven by the company's stock price during the fourth quarter, as well as the increase in the company's book value related to tax reform, which resulted in an assessed fair value of equity that was below its net book value. This adjustment is unrelated to the carrying value of the company's trademark which have not been impaired and it is not in our view reflective of the underlying value of our brands. " | Defendant **Cooper** | | There is no evidence that there was a risk of a material SEC investigation at this point. The SEC had not even started interviews yet. |
| 167 | | "The goodwill impairment really was a result of our stock price in the fourth quarter which resulted in a market cap that was well below our book value of the equity." | | | |
| 170 | 2017 10K, dated March 13, 2018 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1st) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Murray, **Cooper, Sweedler, Hollander, Gossett, and Leonard** | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) by using the Income Approach | Plaintiff does not allege that Defendants did not believe their statements regarding goodwill, which is required when alleging that failure to take an earlier impairment amounts to a material misstatement. The SEC investigation was not material and in any event, there was no duty to disclose the investigation. |
| 170 | | "Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash | | | |

| | | | | | |
|---|---|---|---|---|---|
| 170 | | "goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017." | | | instead of the Market Approach for its impairment testing in 3Q17, Defendants were able to continue avoiding and delaying addressing the changed circumstances involving the sustained share price decline beginning in 4Q16 until 4Q17; (5) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (6) the Company's internal controls were deficient." |
| 170 | | "During the year ended December 31, 2016, we changed our annual impairment testing date from December 31 to October 1…This change in accounting principle did not delay, accelerate or avoid an impairment charge." | | | |
| 170 | | "[W]e applied the change in annual impairment testing date prospectively beginning October 1, 2016." | | | |
| 171 | | "[A]s needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models." | | | |
| | | "Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017." | | | |
| | | During the year ended December 31, 2016, the Company changed its annual impairment testing date from December 31 to October 1…This change in accounting principle did not delay, accelerate or avoid an impairment charge." | | | |
| | | "As such, the Company applied the change in annual impairment testing date prospectively beginning October 1, 2016." | | | Alleged omissions do not make this statement misleading to a reasonable investor. |
| 172 | 2017 10K, dated March 13, 2018 | "During the year ended December 31, 2017 we recorded non-cash impairment charges of $304.1 related to our goodwill . . . The goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization." | Defendants Murray, **Cooper, Sweedler, Hollander, Gossett, and Leonard** | **No reason provided** | Statements regarding goodwill are matters of opinion. |
| 173 | | "[D]uring the current year, due to impairment indicators noted in between | | **No reason provided** | Alleged omissions do not make this statement |

| | | | | |
|---|---|---|---|---|
| | annual tests, the Company performed impairment testing at September 30, 2017, which replaced its October 1st annual test." | | | misleading to a reasonable investor. |
| 173 | "Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company, with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1st annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows (the "Income Approach")." | | **No reason provided** | Any alleged omissions (of which there are none) would not make this statement misleading to a reasonable investor.<br><br>ASC allows Companies discretion in deciding how to measure fair value. |
| 173 | "Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017." | | **No reason provided** | Statements regarding goodwill are matters of opinion. |
| 173 | "Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017." | | **No reason provided** | Any alleged omissions (of which there are none) would not make this statement misleading to a reasonable investor. |
| 173 | "The Company evaluated the fair value of its reporting unit under the Income Approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting | | **No reason provided** | Any alleged omissions (of which there are none) would not make this statement misleading to a reasonable investor.<br><br>ASC allows Companies discretion in deciding |

| | | | | | |
|---|---|---|---|---|---|
| | | that the fair value of its reporting unit indicated by the Income Approach at December 31, 2017 was no longer in excess of its carrying value." | | | how to measure fair value. |
| 173 | | "Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill." | | **No reason provided** | Any alleged omissions (of which there are none) would not make this statement misleading to a reasonable investor.<br><br>Any alleged failure to take an earlier impairment is a matter of opinion. |
| 174 | | "Based on our management's assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2017, based on those criteria." | | **No reason provided** | There is no evidence that the internal controls were deficient. In any event, statements regarding compliance with ethical and legal standards are not material. |
| 177 | 1Q18 10Q, dated May 10, 2018 | "The 1Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of '[t]he changes in goodwill.'" | Defendants Murray and **Lops** | "Defendants made false and/or misleading statements and/or failed to disclose that (1) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it, and (2) the Company's internal controls were deficient." | There is no evidence that there was a risk of a material SEC investigation at this point. The SEC had not even started interviews yet.<br><br>There is no evidence that the internal controls were deficient. In any event, statements regarding compliance with ethical and legal standards are not material. |
| 179 | 2Q18 10Q, dated August 9, 2018 | "The 2Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of '[t]he changes in goodwill.'" | Defendants Murray and **Lops** | | |
| 181 | 3Q18 10Q, dated November 9, 2018 | "The 3Q18 10Q included the $304,123,000 impairment charge from 4Q17 as part of '[t]he changes in goodwill.'" | Defendants Murray and **Lops** | | |
| 184 | 2018 10K, dated March 14, 2019 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants Murray, **Lops, Sweedler, and Hollander** | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in | Whether or not an impairment event had occurred earlier is a matter of opinion.<br><br>But Plaintiff does not allege that Defendants did not believe their statements regarding goodwill, which is required when alleging that failure to take an |
| 184 | | "Due to the identification of impairment indicators during the quarter ended September 30, 2017, specifically the impairment of certain tradenames due to | | | |

| | | | |
|---|---|---|---|
| | reduced contractual minimums or reduced sales forecasts in key distribution channels, we performed impairment testing of our goodwill and indefinite-lived assets at September 30, 2017, which replaced our October 1 annual test." | impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (5) the Company's internal controls were deficient." | earlier impairment amounts to a material misstatement.

There is no evidence that there was a risk of a material SEC investigation at this point. Litigation was not substantially certain. The SEC had not even started interviews yet. Whether or not an impairment event had occurred earlier is a matter of opinion.

There is not duty to disclose uncharged wrongdoing or mismanagement.

Statements regarding testing procedure and dates were not made misleading by any alleged omissions. These are all true statements of fact.

ASC allows Companies discretion when determining how and when to calculate fair value. The decision to use one approach over another is a business judgment—or opinion.

Statements regarding compliance with ethical and legal standards are not material. |
| 184 | "Due to the identification of impairment indicators during the year ended December 31, 2017, we performed impairment testing of our goodwill and indefinite-lived assets during the fourth quarter of 2017. As a result of our testing, we recorded a noncash goodwill impairment charge of $304.1 million during the fourth quarter of 2017." | | |
| 185 | "[A]s needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models." | | |
| 185 | "Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017." | | |
| 186 | "The goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization." | | |
| 187 | "During the year ended December 31, 2017, the Company recorded a non-cash goodwill impairment charge of $304.1 million. The quantitative evaluation of goodwill impairment included an assessment of fair value under the income approach using estimates of future discounted cash flows, a Level 3 measure within the fair value hierarchy." | | |
| 188 | "[D]uring 2017, due to impairment indicators noted in between annual tests, the Company performed impairment | | |

| | | | | |
|---|---|---|---|---|
| | | testing at September 30, 2017, which replaced its October 1st annual test." | | |
| 188 | | "Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company , with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1 annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows." | | |
| 188 | | "Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017." | | |
| 188 | | "Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017." | | |
| 188 | | "The Company evaluated the fair value of its reporting unit under the income approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting that the fair value of its reporting unit indicated by the income approach at | | |

| | | | | | |
|---|---|---|---|---|---|
| | | December 31, 2017 was no longer in excess of its carrying value." | | | |
| 188 | | "[T]he Company noted it could no longer corroborate the results of the income approach by reconciling to within a reasonable range of the Company's market capitalization, including an assumed control premium." | | | |
| 188 | | "Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill." | | | |
| 189 | | Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2018, based on those criteria." | | | |
| 191 | October 7, 2019 Press Release | Sequential's Board was "conducting a broad review of strategic alternatives focused on maximizing shareholder value." | None (only "the Company") | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company. | None of the alleged omissions related to the SEC investigation or risk of suit make either of these statements of objective fact misleading to a reasonable investor. There was no duty to disclose the SEC investigation because litigation was not substantially certain. |
| 192 | | "Karen Murray has stepped down as Director and Chief Executive Officer of the Company…The Board has begun a search to identify the Company's new CEO." | | | |
| 195 | 3Q19 10Q, dated November 12, 2019 | "[T]he Company believes that such [legal] matters are currently not material." | Defendants **Wagenheim and Lops** | Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company." | The investigation was not material and there was no duty to disclose it. |
| 196 | | "With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations." | | | |

| | | | | | |
|---|---|---|---|---|---|
| 198 | January 9, 2020 8-K | "On January 6, 2020, Mr. Peter Lops resigned from his position as Chief Financial Officer of Sequential." | Defendant **Hanbridge** | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company was being investigated by the SEC, (2) the Company's current and/or former employees were being interviewed by the SEC, and (3) because Defendants had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, the SEC investigation was material as the SEC would be bringing a suit against the Company." | None of the alleged omissions related to the SEC investigation or risk of suit make this statements of objective fact misleading.<br><br>There was no duty to disclose the SEC investigation and the investigation was not material. |
| 201 | 2019 10K, dated March 31, 2020 | "Goodwill is tested for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (on October 1) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value." | Defendants **Conn and Hanbridge** (here, Hanbridge is only alleged to have signed a SOX cert attached to the **2018** 10K). | "Defendants made false and/or misleading statements and/or failed to disclose that: (1) by changing the date of the annual impairment test to October 1 in 3Q16, Defendants were able to avoid and delay addressing the changed circumstances involving the sustained share price decline beginning in 4Q16, including writing off a material amount of goodwill, for a year; (2) the Company's December 2016 internal calculations had confirmed that its goodwill was likely impaired; (3) the Company should have written down at least $100 million in impaired goodwill by the end of 3Q17 due to the sustained share price decline beginning in 4Q16 or informed investors of that likely impaired goodwill; (4) because they delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had exposed the Company to the risk of a material SEC investigation resulting in the SEC bringing suit against it; and (5) the Company's internal controls were deficient." | Whether or not an impairment event had occurred earlier is a matter of opinion.<br><br>But Plaintiff does not allege that Defendants did not believe their statements regarding goodwill, which is required when alleging that failure to take an earlier impairment amounts to a material misstatement.<br><br>There is no evidence that there was a risk of a material SEC investigation at this point. Litigation was not substantially certain. The SEC had not even started interviews yet. Whether or not an impairment event had occurred earlier is a matter of opinion.<br><br>There is not duty to disclose uncharged wrongdoing or mismanagement. |
| 201 | | "Due to the identification of impairment indicators during the quarter ended September 30, 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, we performed impairment testing of our goodwill and indefinite-lived assets at September 30, 2017, which replaced our October 1 annual test." | | | |
| 201 | | "Due to the identification of impairment indicators during the year ended December 31, 2017, we performed impairment testing of our goodwill and indefinite-lived assets during the fourth quarter of 2017. As a result of our testing, we recorded a noncash goodwill impairment charge of $304.1 million during the fourth quarter of 2017." | | | |
| 202 | | "[A]s needed, the Company tests goodwill and indefinite lived trademarks for impairment through the use of discounted cash flow models." | | | |
| 202 | | "Due to the identification of impairment indicators during the quarter ended December 31, 2017, the Company | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | performed impairment testing of its goodwill and indefinite-lived assets at December 31, 2017. As a result of its testing, the Company recorded a non-cash goodwill impairment charge of $304.1 million during the quarter ended December 31, 2017." | | | Statements regarding testing procedure and dates were not made misleading by any alleged omissions. These are all true statements of fact. |
| 203 | | "[t]he goodwill impairment was triggered in the fourth quarter of 2017 by the continued decline of our stock price and the related decline in our market capitalization." | | | ASC allows Companies discretion when determining how and when to calculate fair value. The decision to use one approach over another is a business judgment—or opinion. |
| 204 | | "During the year ended December 31, 2017, the Company recorded a non-cash goodwill impairment charge of $304.1 million. The quantitative evaluation of goodwill impairment included an assessment of fair value under the income approach using estimates of future discounted cash flows, a Level 3 measure within the fair value hierarchy." | | | Statements regarding compliance with ethical and legal standards are not material. |
| 205 | | "[D]uring 2017, due to impairment indicators noted in between annual tests, the Company performed impairment testing at September 30, 2017, which replaced its October 1st annual test." | | | |
| 205 | | "Due to impairment indicators noted during the third quarter of 2017, specifically the impairment of certain tradenames due to reduced contractual minimums or reduced sales forecasts in key distribution channels, the Company , with the assistance of a third party valuation specialist, performed a quantitative assessment at September 30, 2017, which replaced its October 1 annual test. Fair value for the quantitative assessment was determined under an income approach using estimates of discounted future cash flows." | | | |
| 205 | | "Reconciling items identified included the benefit of the Company's fully reserved tax assets for which the market may not have been giving full value and depressed market multiples experienced by the entities within our brand licensing peer | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | group. Based on the results of the quantitative assessment, the Company determined that goodwill was not impaired as of September 30, 2017." | | | |
| 205 | | "Due to additional impairment indicators noted during the fourth quarter of 2017, specifically a sharp and continued decline in its stock price and the related decline in its market capitalization, the Company determined that there was a fourth quarter impairment indicator and a quantitative impairment test was required to be performed at December 31, 2017." | | | |
| 205 | | "The Company evaluated the fair value of its reporting unit under the income approach (in the same manner as noted above in its assessment at September 30, 2017), adjusting its assumptions to reflect additional market risk in the discount rate (from 10.25% to 11.25%), as well as adjusted future effective tax rates, noting that the fair value of its reporting unit indicated by the income approach at December 31, 2017 was no longer in excess of its carrying value." | | | |
| 205 | | "[T]he Company noted it could no longer corroborate the results of the income approach by reconciling to within a reasonable range of the Company's market capitalization, including an assumed control premium." | | | |
| 205 | | "Based on this analysis, the fair value of the Company's single reporting unit was below its carrying value by an amount greater than the carrying value of goodwill, and the Company recorded an impairment charge of $304.1 million in the fourth quarter of 2017 to fully write off its goodwill." | | | |
| 206 | | "Based on this assessment, our management concluded that our internal control over financial reporting was effective as of December 31, 2019, based on those criteria." | | | Statements regarding compliance with ethical and legal standards are not material.<br><br>Plaintiff has not provided facts showing that the |

| | | | | | internal controls were not effective. |
|---|---|---|---|---|---|
| 208 | 2019 10K, dated March 31, 2020 | "We believe we complied with generally accepted accounting principles during such periods in all financial matters including goodwill and intangible assets but can provide no assurance that the SEC will agree." | Defendants **Conn and Hanbridge** (here, Hanbridge is only alleged to have signed a SOX cert attached to the **2018** 10K). | "Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company." | Statements regarding compliance with ethical and legal standards are not material.<br><br>This is also a truthful warning to investors that there is a risk that the SEC will disagree—exactly what the Plaintiff complains the Company did not provide. |
| 209 | | "[W]e believe that such [legal] matters are currently not material."<br><br>"With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations or cash flows." | | | The SEC investigation was not material.<br><br>In the same form, the Company did warn of the risk that it could become material in the future: "[T]here can be no assurance that matters …for which we are, or could be, involved in litigation, will not have a material adverse effect on our business, financial condition or results of operations." And, "However, the outcome of such legal matters is inherently unpredictable... Further, regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors."<br><br>In addition, the prediction is a forward-looking statement. |

| | | | | | |
|---|---|---|---|---|---|
| 212 | 1Q20 10Q, dated May 20, 2020 | "We believe we complied with GAAP during such periods in all financial matters including goodwill and intangible assets but can provide no assurance that the SEC will agree." | Defendants **Conn and Hanbridge** | "Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company." | Statements regarding compliance with ethical and legal standards are not material.<br><br>This is also a truthful warning to investors that there is a risk that the SEC will disagree—exactly what the Plaintiff complains the Company did not provide. |
| 213 | | "With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations." | | | The investigation was not material.<br><br>This prediction is a forward-looking statement. |
| 216 | 2Q20 10Q, dated August 14, 2020 | "The Company believes that it has complied with GAAP and SEC rules during such periods in all financial matters including goodwill" | Defendants **Hanbridge, DiSanto, and Sweedler**<br><br>***DiSanto and Sweedler did not actually sign this form**<br><br>***Sweedler is only alleged to have signed the SOX certification "attached to the 1Q20 10Q," which is not the form at issue here.** | "Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company." | Statements regarding compliance with ethical and legal standards are not material.<br><br>In addition, Plaintiff has not provided facts showing that the Company did not comply with GAAP and SEC rules. |
| 217 | | With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations. | | | The investigation was not material.<br><br>This prediction is a forward-looking statement. |
| 219 | November 2, 2020 8-K | "…Mr. Hanbridge's departure, anticipated to be effective November 16, 2020." | Defendant **Hanbridge** | "Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC | These alleged omissions do not make this statement misleading to a reasonable investor.<br><br>There was no duty to disclose these items. The |

| | | | | investigation was material as the SEC would be bringing a suit against the Company." | investigation was not material.<br><br>Plaintiff has not provided facts showing that the Company did not comply with GAAP. |
|---|---|---|---|---|---|
| 222 | 3Q20 10Q, dated November 16, 2020 | "The Company believes that it has complied with GAAP and SEC rules during such periods in all financial matters including goodwill" | Defendants **Hanbridge, DiSanto, and Sweedler**<br><br>*Sweedler is only alleged to have signed the SOX certification "attached to the 1Q20 10Q," which is not the form at issue here. | "Defendants made false and/or misleading statements and/or failed to disclose that because they had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired, they had violated GAAP and the SEC investigation was material as the SEC would be bringing a suit against the Company." | Statements regarding compliance with ethical and legal standards are not material.<br><br>In addition, Plaintiff has not provided facts showing that the Company did not comply with GAAP and SEC rules. |
| 223 | | "With respect to our outstanding legal matters, based on our current knowledge, we believe that the amount or range of reasonably possible loss will not, either individually or in the aggregate, have a material adverse effect on our business, financial condition or results of operations." | | | The investigation was not material.<br><br>This prediction is a forward-looking statement. |