UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------ X
PETER D'ARCY, Individually and on Behalf         :
of All Others Similarly Situated,                :
                                                 :
                    Plaintiff,                   :
                                                 :
        -against-                                :
                                                 :
YEHUDA SHMIDMAN, KAREN                           :
MURRAY, GARY KLEIN, ANDREW                       :     Case No. 1:21-cv-07296 (JPO)
COOPER, CHAD WAGENHEIM, PETER                    :
LOPS, DAVID CONN, DANIEL                         :     **CLASS ACTION**
HANBRIDGE, LORRAINE DISANTO,                     :
WILLIAM SWEEDLER, AARON                          :     Honorable J. Paul Oetken
HOLLANDER, AL GOSSETT, STEWART                   :
LEONARD, JR., COHNREZNICK LLP,                   :
STEPHEN WYSS, STEPHEN JACKSON,                   :
and ROBERT HILBERT,                              :
                                                 :
                    Defendants.                  :
------------------------------------------------------ X
```

## PLAINTIFF'S OMNIBUS OPPOSITION TO
## DEFENDANTS' MOTIONS TO DIMISS THE AMENDED COMPLAINT

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 2

BACKGROUND ................................................................................................................... 6

ARGUMENT ...................................................................................................................... 14

I.   Defendants Klein, Shmidman, Murray, Cooper, Lops, Sweedler, Hollander, Gossett, and  Leonard's Fraudulent Goodwill Statements Had No Reasonable Basis in Fact .................................................... 15

   A. *The Challenged Goodwill Statements Are False Statements of Opinion* .......................... 16

     1. The Goodwill Statements Omitted Known Material Facts. ......................................... 17

     2. The PSLRA Safe Harbor Does Not Protect the Goodwill Statements .......................... 21

   B. *Defendants Acted With Scienter.* ................................................................................ 22

     1. Defendants' Access to, or Failure to Check, Sequential's Internal Calculations Indicating Goodwill Was Impaired Gives Rise to a Strong Inference of Scienter. ..... 23

     2. The Magnitude of the Goodwill Fraud Supports a Strong Inference of Scienter. ........ 25

     3. The Timing of the Impairment is Highly Suspicious. .................................................. 27

     4. The SEC Investigation Supports a Strong Inference of Scienter. ................................ 30

     5. The Importance of Strong Goodwill to Sequential's Financial Condition Supports a Strong Inference of Scienter. ................................................................................ 32

     6. Plaintiff Adequately Pleads Motive and Opportunity. ................................................ 34

     7. CohnReznick's Judgment Does Not Insulate the Sequential Defendants .................... 35

     8. Defendants' "Competing Inference" Does Not Defeat Scienter. .................................. 36

II.  Defendants Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler Fraudulently    Misled Investors About the SEC Investigation ................................................................... 37

   A. *The Challenged SEC Investigation Statements Are Materially Misleading.* ................... 37

     1. The SEC Investigation Was Material to Investors, Regardless of Whether It Would Lead to an SEC Complaint. ..................................................................................... 40

     2. Defendants Were Aware, or Had a Duty to Make Themselves Aware, of the Underlying Facts of the SEC Investigation. ............................................................. 44

   B. *The Misleading SEC Investigation Statements Were Made With Scienter.* ..................... 45

     1. The Gibson Dunn Defendants Had Motive to Conceal the SEC Investigation and/or the Facts Supporting the SEC's Position. ............................................................... 45

2. Defendants Knew, or Were Reckless in Not Knowing, About the SEC Investigation. 46

III. Defendants Falsely Affirmed that Sequential Maintained Adequate Disclosure Controls and Procedures and Internal Controls Over Its Financial Reporting ................................47

A. The Challenged Controls Statements Are Materially False. ............................ 49

B. The False Controls Statements Were Made with Scienter. .............................. 51

1. Sequential's CEOs and CFOs' Tone at the Top Enhances Scienter Inference.......... 51

2. The SOX Certifications Support a Strong Inference of Scienter............................. 53

IV. Plaintiff Adequately Alleges Reliance ................................................................54

V. Plaintiff Adequately Alleges Loss Causation........................................................58

VI. Plaintiff Adequately Alleges Scheme Liability......................................................60

VII. The Court Should Consider, and Not Strike, Plaintiff's Allegations Based on the SEC Consent Orders and Complaint ................................................................64

A. Courts May Consider Allegations Based on SEC Orders and Complaints at the Pleading Stage, Regardless of Their Admissibility. ........................................... 65

B. Courts Do Not Strike Relevant Portions of Pleadings Based on Immateriality............. 67

C. Defendants' Cases Do Not Support Striking or Disregarding Any Allegations.............. 69

VIII. Plaintiff's Claims Are Timely ................................................................72

A. The Statute of Limitations Does Not Bar Plaintiff's Claims. ........................... 73

1. Merck's Discovery Rule Supports Constructive Notice on December 11, 2020. .... 75

2. None of Defendants' Cases Support the SOL Starting on February 28, 2018. ........ 79

B. The Statute of Repose Does Not Bar Plaintiff's Claims. ................................. 84

1. The Claims Against the CohnReznick and Additional Gibson Dunn Defendants Relate Back to the Original Complaint, and Thus, They Were Timely Added as Defendants After Being Mistakenly Excluded........................................ 84

2. Misstatements Alleged From the Original Complaint Are Timely. ........................ 90

3. Plaintiff's Scheme Liability Claims Against the CohnReznick and Additional Gibson Dunn Defendants Are Timely........................................ 91

IX. Plaintiff Adequately Alleges Control Person Liability ....................................94

CONCLUSION ................................................................97

# TABLE OF AUTHORITIES

**Cases**

*380544 Can., Inc. v. Aspen Tech., Inc.,*
    544 F. Supp. 2d 199 (S.D.N.Y. 2008) ................................................................ 95

*Abdell v. City of New York,*
    759 F. Supp. 2d 450 (S.D.N.Y. 2010) ........................................................... 86, 89

*Abramson v. NewLink Genetics Corp.,*
    965 F.3d 165 (2d Cir. 2020) ........................................................................... 19

*Abu Dhabi Inv. Auth. v. Mylan N.V.,*
    No. 20-CV-1342 (JPO), 2021 WL 516310 (S.D.N.Y. Feb. 10, 2021) ................... 92

*Acito v. IMCERA Grp., Inc.,*
    47 F.3d 47 (2d Cir. 1995) ............................................................................... 38

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972) ....................................................................................... 60

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,*
    568 U.S. 455 (2013) ....................................................................................... 58

*Amorosa v. AOL Time Warner Inc.,*
    409 F. App'x 412 (2d. Cir. 2011) ................................................................... 80

*Amorosa v. Gen. Elec. Co.,*
    No. 21-CV-3137 (JMF), 2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) ........ 70, 71, 77

*Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.,*
    879 F.3d 474 (2d Cir. 2018), *vacated and remanded,* 210 L. Ed. 2d 347 (2021) ............ 55

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................... 14

*Athale v. SinoTech Energy Ltd.,*
    No. 11 CIV 0531 AJN, 2014 WL 687218 (S.D.N.Y. Feb. 21, 2014) ................... 24

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) .......................................................................... 22, 94

*Baliga v. Link Motion, Inc.,*
    No. 18 CIV. 11642 (VM), 2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022) ........... 56, 58

*Barrett v. PJT Partners Inc.,*
    No. 16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017) ................. 48

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ..................................................................................... 54, 55

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO,* 475 F. App'x
   353 (2d Cir. 2012) ........................................................................................................................ 54

*Bell Atl. v. Twombly*,
   550 U.S. 544 (2007) ..................................................................................................................... 14

*Bielousov v. GoPro, Inc.*,
   No. 16-CV-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ...................................... 54

*Bond v. Clover Health Invs., Corp.*,
   No. 3:21-cv-00096, 2022 WL 602432 (M.D. Tenn. Feb. 28, 2022) ........................................... 47

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F. Supp. 3d 100 (D. Conn. 2021) ........................................................................................ 96

*Brady v. Wal-Mart Stores, Inc.*,
   531 F.3d 127 (2d Cir. 2008) ........................................................................................................ 69

*Caiola v. Citibank, N.A.*,
   295 F.3d 312 (2d Cir. 2002) ........................................................................................................ 44

*Carpenters Health & Welfare Fund v. Coca-Cola Co.*,
   No. 1:00-CV-02838, 2002 WL 34089163 (N.D. Ga. Aug. 20, 2002) ........................................ 28

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ................................................................................................. 15, 82

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   56 F. Supp. 3d 549 (S.D.N.Y. 2014) ................................................................................... 83, 97

*Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*,
   543 F. App'x 72 (2d Cir. 2013) ................................................................................................... 59

*Chen v. X Fin.*,
   No. 19CV6908KAMSJB, 2022 WL 765417 (E.D.N.Y. Mar. 13, 2022) ..................................... 79

*Christine Asia Co. v. Ma*,
   718 F. App'x 20 (2d Cir. 2017) ................................................................................................... 47

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
   No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ................................... 50

*City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*,
   10 CIV. 2835 (NRB), 2011 WL 4357368 (S.D.N.Y. Sept. 19, 2011) ....................................... 50

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
   No. 19-CV-10825 (JPO), 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) (Oetken, J.), *aff'd sub
   nom Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' &
   Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) .............. 66

*City of Omaha, Neb. Civilian Emp.'s Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) ......................................................................................................... 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................... 20, 21, 37

*City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)......................................................... 74, 76, 82

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011)................................................... 21

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006)................................................ 47, 79

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
  587 F. Supp. 3d 56 (S.D.N.Y. 2022)..................................................... 77

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*,
  928 F. Supp. 2d 705 (S.D.N.Y. 2013)..................................................... 39

*City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*,
  129 F. Supp.3d 48 (S.D.N.Y. 2015)................................................... 19, 96

*CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*,
  No. 09 CIV. 2255 (TPG), 2010 WL 4177103 (S.D.N.Y. Oct. 7, 2010) ............ 18, 28

*CompuDyne Corp. v. Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006)..................................................... 94

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
  323 F. Supp. 3d 393 (S.D.N.Y. 2018)..................................................... 58

*Dudley v. Haub*,
  No. 2:11-CV-05196 (WJM), 2013 WL 1845519 (D.N.J. Apr. 30, 2013)................ 27

*Dura Pharmaceuticals, Inc. v. Broudo*,
  544 U.S. 336 (2005) .................................................................. 58, 59

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................... 35, 43

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015).............................................................. 23

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017).............................................................. 80

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012)..................................................... 54

*Fox v. First BanCorp*,
  Civ. No. 05-2148 (GAG), 2006 WL 4128534 (D.P.R. Nov. 6, 2006)..................... 96

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011)............................................................ 53

*Freidus v. Barclays Bank PLC*,
  734 F.3d 132 (2d Cir. 2013) ................................................................ 80

*Fresno Cnty. Emps.' Ret. Ass'n. v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ................................................ 27

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................ 20, 26, 59

*Ganino v. Citizens Utilities Co.*,
  228 F.3d 154 (2d Cir. 2000) .......................................................... 22, 42

*Gavin/Solmonese LLC v. D'Arnaud-Taylor*,
  639 App'x 664 (2d. Cir. 2016) ...................................................... 81, 82

*Gittens-Bridges v. City of New York*,
  No. 19 CIV. 272 (ER), 2020 WL 3100213 (S.D.N.Y. June 11, 2020) ................. 68

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................ 29

*Hall v. The Children's Place Retail Stores, Inc.*,
  580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................................ 29

*Hammer v. Reetz*,
  No. 16 CIV. 6590 (LLS), 2017 WL 946336 (S.D.N.Y. Feb. 27, 2017) ............ 91, 92, 93

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ................................................ 28

*Hutchinson v. Perez*,
  No. 12 CIV. 1073 HB, 2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012), *amended,* No. 12CIV 1073 HB, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) ............................. 54

*In re Advanced Battery Techs., Inc.*,
  781 F.3d 638 (2d Cir. 2015) .......................................................... 32

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .............................................. 41

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. Dec. 22, 2005) .............................. 61, 97

*In re Ambac Fin. Grp., Inc.*,
  693 F. Supp. 2d 241 (S.D.N.Y. 2010) ................................................ 26

*In re AT&T/DirectV Now Sec. Litig.*,
  No. 19-CV-2892 (VEC), 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) *aff'd sub nom.* *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.,* No. 21-2698-CV, 2022 WL 17587853 (2d Cir. Dec. 13, 2022) ................................................ 62

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ................................................ 33

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................................ 21, 23

*In re Bausch & Lomb, Inc. Sec. Litig.*,
  592 F. Supp. 2d 323 (W.D.N.Y. 2008) ................................................................ 49

*In re Beacon Assocs. Litig.*,
  282 F.R.D. 315 (S.D.N.Y. 2012) ......................................................................... 91

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) ............................................................ 66, 79

*In re Bernard L. Madoff Inv. Sec. LLC*,
  468 B.R. 620 (Bankr. S.D.N.Y. 2012), *cert. denied sub nom. Citibank, N.A. v. Picard,* 212 L.
  Ed. 2d 217 (2022) ............................................................................................... 85

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp.3d 711 (S.D.N.Y. 2015) ..................................................................... 39

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017) .................................................................. 21

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) .................................................................. 30

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ........................................................................... 34, 35

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018) .................................................................. 21

*In re CBI Holding Co.,*
  419 B.R. 553 (S.D.N.Y. 2009), *on reh'g in part,* 01 CV 0131 (KMW), 2010 WL 2287013
  (S.D.N.Y. June 7, 2010) ............................................................................... 62, 64

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  No. 17-CIV-1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018) .................... 16, 18, 78

*In re China Valves Tech. Sec. Litig.*,
  979 F. Supp. 2d 395 (S.D.N.Y. 2013) .................................................................. 40

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd,* 165 F. App'x. 928 (2d Cir. 2006) .................... 38

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  No. CV166509ESCLW, 2020 WL 3026564 (D.N.J. June 5, 2020) ......................................... 92

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  No. 18-CV-7253 (NG)(PK), 2023 WL 2682905 (E.D.N.Y. Mar. 29, 2023) .......... 65, 66, 74, 81

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
  No. 19-CV-6180 (LAP), 2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ................................. 48

*In re DNTW Chartered Accts. Sec. Litig.*,
   172 F. Supp. 3d 675 (S.D.N.Y. 2016) ................................................................ 72

*In re Enzymotec Sec. Litig.*,
   No. CV145556JLLMAH, 2015 WL 8784065 (D.N.J. Dec. 15, 2015) ................... 48

*In re EZCorp, Inc. Sec. Litig.*,
   181 F. Supp. 3d 197 (S.D.N.Y. 2016) ................................................................ 96

*In re Fannie Mae 2008 Sec. Litig.*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd,* 525 F. App'x 16 (2d Cir. 2013) ................. 68, 69

*In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*,
   247 F.R.D. 32 (D.D.C. 2008) .............................................................................. 55

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (E.D.N.Y. 2013) ........................................................... 30, 48

*In re Glob. Crossing, Ltd. Sec. Litig.*,
   322 F. Supp. 2d 319 (S.D.N.Y. 2004) ................................................................ 61

*In re Grupo Televisa Sec. Litig.*,
   368 F. Supp. 3d 711 (S.D.N.Y. 2019) ................................................................ 47

*In re Grupo Televisa Sec. Litig.*,
   No. 18 CIV. 1979 (LLS), 2022 WL 2829253 (S.D.N.Y. July 20, 2022) ............... 57

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
   20 F.4th 131 (2d Cir. 2021) ............................................................................... 66

*In re HEXO Corp. Sec. Litig.*,
   524 F. Supp. 3d 283 (S.D.N.Y. 2021) ................................................................ 25

*In re Hi-Crush Partners L.P. Sec. Litig.*,
   No. 12 CIV. 8557 (CM), 2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ................. 46

*In re IndyMac Mortg.-Backed Sec. Litig.*,
   793 F. Supp. 2d 637 (S.D.N.Y. 2011), *aff'd in part sub nom. Police & Fire Ret. Sys. of City of
   Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) ................................... 86

*In re Initial Pub. Offering Sec. Litig.*,
   241 F. Supp. 2d 281 (S.D.N.Y. 2003) ................................................................ 61

*In re Inv. Tech Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................ 23

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ............................................................... 38, 43

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd,* 604 F. App'x 62 (2d Cir. 2015) ........... 35

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
    501 F. Supp. 2d 452 (S.D.N.Y. 2006)........................................................................ 38, 46

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    218 F.R.D. 76 (S.D.N.Y. 2003)................................................................................... 38, 70

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)............................................................................... 95

*In re MicroStrategy, Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000)................................................................................ 26

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020).............................................................................. 93

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
    No. 09 CIV. 2137 LTS MHD, 2010 WL 3239430 (S.D.N.Y. Aug. 17, 2010)......................... 86

*In re Mylan N.V. Sec. Litig.*,
    16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)................................... 39, 59

*In re Nevsun Res. Ltd.*,
    No. 12 CIV. 1845 (PGG), 2013 WL 6017402 (S.D.N.Y. Sept. 27, 2013) ............................. 52

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
    988 F. Supp. 2d 406 (S.D.N.Y. 2013)............................................................................... 36

*In re Openwave Sys. Sec. Litig.*,
    528 F. Supp. 2d 236 (S.D.N.Y. 2007)............................................................................... 30

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014)........................................................................ 28, 65, 70

*In re Par Pharm., Inc. Sec. Litig.*,
    733 F. Supp. 668 (S.D.N.Y. 1990)................................................................................... 38

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)............................................................................... 40

*In re PetroChina Co. Ltd. Sec. Litig.*,
    120 F. Supp. 3d 340 (S.D.N.Y. 2015)........................................................................ 29, 48, 50

*In re Pfizer Inc. Sec. Litig.*,
    No. 04 CIV. 9866 LTS HBP, 2012 WL 983548 (S.D.N.Y. Mar. 22, 2012)....................... 16, 20

*In re Plug Power, Inc. Sec. Litig.*,
    No. 21 CIV. 2004 (ER), 2022 WL 4631892 (S.D.N.Y. Sept. 29, 2022) ............................... 35

*In re Proshares Tr. II Sec. Litig.*,
    839 F. App'x 649 (2d Cir. 2021)..................................................................................... 80

*In re RAIT Fin. Tr. Sec. Litig.*,
    No. 2:07CV03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) ............................... 26

ix

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................ 62

*In re Rsrv. Fund Sec. & Derivative Litig.*,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010) ................................................................ 32

*In re Rsrv. Fund Sec. & Derivative Litig.*,
   No. 09 CIV. 4346 PGG, 2012 WL 4774834 (S.D.N.Y. Sept. 12, 2012) ................................. 36

*In re Sadia, S.A. Sec. Litig.*,
   643 F. Supp. 2d 521 (S.D.N.Y. 2009) ................................................................ 29

*In re Salix Pharms., Ltd.*,
   14-CV-8925 (KMW), 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ................................. 21, 26

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ............................................................................ 15

*In re Scottish Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ................................................................ 28, 50

*In re Shanda Games Ltd. Sec. Litig.*,
   No. 18-cv-2463-ALC, 2019 WL 11027710 (S.D.N.Y. Sep. 30, 2019) ................................. 22

*In re Shanda Ltd. Sec. Litig.*,
   No. 1:2018CV02463, 2020 WL 5813769 (S.D.N.Y. Sept. 30, 2020) ................................. 22

*In re Signet Jewelers Ltd. Sec. Litig.*,
   16 CIV. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ("*Signet I*") ................. 25

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 16 Civ. 6728 (CM)(RWL), 2019 WL 3001084 (S.D.N.Y. July 10, 2019)
   ("*Signet II*") ......................................................................................... 55, 56

*In re Solucorp Indus., Ltd. Sec. Litig.*,
   No. 98CIV.3248(LMM), 2000 WL 1708186 (S.D.N.Y. Nov. 15, 2000) ............................. 96

*In re Synchrony Fin. Sec. Litig.*,
   450 F. Supp. 3d 127 (D. Conn. 2020), *aff'd in part, rev'd in part*, 988 F.3d 157 (2d Cir. 2021)
   ............................................................................................................ 80

*In re UBS AG Sec. Litig.*,
   No. 07 CIV. 11225 RJS, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012*), aff'd sub nom. City of*
   *Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173 (2d Cir. 2014) ............ 29

*In re Vale S.A. Sec. Litig.*,
   No. 19CV526RJDSJB, 2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................. 51

*In re VEON Ltd. Sec. Litig.*,
   No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ............................. 58

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   No. 15CV1249, 2017 WL 2062985 (S.D.N.Y. May 15, 2017) ................................. 56, 57, 58

*In re Vitamin C Antitrust Litig.,*
   995 F. Supp. 2d 125 (E.D.N.Y. 2014) .................................................................. 87, 89, 90

*In re Vivendi, S.A. Sec. Litig.,*
   838 F.3d 223 (2d Cir. 2016) ................................................................................ 39, 59

*In re Willbros Group, Inc.,*
   4:14-CV-3084, 2016 WL 4920979 (S.D. Tex. Sept. 15, 2016) ............................... 42

*In re Williams Sec. Litig.,*
   339 F. Supp. 2d 1206 (N.D. Okla. 2003) ............................................................... 28

*In re Winstar Commc'ns,*
   No. 01 CV 3014 (GBD), 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) .................... 33

*In re WorldCom, Inc. Sec. Litig.,*
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ............................................................... 26, 96

*In re: Petrobras Sec. Litig.,*
   No. 14-CV-9662 (JSR), 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) .................... 24

*Institutional Invs. Grp. v. Avaya, Inc.,*
   564 F.3d 242 (3d Cir. 2009) ............................................................................... 24, 25

*Int'l Ass'n of Heat v. Int'l Bus. Machines Corp.,*
   205 F. Supp. 3d 527 (S.D.N.Y. 2016) .................................................................... 54

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank,*
   924 F. Supp. 2d 528 (S.D.N.Y. 2013) .................................................................... 91

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC,*
   91 F. Supp. 3d 456 (S.D.N.Y. 2015) ...................................................................... 21

*Janbay v. Can. Solar, Inc.,*
   10 CIV. 4430, 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .................................. 50

*Janus Capital Grp., Inc. v. First Derivative Traders,*
   564 U.S. 135 (2011) .............................................................................................. 20

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001) .................................................................................. 34

*Kleinman v. Elan Corp., plc,*
   706 F.3d 145 (2d Cir. 2013) .................................................................................. 41

*Krupski v. Costa Crociere S. p. A.,*
   560 U.S. 538 (2010) .................................................................................. 85, 89, 90

*Kuriakose v. Fed. Home Loan Mortg. Corp.,*
   897 F. Supp. 2d 168 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension*
   *Fund v. Fed. Home Loan Mortg. Corp.,* 543 F. App'x 72 (2d Cir. 2013) ................................. 20

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  No. 21-CV-03070-ARR-TAM, 2022 WL 16745512 (E.D.N.Y. Nov. 7, 2022) ...................... 20

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) .................................................................................. 77, 79

*Leonard v. Gen. Motors L.L.C.*,
  504 F. Supp. 3d 73 (D. Conn. 2020) ...................................................................... 88, 90

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*,
  902 F. Supp. 2d 329 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr.
  Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC,* 783 F.3d 383 (2d Cir. 2015) .... 83

*Lipow v. Net1 UEPS Techs., Inc.*,
  131 F. Supp. 3d 144 (S.D.N.Y. 2015) ..................................................................... 38, 54

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir.1976) ........................................................................................ 65

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC,
  797 F.3d 160 (2d Cir. 2015) ............................................................................ 65, 66, 71

*Lorenzo v. SEC*,
  139 S. Ct. 1094 (2019) ......................................................................................... 60, 63

*Lucescu v. Zafirovski*,
  No. 09CV4691 (DLC), 2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) .................................. 20

*Makor Issues & Rts, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...................................................................................... 33

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
  164 F. Supp. 3d 568 (S.D.N.Y. 2016) ..................................................................... 38, 45

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010) ................................................................................................... 73

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) ........................................................................ 54

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999) ............................................................................ 78

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
  No. 15 CIV. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ............................ 20

*Nathel v. Siegal*,
  592 F. Supp. 2d 452 (S.D.N.Y. 2008) .......................................................................... 52

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x. 10 (2d Cir. 2011) .................................................................................. 46

xii

*Nguyen v. FXCM Inc.*,
   364 F. Supp. 3d 227 (S.D.N.Y. 2019) .................................................................... 67, 68

*Noto v. 22nd Cent. Grp., Inc.*,
   19-CV-1285 (JLS), 2023 WL 122305 (W.D.N.Y. Jan. 6, 2023) ................................ 26

*Noto v. 22nd Cent. Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) .............................................................. 39, 40, 42, 44

*Ocasio v. City of Canandaigua*,
   No. 18-CV-6712DGL, 2022 WL 17591639 (W.D.N.Y. Dec. 13, 2022) ................................ 87

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................................ 16, 19

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
   432 F. Supp. 3d 131 (D. Conn. 2019) ............................................................ 60, 95

*Pearlstein v. Blackberry Ltd.*,
   No. 13 CIV. 7060 (CM)(KHP), 2022 WL 1000314 (S.D.N.Y. Apr. 4, 2022) .......................... 76

*Pirani v. Slack Techs., Inc.*,
   445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021) ...................... 41

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
   11 F.4th 90 (2d Cir. 2021) ........................................................................ 38, 92

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) ............................................................... passim

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
   No. 1:16-CV-3591-GHW, 2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ............................ 47, 54

*Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*,
   694 F. Supp. 2d 287 (S.D.N.Y. 2010) .................................................................. 20

*Poptech, L.P. v. Stewardship Inv. Advisors, LLC*,
   849 F. Supp. 2d 249 (D. Conn. 2012) .................................................................. 59

*Puddu v. 6D Glob. Techs., Inc.*,
   742 F. App'x 553 (2d Cir. 2018) ...................................................................... 66

*Richman v. Goldman Sachs Grp.*,
   868 F. Supp. 2d 261 (S.D.N.Y. 2012) .................................................................. 38

*Roe v. Johnson*,
   No. 07-CV-2143 RJD RER, 2011 WL 8189861 (E.D.N.Y. Aug. 12, 2011), *report and
   recommendation adopted*, No. 07 CV 2143 RJD RER, 2012 WL 2575340 (E.D.N.Y. July 3,
   2012)................................................................................................ 86, 89

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................... 16

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ........................................................................... 25, 27, 76

*S. Cherry St., LLC v. Hennessee Grp. LLC,*
    573 F.3d 98 (2d Cir. 2009) ........................................................................................ 24

*S.E.C. v. Citigroup Glob. Mkts. Inc.,*
    752 F.3d 285 (2d Cir. 2014) ...................................................................................... 70

*S.E.C. v. Citigroup Glob. Mkts. Inc.,*
    827 F. Supp. 2d 328 (S.D.N.Y. 2011), *vacated and remanded*, 752 F.3d 285 (2d Cir. 2014) . 70

*Saraf v. Ebix, Inc.,*
    No. 21-CV-1589 (JMF), 2022 WL 4622676 (S.D.N.Y. Sept. 30, 2022) .................. 54

*Schiro v. Cemex, S.A.B. de C.V.,*
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...................................................................... 50

*SEC v. Cavanaugh,*
    445 F.3d 105 (2d Cir. 2006) ...................................................................................... 51

*SEC v. Fiore,*
    416 F. Supp. 3d 306 (S.D.N.Y. 2019) ...................................................................... 79

*SEC v. Gabelli,*
    653 F.3d 49 (2d Cir. 2011), *rev'd,* 568 U.S. 442 (2013) ........................................ 39

*SEC v. Rio Tinto plc,*
    41 F.4th 47 (2d Cir. 2022) ................................................................................... 62, 63

*SEC v. Rosenberger,*
    No. 22CV4736 (DLC), 2023 WL 1928093 (S.D.N.Y. Feb. 10, 2023) ..................... 62

*SEC v. Sason,*
    433 F. Supp. 3d 496 (S.D.N.Y. 2020) ...................................................................... 62

*SEC v. SeeThruEquity, LLC,*
    No. 18 CIV. 10374 (LLS), 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019) ............... 92

*SEC v. Sequential Brands Grp., Inc.,*
    No. 20-CV-10471 (JPO), 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) ........ passim

*SEC v. Sugarman,*
    No. 19 CIV. 5998, 2020 WL 5819848 (S.D.N.Y. Sept. 30, 2020) ..................... 61, 92

*SEC v. Xia,*
    No. 21CV5350PKCRER, 2022 WL 17539124 (E.D.N.Y. Dec. 8, 2022) ................. 91

*SEC. v. Lee,*
    720 F. Supp. 2d 305 (S.D.N.Y. 2010) ...................................................................... 67

*Setzer v. Omega Healthcare Invs., Inc.,*
    968 F.3d 204 (2d Cir. 2020) ................................................................................ 42, 44

*Siebert v. Nives,*
   871 F. Supp. 110 (D. Conn. 1994) ...................................................................... 78

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
   417 F. Supp. 3d 379 (S.D.N.Y. 2019) ..................................................... 49, 50, 71

*Sjunde AP-Fonden v. Gen. Elec. Co.,*
   No. 17-CV-8457 (JMF), 2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) .................... 71

*Soto v. Brooklyn Corr. Facility,*
   80 F.3d 34 (2d Cir. 1996) .................................................................................. 86

*Steginsky v. Xcelera Inc.,*
   741 F.3d 365 (2d Cir. 2014) .............................................................................. 14

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta,*
   552 U.S. 148 (2008) ......................................................................................... 55

*Stratte-McClure v. Morgan Stanley,*
   776 F.3d 94 (2d Cir. 2015) ................................................................................ 45

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007). .......................................................................... 22, 23, 34

*Tobia v. United Grp. of Co., Inc.,*
   No. 115CV1208BKSDEP, 2016 WL 5417824 (N.D.N.Y. Sept. 22, 2016) ............ 68

*Tongue v. Sanofi,*
   816 F.3d 199 (2d Cir. 2016) .......................................................................... 17, 19

*Touchstone Strategic Tr. v. Gen. Elec. Co.,*
   No. 19-CV-1876 (JMF), 2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ........... 35, 71

*United States. v. Gilbert,*
   668 F.2d 94 (2d Cir. 1981) ................................................................................ 65

*Van Dongen v. CNinsure Inc.,*
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ................................................................ 28

*Vanleeuwen v. Keyuan Petrochemicals, Inc.,*
   No. 13 CIV. 6057 PAC, 2014 WL 3891351 (S.D.N.Y. Aug. 8, 2014) .................. 69

*Varghese v. China Shenghuo Pharm. Holdings, Inc.,*
   672 F. Supp. 2d 596 (S.D.N.Y. 2009) ................................................................ 50

*VNB Realty v. Bank of Am. Corp.,*
   No. 11 CIV. 6805 (DLC), 2013 WL 5179197 (S.D.N.Y. Sept. 16, 2013) ............. 67

*Woodley v. Wood,*
   No. 20 CIV. 2357 (ER), 2022 WL 103563 (S.D.N.Y. Jan. 11, 2022), *aff'd sub nom. Rotunno v. Wood,* No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) ............................................. 48

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020) ............................................................ 20, 36

*Yaroni v. Pintec Tech. Holdings Ltd.*,
   600 F. Supp. 3d 385 (S.D.N.Y. 2022) ................................................................ 80

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
   65 F.4th 459 (9th Cir. 2023) ......................................................................... 76, 77

*Zwick Partners, LP v. Quorum Healthy Corp.*,
   No. 3:16-CV-2475, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018) ..................... 18

## Other Authorities

15 U.S.C. § 77m ............................................................................................. 80
15 U.S.C. § 78u-4(b)(1) ................................................................................... 15
28 U.S.C. § 1658(b) .................................................................................. 73, 74
ASC 350 ......................................................................................................... 7
Fed. R. Civ. P. 12(f) ....................................................................................... 67
Fed. R. Civ. P. 8(a)(2) .................................................................................... 59
Rule 10b-5 ..................................................................................................... 92
Rule 12(b)(6) ........................................................................................... 14, 62
Rule 12(f) ...................................................................................................... 67
Rule 9(b) ....................................................................................................... 15
SEC Staff Accounting Bulletin No. 99,
   1999 WL 1123073 (Aug. 12, 1999) .............................................................. 51

Plaintiff CJD Property Finance Company LLC, on behalf of itself and the putative Class, respectfully submits this Omnibus Memorandum in Opposition to Defendants' five motions to dismiss[1] the Amended Complaint (ECF No. 44).[2]

## PRELIMINARY STATEMENT

This action arises from Defendants' misstatements and scheme to defraud investors in Sequential, a now bankrupt company which had owned and managed a portfolio of major consumer brands. Defendants hid the fact that the value of Sequential's core brands had materially deteriorated in 3Q17, and delayed writing off the value of those brands, until the Company was forced to write off *all $304.1 million* of its goodwill in 4Q17. In the detailed disclosures about the write-off, however, Defendants still omitted that two of Sequential's own analyses had shown that its goodwill was impaired as of mid-December 2016 and year-end 2016, and that changes to the Company's methodology for assessing goodwill were made to delay the write-off and the publicizing of the value of its brands being permanently and materially deteriorated. But Shmidman and Klein knew; they just left long before the true value of the Company was revealed to investors, causing Plaintiff and the rest of the putative class substantial loss.

When the SEC began interviewing Sequential employees in 3Q19 about its "controls and practices" around assessing goodwill in 2016 and 2017, defendants hid the investigation from investors despite knowing that the Company had violated GAAP in delaying the write-off, and that its internal controls had failed to prevent material misstatements about goodwill. But Murray

---

[1] ECF Nos. 105 ("CR MTD"), 109 ("Murray MTD"), 111 ("Klein MTD"), 115 ("GD MTD"), and 119 ("Shmidman MTD").

[2] Unless otherwise noted, capitalized terms have the meanings ascribed in the Amended Complaint to which all "¶" citations refer, citations and footnotes are omitted, and all emphasis is added. For brevity, "defendants" refers to those Sequential Defendants who made, and the CohnReznick Defendants who signed off on, the alleged misstatements at issue in that particular sentence.

and Lops knew; they just left without telling investors that there was more to the goodwill write-off than what was previously disclosed. Defendants finally disclosed the SEC Investigation on March 31, 2020, but assured investors that there was nothing more to see. And as the investigation escalated, Conn and Hanbridge quietly left before the SEC filed its complaint on December 11, 2020, which finally revealed the internal calculations showing that the Company's goodwill had been impaired by mid-December 2016, that the basis for the changes in Sequential's methodology for assessing goodwill were to delay the write-off, and that there were resulting GAAP violations.

The SEC Complaint further explained that "[b]y avoiding an impairment to its goodwill in 2016, Sequential's financial statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets" and "created a false impression of its financial health and ability to execute on its business plan." The SEC ultimately settled charges against Sequential and Klein "for causing [its] reporting, books and records, and internal controls violations" related to its failure to timely impair goodwill (but did not impose a monetary fine on Sequential because of its bankruptcy). The fraud at issue in this case, moreover, went beyond the bounds of the Company.

The Company's independent auditor, CohnReznick, and its partners were part of the scheme. Despite being the "public watchdog" and last line of defense for investors in identifying fraud risks and detecting fraud, CohnReznick helped the Sequential Defendants document its audit files and signed off on its SEC filings to support delaying the write-off for a year, the SEC investigation disclosure for six months, and the SEC Complaint for eight months. The SEC thus also charged and settled with CohnReznick for its "improper professional conduct" connected to the 3Q17 "review and 2017 annual audit of Sequential" which "were a cause of" its "materially misstated financial statements," and individually with Wyss, Jackson, and Hilbert for their

3

"improper professional conduct" connected to CohnReznick's "interim reviews and audits of the financial statements of Sequential," particularly its goodwill impairment testing in 2016 and 2017 "which were a cause of" it filing "materially misstated financial statements."

As Defendants' misstatements and scheme artificially buoyed the Company's business and stock price during the Class Period, Plaintiff and the other Class members unknowingly bought Sequential securities at a premium. They thereafter suffered enormous losses as the truth about the Company emerged through a series of disclosures that wiped out millions of dollars in shareholder value. The disclosures about the goodwill write-off (February 28, 2018), the SEC investigation (March 31, 2020), and the SEC Complaint (December 11, 2020) caused Sequential's stock price to fall $12.00 per share (13%), $5.20 per share (48%), and $2.03 per share (11%), respectively. This action now seeks recovery for investors' losses. To that end, the Complaint alleges Rule 10b-5(b) claims based on Defendants' misstatements and omissions and Rule 10b-5(a) and (c) claims based on Defendants' scheme to defraud investors.

Plaintiff's Rule 10b-5(b) claims arise from (1) the Sequential Defendants' statements and omissions in Company press releases, during earnings calls, and in SEC filings and (2) the CohnReznick Defendants' statements in CohnReznick's audit opinions concerning Sequential's consolidated financial statements in its 10Ks. On the issue of falsity, Defendants materially misled investors about three topics: the value of Sequential's goodwill and the basis for the multiple changes to its methodology for assessing goodwill, the existence and materiality of the SEC Investigation, and the adequacy of the Company's disclosure controls and procedures and internal controls over financial reporting. Contrary to Defendants' arguments, the challenged statements omitted known material facts, contained untrue supporting facts, were not protected by the PSLRA Safe Harbor, and/or were material to investors. *See infra* §§ I.A, II.A., III.A.

On scienter, the facts alleged give rise to a strong inference that Defendants acted knowingly or, at a minimum, recklessly. *See infra* §§ I.B, II.B., III.B. A strong inference of scienter is warranted where, as here, a corporation's senior management and its independent auditor are alleged to have engaged in widespread and continued accounting violations and then was investigated and sued by the SEC over those same violations. Indeed, the Complaint details emails involving Klein, Hanbridge, Wyss, Hilbert, and other CohnReznick employees as well as rampant GAAP violations, including the disregard of clear, objective, and quantitative evidence of likely impaired goodwill and the making of multiple changes to the Company's methodology for assessing goodwill for the purpose of delaying a write-off. Those changes included changing the annual impairment date from December 31 to October 1 on the first day of the Class Period, switching from the Market Approach to the Income Approach for 3Q17, and then back to the Market Approach for 4Q17 to finally write off all $304.1 million of the Company's goodwill. In these circumstances, there is no reasonable inference that Defendants' conduct was innocent—and certainly none that is more compelling than the inference of scienter. *Infra* §I.B.8. In addition, Shmidman, Klein, Murray, Lops, Conn and Hanbridge each suspiciously departed before the truth about the challenged goodwill, SEC investigation, or internal controls statements came out. Defendants' disagreement with this characterization of the facts is no grounds for dismissal.

Plaintiff also properly alleged reliance, loss causation, scheme liability, and control person liability. *See infra* §§ IV-VI, IX. Defendants' arguments to the contrary all fail. Indeed, the Court already found that the SEC Complaint alleged scheme liability based on "Sequential's accounting and finance personnel cover[ing] up quantitative evidence of an impairment to its goodwill by discarding that quantitative evidence, conducting a biased qualitative assessment, and ultimately changing its methodology to assess goodwill" to delay writing it off for a year. *See SEC v.*

*Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *6 (S.D.N.Y. Sept. 30, 2021).

Defendants' technical arguments regarding whether the Court may consider Plaintiff's allegations based on the SEC Complaint and Consent Orders, and whether Plaintiff's claims are timely fare no better. There is nothing improper about Plaintiff utilizing information contained in the SEC Complaint, the Klein Order, the CohnReznick Order, or the CohnReznick Partner Orders as evidence, particularly because the information overlaps with that from its and its counsel's investigation. *See infra* § VII. And the statute of limitations does not bar any claims because this action was timely filed just over three months after the facts constituting violations of the Exchange Act were revealed on December 11, 2020. *See infra* § VIII.A. Nor does the statute of repose bar Plaintiff's claims against the defendants added in the Amended Complaint, because they relate back to the original Complaint, and Plaintiffs properly named these defendants after the SEC Orders against the CohnReznick Defendants became public on June 8, 2022. *See infra* § VIII.B.

Accordingly, for the foregoing reasons, and as further detailed below, Plaintiff respectfully requests that the Court deny Defendants' motions to dismiss in their entirety.

## BACKGROUND

Sequential owned and managed a diversified portfolio of consumer brands in the active and lifestyle categories, including Martha Stewart, Emeril Lagasse, Jessica Simpson, and Gaiam. ¶ 57. At the end of 2016, the Company recorded over $307 million in goodwill resulting from seven acquisitions it made between 2014 to 2016. ¶¶ 58-59.

Just before the Class Period began, Sequential saw its stock price fall over 41%, or over $138 a share, in 4Q16. Most of that loss occurred when the Company announced its 3Q16 financial results and revealed slashed guidance for its 2016 full-year earnings, causing its stock price to fall $123.60 a share – from $289.20 on November 2, 2016 to $165.60 on November 4. ¶¶ 60, 87.

In reviewing the Company's goodwill for 2016, CEO Shmidman, CFO Klein, and Board

members Sweedler, Hollander, Gossett, and Leonard knew or recklessly disregarded that the Company's goodwill was impaired based on the material declines in the Company's stock price in 4Q16. *See* ¶¶ 26, 28-29, 35-38, 88, 90, 102. A sustained decrease in stock price is an indicator of impairment under ASC 350. *See* ASC 350-20-35-3C; ¶ 76.

Faced with the material 4Q16 stock price declines, Sequential chose to deviate from the goodwill impairment process and procedures that it had been utilizing for years to assess its FY16 goodwill. ¶ 91. Instead of analyzing its annual goodwill impairment as of December 31—requiring it to account for the 4Q16 material decrease in share price in its evaluation—the Company changed its annual impairment date to October 1, just before its share price plummeted, and then disclosed the change to shareholders on the first day of the Class Period. ¶¶ 92, 135. Under the applicable accounting standards that Sequential was required to follow through the end of 2016, any quantitative goodwill impairment test it conducted consisted of two steps. ¶ 94. Under Step 1, it had to identify any potential impairment by comparing the fair value of a reporting unit with the unit's carrying amount, also known as the net book value, including goodwill. *See* ASC 350-20-35-4; ¶ 94. At the end of 2016, Sequential disclosed that it had a single reporting unit. Under Step 2, if the carrying amount of that reporting unit exceeded its fair value, Sequential had to measure the amount of impairment loss, if any. *See* ASC 350-20-35-8; ¶ 94. The Company did not do so.

Shmidman, Klein, Sweedler, Hollander, Gossett, and Leonard bypassed any qualitative assessment and set the Company's market capitalization as of October 1, 2016 as the external representation of its estimated fair value for FY2016. *See* ¶¶ 26, 28-29, 35-38, 95. Internally, however, at the direction of Klein, Sequential's senior accounting and finance personnel conducted a quantitative analysis to determine its goodwill valuation as of December 14, 2016. ¶ 100. This analysis showed that the Company's estimated fair value had fallen below its carrying amount by

approximately $63 million, a material amount. *Id*. A subsequent analysis conducted by Sequential's senior accounting and finance personnel, at the direction of Klein, and using the same methodology as used in connection with the Company's annual goodwill impairment testing, showed that, as of December 31, 2016, its estimated fair value was approximately $96 million below its carrying amount, an increase of over 50% from the calculation as of December 14, 2016. ¶ 101.

Due to Shmidman, Klein, Sweedler, Hollander, Gossett, and Leonard's failure to conduct additional goodwill impairment testing in 4Q16 and timely impair goodwill, Sequential materially understated operating expenses and overstated income from operations by at least $100 million and understated the reported net loss by at least $42 million in its 2016 10K. *See* ¶¶ 26, 28-29, 35-38, 113. If the goodwill had been timely impaired in 4Q16, the Company's reported net loss would have been *54x larger* and the $100 million impairment would have equaled 33% of recorded goodwill, or 7% of the Company's total assets. ¶ 113. After the results of the Company's mid-December 2016 and year-end 2016 goodwill calculations came out, Shmidman certified the 3Q16 10Q and 2016 10K which had not written down any goodwill and then stepped down as CEO in March 2017. *See* ¶¶ 61, 100-02, 134, 139.

During 1Q17, Sequential's stock price fell another 20%, from $195.60 on January 3 to $155.60 on March 31. ¶ 118. Despite knowing that the Company's goodwill was likely impaired at the end of 2016, and knowing about the additional triggering events in the first half of 2017, Klein falsely stated in Sequential's 1Q17 and 2Q17 10Qs, that "[n]o events or circumstances have been identified to indicate an impairment [of goodwill] has occurred subsequent to the Company's October 1, 2016 impairment testing." ¶¶ 114, 121. Klein and Murray further attested to the accuracy of financial reporting in those 10Qs, and to the disclosure of any material changes to the

Company's internal control over financial reporting and of all fraud. *See* ¶¶ 114,148, 154.

During 3Q17, Klein, Murray, Sweedler, Hollander, Gossett, and Leonard could no longer avoid or delay the quantitative assessment of Sequential's goodwill. They were forced to face the reality that the Company would not pass its annual goodwill impairment test as of October 1, 2017 using its disclosed market capitalization methodology (the "Market Approach"), which primarily relied on its stock price. *See* ¶¶ 27-29, 35-38, 122. While the Company was assessing its options, Klein departed as CFO on August 31, 2017 and the Board appointed Sequential's president, Cooper, as interim CFO beginning on September 1, 2017. ¶¶ 29-30. Under Cooper's direction, the Company pivoted again, performing a goodwill impairment test for 3Q17 utilizing a different methodology which used estimates of discounted cash flow (the "Income Approach"). ¶ 122. While the Market Approach indicated that goodwill was likely impaired, the Income Approach did not because Sequential used high, unrealistic projections of future cash flows. ¶ 123. Ultimately, defendants Cooper, Murray, Sweedler, Hollander, Gossett, and Leonard chose to avoid recognizing impaired goodwill in 3Q17 by utilizing the Income Approach—yet another material change in Sequential's process and procedure for analyzing goodwill—to deceptively produce a favorable fair value estimate, reporting goodwill of $304.1 million, total assets of $1.381 billion, and an accumulated deficit of $62.48 million. *See* ¶¶ 27, 30, 35-38, 114, 123, 159-61, 163.

The following quarter, Sequential had no choice but to perform a goodwill impairment test as of December 31, 2017 and finally write off all $304.1 million of its goodwill which "was driven by the company's stock price." ¶¶ 7, 124-25, 165-67. When this news was disclosed before markets opened on February 28, 2018, and further explained by Cooper during Sequential's earnings call later that day, the Company's stock price fell $12.00 per share, or over 13%, to close at $79.20 that day on unusually heavy volume, damaging investors. ¶¶ 319-20.

9

Unable to reconcile the vast difference between the fair values derived using estimated future cash flows (Income Approach) versus market capitalization (Market Approach), Cooper, Murray, Sweedler, Hollander, Gossett, and Leonard finally acknowledged in the Company's 2017 10K that the Income Approach produced erroneous results and that the Market Approach should be used to determine the fair value of Sequential's sole reporting unit. ¶¶ 124-25, 169-74.

In failing to write down at least $100 million of Sequential's goodwill in FY16, or to at least notify the investing public of that likely impaired goodwill, Defendants exposed unwitting investors to the real risk of the SEC investigating and suing the Company. ¶ 127. The SEC did investigate, and did determine that Sequential's 2016 financial statements contained several material accounting errors, that Sequential carried these errors forward into the first two quarters of 2017, and that Sequential made additional misstatements and omissions related to its goodwill impairment testing in its periodic and current reports. *Id*.

In addition, after the SEC initiated an investigation into Sequential's goodwill and began interviewing former and current Company employees during 3Q19, Murray, Lops, Wagenheim, Conn, and Hanbridge disclosed none of these facts to investors. ¶ 129. While the SEC investigation was ongoing, before it was publicly announced, Murray departed as CEO in October 2020 and Lops as CFO in January 2020. *Id.* Conn and Hanbridge as Sequential's new CEO and CFO finally disclosed the SEC Investigation in the Company's 2019 10K on March 31, 2020. ¶¶ 129-30. On this news, the Company's stock price fell $5.20 per share, or over 48%, to close at $6.80 on April 1, 2020, further damaging investors. ¶ 321. But Conn, Hanbridge, DiSanto, and Sweedler continued to assure investors that Sequential's disclosure controls and procedures and internal control over financial reporting were effective, that Sequential had complied with GAAP, and that the SEC investigation was not "material" for the rest of the Class Period – even after disclosing

receipt of a Wells Notice from the SEC on July 17, 2020. *See* ¶¶ 11, 131, 200, 208-09, 211-13, 215-17, 221-23.

On November 2, 2020, just over seven months after disclosing the SEC investigation, and just over a month before the SEC filed a complaint ("SEC Complaint") against the Company on December 11, 2020, Sequential announced the resignations of Conn and Hanbridge. ¶¶ 132-33, 198, 219. The SEC Complaint alleged that Sequential had failed "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill in the fourth quarter of 2016 and the first three quarters of 2017 (the 'Relevant Period')." ¶ 133. The SEC Complaint detailed how the Company had "conducted two internal calculations as of mid-December 2016 and year-end 2016 that showed that its goodwill was likely impaired," but "ignored this clear, objective, quantitative evidence of likely impairment." *Id.* The SEC Complaint further stated that "[b]y avoiding an impairment to its goodwill in 2016, Sequential's financial statements and SEC filings materially understated its operating expenses and net loss and materially overstated its income from operations, goodwill, and total assets" and "created a false impression of its financial health and ability to execute on its business plan." *Id.* And according to the SEC Complaint, if the Company "had reasonably conducted goodwill impairment testing in the fourth quarter of 2016, then that test would have shown that Sequential's goodwill was impaired by over $100 million, a material amount[,]" and that "Sequential had in its possession facts and information tending to show that its statement that goodwill was not impaired was materially false and misleading." *Id.*

On this final corrective disclosure, the Company's stock price fell $2.03 per share, or over 11%, to close at $16.20 on December 11, 2020, further damaging investors. ¶ 13.

The Company's auditor, CohnReznick, was the last line of defense against the Sequential

Defendants' materially misleading investors. But during the Class Period, the CohnReznick Defendants failed to comply with auditing standards in issuing Sequential clean audit reports that they knew or should have known contained false and misleading statements to the investing public.

From the beginning, while planning the 2016 audit of Sequential, CohnReznick and its engagement team identified goodwill impairment as an area of significant risk. ¶ 254. Wyss, the CohnReznick engagement partner on the 2016 and 2017 audits, received Sequential's year-end 2016 goodwill impairment memo ("Goodwill Memorandum") as part of CohnReznick's audit work. ¶¶ 53, 258. The Goodwill Memorandum indicated that there was no goodwill impairment as of the Company's annual testing date, October 1, 2016, and that a goodwill impairment, more likely than not, existed at the Company's year-end financial reporting date, December 31, 2016. ¶ 258. Wyss nevertheless approved CohnReznick's issuance of its clean audit report regarding Sequential's 2016 financial statements. ¶ 261.

On the heels of the Company's mid-December 2016 and year-end 2016 analyses showing goodwill was likely impaired came the Board's firing of its CEO, the Company continuing to revise its earnings guidance downward, and its stock price continuing to decline—all during the first two quarters of 2017. ¶ 262. Sequential's interim goodwill assessments should have concluded that goodwill was at least likely impaired and thus further testing was required, yet Wyss continued to accept Sequential management's assertions that goodwill was not likely impaired without obtaining sufficient and relevant evidence to support those assertions. ¶¶ 263-64.

In the 2017 audit planning process, CohnReznick and its engagement team "identified goodwill impairment testing to be an area of significant risk, as it had done in the previous year's audit." ¶ 266. Based on Sequential's then-current stock price and number of shares outstanding, Wyss and Jackson, CohnReznick's engagement quality control review ("EQCR") partner,

understood that under the Market Approach, the Company's goodwill was impaired. ¶ 268. But about a week before Sequential had to file its 3Q17 10Q, and release its earnings, Wyss received from the Company a draft valuation report, which was prepared by Sequential's third-party valuation specialist based on information and guidance provided by the Company, departing from its previously disclosed Market Approach to goodwill impairment testing. ¶ 269

Upon receiving the report from the engagement team, CohnReznick's assigned internal valuation specialist assessed it, identified several concerns suggesting that Sequential might fail the impairment test, and shared those concerns with Wyss and Hilbert, CohnReznick's Managing Partner of Assurance and National Director of Accounting. ¶ 271. Wyss shared the report with Jackson later the same day. *Id.* In response to CohnReznick's comments, Sequential prepared a quantitative reconciliation that again relied heavily on its management's unsubstantiated assertions that it was undervalued by the market. ¶ 275. CohnReznick's internal valuation specialist reviewed the revised report and raised concerns, which were communicated to the engagement team and Hilbert, about whether there was sufficient evidentiary support for management's assertions. ¶ 276.

As part of CohnReznick's documented quality control system, an EQCR review was to be performed for every public company audit. ¶ 279. Despite the requirement that the EQCR be involved in evaluating significant engagement team judgments, the Sequential engagement team did not include the assigned EQCR, and as a result, the EQCR was unable to complete his review or provide input to the engagement team regarding Sequential's goodwill impairment testing prior to it issuing its earnings release. ¶ 280. Sequential thus released its 3Q17 earnings to investors without the EQCR's involvement, and did not incorporate any impairment to goodwill. ¶ 281.

After Sequential published its 3Q17 earnings, but before filing its 10Q, disagreements

arose within CohnReznick among the engagement team and members of the National Office. ¶ 284. CohnReznick's senior management nevertheless decided, after internal discussion but without directing the engagement team to obtain or review further evidence or perform additional procedures, that the engagement team could authorize Sequential to file its 3Q17 10Q. ¶ 286.

In January 2018, months after completing the 3Q17 interim review, the engagement team supplemented the review file with a consultation memo which purported to describe Sequential's goodwill impairment analyses and conclusions throughout 2017, the engagement team's views of those analyses, and their own internal analyses concluding that management's 3Q17 goodwill impairment conclusion was reasonable. ¶ 287. This memo was based on new data and justifications not documented prior to the filing of the 3Q17 10Q. ¶ 288.

Despite the vigorous disagreements that arose between Wyss and Hilbert on the one hand, and the EQCR partner, the internal valuation specialists, and the National Director of SEC Services on the other hand, Jackson failed to reasonably evaluate whether appropriate consultations had taken place on difficult and contentious matters, especially the engagement team's assessment of Sequential's annual goodwill impairment test, which the engagement team had identified as an area of significant risk since 2016. ¶¶ 289-90.

## ARGUMENT

Under Rule 12(b)(6), a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must also "accept[] the complaint's factual allegations as true and draw[] all reasonable inferences in . . . plaintiff's favor." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014).

A securities fraud plaintiff must also satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," *id.*, and the PSLRA requires that a plaintiff specify each misleading statement, the reasons why the statement is misleading, and, if an allegation "is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Despite the heightened pleading standards of Rule 9(b) and the PSLRA, complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

The elements of a securities fraud claim are: (1) a material misrepresentation or omission; (2) in connection with a purchase or sale of a security; (3) made with scienter; (4) in reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232 (2d Cir. 2014). Defendants' Motions assert that Plaintiff fails to allege falsity or scienter, that Plaintiff should not be permitted to rely on factual allegations from the SEC Complaint, Klein Order, or consent orders with CohnReznick and certain of its partners, and that Plaintiff's claims are not timely. Plaintiff shows below that these contentions are meritless and therefore, the Court should deny the Motions in full.

## I.   Defendants Klein, Shmidman, Murray, Cooper, Lops, Sweedler, Hollander, Gossett, and Leonard's Fraudulent Goodwill Statements Had No Reasonable Basis in Fact.[3]

---

[3]      Klein and Shmidman are liable for the challenged statements relating to goodwill in the 3Q16 10Q and, with Sweedler, Hollander, Gossett, and Leonard, are liable for the ones in the 2016 10K. Klein and Murray are liable for the statements in the 1Q17 and 2Q17 10Qs. Murray and Cooper are liable for the statements in the 3Q17 10Q, and with Sweedler, Hollander, Gossett, and Leonard, are liable for the statements in the 2017 10K. Murray and Lops are liable for the statements in the 1Q18, 2Q18, and 3Q18 10Qs, and with Sweedler and Hollander, are liable for the statements in the 2018 10K. Klein signed the 10Qs for 3Q16, 1Q17, and 2Q17; Klein, Shmidman, Sweedler, Hollander, Gossett, and Leonard signed the 2016 10K; Murray, Cooper,

A qualifying misstatement or omission is any statement that "viewed as a whole, would have misled a reasonable investor." *Rombach v. Chang*, 355 F.3d 164, 178 n.11 (2d Cir. 2004). Defendants claim that the challenged goodwill statements are "inactionable opinion and forward-looking statements." GD MTD at 2; *see also* Klein MTD at 14 ("Plaintiff has not pleaded with particularity that Mr. Klein did not genuinely believe his stated opinions, or that he omitted information that, in its full factual context, would cause the statements to mislead a reasonable investor."); Shmidman MTD at 9 ("[N]one of Mr. Shmidman's statements are actionable."); Murray MTD at 12 (same with respect to Ms. Murray); CR MTD at 25 ("CohnReznick's at-issue statements are nonactionable opinion statements about goodwill.'"). Defendants' argument fails because the goodwill statements are literally false or materially misleading when viewed as a whole, and thus the PSLRA Safe Harbor does not protect them.

A.  The Challenged Goodwill Statements Are False Statements of Opinion.

An opinion statement (such as a statement relating to goodwill) may be false if (1) the speaker did not hold the belief she professed, (2) the supporting facts she supplied were untrue, or (3) the stated opinion, even if sincerely held and otherwise true as a matter of fact, omitted information whose omission made the stated opinion misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 195 (2015); *see also In re Chicago Bridge and Iron Co. N.V. Sec. Litig*, No. 17 CIV. 1580 (LGS), 2018

---

Sweedler, Hollander, Gossett, and Leonard signed the 2017 10K; Lops signed the 1Q18, 2Q18 and 3Q18 10Qs; Murray, Lops, Sweedler, and Hollanders signed the 2018 10K; and in accordance with SOX, Shmidman and Klein reviewed and certified the 3Q16 10Q and 2016 10K, Klein and Murray reviewed and certified the 1Q17 and 2Q17 10Qs, Murray and Cooper reviewed and certified the 2017 10K, and Murray and Lops reviewed and certified the 1Q18, 2Q18 and 3Q18 10Qs and 2018 10K. *See* ¶¶ 134, 139, 148, 154, 160, 169, 176, 178, 180, 183; 15 U.S.C. § 7241(a); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75-76 (2d Cir. 2001) (corporate officer is liable for statements that they "review[ed]"); *In re Pfizer Inc. Sec. Litig.*, No. 04 CIV. 9866 LTS HBP, 2012 WL 983548, at *4 & n.3 (S.D.N.Y. Mar. 22, 2012) (defendant is liable for statements in SEC filings they signed).

WL 2382600, *6 (S.D.N.Y. May 24, 2018). *Omnicare*'s recognition that an opinion statement is false even if not subjectively disbelieved "altered the standard" in the Second Circuit, which had required that an opinion statement "was both objectively false and disbelieved by the defendant at the time it was expressed." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016).

In this case, implicating *Omnicare*'s second and third scenarios, the challenged goodwill statements are false because they contain untrue supporting facts and omitted material information regarding the underlying inquiry. Sequential falsely stated, repeatedly, that changing its "annual impairment testing date from December 31 to October 1" in 3Q16 was "*not material to its financial statements, in part because the change does not delay, accelerate or avoid an impairment charge*" when the change allowed it to avoid and delay any write-off related to its November 2, 2016 share price decline until 4Q17. *See* ¶¶ 134-36, 142, 144, 170-71, 175.

In addition, Plaintiff specifically alleges that Sequential concealed the results of two internal calculations as of mid-December 2016 and year-end 2016 showing that its goodwill was impaired and of its Market Approach in 3Q17 which again indicated that its goodwill was impaired, and thus all subsequent goodwill statements were misleading. *See, e.g.,* ¶¶ 137-41, 145-50, 153-56, 159-62 (providing goodwill balances), ¶¶ 142, 144, 163-64, 173, 175 (declaring that goodwill was not impaired), ¶¶ 142, 144, 151-52, 157-58, 163-64, 169-70, 175, 183-84, 190, 201, 207 (touting process for testing goodwill), and ¶¶ 165-73, 175-88, 190 (disclosing and explaining 4Q17 $304.1 million goodwill adjustment). These specific and detailed allegations are more than sufficient at this stage.

### 1. *The Goodwill Statements Omitted Known Material Facts.*

No Defendant disputes the existence of the Company's mid-December 2016 and year-end 2016 internal calculations and 3Q17 Market Approach analyses analyzing Sequential's 4Q16 stock

price decline and showing impaired goodwill, which investors were in the dark about until the end of the Class Period. Because "identical factors that caused [defendant] to drastically write down the value of the [asset] . . . were operative and evident to defendants at the time they issued" the challenged statements, those statements are false. *CLAL Fin. Batucha Inv. Mgmt., Ltd. v. Perrigo Co.*, No. 09 CIV. 2255 (TPG), 2010 WL 4177103, at *7 (S.D.N.Y. Oct. 7, 2010); *see also In re Chicago Bridge*, No. 17 CIV. 1580 (LGS), 2018 WL 2382600, at *8 (finding goodwill statements materially misleading where goodwill was not written down "despite known delays, cost overruns, growing liability disputes" and defendant "eventual[ly] execut[ed] a quitclaim deed to relieve itself of liabilities"); *Zwick Partners, LP v. Quorum Healthy Corp.*, No. 3:16-CV-2475, 2018 WL 2933406, at *6 (M.D. Tenn. Apr. 19, 2018) (finding "failures to test and take additional impairments[] did not 'fairly align with the information' in [Defendants'] possession at the time'" given declining financial performance, under-performance of a key asset, and deterioration in the overall industry).

In disagreeing, Defendants argue (*see* GD MTD at 21-23) for both a narrower falsity standard (that the challenged goodwill statements were only misleading if they "did not rest on some meaningful . . . inquiry") and a higher materiality standard (that Sequential's internal calculations need not be disclosed even though "they were in tension with other analyses") than their own cases support. In addition, their cases do not involve allegations of the Company unearthing facts in its own inquiry, but rejecting them to justify the disclosed opinions.

As a threshold matter, the Gibson Dunn Defendants[4] fail to provide the full falsity standard laid out in *City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*, 129 F. Supp.3d 48, 71

---

[4] Any argument referencing the "Gibson Dunn Defendants" shall apply equally to all Defendants because each Defendant's MTD has adopted and incorporated by reference the arguments raised in the GD MTD. *See* CR MTD at 25; Klein MTD at 3; Shmidman MTD at 1; Murray MTD at 1.

(S.D.N.Y. 2015), which is that a "reasonable person, who 'understands a statement of opinion in its full context,' would expect 'not just that the issuer believes the opinion (however irrationally),' but that the opinion 'rest[s] on some meaningful . . . inquiry—rather than, say, on mere intuition, however sincere.'" *Id*. at 71. This standard is not a free pass for opinions that are based on a "meaningful" inquiry, but rather a reiteration that opinions must be considered "fairly and in context," which includes whether they "fairly align[ed] with the information in [defendant's] possession at the time." *See also id*. at 77. In addition, the Court was not considering whether, as here, an opinion is misleading if material facts then-known from a "meaningful" inquiry were withheld from investors.

Similarly unavailing is Defendants' argument that Sequential "was not obligated to disclose its own internal calculations that it believed to be inaccurate." GD MTD at 22; *see also* Klein MTD at 18 (opinion statements cannot be "false based on the failure to disclose the lack of a material inquiry"). *Omnicare* noted that "some fact cutting the other way" does not automatically render an opinion misleading, but confirmed that the analysis "always depends on context" and that if an opinion "fairly impl[ies] facts about the inquiry the issuer conducted or the knowledge it had[, a]nd if the real facts are otherwise, but not provided, the opinion statement will mislead by omission." 575 U.S. at 176; *see also Sanofi*, 816 F.3d at 210 ("The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'"); *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 177 (2d Cir. 2020) ("When omitted contrary facts substantially undermine the conclusion a reasonable investor would reach from a statement of opinion, that statement is misleading and actionable."). The context here is that Sequential itself uncovered "real facts" showing that its goodwill was impaired, chose not to provide those facts to investors, and purposefully changed its goodwill-testing process multiple

times to justify not disclosing those facts.[5] Under these circumstances, the challenged goodwill

statements are classic materially misleading statements.[6]

And since each Defendant is responsible for their own statements about goodwill as

Sequential's executives and/or directors, they are each liable for securities fraud.[7] Each Defendant

---

[5] Defendants argue that "a reasonable investors could have discovered" a "possible impairment" based on "simple math—the number of outstanding shares and the Company's stock price." GD MTD at 23, Klein MTD at 13. This is nonsensical based on Sequential and its auditors' analyses reaching varying conclusions based on what inputs and accounting methodologies they used.

[6] The cases cited by Defendants involving allegations of external, and no internal, indicators of possible impairment of goodwill are inapposite. *See City of Omaha, Neb. Civilian Emp.'s Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68 (2d Cir. 2012) (not alleging interim impairment testing); *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (alleging defendants did not know whether company had written down goodwill); *Plumbers & Steamfitters Local 773 Pension Fund v. Can. Imperial Bank of Commerce*, 694 F. Supp. 2d 287, 303 (S.D.N.Y. 2010) (not alleging "statements of any corporate insider or confidential informant to buttress its allegations on the fraudulent timing of write downs"); *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 180 (S.D.N.Y. 2012), *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013) (not alleging "Freddie Mac recognized but ignored the probability that a party would default on its loan"); *Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21-CV-03070-ARR-TAM, 2022 WL 16745512, at *22 (E.D.N.Y. Nov. 7, 2022) (not alleging interim impairment). Also irrelevant are Defendants' cases involving information from employees who did not report to the individual defendants. *See Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 220 (S.D.N.Y. 2020) (noting that the alleged reports came from employees who were "not alleged to have any direct contact with the [i]ndividual [d]efendants at all"); *Lucescu v. Zafirovski*, No. 09CV4691 (DLC), 2018 WL 1773134, at *12 (S.D.N.Y. Apr. 11, 2018) (noting that reports came from two employees, "neither of them reported to [defendant]").

[7] Each of these defendants is liable for his or her own statements, whether orally or in writing. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-143 (2011); *In re Pfizer Inc. Sec. Litig.*, No. 04 CIV. 9866(LTS)(HBP), 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012). Additionally, all conference call participants are liable for the statements made during the call, whether they were the speaker or a participant who failed to correct the misstatement. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 195 (S.D.N.Y. 2010) ("[A] high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements."). *Janus* did not change the basic principle that officers can be liable for statements of other corporate insiders. *See In re Pfizer Inc. Sec. Litig.*, 2012 WL 983548 at *4; *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 374 (S.D.N.Y. 2012). The authority that Murray cites holding otherwise is factually different and thus inapplicable here. *See In re Cannavest Corp. Sec. Litig.*,

is also responsible for Company press releases issued while they were executives and/or directors based on the "presumption that *written* statements that are 'group-published,' *e.g.*, SEC filings and press releases, are statements made by all individuals 'with direct involvement in the everyday business of the company.'" *Lockheed*, 875 F. Supp. 2d at 373 (emphasis in original). And as detailed below and contrary to their arguments otherwise (GD MTD at 23; Klein MTD at 17; Shmidman MTD at 9; Murray MTD at 14), Plaintiff adequately alleges Defendants' access to, awareness of, and/or reckless disregard of the Company's contradictory internal calculations.

### 2. The PSLRA Safe Harbor Does Not Protect the Goodwill Statements.

The PSLRA "safe harbor provision does not apply to any 'allegedly false statement [that] has both a forward-looking aspect and an aspect that encompasses a representation of present fact'" or "'protect material omissions.'" *In re Salix Pharms., Ltd.*, 14-CV-8925 (KMW), 2016 WL 1629341, at *9 (S.D.N.Y. Apr. 22, 2016) (finding that statements about future inventory and changes in wholesale buyer patterns, "in light of the overall context in which they were made, are not subject to the PSLRA safe harbor . . . because they (1) incorporated misleading representations of present fact, and/or (2) were made misleading by material omissions").

The Gibson Dunn Defendants contend that the safe harbor protects four alleged

---

307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018) (finding new CEO responsible for signing SEC Form 10Qs); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 641 (S.D.N.Y. 2017) (rejecting group-pleading doctrine but citing *In re Fannie Mae* for the proposition that "an executive may be held accountable where he 'signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive.'"); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 762 (S.D.N.Y. 2017) (prior CEO not alleged to have signed any of the SEC filings at issue or to have played any role in bringing about any statement); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Cap. Partners, LLC*, 91 F. Supp. 3d 456 (S.D.N.Y. 2015) (discussing control by ownership); *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (holding "[t]here is no dispute that [defendant company] and each of the [i]ndividual [d]efendants who signed the [r]egistration [s]tatements 'made' the statements under *Janus*").

misstatements, but Plaintiff alleges that those statements contain representations of "present fact." *See* ¶ 209 ("such matters are currently not material"); and ¶¶ 209, 213, 217, 223 ("based on our current knowledge"). In addition, Plaintiff alleges that those statements omitted then-current and known facts, including that the Sequential Defendants "had delayed writing off any goodwill until 4Q17, despite the sustained share price decline beginning in 4Q16 and their own internal calculations in December 2016 showing that goodwill was likely impaired" and that in doing so, "they had violated GAAP." ¶¶ 210, 214, 218, 224. The PSLRA safe harbor thus does not protect any of the challenged goodwill statements.

### B. Defendants Acted With Scienter.

"Scienter may be inferred from (i) facts showing that a defendant had 'both motive and opportunity to commit the fraud,' or (ii) facts that constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 613 (S.D.N.Y. 2015) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007)). Either set of facts is an independent basis for scienter. *See Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000) ("Complaint need only plead scienter by alleging either motive and opportunity, *or* conscious or reckless misbehavior."); *In re Shanda Games Ltd. Sec. Litig.*, No. 18-cv-2463-ALC, 2019 WL 11027710, at *7 (S.D.N.Y. Sep. 30, 2019), *adhered to on reconsideration sub nom*. *In re Shanda Ltd. Sec. Litig.*, No. 1:2018CV02463, 2020 WL 5813769 (S.D.N.Y. Sept. 30, 2020) (finding scienter based on motive alone).

Scienter must be considered "holistically," with a court determining "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). An inference of scienter is "strong" if it is "cogent

and compelling" and "*at least as likely as* any plausible opposing [non-culpable] inference." *Id*. at

324, 328 (emphasis in original). Under *Tellabs*, an inference of scienter "need not be irrefutable,

*i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences[.]'" *Id*. at

324. If an inference of scienter is equal to a non-culpable one, the court should find that the plaintiff

has adequately alleged scienter – in other words, on scienter, a "tie goes to the plaintiff." *In re*

*Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 666-67 (S.D.N.Y. 2017).

### 1. Defendants' Access to, or Failure to Check, Sequential's Internal Calculations Indicating Goodwill Was Impaired Gives Rise to a Strong Inference of Scienter.

Scienter may be inferred when defendants "knew facts or had access to information

suggesting that their public statements were not accurate" or "failed to check information they had

a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *Emps.' Ret. Sys. of Gov't*

*of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015); *see also In re Inv. Tech Grp.,*

*Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 621 (S.D.N.Y. 2017) (knowledge or access to information

showing public statements to be inaccurate "alone" is enough to satisfy scienter). No Defendant

denies that when the alleged misstatements regarding Sequential's goodwill were made during the

Class Period, there existed internal reports and communications indicating the retail sector's

struggles resulting from online shopping were enduring (¶¶ 3, 60, 90) and internal analyses as of

mid-December 2016 and year-end 2016 indicating impaired goodwill (¶¶ 4, 12, 133, 323). Indeed,

Plaintiff alleges actual knowledge by Klein, Hollander, Hanbridge, and CohnReznick of the

analyses showing that the Company's estimated fair value had fallen approximately $63 million

as of mid-December 2016 and $96 million as of year-end 2016 due to its materially decreased

stock price, and of emails related to those analyses. *See* ¶¶ 97-101, 104, 106, 108-10.[8]

---

[8] Since Plaintiffs adequately allege that the CohnReznick Defendants had actual knowledge of the
fraud, their claims that they did not have scienter fail (*see* CR MTD at 18-22) and their cited

Ignoring these allegations, Defendants construe Plaintiff's allegations as "guilt by association" and group pleading, particularly with regard to Conn, DiSanto, Lops and Wagenheim, in arguing that Plaintiff failed to plead scienter for any individual Defendant. GD MTD at 17-18; Shmidman MTD at 13; Murray MTD at 6-7. This argument would require the Court to close its eyes to common sense. Under GAAP, Sequential was required to evaluate goodwill for impairment annually and further "assess 'qualitative factors,' known as triggering events, to determine if it should perform an interim analysis." ¶¶ 74-75, 119. Those factors included a company's stock price, which in this case had materially declined by the start of the Class Period and continued to do so throughout the Class Period. ¶¶ 76, 79, 88, 120. Moreover, Sequential's own goodwill impairment testing policy stated that it "considered its market capitalization . . . to represent its estimated fair value." ¶ 89. The Company's goodwill analyses as of mid-December 2016 and year-end 2016 did not suddenly disappear later, and would have been relevant to consider disclosure of each time any Defendant subsequently reviewed the challenged goodwill statements before signing off on them. *See* ¶¶ 15-16, 134-224, 302-18.

The Court's analysis here should rest "on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter." *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 268-69 (3d Cir. 2009). "Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance. In assessing

---

authority is factually distinguishable. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 102 (2d Cir. 2009) (audit firm was not a genuine auditor and never did any auditing); *In re: Petrobras Sec. Litig.*, No. 14-CV-9662 (JSR), 2016 WL 1533553, at *2 (S.D.N.Y. Feb. 19, 2016) (no knowledge of any internal investigations or reports); *Athale v. SinoTech Energy Ltd.*, No. 11 CIV. 0531 AJN, 2014 WL 687218, at *8 (S.D.N.Y. Feb. 21, 2014) (red flags discovered through investigation of third-party entities); *see also Novak*, 216 F.3d at 309 (public statements consistent with reasonably available data).

the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their

eyes to circumstances that are probative of scienter viewed with a practical and common-sense

perspective." *Id*. at 272-73. Beyond each Sequential Defendant's access to or failure to check the

Company's internal calculations indicating impaired goodwill when signing off on the challenged

goodwill statements, Plaintiff alleges numerous additional facts, detailed below, which when

considered holistically, gives rise to a strong inference of scienter for each Defendant.[9]

### 2.  *The Magnitude of the Goodwill Fraud Supports a Strong Inference of Scienter.*

"[T]he Second Circuit has instructed that a significant write-off can also support an

inference that management acted recklessly in its earlier financial reporting." *In re Signet Jewelers*

*Ltd. Sec. Litig.*, 16 CIV. 6728 (CM), 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018) ("*Signet*

*I*") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) in finding that "the size of the loss

that Signet took on the sale of the subprime portion of its total book – which sold for 72% of par

value, constituting a $170 million loss . . . – speaks for itself"). "[C]ommon sense and logic dictate

that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such

a restatement or violation was made consciously or recklessly." *In re MicroStrategy, Inc. Sec.*

---

[9] Murray states that the Complaint "does not contain any allegations regarding Ms. Murray's role in [employing the Income Approach in the third quarter of 2017], or even of her being informed of the change." Murray MTD at 8-9. But Plaintiff alleges that Murray signed the SOX certification attached to the 3Q17 10Q which announced the change in Sequential's methodology to determine the fair value of its reporting unit from the Market Approach, which primarily relied on its stock price, to the Income Approach, which used estimates of discounted future cash flows. ¶¶ 6, 160, 163. As such, she had actual knowledge of the change or recklessly failed to be informed of the change before certifying the 10Q, either of which supports the requisite scienter. The case Murray relies on does not compare here since the plaintiff there failed to identify "any reports or statements containing adverse facts to which defendants had access at the time the statements at issue were made." *See In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 314 (S.D.N.Y. 2021). Shmidman raises a similar point regarding the mid-December 2016 and year-end 2016 internal calculations indicating impaired goodwill (Shmidman MTD at 12), which fails for the same reason as he signed the 3Q16 10Q and 2016 10K which represented no change in goodwill despite the Company's materially decreased stock price. *See* ¶¶ 134, 139.

*Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000).[10] As a result, a "large enough" write-off will "support an inference of scienter." *In re Ambac Fin. Grp., Inc.*, 693 F. Supp. 2d 241, 273 & n.38 (S.D.N.Y. 2010); *see also Freudenberg*, 712 F. Supp. 2d at 196 ("[T]he magnitude of write-offs alleged to be the subject of the misstatements supports a strong inference of scienter"); *In re RAIT Fin. Tr. Sec. Litig.*, No. 2:07CV03148-LDD, 2008 WL 5378164, at *13 (E.D. Pa. Dec. 22, 2008) ("The sheer size of the impairment eventually taken . . . adds to the inference that [defendants] by imputation must have had some awareness that the problem was brewing.").

In this case, Sequential was forced to write-off *all* its goodwill, $304.1 million, in 4Q17 after reporting $307.7 million in goodwill for FY16 and 1Q17 and $304.1 million in 2Q17 and 3Q17, despite being aware that its goodwill was impaired by at least $100M after the *$123.60 per share drop* in its stock price from $289.20 a share on November 2, 2016 to $165.60 on November 4. *See, e.g.,* ¶¶ 3-4, 7, 87-88, 112, 125-26. Accordingly, the sheer size of the eventual write-off Sequential took is strongly probative of each Defendant's knowledge or severe recklessness.

This strong inference of scienter is further strengthened by the assurances Cooper provided in response to analysts inquiring about the write-off during the 4Q17 earnings call and the robust disclosures he and the rest of the Gibson Dunn Defendants provided to investors about the accounting behind the write-off in SEC filings for the rest of the Class Period. *See, e.g.,* ¶¶ 165-67, 170-73, 184-88, 201-05, 319-20; *Noto v. 22nd Cent. Group, Inc.*, 19-CV-1285 (JLS), 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) (finding that scienter "evidence is further strengthened

---

[10] *See also Salix*, 2016 WL 1629341, at *16 (finding scienter in part due to the "startling" magnitude of the fraud); *Orthofix*, 89 F. Supp. 3d at 619 ("the size of the purported fraud may also contribute to an inference of scienter" and large enough numbers "render less credible the defendants' arguments that they had no notice" of accounting improprieties); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) ("enormous amounts at stake in the alleged fraud" supported finding of scienter).

when circumstances indicate that public statements were made to placate the market in response to inquiries about accounting practices."); *Signet I*, 2018 WL 6167889, at *16 ("Defendants' attempts to 'placate the market in reaction to the inquiries by . . . analysts' – as, Plaintiff alleges . . . – 'provides cogent support for [an] inference of scienter.'"); *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017) (Defendants' "campaign . . . to placate the market in reaction to the inquires by the media, analysts, investors and the SEC regarding comScore's accounting practices provides cogent support for the inference of scienter").

### 3.   *The Timing of the Impairment is Highly Suspicious.*

The Company's abrupt revelation of false accounting in 4Q17 also supports an inference of scienter. *See Rothman*, 220 F.3d at 92 (sudden realization of need to expense $73.8 million of royalty supported a finding of scienter); *Dudley v. Haub*, No. 2:11-CV-05196 (WJM), 2013 WL 1845519, at *12 (D.N.J. Apr. 30, 2013) (noting that "[g]oodwill does not go from being unimpaired to fully impaired overnight" in finding goodwill statements actionable).

The sudden goodwill impairment in 4Q17 "attributable to Sequential's lower stock price" is particularly suspicious here given that just four quarters earlier, it had announced dismal 3Q16 financial results and slashed its FY16 guidance – causing its stock price to fall $123.60 a share, or over 41%. ¶¶ 3, 60, 87, 319-20. And leading up to that announcement, the retail industry had seen a continuous decrease in in-store sales since 2015 due to the rise of online shopping, which corresponded to a decrease in retail stocks' share prices generally, and Sequential itself had "(i) received reports that significant retailers were experiencing declines in business, directly affecting its licensees; (ii) was on notice of increases in accounts receivable collection issues; (iii) received a request from one of its most significant licensees, seeking relief from its contractual minimums; and (iv) identified nearly $10 million in expenses from an acquired brand, which Sequential had

not anticipated at the time of acquisition, less than 12 months prior." ¶¶ 3, 60, 87, 90.

When "identical factors" that force a company to make write-downs are "operative and evident to defendants" at the time of earlier public statements, such timing supports an inference of scienter. *See CLAL Fin.*, 2010 WL 4177103, at *7; *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00-CV-02838, 2002 WL 34089163, at *18 (N.D. Ga. Aug. 20, 2002) ("numerous allegations" indicate "that the need to write-down was so apparent to Defendants that a failure to take earlier write-down amounts to fraud"); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 n.4 (N.D. Okla. 2003) ("Many of the factors which admittedly caused the write-downs were operative throughout the Class Period, but their impact were not properly reflected.").

In addition, Shmidman, Klein, Murray, Lops, Conn and Hanbridge all departed before the full truth about the challenged goodwill statements was disclosed, enabling them to leave while Sequential's stock price was still artificially inflated. Those are "highly unusual and suspicious facts" that "add to the [overall] pleading of circumstantial evidence of fraud." *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 381, 394 n. 176 (S.D.N.Y. 2007); *see Orthofix*, 89 F. Supp. 3d at 619 ("[T]he timing and circumstances of individual defendants' resignations [in the lead-up to the alleged corrective disclosure] may add some further weight to an overall inference of scienter"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632-33 (S.D.N.Y. 2014) ("The circumstances and timing of the resignations . . . more likely suggests a higher level of wrongdoing approaching recklessness or even conscious malfeasance."); *Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013) ("[R]esignation and retirement of company insiders alleged to have been involved in the scheme . . . contribute to the inference of scienter."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 575 (S.D.N.Y. 2012) (CEO's resignation, "when considered in conjunction with the rest of Plaintiffs' allegations," supports "a strong inference of scienter");

*Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("highly unusual or suspicious" resignations "add to the overall pleading of circumstantial evidence of fraud," including "when independent facts indicate that the resignation was somehow tied to the fraud alleged"); *In re Sadia, S.A. Sec. Litig.*, 643 F. Supp. 2d 521, 534 (S.D.N.Y. 2009) (resignations of former president and chairman and former vice chairman support scienter); *Hall v. The Children's Place Retail Stores, Inc.,* 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (resignations of CEO and auditor support scienter).

After five years at the helm, Shmidman stepped down as CEO in March 2017 after the results of the Company's mid-December 2016 and year-end 2016 goodwill calculations were conducted showing impairment and multiple red flags indicating that the retail industry's struggles were not temporary arose. *See, e.g.,* ¶¶ 61, 90, 100-02. But he knew investors were in the dark about the impaired goodwill when he stepped down, as he certified the 3Q16 10Q and 2016 10K which had not written down any goodwill.[11] *See* ¶¶ 61, 134, 139.

Similarly, while the SEC was investigating Sequential's goodwill, but before the investigation was publicly announced, Murray departed as CEO in October 2019 and Lops as CFO in January 2020. ¶ 129. The SEC investigation was finally publicized in March 2020, when the Company was under new leadership with Conn as CEO and Hanbridge as CFO. ¶ 130. Hanbridge had worked on Sequential's year-end 2016 goodwill under Klein as its SVP of Finance, and thus had actual knowledge of its goodwill analysis from that point forward. ¶¶ 108-10. On November

---

[11] Plaintiff alleges Shmidman is liable for the "underlying fraud [which] took place during the time period" he was employed by Sequential, and therefore his argument and supporting case law that he cannot be liable for the fraud when he "was not employed" by the Company is of no moment. *See* Shmidman MTD at 11-12 (citing *In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 358 (S.D.N.Y. 2015), and *In re UBS AG Sec. Litig.*, No. 07 CIV. 11225 RJS, 2012 WL 4471265, at *22 n. 20 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG,* 752 F.3d 173 (2d Cir. 2014)).

2, 2020, the Company announced the resignations of Conn and Hanbridge—just over a month

before the SEC filed its complaint against the Company on December 11, 2020. ¶¶ 132-33, 198,

219. The timing of all these major corporate departures around the goodwill impairment strongly

supports an inference of scienter and provides the "link" between the executive departures and the

fraud and knowledge thereof. *Cf. In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 251

(S.D.N.Y. 2007) (general allegations of a single executive's departure without more did not

sufficiently link the resignation to the fraud or defendant's knowledge).

### 4. The SEC Investigation Supports a Strong Inference of Scienter.

Government investigations may be additional evidence demonstrating scienter. *See In re

Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 167-68 (S.D.N.Y. 2008) (finding DOJ

investigation "relevant to the 'holistic' view of the purported facts" and supportive of a strong

inference of scienter); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013)

("[W]hile the existence of an investigation alone is not sufficient to give rise to a requisite cogent

and compelling inference of scienter, it may be considered by the Court as part of its analysis.").

Despite the SEC investigating its goodwill since 3Q19, Sequential announced the

departures of Murray as CEO in October 2019 and Lops as CFO in January 2020 without any

reference to the investigation. ¶ 129. Investors were thus shocked when the investigation into the

Company's goodwill was announced on March 31, 2020, causing its stock price to fall by over

48%. ¶ 321. But the Company assured investors that its disclosure controls and procedures and

internal control over financial reporting were effective and that the investigation was not material,

even after receiving a Wells Notice from the SEC that summer. ¶¶ 11, 131. And on November 2,

2020, the Company announced the resignations of CEO Conn and CFO Hanbridge without

reference to the investigation escalating. ¶¶ 132-33, 198, 219. Investors were thus shocked again

when the SEC filed a complaint against the Company on December 11, 2020, causing its stock price to fall another 11%. ¶¶ 12-13.

Through the SEC Complaint, investors finally learned about Sequential's failure "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill in" 4Q16 and the first three quarters of 2017. ¶ 12. That "clear, objective, quantitative evidence of likely impairment" included the mid-December 2016 and year-end 2016 calculations. *Id*. Investors further learned that the delayed write down caused a material understatement of the Company's operating expenses and net loss and a material overstatement of its income from operations, goodwill, and total assets, which "created a false impression of its financial health and ability to execute on its business plan," and that it had "had in its possession facts and information tending to show that its [prior] statement that goodwill was not impaired was materially false and misleading." *Id*.

In addition to charging Sequential for failing to timely impair its goodwill, the SEC charged Klein, CohnReznick, Wyss, Jackson, and Hilbert. ¶ 14. The SEC settled charges against Klein "for causing Sequential's reporting, books and records, and internal controls violations related to [its] failure to impair goodwill in a timely manner," and settled with CohnReznick for its "improper professional conduct … in connection with the [3Q17] review and 2017 annual audit of Sequential" which "were a cause of [its] filings of materially misstated financial statements with the" SEC and with Wyss, Jackson, and Hilbert for their "improper professional conduct . . . in connection with the firm's interim reviews and audits of the financial statements of Sequential . . . in particular, the goodwill impairment testing performed by the [C]ompany in 2016 and 2017 . .

31

. which were a cause of [its] filing of materially misstated financial statements with the" SEC. *Id.*[12] The SEC investigation thus further evidences a strong inference of scienter.

### 5. The Importance of Strong Goodwill to Sequential's Financial Condition Supports a Strong Inference of Scienter.

It is reasonable to conclude that Defendants "had intimate knowledge of those [alleged concealed] facts or should have known of them" where, as here, they affected the Company's core operations and contradicted the Sequential Defendants' public statements. *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 323 (S.D.N.Y. 2010) (finding that as a money market fund, the Company "was required to maintain a certain level of liquidity," and thus its "liquidity crisis and corresponding inability to satisfy redemption requests went to the Fund's 'core operations' and were of critical importance to the Fund, its investment adviser, RMCI, and management distributor, Resrv Partners").

Just like a key product, a key asset such as Sequential's goodwill which was purportedly worth $307.7 million at the end of 4Q16 is a core operation. That goodwill represented "the excess of the purchase price over the fair value of net assets acquired" in the Company's seven acquisitions between 2014 and 2016. ¶¶ 58-59. Those assets were intangible assets, including proprietary or intellectual property and brand recognition, which amounted to over $128 million for Martha Stewart and $168 million for Galaxy Brand. *Id.* And because those brands were sold in stores, they were negatively impacted by online shopping as all store retail brands were beginning in 2015. ¶¶ 3, 60. As the Seventh Circuit noted, "it is exceedingly unlikely" that an executive defendant was "unaware of the problems of his [or her] company's two major products and merely

---

[12] Based on these allegations about CohnReznick, Wyss, Jackson, and Hilbert's participation in the scheme to defraud investors, Plaintiff has alleged that "CohnReznick's conduct was 'highly unreasonable, representing an extreme departure from the standards of ordinary care.'" CR MTD at 15 (citing *In re Advanced Battery Techs., Inc.*, 781 F.3d 638, 644 (2d Cir. 2015)).

repeating lies fed to him [or her] by other executives." *Makor Issues & Rts, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008). Although scienter cannot be inferred solely from the Sequential Defendants' Board membership or executive positions, "knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Commc'ns*, No. 01 CV 3014 (GBD), 2006 WL 473885, at *7 (S.D.N.Y. Feb. 27, 2006).

It is "exceedingly unlikely" that the Sequential Defendants were unaware of the need to materially impair the Company's goodwill after its stock price fell over $138 a share, or 41%, during 4Q16 in reaction to its dismal 3Q16 financial results and slashed FY16 guidance, particularly after the SEC began investigating the issue. *See* ¶¶ 3, 9-12, 60, 87, 128-33. As signatories to and certifiers of the Company's SEC filings, they had a "duty to familiarize themselves" "with the facts relevant to the core operations of the company and the financial reporting of those operations," such as the $307.7 million in goodwill that Sequential had on its balance sheet at the end of 4Q16 through 3Q17. *See, e.g.,* ¶¶ 4, 58-59, 134, 139, 148, 154, 160, 169, 176, 178, 180, 183; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004). In addition, Shmidman, Klein, Sweedler, Hollander, Gossett, and Leonard had overseen all seven acquisitions as CEO, CFO, or a director of the Company, and Lops had previously worked at Anderson LLP where he led the IPO of Martha Stewart Living Omnimedia. ¶¶ 26, 28, 32, 35-38. As reflected in their exposure to, and knowledge of, the value of the brands acquired, and by virtue of their positions and close access to Company financials, they are knowledgeable of the pre-Class Period rise in online shopping and corresponding drop in the value of retail stocks as a whole. *See* ¶¶ 3, 60. These facts would have led Shmidman, Klein, Sweedler,

33

Hollander, Gossett, and Leonard to realize that the goodwill balances, which underwent no or *de minimis* impairments despite the mid-December 2016 and year-end 2016 internal calculations demonstrating impairment, were false when issued, and further support an inference of scienter.

The inference is even stronger for Murray and Lops who left Sequential after the SEC investigation began without saying anything about it to investors despite it being focused on the Company's goodwill analyses in 2016 and 2017, ¶¶ 9, 129, 191-92, 198, and Wagenheim, Conn, and Hanbridge who continued to speak about the Company's goodwill while the investigation was ongoing without saying anything about it to investors until March 31, 2020, ¶¶ 194-96, 198. Even if these individual Defendants did not know about the Company's mid-December 2016 and year-end 2016 internal analyses before the SEC investigations began, they certainly had a duty as the CEO or CFO to obtain that knowledge before making any statements on behalf of the Company.

### 6. *Plaintiff Adequately Pleads Motive and Opportunity.*

In addition to recklessness, scienter can be established by demonstrating motive and opportunity. Defendants concede opportunity, but challenge motive. *See* GD MTD at 3, 30-31; Klein MTD at 20; Shmidman MTD at 11; Murray MTD at 11-12; CR MTD at 15. Motive allegations must be considered in the context of the entire complaint, and motive is demonstrated by allegations of a "specific benefit that would inure to the defendants." *In re Openwave*, 528 F. Supp. 2d at 250 (quoting *Tellabs*, 127 S. Ct. at 2511); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Allegations that defendants fraudulently preserved the appearance of financial health when "executives' careers and the very survival of the company were on the line" establish motive. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002). The fact that executives are forced out when the fraud is revealed confirms the fears and demonstrates something "more than the usual concern by executives to improve financial results." *Id.*

The Sequential Defendants faced colliding existential threats from the start of the Class Period, including the rise of online shopping leading to declines in business of significant retailers which directly affected the Company's licensees; increases in accounts receivables collection issues, a request by one of the Company's most significant licensees to be relieved from its contractual minimums, and nearly $10 million in unanticipated expenses from a recently acquired brand. *See* ¶¶ 3, 60, 90. On top of the stock price declines in all retail stocks, including Sequential, and its downward guidance going into and continuing during the Class Period, the SEC began investigating the Company during 3Q19—on issues that involved judgment calls by the top executives of the Company. *See, e.g.,* ¶¶ 10, 86, 128-29. All the Sequential Defendants were thus motivated not by typical executive goals, but rather because their "careers and the very survival of the company were on the line." *Cabletron*, 311 F.3d at 39. And, as in *Cabletron*, the feared negative consequences were borne out. The Company filed for bankruptcy on August 31, 2021 and Shmidman, Klein, Murray, Lops, Conn and Hanbridge were forced out or left. ¶¶ 9, 23, 29, 61, 129, 132, 198, 219. Plaintiff's motive allegations thus support scienter.[13]

### 7. *CohnReznick's Judgment Does Not Insulate the Sequential Defendants.*

The fact that CohnReznick audited Sequential's Class Period financial statements and publicly never disagreed with the Company's judgment cannot defeat an inference of scienter at this stage. *See* GD MTD at 6-7, 10-12, 21, 34; Klein MTD at 22-23. The Sequential Defendants

---

[13] All Defendants raise a motive argument. *See* GD MTD at 3, 30-31; Klein MTD at 20; Shmidman MTD at 11; Murray MTD at 11-12; CR MTD at 15. Since Plaintiffs plead more than just "general motives common to most corporate officers," as evidenced in this section and throughout this brief, Defendants' argument and supporting case law fail. *See ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *Novak*, 216 F.3d at 307; *In re Plug Power, Inc. Sec. Litig.*, No. 21 CIV. 2004 (ER), 2022 WL 4631892, at *11 (S.D.N.Y. Sept. 29, 2022); *Touchstone Strategic Tr. v. Gen. Elec. Co.*, No. 19-CV-1876 (JMF), 2022 WL 4536800, at *2 (S.D.N.Y. Sept. 28, 2022); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 573 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

have a "well defined obligation to ensure the accuracy of the information filed with the SEC" even where they have relied on independent accountants. *In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013). This is particularly true given that the SEC charged CohnReznick for "improper professional conduct . . . in connection with the 2017 third quarter review and 2017 annual audit of Sequential" and its partners Wyss, Jackson, and Hilbert for "improper professional conduct . . . in connection with the firm's interim reviews and audits of the financial statements of Sequential . . . in particular, the goodwill impairment testing performed by the [C]ompany in 2016 and 2017." ¶ 14. That improper professional conduct included CohnReznick's engagement team overriding the concerns raised by its National Office relating to Sequential's goodwill in signing off on its 3Q17 10Q. ¶ 284.[14]

In addition, the affirmative defense of good faith reliance on an accountant's advice is a highly fact-specific inquiry (on which defendants bear the burden) that is suited for resolution at trial, not a motion to dismiss. *See, e.g. In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09 CIV. 4346 PGG, 2012 WL 4774834, at *2 (S.D.N.Y. Sept. 12, 2012).

### 8.  *Defendants' "Competing Inference" Does Not Defeat Scienter.*

The Gibson Dunn Defendants contend that a non-fraudulent inference is more compelling because they "honestly believed there was no impairment before" 4Q17 based on the disclosed (1) "plausible, non-fraudulent reason for…the new October 1 date" that "would 'allow for more timely completion of the annual impairment test prior to the end of its annual financial reporting period'" and (2) "non-fraudulent reason for using the Income Method for its [3Q17] impairment test." GD MTD at 34; *see also* Klein MTD at 23 ("[T]he Complaint actually creates a negative inference of

---

[14] Klein's reliance on *Woolgar*, 477 F. Supp. 3d 193, is not persuasive because there, the defendant's independent auditor was not charged by the SEC for "improper professional conduct" the way CohnReznick was here.

scienter."); Shmidman MTD at 13 ("[O]ther allegations in the Amended Complaint actually *negate* the required inference of scienter."). The Gibson Dunn Defendants thus do not deny that they "were receiving some form of specific information" to support the Company statements they signed off on, which combined with the direct emails sent or received by Hanbridge, Klein, Wyss, Hilbert, and CohnReznick, at a minimum creates "a tie on scienter" that goes to Plaintiff. *See Lockheed*, 875 F. Supp. 2d at 372 (finding scienter where "plaintiff has alleged specific instances through which information was given to Defendant Gooden before the misstatements were made, and has adequately alleged circumstantial evidence showing that Gooden passed on some kind of information on IS & GS to Stevens and Tanner to allow them to make specific statements about the growth potential of IS & GS, lack of performance issues, etc.").

## II. Defendants Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler Fraudulently Misled Investors About the SEC Investigation.[15]

A. The Challenged SEC Investigation Statements Are Materially Misleading.

Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler do not deny that the SEC investigation was concealed from investors for at least six months until it was finally disclosed on March 13, 2020. Instead, they defend the concealment by claiming that they "had no duty to disclose the SEC investigation" because (1) it was not material, (2) if it was material, Plaintiff did not allege that they were aware of it, and (3) if it was material and they were aware of it, the eventual SEC "action was not 'substantially certain.'" GD MTD at 2; Murray MTD at 7-8; CR

---

[15] For the same legal basis as in note 1, *supra*, Lops and Wagenheim are liable for the statements in the 3Q19 10Q, Hanbridge is liable for the statements in the 1.9.2020 and 11.2.2020 8Ks, Hanbridge and Conn are liable for the statements in the 2019 10K and 1Q20 10Q, and Hanbridge, DiSanto and Sweedler are liable for the statements in the 2Q20 and 3Q20 10Qs. Lops signed the 10Q for 3Q19; Conn signed the 2019 10K; Hanbridge signed the 1Q20 10Q and 1.9.20 and 11.2.2020 8Ks; Hanbridge and DiSanto signed the 2Q20 and 3Q20 10Qs; and in accordance with SOX, Lops and Wagenheim reviewed and certified the 3Q19 10Q, Hanbridge and Conn reviewed and certified the 2019 10K and 1Q20 10Q, and Hanbridge, DiSanto and Sweedler reviewed and certified the 2Q20 and 3Q20 10Qs. *See* ¶¶ 194, 198, 200, 211, 215, 219, 221.

MTD at 20-21. The question before the Court, however, is not whether Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler had an *independent duty* to disclose the SEC investigation; the question is "whether, in light of that Investigation, the statements [they] chose to make were materially misleading." *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016).[16] Those statements certainly were materially misleading.

For example, after the SEC began interviewing current and former Sequential employees during 3Q19 about the Company's "controls and practices" around its "impairment analyses of goodwill and intangible assets in 2016 and 2017," Sequential disclosed the departures of its top

---

[16] Accordingly, to the extent Defendants' cases involve allegations of an independent duty to disclose a government investigation, they are irrelevant. *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 15 (S.D.N.Y. 2016) ("[P]laintiffs argue that the defendants had a duty to disclose the SEC investigation and the Wells Notices"); *Richman v. Goldman Sachs Grp.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("Plaintiffs also argue that Defendants had an affirmative legal obligation to disclose their receipt of Wells Notices under Regulation S–K, Item 103, FINRA and NASD Rules."); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x. 928 (2d Cir. 2006) ("Plaintiff's claims that Citigroup violated the securities laws by allegedly incurring, and not disclosing, litigation risks associated with its Enron-related, analysis/investment banking and reporting activities also fail to state a claim under [§] 10(b)"); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 471 (S.D.N.Y. 2006) ("Plaintiffs also allege that MMC failed to disclose the risk that contingent commissions might be discontinued or that the Company would be subject to litigation, regulatory action, or other penalties."); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) ("[P]laintiffs' contention that the documents Par disseminated to the public or filed with the SEC should have predicted the consequences of discovery of the bribery scheme and its cessation cannot be the basis of Rule 10b–5 liability."); *see also Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 98 (2d Cir. 2021) ("[Plaintiffs] go on to argue that it was misleading for [Defendant] to release those numbers without simultaneously disclosing what it knew about possible money laundering at the branch."); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) ("Plaintiffs also contend that the first two inspections put defendants on notice that a third inspection would result in negative consequences."); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015) ("Plaintiff asserts that . . . Defendants were duty bound to disclose the commensurate risks."). Indeed, in *Marsh*, the Court found actionable the alleged misstatements made after a NYAG investigation was announced. 501 F. Supp. 2d at 486. Since the CohnReznick Defendants are liable due to their participation in a fraudulent scheme, their argument that they had no duty to disclose the SEC investigation also fails. *See* CR MTD at 20-21 (citing *In re Merrill Lynch & Co., Inc. Rsch. Reps Sec. Litig.*, 272 F. Supp. 2d 243, 264 (S.D.N.Y. 2003)).

executives, CEO Murray on October 7, 2019 and CFO Lops on January 9, 2020, without disclosing the investigation. ¶¶ 9, 129, 191-92, 198. Sequential also issued its 3Q19 10Q on November 12, 2019, signed by Lops and certified by Wagenheim and Lops, without mentioning the investigation and affirmed that it was not involved in any "material" legal matters. ¶¶ 194-96. The market therefore had no reason to even wonder if Murray and Lops' departures were anything out of the ordinary, if they were related to the $304.1 million goodwill write-off, or if any legal matter in which the Company was involved could materially and negatively impact it. ¶¶ 193, 197, 199.

Those statements misleadingly conveyed that it was business as usual at Sequential when that was far from true, based on its own internal calculations indicating a material goodwill impairment as early as mid-December 2016, and thus support Plaintiff's securities fraud claims. *See, e.g., Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d Cir. 35 F.4th 95, 106 (2d Cir. 2022) ("easily find[ing] that the complaint adequately alleged that defendants violated Rule 10b-5(b) both by first *omitting mention of the SEC investigation* and then by affirmatively denying its existence"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp.3d 711, 727 (S.D.N.Y. 2015) (finding boilerplate legal compliance statements materially misleading where they suggested that the defendant "routinely responded to investigatory requests from the Government, but was not presently in the process of responding to such a request"); *In re Mylan N.V. Sec. Litig.*, 16-CV-7926 (JPO), 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018) (Oetken, J.) (finding rebate and regulatory risk statements materially misleading for failure to disclose "the existence of significant governmental scrutiny").[17]

---

[17] *See also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239-40 (2d Cir. 2016); *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd*, 568 U.S. 442 (2013) ("The law is well settled, however, that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."); *City of Westland Police and Fire Ret. Sys. v. Metlife, Inc.*, 928 F. Supp. 2d 705, 718-19 (S.D.N.Y. 2013) (holding statements about, *inter alia*, "the

Even after disclosing the SEC investigation, Sequential continued to misleadingly convey, in SEC filings that Conn, Hanbridge, DiSanto and/or Swedler signed off on, that there was nothing to worry about because the investigation was not material, and that the Company had "complied with [GAAP] during such periods in all financial matters including goodwill and intangible assets." ¶¶ 11, 200, 208-09, 211-13, 215-17. Since the Company had already written off all its goodwill and subsequently explained the write-off in great detail, investors had no reason to think another bomb related to goodwill could drop. *See* ¶¶ 7-8, 165-67, 170-73, 184-88, 201-05, 319-20. Sequential's messaging did not change in announcing the resignations of Conn and Hanbridge in the press release signed by Hanbridge on November 2, 2020, or in filing its 3Q20 10Q signed and certified by Hanbridge and DiSanto and certified by Swedler on November 16, 2020. ¶¶ 132, 219, 221-23. But the investigation was material and Sequential had not complied with GAAP, ¶¶ 210, 214, 218, 220, 224, the truth of which was finally revealed to investors through the SEC complaint publicly filed on December 11, 2020, causing them losses as the Company's stock price fell over 11% in response, ¶¶ 12-13, 133, 322-26. *See Noto*, 35 F.4th at 105 (explaining that "[b]y not disclosing that the SEC was investigating the Company's specific accounting weakness, defendants' statements about that weakness were not accurate and complete" and thus actionable under the securities laws).

### 1. *The SEC Investigation Was Material to Investors, Regardless of Whether It Would Lead to an SEC Complaint.*

"Materiality is 'a mixed question of law and fact and is rarely a basis for dismissal on the pleadings.'" *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 378 (S.D.N.Y. 2015). "A drop in

---

strength of the life insurance business" actionable where defendants were under a nationwide investigation into whether its business practices violated state laws); *In re China Valves Tech. Sec. Litig.*, 979 F. Supp. 2d 395, 409 (S.D.N.Y. 2013) (failing to disclose FCPA investigation materially misleading where existence of investigation called into question legitimacy of company's past and future earnings potential).

stock price, if relevant, tends to establish materiality, i.e., whether reasonable investors would consider the information 'to be significant or to have altered the total mix of information affecting their investment decisions.'" *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 155 (2d Cir. 2013) (quoting *Ganino*, 228 F.3d at 166); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 816 (N.D. Ill. 2017) (stock price drop after misstatements "confirms that those misstatements were material"); *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021) ("The nearly 12% drop in stock price to $27.38 immediately following the September 4 announcement about financial highlights, outages in the quarter, and the unusual uptime commitment—followed by another 8.98% drop to $24.92 the next trading day—indicate the materiality of this information to investors"). In this case, the challenged SEC investigation statements were material to investors, as evidenced by the stock declines that occurred when the truth emerged. *See* ¶¶ 10, 12-13, 321-26. This is enough.

Over the course of the SEC investigation, moreover, Sequential had a continuous stream of CEOs and CFOs departing—Murray, Lops, Conn, and Hanbridge—that did not appear to have anything to do with the investigation. Accordingly, there was no indication that the Company's statements relating to goodwill that they had signed off on were a problem. Sequential's disclosure about Murray stepping down, for example, simply indicated that the Company was going in a different direction as it "was considering 'strategic alternatives' which 'include[d] the divestiture of one or more existing brands, the acquisition of one or more new brands, a stock buyback program, and other initiatives.'" ¶¶ 129, 191-92. And Lops' resignation, similarly, appeared innocuous as he agreed to consult for the Company for several months before departing. ¶ 198. Conn and Hanbridge's departures also did not appear to be out of the ordinary, despite the SEC initiating its action just a month later. ¶ 219. These departures thus appeared related to ordinary

business decisions rather than anything to do with an ongoing legal matter—a distinction investors would have found material. *See Noto,* 35 F.4th 95 at 105 *("[T]he fact of the SEC investigation would directly bear on the reasonable investor's assessment of the severity of the reported accounting weaknesses."); In re Willbros Group, Inc.*, 4:14-CV-3084, 2016 WL 4920979, at *3 (S.D. Tex. Sept. 15, 2016) (finding portrayal of CEO as retiring material where allegations, accepted as true, indicated it was not just "a benign succession of executives").

Ignoring these allegations, the Gibson Dunn Defendants focus their materiality analysis on whether and when they knew the SEC investigation would result in a *future* enforcement action and/or a monetary penalty. *See* GD MTD at 24-25. But as the Second, Seventh, and Eighth Circuits have held, "[m]ateriality is determined in light of the circumstances existing *at the time* the alleged misstatement occurred." *Ganino*, 228 F.3d at 165 (collecting cases). And at the time of the challenged SEC investigation statements, investors had a false impression of Sequential's exposure to legal proceedings related to its goodwill accounting because they were still in the dark about its internal goodwill analyses showing impairment as of mid-December 2016 and year-end 2016 and its financial statements not being GAAP compliant. *See Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 (2d Cir. 2020) ("[W]ithout disclosing the existence of the Loan, Defendants' statements regarding Orianna's rent payments gave a false impression of the financial health of one of Omega's largest assets.").

Defendants' further arguments, based on the SEC imposing no or small fines on Sequential, Klein, CohnReznick, Wyss, Jackson, and Hilbert, are red herrings. First, the evidence is that the only reason the SEC did not fine Sequential was because of its bankruptcy.[18] Second, even if the

---

[18] *See* US SECURITIES AND EXCHANGE COMMISSION, *SEC Obtains Final Judgment Against Sequential Brands Group, Inc. for Failing to Timely Impair Goodwill* (Litigation Release No. 25289 / December 15, 2021), https://www.sec.gov/litigation/litreleases/2021/lr25289.htm ("In

monetary penalties against Klein ($20,000), CohnReznick ($1.9 million), Wyss ($30,000), Jackson ($20,000) and Hilbert ($30,000)[19] were relativity small, the subject of the investigation – the delayed write-off of *all $304.1 million* of Sequential's goodwill—was of a magnitude to support materiality. *See supra* §I.B.2. In addition, considering just the impact of not taking a smaller charge of $100 million in 4Q16, that would have equaled 33% of recorded goodwill and 7% of the Company's total assets, clearing "the five percent numerical threshold that the Court of Appeals for the Second Circuit has determined is a 'good starting place for assessing the materiality of the alleged misstatement.'" *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 13 (S.D.N.Y. 2016 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009)).

Accordingly, in contrast to the cases the Gibson Dunn Defendants cite, Plaintiff adequately alleged quantitative *and* qualitative factors demonstrating that the alleged misstatements about the SEC investigation were material. *Compare Lions Gate*, 165 F. Supp. 3d at 13-14 (SEC investigation resulting in $7.5 million penalty "was less than one percent of Lions Gate's consolidated revenue of $839.9 million" for 3Q14 and "plaintiffs do not explain any qualitative factors that would plausibly show materiality"); *ECA*, 553 F.3d 197 (statements "reclassifying $2 billion out of one category of trading assets (derivative receivables) totaling $76 billion into another category (loan assets) totaling $212 billion" immaterial as the reclassified assets were only 0.3% of JPMC's total assets of $715 billion and "the qualitative factors do not adequately demonstrate the materiality of the decision to classify the prepay transactions as loans").

---

light of Sequential's financial condition as set forth in filings before the bankruptcy court…, the final judgment does not impose a monetary penalty.")

[19] *See* US SECURITIES AND EXCHANGE COMMISSION, *SEC Charges CohnReznick LLP and Three Partners with Improper Professional Conduct,* (Press Release No. 2022-102 / June 8, 2022) https://www.sec.gov/news/press-release/2022-102.

### 2. Defendants Were Aware, or Had a Duty to Make Themselves Aware, of the Underlying Facts of the SEC Investigation.

Defendants cannot deny that they all knew about the ongoing SEC investigation when they were an executive or director of Sequential, so they make the only argument they can—that they had no duty to disclose the investigation any earlier than they did. GD MTD at 2, 25-28; CR MTD at 13-14; Klein MTD at 20. They are wrong.

After the SEC investigation began during 3Q19 and Sequential disclosed in its 3Q19 10Q that "[f]rom time to time, the Company is involved in legal matters arising in the ordinary course of business," Lops and Wagenheim had "a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014); *Noto*, 35 F.4th at 105 ("Defendants had a duty to disclose the SEC investigation in light of the specific statements they made about the Company's accounting weaknesses."); *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002) ("[U]pon choosing to speak, one must speak truthfully about material issues. Once Citibank chose to discuss its hedging strategy, it had a duty to be both accurate and complete."); *Setzer*, 968 F.3d at 214 (Once Omega made statements about "making 'partial monthly payments,' Omega was duty-bound [under Rule 10b-5] to disclose that its loan was the source of [those] rent payments"). That duty continued for every CEO, CFO, and director of Sequential who signed off on its subsequent generic statements to investors about legal matters, and then after March 31, 2020, its statements specifically about the SEC investigation, until the truth was finally fully disclosed on December 11, 2020 and caused the Company's stock price to fall over 11%.

The Gibson Dunn Defendants say there are no facts showing litigation was "substantially certain" to result from the SEC investigation. GD MTD at 26-28, but Plaintiff is not alleging that Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler had an independent duty to announce the SEC investigation or the eventually filed enforcement action. Instead, Plaintiff is alleging that

a duty to disclose arose because the alleged omitted facts conflicted with what investors understood from the challenged SEC investigation statements, which included that no legal proceeding was material—even after the SEC investigation was disclosed—and that all the Company's financial statements to-date complied with GAAP. *See Menaldi*, 164 F. Supp .3d at 584 (finding "projections about the likely impact of regulatory proceedings were based on omitted facts that, if disclosed, would have conflicted with what a reasonable investor would have taken from [defendant]'s statements themselves"). In addition, the Company's announcements of the departures of CEO Murray on October 7, 2019, and CFO Lops on January 6, 2020, presented ordinary executive departures because investors were in the dark about the existence of the SEC investigation which involved, *inter alia*, statements relating to goodwill that Murray and Lops had previously signed off on. *See* ¶¶ 191-93, 198-99. The departures of CEO Conn and CFO Hanbridge on November 2, 2020, likewise, did not appear out of the ordinary despite the disclosed SEC investigation because of their prior statements about it not being material and the Company's compliance with GAAP. *See* ¶¶ 200, 208-09, 211-13, 215-17, 219-20.

Accordingly, even under the standard set forth in the Gibson Dunn Defendants' own case law, Plaintiff has adequately alleged a duty to disclose the material omissions relating to the SEC investigation. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("[A] duty to disclose the omitted facts" arises "when there is . . . a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'").

B.  The Misleading SEC Investigation Statements Were Made With Scienter.

1.  ***The Gibson Dunn Defendants Had Motive to Conceal the SEC Investigation and/or the Facts Supporting the SEC's Position.***

The same motive allegations supporting scienter for the challenged goodwill statements (*see supra* § I.B.6.) support scienter for the challenged SEC investigation statements because,

again, the investigation affected the Sequential executives' very survival as demonstrated by the high turnover of CEOs and CFOs as the investigation progressed. *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x. 10, 14 n.3 (2d Cir. 2011) ("[A]llegations of a company's core operations, GAAP violations, and removal of its executives can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently."). The SEC investigation was also "critical to the long term viability" of the Company. *See In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 CIV. 8557 (CM), 2013 WL 6233561, at *43 (S.D.N.Y. Dec. 2, 2013) (inferring that a company's "senior executives have knowledge of information concerning the "core operations" of a business, including matters related to its "long term viability"). Indeed, the Company was delisted from the NASDAQ and filed bankruptcy while the SEC enforcement action was pending. ¶¶ 23-24. In addition, Plaintiff's allegations demonstrate Defendants' conscious behavior and recklessness and thus provide a separate, independent basis for a strong inference of scienter.

### 2. *Defendants Knew, or Were Reckless in Not Knowing, About the SEC Investigation.*

Plaintiff alleges Defendants knew or were reckless in not knowing about the existence of the SEC investigation and/or the facts supporting the SEC's position as they signed off on Sequential's implicit and explicit statements concerning the investigation, which gives rise to the requisite inference of scienter. *See supra* fn. 7*; Novak*, 216 F3d at 311; *Marsh*, 501 F. Supp. 2d at 486 (finding that, as to defendants who "personally made misstatements and aggressively supported the Company's business practices, the existence of the NYAG investigation and the rapid discovery of widespread misconduct at Marsh shortly thereafter constitute strong circumstantial evidence that those defendants either knew or were reckless in not learning of the fraudulent business practices at Marsh"). Even where regulatory activity did not result in a finding

of wrongdoing or punishment, courts have repeatedly held scienter sufficiently alleged where defendants knew, but failed to disclose, the regulatory activity. *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (failure to disclose regulatory meeting); *Bond v. Clover Health Invs., Corp.*, No. 3:21-cv-00096, 2022 WL 602432, at *25 (M.D. Tenn. Feb. 28, 2022) (failure to disclose investigation).

Plaintiff also alleges that Defendants knew or were reckless in not knowing that their statements to investors about the SEC investigation failed to accurately portray the true risk of a potential enforcement action, particularly in light of their continued concealment of the Company's internal calculations supporting goodwill impairment as of mid-December 2016 and year-end 2016. *See* ¶¶ 193, 197, 199, 207, 210, 214, 218, 220, 224. These allegations indicate an "egregious refusal to see the obvious, or to investigate the doubtful" which further support scienter. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) (quoting *Novak*, 216 F.3d at 308).[20]

## III. Defendants Falsely Affirmed that Sequential Maintained Adequate Disclosure Controls and Procedures and Internal Controls Over Its Financial Reporting.

Misrepresentations regarding the adequacy of a company's internal controls, including in SOX certifications, are actionable under the Exchange Act. *See, e.g.*, *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *12 (S.D.N.Y. Apr. 14, 2020) ("The Fund has also plausibly alleged that some of Defendants statements about its internal controls were false or misleading."); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) (misstatements "concerning the design and efficacy of internal controls are

---

[20] The Gibson Dunn Defendants focus on the lack of allegations detailing "statements or emails from employees showing that they reported the December 2016 Calculations to *any* of the Gibson Dunn Defendants," GD MTD at 33, but such direct evidence is not required. *See Blanford*, 794 F.3d at 306 ("Circumstantial evidence can support an inference of scienter in a variety of ways.").

actionable"); *In re Enzymotec Sec. Litig.*, No. CV145556JLLMAH, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (sustaining claims based on SOX certifications where plaintiff alleged "Defendants had no reasonable basis" for certifying adequacy of company's internal controls and noting that, "in contrast to the certifications, Lead Plaintiffs specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period. The Court finds this sufficient.").

Plaintiff alleges that while the Sequential Defendants were assuring investors that the Company's internal controls were "effective," they knew that those same controls were allowing them to withhold from investors material information about the Company's own mid-December 2016 and year-end 2017 analyses showing impaired goodwill and delay impairing goodwill until 4Q17. *See, e.g.,* ¶¶ 5-6, 11-12, 143-44, 174-75, 189-90, 206-07, 219-20. Because the Company's internal controls were deficient, the challenged controls statements are actionable. *See Orthofix*, 89 F. Supp. 3d at 617-18 (finding internal controls statements actionable where defendant "possessed information contrary to her public statements in the SOX Certifications regarding the adequacy of Orthofix's revenue recognition practices").[21]

---

[21] Accordingly, Shmidman's argument, Shmidman MTD at 8-10, that Plaintiff has not pleaded any actionable misstatement or omission against him due to there being nothing actionable in the SOX certifications falls flat and the cases he cites are factually inapposite. *See In re Diebold Nixdorf, Inc., Sec. Litig.*, No. 19-CV-6180 (LAP), 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) (alleging nothing to "suggest [i]ndividual [d]efendants knew—at the time they signed their certifications—of any misrepresentations in [defendant]'s financial statements or deficiencies in the Company's internal controls."); *Barrett v. PJT Partners Inc.*, No. 16-CV-2841 (VEC), 2017 WL 3995606, at *6 (S.D.N.Y. Sept. 8, 2017) (alleging one "rogue employee" circumvented internal controls); *In re PetroChina*, 120 F. Supp. at 358 (alleging no "facts pertaining to the Company's internal structure for financial controls"); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352 (E.D.N.Y. 2013) (same). For the same reasons, Klein's argument, Klein MTD at 22-23, that the Complaint's allegations do not establish that he knew of any alleged internal control deficiencies also falls flat and his cited cases are equally inapposite. *See Woodley v. Wood*, No. 20 CIV. 2357 (ER), 2022 WL 103563, at *2 (S.D.N.Y. Jan. 11, 2022), *aff'd sub nom. Rotunno v. Wood,* No. 22-502, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) (not alleging interim impairment

A. <u>The Challenged Controls Statements Are Materially False.</u>

Ignoring the Complaint's well-plead allegations, the Gibson Dunn Defendants argue that "Plaintiff does not make any allegations as to how or why the Company's internal controls were deficient." GD MTD at 28-29. Indeed, Plaintiff alleges that despite adopting FASB's new goodwill-impairment standard in 1Q17, internal analyses indicating impairment, and the stock price continuing to be depressed, Sequential's internal controls did not require it to "perform a quantitative impairment test of its goodwill during each of the first two quarters of 2017, carrying over $300 million of goodwill on its financial statements." ¶¶ 115-17. In addition, Sequential's internal controls allowed it to ignore its mid-December 2016 and year-end 2016 internal calculations in assuring investors that "[n]o events or circumstances have been identified to indicate an impairment [of goodwill] has occurred subsequent to the Company's October 1, 2016 impairment testing" in its 1Q17 and 2Q17 10Qs and in conducting its goodwill impairment testing for the first three quarters of 2017. ¶¶ 121-23. As a result, the Company's internal controls allowed Klein, Shmidman, Murray, Cooper, Lops, Sweedler, Hollander, Gossett, and Leonard to intentionally not "perform a proper goodwill impairment assessment during the Class Period" and to overstate the Company's reported goodwill balance "by at least $100 million as of December 31, 2016 and March 31, June 30, and September 30, 2017." ¶ 126.

These allegations easily support the inference that the Sequential Defendants disbelieved their statements that the Company's internal controls were "effective" at the time they were made. *See Petrobras*, 116 F. Supp. 3d at 380-81 (holding actionable statements "that the company's

---

testing); *Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 399 (S.D.N.Y. 2019) ("[A]nnual deficiency testing returned positive results year after year"); *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 341 (W.D.N.Y. 2008) (independent auditors not charged with fraud).

internal controls were effective" where "that same management was well aware of the extensive corruption in the Company's procurement activities"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (holding that plaintiffs plausibly alleged that defendant's "internal control problems were much more serious than the picture conveyed by its filings and press releases"); *Scottish*, 524 F. Supp. 2d at 398 (holding that "plaintiffs' factual allegations, accepted as true, suggest that the Company recklessly or intentionally misled investors as to the state of its internal controls").

The SEC came to the same conclusion, bringing charges against Sequential on December 11, 2020 for failing "to take into consideration clear, objective evidence of likely goodwill impairment, which avoided and delayed a material write down to goodwill" from 4Q16 to 4Q17, and as part of its settlement, permanently enjoined the Company from future violations of "certain reporting, books and records, and internal control provisions under the Securities Exchange Act of 1934." ¶¶ 12, 24. The SEC further settled charges against Klein "for causing Sequential's reporting, books and records, and internal controls violations related to the Company's failure to impair goodwill in a timely manner." ¶¶ 14, 29.[22]

The fact that CohnReznick issued reports stating that Sequential's internal controls were effective, GD MTD at 29, does not negate the falsity of the challenged controls statements,

---

[22] Plaintiff therefore adequately alleges why and how Sequential's internal controls were materially deficient at the time of the challenged controls statements, unlike the allegations at issue in the cases cited by Defendants. *See* GD MTD at 28-29 (citing *Janbay v. Can. Solar, Inc.*, 10 CIV. 4430, 2012 WL 1080306 at *9 (S.D.N.Y. Mar. 30, 2012); *In re PetroChina*, 120 F. Supp. at 359; and *City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Grp.*, 10 CIV. 2835 (NRB), 2011 WL 4357368, at *22 (S.D.N.Y. Sept. 19, 2011)); Klein MTD at 18-19 (citing *Sjunde AP-Fonden*, 417 F. Supp. at 379, and *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283 (S.D.N.Y. 2019)). The Gibson Dunn Defendants' reliance on *City of Brockton Ret. Sys. v. Avon Prods., Inc.,* No. 11 Civ. 4665(PGG), 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014), is even more tenuous as the challenged statements there did not reference internal controls anywhere, and "merely set forth standards in generalized terms that Avon hoped its employees would adhere to." *Id*. at *14.

especially given Plaintiff's allegations that CohnReznick, Wyss, Jackson, and Hilbert participated in the scheme to deceive investors. *See In re Vale S.A. Sec. Litig.*, No. 19CV526RJDSJB, 2020 WL 2610979, at *13 (E.D.N.Y. May 20, 2020) (explaining that "third-party certifications 'gave [false] comfort to investors' when they were allegedly tainted by Vale's meddling"); *see also Scottish*, 524 F. Supp. 2d at 392 (finding falsity as to defendants' SOX certifications despite auditor approval).

 B. <u>The False Controls Statements Were Made with Scienter.</u>

 The Sequential Defendants were motivated to assure investors that the Company's internal controls were effective even though they knew they were not. *See supra* §§ I.B.8., II.B.1. In addition, Plaintiff has adequately alleged facts that constitute strong circumstantial evidence of conscious behavior or recklessness as to the challenged controls statements.

  *1. Sequential's CEOs and CFOs' Tone at the Top Enhances Scienter Inference.*

 As CEO or CFO of Sequential, Shmidman, Klein, Murray, Cooper, Wagenheim, Lops, Conn, and Hanbridge's approach throughout the Class Period was to disregard the Company's mid-December 2016 and year-end 2016 internal calculations indicating goodwill was impaired. That "tone at the top" was "*the most important factor* contributing to the integrity of the financial reporting process" at the Company. *See* SEC Staff Accounting Bulletin No. 99, 1999 WL 1123073, at *8 (Aug. 12, 1999) (quoting Nat'l Comm'n on Fraudulent Fin. Reporting, Report of the Nat'l Comm'n on Fraudulent Fin. Reporting 32 (1987) (the "COSO Report")).[23]

 At its core, "tone at the top" refers to senior management's commitment to legal and ethical compliance and accurate reporting, expressed as a function of management initiatives, policies,

---

[23] The SEC's position as reflected in that bulletin is entitled to deference. *See SEC v. Cavanaugh*, 445 F.3d 105, 114 n.20 (2d Cir. 2006) ("We owe deference to the SEC's release.").

and, most importantly, management's conduct. The term "tone at the top" was first used in the COSO Report, which explained that to set the right tone, top management "*must . . . identify and assess the factors*" that could create an incentive or opportunity to engage in fraudulent behavior.[24] Accordingly, the need to establish and maintain an effective "tone at the top" places affirmative obligations on senior management officials which, in turn, directly implicates this Circuit's scienter standard. *See In re Nevsun Res. Ltd.*, No. 12 CIV. 1845 (PGG), 2013 WL 6017402, at *14 (S.D.N.Y. Sept. 27, 2013) ("A failure 'to check information [defendants] *had a duty to monitor*' may also give rise to a strong inference of recklessness."); *see also Nathel v. Siegal*, 592 F. Supp. 2d 452, 465 (S.D.N.Y. 2008) (finding "the SAC sufficiently pleads a duty to monitor, an allegation that is . . . relevant in determining scienter.").

Sequential and CohnReznick explicitly affirmed that they evaluated the internal control environment within which Sequential's employees functioned according to the standards of the COSO Report, which recognizes that a company's CEO sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. ¶¶ 80, 86. In other words, "'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system . . . The influence of the CEO on an entire organization cannot be overstated." ¶ 86. The CEO "fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business." *Id*.

In this case, the direction from Shmidman to senior managers when he was CEO was to not mention the mid-December 2016 and year-end 2016 internal calculations indicating impaired

---

[24] NATIONAL COMMISSION ON FRAUDULENT FINANCIAL REPORTING (U.S.), *Report of the National Commission on Fraudulent Financial Reporting: exposure draft, April 1987 (1987)*, p. 11 https://egrove.olemiss.edu/aicpa_assoc/420 (last visited May 24, 2023)

goodwill in any public statements. *See* ¶¶ 134-46. When Murray, Wagenheim, and Conn were CEO, in turn, they either also knew and directed senior managers to not mention those internal calculations to investors, or recklessly did not direct senior managers to dig into the Company's past goodwill analyses. Either way, the result was the same: investors were in the dark. *See* ¶¶ 147-224. Accordingly, "[u]nlike cases in which misrepresentations plausibly result from issues flowing from the bottom-up (for example, where subordinates fail to give executives pertinent information), it is more plausible based on the [corrective] disclosure that *the fraud flowed from the top-down*." *comScore*, 268 F. Supp. 3d at 551-52 (finding scienter based on allegations of, *inter alia*, "fail[ing] to evaluate the nonmonetary transactions using GAAP and affirmatively misrepresent[ing] that the recognition of the revenue complied with GAAP when it did not . . . and the 100% write-off of comScore's nonmonetary revenue of $43.2 million").

### 2.    *The SOX Certifications Support a Strong Inference of Scienter.*

Shmidman, Klein, Murray, Cooper, Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler's SOX certifications also add to the strong inference of scienter alleged. *See Frank v. Dana Corp.*, 646 F.3d 954, 961-62 (6th Cir. 2011) ("Viewing the factors holistically," including the alleged false SOX certifications and the SEC investigation into the Company's accounting practices, and finding that "the inference that [defendant] recklessly ignored the falsity of their external statements is at least as plausible as the faulty accounting inference").

Shmidman, Klein, Murray, Cooper, Lops, Wagenheim, Hanbridge, Conn, DiSanto, and Sweedler each attested to the accuracy of Sequential's financial statements, the disclosure of any material changes to its internal control over financial reporting, and the disclosure of all fraud. ¶¶ 134, 139, 148, 154, 160, 169, 176, 178, 180, 183, 194, 200, 211, 215, 221. These certifications properly add to the scienter calculus because such certifications require executives "to access sufficient reporting information to certify that the information provided did not omit any material

facts to make the report not misleading." *Bielousov v. GoPro, Inc.*, No. 16-CV-06654-CW, 2017 WL 3168522, at *7 (N.D. Cal. July 26, 2017); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, No. 1:16-CV-3591-GHW, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020) ("The Fund has plausibly pleaded that Defendants acted with scienter by attesting to the adequacy of their internal controls in the SOX certifications."). "For these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex Ret. Sys. v. Quest Software Inc.,* 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007).[25]

## IV. Plaintiff Adequately Alleges Reliance.

"In securities fraud cases, reliance is equated with 'transaction causation,' which requires the defendant's conduct be the 'but for' cause of the plaintiff's detrimental action." *Charney v. Wilkov*, 734 F. App'x 6, 9 (2d Cir. 2018). "[A] plaintiff may establish reliance by demonstrating that '*but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction.'" *Id.* To do so, a plaintiff may rely on the presumption of reliance established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988),"allow[ing] courts to presume that

---

[25] As such, Shmidman and Murray's arguments that the mere signing of SEC filings and SOX certifications does not support an inference of scienter have no merit. *See* Murray MTD at 9; Shmidman MTD at 12. As discussed *supra*, those facts may be considered holistically with Plaintiff's other scienter facts to support a strong inference of scienter. None of the case law cited by Shmidman and Murray is analogous to the facts of this case. *See Saraf v. Ebix, Inc.*, No. 21-CV-1589 (JMF), 2022 WL 4622676, *5 (S.D.N.Y. Sept. 30, 2022) (no showing defendants had access to contradictory information); *Int'l Ass'n of Heat v. Int'l Bus. Machines Corp.*, 205 F. Supp. 3d 527, 536 (S.D.N.Y. 2016) (no interim impairment testing); *Orthofix*, 89 F. Supp. 3d at 615 (no internal impairment testing); *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 164-65 (S.D.N.Y. 2015) (no internal impairment memo); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 213 (S.D.N.Y. 2012) (no report alleged prior to conference call that formed basis of claim); *Hutchinson v. Perez*, No. 12 CIV. 1073 HB, 2012 WL 5451258, at *6 (S.D.N.Y. Nov. 8, 2012), *amended,* No. 12CIV 1073 HB, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013) (defendant did not have access to contrary information at time of statement); *Bd. of Trustees of City of Ft. Lauderdale Gen. Emps' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO,* 475 F. App'x 353 (2d Cir. 2012) (individual defendants not privy to reports contradicting their public statements).

the price of the stock traded in an efficient market reflects all public, material information–including misrepresentations–and that investors rely on the integrity of the market price when they choose to buy or sell stock." *Arkansas Tchrs. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 478 (2d Cir. 2018), *vacated and remanded,* 210 L. Ed. 2d 347 (2021). *Basic* also "endorsed the fraud-on the-market theory and applied it to class action lawsuits for securities fraud." *Id.* at 483. "[U]nder the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). "The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." *Id.* (citing *Basic*, 485 U.S. at 247). A defendant may rebut the presumption of reliance with "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248.

Plaintiff has established the applicability of *Basic*'s presumption of reliance. *See, e.g,* ¶¶ 331-34; ECF No. 14-1. Accordingly, "the burden then shifts to the defendants, who 'bear the burden of persuasion under *Halliburton II* to rebut the *Basic* presumption by a preponderance of the evidence.'" *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM)(RWL), 2019 WL 3001084, at *11 (S.D.N.Y. July 10, 2019) ("*Signet II*"). "To meet the burden, defendants must 'do more than merely produce evidence that might result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the company's stock's price.'" *Id.* The "dispute boils down, in essence, to when sufficient corrective information entered the market, making reliance thereafter unreasonable as a matter of law, and thereby rebutting the fraud-on-the-market presumption." *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig.*, 247 F.R.D. 32, 38 (D.D.C. 2008) ("[T]the Court must determine whether 'a curative disclosure had been made

55

so as to render it unreasonable for an investor, or the market, to continue to be misled by the defendants' alleged misrepresentations.'"); *see also Baliga v. Link Motion Inc.*, No. 18CV11642VMVF, 2022 WL 3363787, at *20 (S.D.N.Y. Aug. 10, 2022), *report and recommendation adopted in part, rejected in part*, No. 18 CIV. 11642 (VM), 2022 WL 16707361 (S.D.N.Y. Nov. 4, 2022) ("[T]he fraud-on-the-market theory expressly requires that the plaintiff trade the security 'between the time the misrepresentations were made and the time the truth was revealed.'"); *In re Virtus Inv. Partners, Inc. Sec. Litig.*, No. 15CV1249, 2017 WL 2062985, at *4 (S.D.N.Y. May 15, 2017) ("The class period is defined to end when the truth [is] revealed."). Where "a purported 'disclosure' is accompanied by a corporate denial, it is no 'disclosure' at all, since such a denial is counteractive, misleading, and can cause investors to doubt the contents of the purported disclosure." *Signet II*, 2019 WL 3001084, at *16.

The Gibson Dunn Defendants argue that "Plaintiff cannot plausibly allege that any alleged misstatements or omissions caused Plaintiff to rely on a fraudulent inflated price because all alleged 'red flags' calling for impairment testing were public," and thus, the "Company's market price reflected at all pertinent times the need for, if any, or culpable failure to undertake, if any, interim impairment testing." GD MTD at 35-36. Those red flags included "the stock price decline beginning in November 2016, the overall decline of stock prices in the retail industry, the Company's issuance of downward revised earnings guidance, and Defendants Shmidman's announcement that he was stepping down as CEO." *Id.* at 35. Such "red flags" do not suffice to rebut the presumption of reliance to which Plaintiff is entitled because, *inter alia*, Defendants made express assurances to investors about those red flags. *See, e.g.,* ¶¶ 11, 114, 120-24, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23.

Defendants ignore those assurances and the fact that the results from the Company's mid-

December 2016 and year-end 2016 internal calculations were never disclosed to investors until the SEC did through its Complaint on December 11, 2020 in order to liken this case to *CBS Corp.* GD MTD at 45-46. The Court in *CBS Corp.* did not find reliance, in part, because the "red flags" were all public knowledge, including "the difference between [defendant]'s book value and market capitalization, the declines in advertising revenues, and the expectations of analysts regarding the media business's environment." 679 F.3d at 69. In contrast, Plaintiff here alleges not only red flags, but that the red flags led Sequential to undertake interim impairment testing as of mid-December 2016 and year-end 2016 and to conceal the results indicating impaired goodwill, causing the Company's stock price to be artificially inflated until the impaired goodwill was finally revealed and written off a year later in 4Q17. *See, e.g.,* ¶¶ 3-8, 22, 46, 60, 90, 302, 330-34. *CBS Corp.* thus does not support a finding of no "reliance" in this case.

Defendants further argue that Sequential "disclosed the SEC investigation and the receipt of a Wells Notice even though it was never required to do so," and therefore "Plaintiffs cannot plausibly allege that [its] stock price was fraudulently inflated by any failure to disclose this information." GD MTD at 36. But Plaintiff alleges the full truth was concealed until December 11, 2020, so Defendants' argument neither "severs the link" between the misrepresentations and the price paid by Plaintiff nor rebuts the presumption of reliance. As in *Virtus*, "[d]efendants' theory [is] undermined by evidence that investors were still in the dark throughout the class period" until the final corrective disclosure. 2017 WL 2062985 at *5 (finding the entire truth was not in the market and therefore *Basic*'s presumption of reliance applied, even when the company disclosed that the SEC was investigating the company, it had received a Wells Notice, and the CEO had resigned); *see also In re Grupo Televisa Sec. Litig.*, No. 18 CIV. 1979 (LLS), 2022 WL 2829253, at *2 (S.D.N.Y. July 20, 2022) (finding that the "single event" which notified investors

57

of defendants' fraudulent scheme was defendants' testimony in criminal proceeding). And again, Defendants continued to provide reasonable assurances to investors after disclosing the resignation of Shmidman, the SEC investigation, and the Wells Notice, thereby preventing Plaintiff from knowing that the market price of Sequential's stock was still inflated by fraud. *See* ¶¶ 11, 120-24, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23; *see also DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 438 (S.D.N.Y. 2018) (collecting cases) (finding that "express denials of the reported allegations could have allayed a reasonable investor's concerns").

In addition, "whether Plaintiff['s] reliance was justified or whether [its] subsequent trades belie any reliance on [Defendants'] alleged misrepresentations or omissions raises a question of fact not appropriate for resolution on a motion to dismiss." *Baliga v. Link Motion, Inc.*, No. 18 CIV. 11642 (VM), 2022 WL 16707361, at *12 (S.D.N.Y. Nov. 4, 2022); *see also Virtus*, 2017 WL 2062985 at *5 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 482 (2013)) ("Rebutting the fraud-on-the-market presumption of reliance . . . by demonstrating that 'news of truth credibly entered the market and dissipated the effects of prior misstatements' . . . is a matter for trial (and presumably also for a summary judgment motion).").

## V.   Plaintiff Adequately Alleges Loss Causation.

A "securities fraud plaintiff's burden [in pleading loss causation] is not a heavy one." *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *11 (S.D.N.Y. Sept. 19, 2017). In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court emphasized that plaintiffs are not required to plead loss causation in a rigid or formulaic manner. ("[N]either the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss."). Rather, all that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id*. (quoting Fed. R.

Civ. P. 8(a)(2)); *see also Poptech, L.P. v. Stewardship Inv. Advisors, LLC*, 849 F. Supp. 2d 249,

274 (D. Conn. 2012) ("Unlike the scienter element of § 10(b) claims, loss causation allegations

are governed by Rule 8.").

Under Rule 8, a plaintiff need only "provide a defendant with some indication of the loss

and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. Stated otherwise,

all that is necessary at this stage is a plausible pleading of loss causation generally; "the Court

[should] defer[] questions about the robustness of Plaintiff['s] selection of corrective disclosures

to a later stage of litigation, after the aid of discovery."[26] *Mylan*, 2018 WL 1595985 at *18. Indeed,

"neither the Supreme Court in *Dura*, nor any other court addressing the loss causation pleading

standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud."

*Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d at 202. As the Second Circuit has explained,

"a plaintiff can establish loss causation *either* by showing a 'materialization of risk' *or* by

identifying a 'corrective disclosure' that reveals the truth behind the alleged fraud." *Vivendi*, 838

F.3d at 261. The two methods are not "fundamentally different pathways for proving loss

causation;" the concealed risk or truth may "come[] out by way of a corrective disclosure

describing the precise fraud inherent in the alleged misstatements, *or through events constructively

disclosing the fraud.*" *Id.* at 261-62.

Plaintiff alleges that Defendants' fraud was partially revealed through a series of

---

[26] Shmidman argues that Plaintiff cannot show loss causation because the SEC filings "*themselves* made extensive disclosures surrounding the evaluation of the Company's goodwill." Shmidman MTD at 14. This ignores Plaintiff's allegations about the results of the mid-December 2016 and year-end 2016 internal calculations indicating goodwill being concealed from investors until December 11, 2020. In addition, Shmidman's case in support of his position is different because the alleged corrective disclosures there did not "reveal some then-undisclosed *fact* with regard to the specific misrepresentations alleged in the complaint." *Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72, 75 (2d Cir. 2013).

incremental disclosures that occurred on February 28, 2018, ¶¶ 7-8 (over 13% drop), March 31, 2020, ¶ 10 (over 48% drop), and December 11, 2020, ¶¶ 12-13 (over 11% drop), causing it and the putative Class losses. These loss causation averments readily satisfy the applicable pleading standards as they connect the material misstatements and omissions about Sequential's goodwill, its internal controls, and the SEC Investigation to it and the putative Class's losses when the market learned: (1) on February 28, 2018 that the Company was writing off all its goodwill as of 4Q17, (2) on March 31, 2020 that the SEC had been investigating the Company's controls and practices surround the 4Q17 goodwill write-off since 3Q19, and (3) on December 11, 2020, via the SEC Complaint, that the Company had internal calculations indicating its goodwill was impaired as early as mid-December 2016. *See, e.g.*, *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019) ("[P]laintiff's allegations regarding the investigations, the bad press, and the various departures of executives, and the resultant dip in stock prices, 'suffice at the pleading stage for the purposes of loss causation.'").

## VI.  Plaintiff Adequately Alleges Scheme Liability.

Rules 10b-5(a) and (c) make it "unlawful . . . (a) [t]o employ *any* device, scheme, or artifice to defraud, . . . or (c) [t]o engage in *any* act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. 240.10b-5; *see also Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151 (1972) ("These proscriptions, [in § 10(b) and Rule 10b-5], are *broad*."). Indeed, the Supreme Court has confirmed that the "*expansive*" language found in Rules 10b-5(a) and (c) "*capture a wide range of conduct*." *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094, 1101 (2019).

In contrast to Rule 10b-5(b), which only prohibits material misrepresentations and omissions, Rules 10b-5(a) and (c) "encompass the use of '*any* device, scheme, or artifice' or '*any* act, practice or course of business' used to perpetrate a fraud on investors." *In re Glob. Crossing,*

*Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335 (S.D.N.Y. 2004) (emphases in original); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474 n.37 (S.D.N.Y. Dec. 22, 2005) ("[S]ubsections (a) and (c) . . . encompass a wide range of activities."). "[A] cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant." *Glob. Crossing*, 322 F. Supp. 2d at 335.

"[T]he 'deceptive or manipulative conduct' in a market manipulation claim, while still requiring particularity, may be pled with less specificity than that required in claims alleging material misstatements or omissions." *In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 385 (S.D.N.Y. 2003). Indeed, numerous courts have deemed allegations addressing the "nature, purpose, and effect of the fraudulent conduct and the roles of the defendants" to suffice to meet the pleading requirements. *Id*. at 386.

Plaintiff alleges that the Sequential Defendants provided information to support, and are thus liable for, the CohnReznick Defendants' misstatements under Rules 10b-5(a) and (c). ¶¶ 46, 343-55. In addition, Plaintiff alleges that the CohnReznick Defendants reviewed, advised, and signed off on, and are thus liable for, the Sequential Defendants' misstatements under Rules 10b-5(a) and (c). ¶¶ 52, 364-71. While Defendants are not liable for any statements that they did not make under Rule 10b-5(b), they can still be liable for such statements as part of a scheme. *See, e.g., Sequential Brands*, 2021 WL 4482215 at *6 (finding scheme liability where "Sequential's accounting and finance personnel covered up quantitative evidence of an impairment to its goodwill by discarding that quantitative evidence, conducting a biased qualitative assessment, and ultimately changing its methodology to assess goodwill"); *SEC v. Sugarman*, No. 19 CIV. 5998, 2020 WL 5819848, at *7 (S.D.N.Y. Sept. 30, 2020) (finding deceptive a misleading memo presented to the board of directors regarding an acquisition); *SEC v. Sason*, 433 F. Supp. 3d 496,

509 (S.D.N.Y. 2020) (although other defendants allegedly created false documents, the "Complaint need not establish that [non-maker defendants] 'participated in each and every aspect of the fraudulent scheme' to withstand a Rule 12(b)(6) motion. Rather, the [plaintiff] must only allege that [non-maker defendants] engaged in deceptive conduct that contributed to the larger scheme."); *see also In re CBI Holding Co.,* 419 B.R. 553, 567 (S.D.N.Y. 2009), *on reh'g in part*, 01 CV 0131 (KMW), 2010 WL 2287013 (S.D.N.Y. June 7, 2010) (citing *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658-59 (S.D.N.Y. 2007)) ("Courts have also permitted claims to go forward where plaintiffs have sufficiently alleged that an auditor had access to documents that provided details about the fraudulent scheme").[27]

Murray, Shmidman, and the Gibson Dunn Defendants claim that more is required. *See* Murray MTD at 18-19; Shmidman MTD at 15; GD MTD at 36-37. Murray and the Gibson Dunn Defendants rely on *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) for their position that "[s]cheme liability requires the performance of a deceptive act that is distinct from the alleged misstatements and omissions, such as dissemination."[28] "But *Rio Tinto* addressed only 'whether misstatements and omissions – without more – can support scheme liability' under Rules 10b-5(a) and (c)." *SEC v. Rosenberger*, No. 22CV4736 (DLC), 2023 WL 1928093, at *5 (S.D.N.Y. Feb. 10, 2023) (Rejecting defendant's argument that she was not the "maker" of the misstatements

---

[27] Defendants' argument that they are not liable for statements they did not make thus does not save them. *See* Murray MTD at 12-13; GD MTD at 14-16; CR MTD at 13.

[28] Shmidman makes the same argument as Murray and the Gibson Dunn Defendants, Shmidman MTD at 15 n. 6, but instead relies on two cases where the plaintiffs only alleged misstatements and omissions, nothing separate. *See In re AT&T/DirectV Now Sec. Litig.*, No. 19-CV-2892 (VEC), 2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020) *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.,* No. 21-2698-CV, 2022 WL 17587853 (2d Cir. Dec. 13, 2022); *Touchstone Strategic Tr. v. Gen. Elec. Co.*, No. 19-CV-1876 (JMF), 2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022). Since Plaintiff alleges deceptive conduct here beyond misstatements, those cases do not apply.

when she signed and certified the company's Forms 10-Q and 10-K). In *Rio Tinto*, moreover, the documents failed to disclose any valuation impairment. *See* 41 F.4th at 50 ("Importantly, the SEC alleges that none of the documents disclosed that the Mine's valuation was impaired."). Plaintiff here alleges that the Sequential Defendants provided information to support the CohnReznick Defendants' statements, defeating any argument that they are not alleged to have disseminated any statements. *See* Murray MTD at 18-19; Shmidman MTD at 15; GD MTD at 36.

In addition, this Court has already found scheme liability against Sequential in denying its motion to dismiss the SEC Complaint. *See Sequential Brands*, 2021 WL 4482215, at *6 ("The SEC has alleged that Sequential committed a deceptive act in furtherance of an alleged scheme to defraud."). Defendants here raise the same argument that Sequential raised there: "such allegations do not state a claim because 'alleged misrepresentations or omissions' alone cannot serve as the basis for scheme liability." *Id.* Relying on *Lorenzo*, this Court held that a defendant can be liable for scheme liability "where the defendant only 'disseminated false or misleading statements to potential investors with the intent to defraud.'"[29] *Id.* (citing *Lorenzo*, 139 S. Ct. at 1099). "Many courts in the Second Circuit have come to the same conclusion: *Lorenzo* instructs that a plaintiff may make out a scheme liability claim by identifying manipulative or deceptive acts grounded in alleged misrepresentations or omissions." *Id.* As in this case, the SEC's complaint alleged "that Sequential's accounting and finance personnel covered up quantitative evidence of an impairment to its goodwill by discarding that quantitative evidence, conducting a biased qualitative assessment, and ultimately changing its methodology to assess goodwill." *Id.* The Court found that although that course of conduct may not have been inherently unlawful, it was deceptive and "part

---

[29] Although the SEC brought claims under §17(a)(3) of the Securities Act, the Court held that §17(a)(3) "parallels the SEC's Rule 10b-5(c)." *Id.* at *5.

of a deliberate course of conduct continued for over a year." *Id.* Since there were deceptive acts

grounded in the alleged misrepresentations and omissions, that "counsel[ed] against granting

Sequential's motion on the ground that the SEC did not plead scheme liability." *Id.* The same

deceptive acts the SEC pled are among the same ones pled here, and therefore Plaintiff has

adequately alleged scheme liability with respect to the Sequential Defendants. *See* ¶¶ 46, 343-55.

Since Plaintiff alleged that CohnReznick Defendants were involved in the same deceptive

conduct, moreover, those claims must also prevail. *See* ¶¶ 52, 364-71; *Sason*, 433 F. Supp. 3d at

509 (non-maker defendants held liable under scheme liability where they were engaged in

deceptive conduct that contributed to the larger scheme); *CBI Holding*, 419 B.R. at 567 ("Courts

have also permitted claims to go forward where plaintiffs have sufficiently alleged that an auditor

had access to documents that provided details about the fraudulent scheme.").

## VII. The Court Should Consider, and Not Strike, Plaintiff's Allegations Based on the SEC Consent Orders and Complaint.

Defendants[30] argue that this Court should strike or decline to consider any allegations that

rely on the SEC Complaint, the Klein Order, and the consent orders with CohnReznick and certain

of its partners.[31] *See* Klein MTD at 8-10; GD MTD at 43-44; CR MTD at 15-16; Murray MTD at

---

[30] Klein and the Gibson Dunn Defendants argue that the Complaint's allegations relying on the SEC Complaint and SEC Consent Orders should be stricken or disregarded in their entirety. *See* Klein MTD at 8-10; GD MTD at 43-44. CohnReznick, Wyss, Jackson, and Hilbert similarly argue that reliance on the Consent Orders is inappropriate, and incorporate the arguments raised by "[s]everal of the other defendants, including the Gibson Dunn Defendants." CR MTD at 16-16, 25. Murray incorporates the Gibson Dunn Defendants' arguments in their entirety. Murray MTD at 1 n. 1. Shmidman also incorporates the arguments from the other Sequential Defendants, specifically that the allegations based on the SEC Complaint and settlement orders should be stricken. Shmidman MTD at 1 n. 1. Because all defendants have moved to strike or for the Complaint's allegations to be disregarded based on the same arguments, either explicitly or by incorporating the arguments by reference, this section responds to all "Defendants."

[31] Klein argues that ¶¶ 12, 24, 29, 90, 96-101, 104-11, 113, 120, 122, 127, 128, 133, 254-90 and 322-26 should be stricken from the Complaint. Klein MTD at 10 n. 6. The Gibson Dunn

1 n.1; Shmidman MTD at 1 n.1. They are wrong. Defendants' flawed arguments are based on (1) a misreading of the Second Circuit's decision on admissibility at the evidentiary stage in *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) as applying to the materiality of allegations at the pleading stage, (2) ignoring the explicit language of *Lipsky* cautioning against striking parts of the pleadings based on immateriality, and (3) inapposite case law, all while disregarding the numerous post-*Lipsky* cases that have already rejected Defendants' arguments.

A.  Courts May Consider Allegations Based on SEC Orders and Complaints at the Pleading Stage, Regardless of Their Admissibility.

The Second Circuit itself, in 2015, explained that while *Lipsky* may make consent orders inadmissible at the evidentiary stage, it "does not categorically bar courts from considering the content of such orders at the pleading stage, regardless of their admissibility." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec.*, LLC, 797 F.3d 160, 179 (2d Cir. 2015). Instead, when an SEC consent order overlaps with "other non-conclusory facts . . . made directly by Plaintiffs, and [which] were signed by Plaintiffs' counsel subject to the requirements of Rule 11," reliance on an SEC Order is "unproblematic" at the pleading stage. *Id.* at 180.

This is so because "*Lipsky* stands for an *evidentiary* principle that SEC consent decrees, like pleas of nolo contendere, may not be used for collateral estoppel purposes because the issues in the underlying action were not fully adjudicated." *In re Dentsply Sirona, Inc. Sec. Litig.*, No. 18-CV-7253 (NG)(PK), 2023 WL 2682905, at *8 (E.D.N.Y. Mar. 29, 2023) (citing *United States. v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981)). *Lipsky* does not stand for the broad proposition that the content of SEC orders may never support a complaint's allegations. *Id.*; *see also OSG*, 12 F. Supp. 3d at 620 ("no Second Circuit precedent indicates such a broad rule" that a complaint may never

---

Defendants similarly state that "[t]his Court should strike or decline to consider, at a minimum, those fifty-seven paragraphs that copy, reference, or rely upon the SEC Complaint and settlement orders." GD MTD at 44.

reference allegations from a separate proceeding that has not been decided on the merits); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768 n.24 (S.D.N.Y. 2012) (declaring that "[n]either Circuit precedent nor logic supports" reading *Lipsky* as imposing "such an absolute rule").

Accordingly, "since *Lipsky*, the Second Circuit has both explicitly and implicitly sanctioned the inclusion of allegations taken from SEC Orders, in pleadings, where a plaintiff 'also allege[s] [additional] non-conclusory facts' that 'render unproblematic any implied reliance on the SEC findings.'" *Dentsply*, 2023 WL 2682905 at *9 (quoting *Loreley*, 797 F.3d at 180); *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 135 (2d Cir. 2021) (referring to SEC investigation and settlement with defendant in support of its opinion); *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 556 (2d Cir. 2018) (vacating dismissal of complaint based on allegations incorporated by reference from SEC complaint).

Most district courts that have considered the issue, including this one, have also limited the holding in *Lipsky* and allowed complaints to rely on SEC complaints and orders. *See, e.g., City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *5 (S.D.N.Y. Jan. 21, 2021) (Oetken, J.), *aff'd sub nom Town of Davie Police Officers Ret. Sys. v. City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan*, No. 21-909-CV, 2021 WL 5142702 (2d Cir. Nov. 5, 2021) (collecting cases). "[T]he *Lipsky* rule is founded on an evidentiary premise and should not be seen as a blanket rule established by some courts in this Circuit 'that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial within the meaning of Fed. R. Civ. P. 12(f).'" *Id*. Accordingly, "there is nothing improper about utilizing information contained in an SEC

complaint as evidence to support private claims under the PSLRA," as Plaintiff does here. *See SEC. v. Lee*, 720 F. Supp. 2d 305, 340-41 (S.D.N.Y. 2010) (Daniels, J.).

      B.  <u>Courts Do Not Strike Relevant Portions of Pleadings Based on Immateriality.</u>

The federal courts routinely deny motions to strike allegations based on an SEC order or complaint at the pleading stage. As Judge Cote has explained, a "close reading of *Lipsky* reveals that it does not mandate the elimination of material from a complaint simply because the material is copied from another complaint." *VNB Realty v. Bank of Am. Corp.*, No. 11 CIV. 6805 (DLC), 2013 WL 5179197, at *3 (S.D.N.Y. Sept. 16, 2013). "*Lipsky* principally addressed whether a complaint had adequately pleaded that the offering documents filed by the defendants … contained material omissions and misrepresentations" when "[i]nstead of discussing its own offering documents, the plaintiff had copied passages from an SEC complaint *with allegations about other offering documents*." *Id.* In short, "*Lipsky*'s discussion of Rule 12(f), and in particular its examination of whether references to other pleadings should be stricken as 'immaterial,' has limited utility if a plaintiff has adequately identified the material omissions and misstatements in the offering documents *relevant to his claim*." *Id.* at *4. Here, as discussed *supra*, Plaintiff has adequately alleged material misstatements and omissions relevant to his claims.

In addition, "[t]he more general teaching of *Lipsky*, that 'courts should not tamper with the pleadings unless there is a strong reason for so doing,' has broader applicability, as does its admonition that Rule 12(f) should be 'construed strictly against striking portions of the pleadings on the grounds of immateriality, and if the motion is granted at all, the complaint should be pruned with care.'" *Id.* at *4; *see also Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 237 (S.D.N.Y. 2019) (denying motion to strike where consent judgments following defendants' settlements with the government, unlike the consent judgment in *Lipsky*, "[were] directly relevant to and form the basis of the claims against [defendants]"). Judge Crotty has similarly recognized that *Lipsky* simply:

> *reiterated the strong presumption against striking portions of the pleadings* and
> cautioned that its holding was limited to "the facts of this case." Lipsky does not
> … stand for the proposition that any factual allegation derived from a government
> investigation or pleading must be stricken from a private plaintiff's complaint.
> "*There is no absolute rule barring a private plaintiff from relying on government
> pleadings and proceedings in order to meet the Rule 9(b) and PSLRA thresholds*."

*In re Fannie Mae 2008 Sec. Litig.,* 891 F. Supp. 2d 458, 471-72 (S.D.N.Y. 2012)*, aff'd,* 525 F.

App'x 16 (2d Cir. 2013). "At the pleading stage, Plaintiffs need only allege facts that, upon their

information and belief, will likely lead to admissible evidence in discovery." *FXCM*, 364 F. Supp.

3d at 236; *see also Gittens-Bridges v. City of New York*, No. 19 CIV. 272 (ER), 2020 WL 3100213,

at *7 (S.D.N.Y. June 11, 2020) (rejecting *Lipsky* argument and denying motion to strike when "the

allegations are relevant and could lead to fruitful discovery"). In this case, Plaintiff's allegations

based on the SEC complaint and settlement orders will lead to evidence in discovery that will be

admissible. *See, e.g.,* ¶¶ 2-14, 25-39, 41-44, 49-55, 57-61, 87-102, 104-12, 114-15, 117, 120, 122-

23, 126-35, 166-67, 228, 254-90, 298, 303, 307, 309, 311, 313, 315, 317, 322-26, 337; *Fannie

Mae*, 891 F. Supp. 2d. at 471 (denying motion to strike allegations derived from a SEC complaint

and non-prosecution agreement because "there is evidence in support of the factual allegations

contained within these documents that would be admissible"); *Tobia v. United Grp. of Co., Inc.*,

No. 115CV1208BKSDEP, 2016 WL 5417824, at *2 (N.D.N.Y. Sept. 22, 2016) (rejecting *Lipsky*

argument and denying motion to strike allegations based on SEC complaint and consent order,

because the Court could not, as a matter of law at the pleading stage, "conclude that no other

evidence in support of the SEC's allegations would be admissible").

Plaintiff's factual allegations are also supported by Sequential's SEC filings, earnings calls,

and press releases as well as publicly available information from third parties. *See, e.g.,* ¶¶ 58-61,

92-95, 102, 112-13, 115, 121, 123, 125, 127-30, 132-40, 142-43, 145, 147-49, 151, 153-55, 157,

159-61, 163, 165-67, 169-74, 176-81, 183-89, 191-92, 194-95, 198, 200-06, 208-09, 211-13, 215-

17, 219, 221-23, 262, 264, 281, 299, 319-21, 324; *Fannie Mae*, 891 F. Supp. 2d at 472] (denying motion to strike when "some of the publicly available information supports plaintiffs' allegations"); *see also Vanleeuwen v. Keyuan Petrochemicals, Inc.*, No. 13 CIV. 6057 PAC, 2014 WL 3891351, at \*4 (S.D.N.Y. Aug. 8, 2014) ("'Indeed, [i]t makes little sense to say that information from . . . a study [or investigation]—which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony—is immaterial simply because it is conveyed in an unadjudicated complaint.'") (quoting *Fannie Mae*, 891 F. Supp. 2d. at 471).[32]

   C.   Defendants' Cases Do Not Support Striking or Disregarding Any Allegations.

   Defendants' other cases do not help them. First, as with *Lipsy*, Defendants cite *Gilbert* for the proposition that the Second Circuit has struck as immaterial references to preliminary steps in litigations not adjudicated on the merits under Rule 12(f). *See* Klein MTD at 9; *see also* GD MTD at 43. In *Gilbert*, however, the Second Circuit rejected the argument that the SEC civil consent decree signed by the defendant should not have been admitted into evidence, allowed it into evidence, and held that while SEC consent decrees (like pleas of *nolo contendere*) may not be used for collateral estoppel purposes, "[t]he decree was clearly admissible" as "evidence for other purposes."[33] 668 F.2d at 97; *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 136 (2d Cir. 2008) ("A consent decree may properly be admitted to demonstrate that a defendant was aware of

---

[32] In *Vanleeuwen*, Judge Crotty rejected an argument that the plaintiffs could not rely on allegations taken from an SEC complaint where the SEC elected not to pursue the case because its "decision to not prosecute its claims is irrelevant as to whether Plaintiffs have plausibly alleged claims in *this* case." 2014 WL 3891351 at \*4 n. 5. Similarly, Defendants' arguments that "the SEC's findings only support non-scienter" and "the SEC did not prove anything," CR MTD at 16; GD MTD at 12, raise issues of fact, but are irrelevant as to whether Plaintiff's allegations, accepted as true and considered holistically, plausibly raise a strong inference of scienter.

[33] The *Gilbert* Court held that the SEC civil consent decree was admissible under Rule 404(b) in the subsequent criminal trial regarding securities law violations to show that the defendant knew of the reporting requirements involved in the decree.

its legal obligations."); *OSG*, 12 F. Supp. at 621 ("While settlements are inadmissible as evidence of liability, they are admissible for other purposes, including proof of knowledge. It follows that reference to the complaints or allegations in such actions would be permissible for the same reasons."). Defendants also cite to *U.S. S.E.C. v. Citigroup Glob. Mkts. Inc.*, 827 F. Supp. 2d 328, 333 (S.D.N.Y. 2011), *vacated and remanded*, 752 F.3d 285 (2d Cir. 2014)*,* for the proposition that courts routinely disregard or strike unproven allegations in SEC proceedings. *See* Klein MTD at 9-10. Yet, they misquoted the Court when it was explaining *Lipsky*'s holding,[34] and further failed to note that the decision had been vacated and remanded by the Second Circuit – and thus inapplicable. *See U.S. S.E.C. v. Citigroup Glob. Markets Inc.*, 752 F.3d 285 (2d Cir. 2014).

As to *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.,* 218 F.R.D. 76 (S.D.N.Y. 2003), the case is factually distinguishable because the Court granted the motion to strike based on the fact that "[m]any of the allegations merely state the conclusions necessary to prevail on the merits and are unsupported by facts" and "[w]hat facts the [a]mended [c]omplaint does include are irrelevant to [p]laintiffs' claim." *Id*. at 78. Plaintiff's allegations from the SEC documents are completely relevant to his claims and either supported by facts that are publicly available or will be revealed in-depth in discovery.

Similarly, equally inapposite are *Amorosa v. Gen. Elec. Co.*, No. 21-CV-3137 (JMF), 2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) and *Touchstone Strategic Tr. v. GE*, No. 19-CV-1876 (JMF), 2022 WL 4536800 (S.D.N.Y. Sep. 28, 2022), which arise from the same underlying class

---

[34] Full quote from *Citigroup*: "**Indeed the Lipsky court went so far as to hold that** 'neither [an SEC] complaint nor reference to [such] a complaint which results in a consent judgment may properly be cited in the pleadings' in a parallel private action and must instead be stricken." 827 F. Supp. 2d at 333 (emphasis on language Defendants omitted).

action.[35] In *Amorosa*, Judge Furman found that the plaintiff's "fatal flaw" was that he "copied almost verbatim from the operative complaint in the [c]lass [a]ction" and "an [o]rder memorializing a settlement between the SEC and [defendant]" without verifying any "of what he copied" or alleging any "non-conclusory facts that support[ed] the truth of these secondhand allegations." 2022 WL 3577838 at *1, *3. The plaintiff had not "examined the documents," knew "nothing about the circumstances of the alleged statement," and sourced "every factual allegation . . . secondhand." *Id.* at *4-5. The SEC order that the plaintiff was relying on "[did] not describe the relevant documents with sufficient detail or state who, specifically, made the relevant statements, as required to satisfy the heightened pleading requirements of Rule 9(b)." *Id.*[36] A month later in *Touchstone*, relying on his analysis in *Amorosa*, Judge Furman again found plaintiffs' reliance on the SEC order problematic because of their conclusory allegations of wrongdoing and their "claims resting on many of the very same allegations made in the putative class actions, including information derived from former employee confidential witnesses … that [p]laintiffs here concededly did not interview themselves." 2022 WL 4536800, at *1. in addition,

---

[35] In deciding both cases, Judge Furman noted that the plaintiffs' claims in *Touchstone* and *Amorosa* mirrored those brought on behalf of a putative class in *Sjunde AP-Fonden v. General Elec. Co.*, No. 17-CV-8457 (JMF) (S.D.N.Y) which were largely dismissed in a pair of earlier rulings. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379 (S.D.N.Y. 2019) ("*Sjunde I*"); *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF), 2021 WL 311003 (S.D.N.Y. Jan. 29, 2021) ("*Sjunde II*").

[36] Defendants selectively quote Judge Furman to argue that reliance on an SEC order at the pleading stage is inappropriate. *See* CR MTD at 10. But the full quote is this "*Disregarding the allegations copied from the CAC (including those derived from the former employees whom Amorosa did not interview), and mindful that those portions of the Amended Complaint that are* direct quotations from the SEC Order are to be considered 'in the nature of allegations "upon information and belief" which cannot ordinarily form the basis of a fraud claim,' *Loreley*, 797 F.3d at 180, *the Court is left with very little.*" *Amorosa*, 2022 WL 3577838 at *3 (emphasis on language Defendants omitted). Thus, far from categorically rejecting the SEC order, Judge Furman "considered the allegations in the SEC [o]rder" and simply found them too conclusory to meet Rule 9(b)'s pleading requirements. *See id.* at *3 n.4.

the "SEC [o]rder provide[d] little or no aid to [p]laintiffs" as the *Sjunde I* Court had already dismissed the same claims based on the factual allegations contained in the SEC order. *Id.* at \*4.

Plaintiff's allegations do not stem from a dismissed court case based on the same factual allegations. Indeed, this Court upheld the SEC's allegations against Sequential. *See SEC v. Sequential Brands Group, Inc.*, 20-CV-10471 (JPO), 2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021) (denying motion to dismiss). Although some allegations are copied from SEC documents, Plaintiff's counsel verified and/or corroborated those allegations and facts in conducting its independent investigation. *See* Complaint at 5. Plaintiff also alleges multiple non-conclusory facts that support the truth of these allegations, *see, e.g.,* ¶¶ 59-60, 87-89, 91-94, 112, 115-19, 123-26, 129-32, 225-53, 295-96, 298, and the relevant documents referenced and mentioned are described with sufficient detail, *see, e.g.,* ¶¶ 58-61, 92-95, 102, 112-13, 115, 121, 123, 125, 127-30, 132-40, 142-43, 145, 147-49, 151, 153-55, 157, 159-61, 163, 165-67, 169-74, 176-81, 183-89, 191-92, 194-95, 198, 200-06, 208-09, 211-13, 215-17, 219, 221-23, 262, 264, 281, 299, 319-21, 324. Lastly, as Defendants' own case holds, "[w]ith respect to the SEC's findings concerning deficiencies in [defendants]'s audits—including violations of PCAOB standards— . . . *[p]laintiffs can make use of such material in attempting to plead scienter.*" *In re DNTW Chartered Accts. Sec. Litig.*, 172 F. Supp. 3d 675, 690 (S.D.N.Y. 2016).[37] Accordingly, where, as here, Plaintiff's allegations based on the SEC Complaint, the Klein Order, the CohnReznick Order, and the CohnReznick Partner Orders overlap with those based on public information and his counsel's investigation, the Court should consider all of Plaintiff's allegations and strike none of them.

**VIII. Plaintiff's Claims Are Timely.**

---

[37] Defendants' attempt to liken the facts of *DNTW* to this case (CR MTD at 10) fails. As discussed *supra*, Plaintiff alleges a strong inference of scienter based on far more than – and do not just mirror – the factual allegations in the SEC documents.

Defendants argue that Plaintiff's claims are time-barred by the statute of limitation based on a misunderstanding of *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010), and the reliance on inapposite cases, including decisions interpreting the statute of limitations ("SOL") for Securities Act claims, despite the fact that §§11, 12(a)(2), and 15 have no scienter or loss causation requirements.[38] The SOL applicable to Exchange Act claims, like Plaintiff's, provides that private actions for securities fraud must "be brought not later than the earlier of – (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." *Merck*, 559 U.S. at 638 (quoting 28 U.S.C. § 1658(b)). No putative Class Member discovered facts constituting violations of the Exchange Act until the alleged fraud was fully revealed on December 11, 2020, which led to this action being timely filed on March 16, 2021, just over three months later.

Plaintiff's claims are not time-barred by the statute of repose either. The claims against the defendants newly named in the Complaint relate back to the Original Complaint under Rule 15, and Plaintiff timely cured the mistake of not naming them in the Original Complaint. After the SEC Orders against the CohnReznick Defendants were released on June 8, 2022, Plaintiff realized that additional defendants were liable for the alleged scheme. Just over five months later, on November 14, 2022, Plaintiff filed the Complaint to include, *inter alia*, allegations against all Defendants. Accordingly, all of Plaintiff's claims are timely.

A. The Statute of Limitations Does Not Bar Plaintiff's Claims.

Private actions for securities fraud must be brought within two years after discovery of the facts constituting the violation. 28 U.S.C. § 1658(b)(1). That period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts

---

[38] Specifically, the Gibson Dunn Defendants argue that the claims against nine of the ten new Gibson Dunn Defendants "were brought more than two years after the [SOL] period began," and therefore "Rule 15 does not override the [SOL]." GD MTD at 43.

constituting the violation'—whichever comes first." *Merck,* 559 U.S. at 653. Courts do consider "storm warnings" in evaluating when to start the limitations period, GD MTD at 42, but the period does not begin until facts supporting *all the elements, including scienter and loss causation, are discovered. See Merck*, 559 U.S. at 653. As the Supreme Court explained, although "terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating," the SOL "does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' including scienter–irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.*

"In other words, the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Empls.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011). In that case, the Second Circuit expanded upon *Merck* and confirmed that "the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *Id.* at 175. As such, the SOL "for securities fraud cannot begin to run before a reasonably diligent plaintiff would have uncovered enough information about the defendant's intent to satisfy the heightened pleading standard for fraud." *Id.* at 176; *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 2023 WL 2682905, at *10 ("Under the logic of *Merck*, because loss causation is an element of a § 10(b) claim, I agree with Plaintiff that it must have discovered sufficient facts to plead the misrepresentations and omissions, scienter, and loss causation elements before the [SOL] began to run.").

The initial complaint in this action was filed on March 16, 2021, just over three months after the final alleged corrective disclosure on December 11, 2020. The "critical date" for this Court's SOL analysis is March 16, 2019. *See Merck*, 559 U.S. at 638 ("[T]he critical date for timeliness purposes is … two years before [the] complaint [is] filed."). No one in the putative class had uncovered facts constituting their securities fraud claims until December 11, 2020, well after the critical date, and thus the initial complaint was timely.

Defendants, however, claim that the limitations period began on February 28, 2018, when Sequential announced it was taking the impairment charge, and thus, plaintiff's claims are time-barred. *See* Klein MTD at 11; GD MTD at 42; CR MTD at 25; Shmidman MTD at 6. In addition, the Gibson Dunn Defendants argue that the "limitations period for claims related to the SEC investigation and risk of lawsuit began when the Company disclosed the investigation on April 1, 2020" and "even if we consider the disclosure of the Wells Notice on August 14, 2020, as the discovery date, Plaintiff's claims are still barred." GD MTD at 42. Shmidman also mentions that the claims against him "are based on his signing a SOX certification on November 9, 2016, and Sequential's 10-K and related SOX certification on March 14, 2017." Shmidman MTD at 6. Defendants' conclusion that Plaintiff had "constructive notice" after the first corrective disclosure on February 28, 2018, triggering the SOL period,[39] is based on a misunderstanding of *Merck* and relies on inapposite cases.

### 1. *Merck's Discovery Rule Supports Constructive Notice on December 11, 2020.*

---

[39] Klein MTD at 12-13 ("Under these factual circumstances, the case law is again clear that constructive notice was triggered no later than the impairment disclosure date."); GD MTD at 42 ("Plaintiff had constructive notice of its claims by the time of the Company's 'corrective disclosure,' at which time the claims were 'discoverable through reasonable diligence.'"); Shmidman MTD at 7 ("Having alleged that the fraud about Sequential's goodwill valuation was revealed to the market on February 28, 2018, Plaintiff cannot also maintain that it was not on constructive notice of any claims against Shmidman by that date.").

No putative Class Member was on constructive notice of all the elements of their claims until the alleged fraud was fully revealed via the SEC complaint on December 11, 2020. Defendants assert constructive notice as of February 28, 2018, only by disregarding the "discovery rule" adopted by the Supreme Court when it "reject[ed] 'inquiry notice' as the standard" in securities fraud cases. *See Merck*, 559 U.S. at 651-52; *see also MBIA*, 637 F.3d at 173 ("Prior to *Merck*, the law of our Circuit had provided that a plaintiff was on 'inquiry notice' when public information would lead a reasonable investor to investigate the possibility of fraud."); *Rothman v. Gregor*, 220 F.3d 81, 96 (2d Cir. 2000) (pre-*Merck* holding that "[d]iscovery of facts for the purposes of this [SOL] includes constructive or inquiry notice, as well as actual notice").[40]

"Under controlling Second Circuit law [which followed *Merck*], the start of the limitations period – which normally runs from the date of the corrective disclosure, [will be] delayed until the discovery of facts necessary to survive a motion to dismiss for failure to plead scienter." *Pearlstein v. Blackberry Ltd.*, No. 13 CIV. 7060 (CM)(KHP), 2022 WL 1000314, at *7 (S.D.N.Y. Apr. 4, 2022) (citing *MBIA*, 637 F.3d at 175). Where a corrective disclosure does not reveal enough information to plead scienter, a release regarding the results from a government investigation could provide sufficient scienter facts to trigger the start of the SOL. *See York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 459, 467 (9th Cir. 2023) (finding that plaintiff "has plausibly alleged that the SEC Order provided facts and context without which it could not have otherwise

---

[40] Even under the less stringent pre-*Merck* standard, the February 28, 2018 corrective disclosure was not sufficiently specific to give a reasonable investor "inquiry notice" of fraud. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406 (2d Cir. 2008) (finding that a reasonable investor did not have notice of fraud where "state filings do not provide specific information that would suggest to a reasonable investor the probability of fraud"); *Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 194 (2d Cir. 2003) (finding that even where a Form 10-K contained specific information about write downs and accounting charges that later formed the basis for fraud allegations, the statements contained in the 10-K were not presented with "clarity sufficient to place Plaintiffs on inquiry notice that there was a probability of fraud").

pleaded scienter"); *see also Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (finding that plaintiffs did not become aware of the fraud until the NYAG released information about its investigation, as the prior corrective disclosures did not provide enough detail to provide notice);[41] *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 84 (S.D.N.Y. 2022) (denying motion to dismiss claims as untimely when "[i]n alleging the defendants' knowledge and intent, the [c]omplaint extensively relies on information disclosed in connection with the [] criminal proceedings against [defendants], including the contents of internal e-mails and documents").

The Ninth Circuit's recent holding in *HP* that plaintiffs' claims were not "discovered" until an SEC Order was issued which provided sufficient evidence of scienter applies with equal force here. 65 F.4th at 467. In analyzing Defendants' prior statements, the Ninth Circuit concluded that without additional context, the statements were innocuous and "could not form the basis of a claim for securities fraud" because they "seem[ed] like standard assurances to shareholders." *Id.* Notably, the Ninth Circuit found that the facts in the SEC Order gave rise to scienter even though it only alleged non-fraud violations and did not find that any executives acted with scienter, and defendants accepted the settlement without admitting or denying the allegations. *Id.* at 468.

Plaintiff here too could not have discovered the facts necessary to survive a motion to dismiss for failure to plead scienter until the release of the SEC Complaint and related documents

---

[41] One irrelevant § 11 case relied upon by Defendants, *Amorosa*, cites *Lentell*, 396 F.3d at 175 n. 4, for the proposition that the corrective disclosure is the same as constructive notice for SOL purposes. 409 F. App'x at 416. But the court in *Lentell* actually stated that "[t]hese allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior recommendations." 396 F.3d at 175 n.4. And the plaintiffs in *Lentell* successfully argued "that the falsity of Merrill's recommendations was made public no earlier than April 2002, when the NYAG's affidavit 'describ[ed] the inner workings of Merrill's Internet Group,' and that until then plaintiffs (and presumably the market at large) therefore lacked knowledge of the fraud. The complaints withstand the [SOL] on the strength of that argument." *Id.*

on December 11, 2020. *See* ¶ 11. After the February 28, 2018 press release announcing that all the Company's goodwill was being written down, the Sequential Defendants went out of their way to assure investors about the health and value of the business during the 4Q17 Earnings Call later that same day. ¶¶ 165-67 ("… but the goodwill is unrelated completely unrelated to the strength of our brands, unrelated to any impairments or anything like that on our brands which we did not have this quarter. So, no it does not reflect that all on the value or the trademarks, it's not associated with any of the trademark and doesn't reflect at all on – as our positive review on the strength of the brands going forward."). Those assurances prevented Plaintiff from having inquiry notice of the alleged fraud. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17-CIV-1580 (LGS), 2018 WL 2382600, at *5 (S.D.N.Y. May 24, 2018) (declining to dismiss on SOL grounds when defendants "countered" statements in "many news reports of delays and accounting irregularities" with explicit denials of any wrongdoing); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 229 (S.D.N.Y. 1999) ("[C]ourts have been reluctant to find that public disclosures provided inquiry notice where those disclosures were tempered with positive statements.").

Even after the Company disclosed the investigation on April 1, 2020, and the Wells Notice on August 14, 2020, Defendants continued to prevent investors from having notice of the fraud by assuring them that Sequential's disclosure controls and procedures and internal control over financial reporting were effective, that Sequential had complied with GAAP, and that the SEC investigation was not "material." *See* ¶¶ 11, 114, 121, 123, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23; *Siebert v. Nives*, 871 F. Supp. 110, 115 (D. Conn. 1994) (finding disclosure of FDIC investigation did not trigger inquiry notice where company simultaneously announced that it had revised its policies to meet investigators' concerns). The facts constituting the fraud, particularly scienter, were not known and could not have been known, by investors

before the release of the SEC Complaint and related documents on December 11, 2020 because only the Sequential Defendants and the SEC participated in the internal communications and documents between them after the SEC began its investigation. *See* ¶¶ 9, 108-09. Plaintiff could not have discovered enough information about any Defendants' scienter to satisfy the heightened pleading standard until the SEC Complaint and related documents became public, and therefore the earliest the SOL could begin running is December 11, 2020.

In addition, whether there are sufficient facts to prove scienter at a specific time is a fact-intensive inquiry inappropriate for resolution at the motion to dismiss stage. *See Chen v. X Fin.*, No. 19CV6908KAMSJB, 2022 WL 765417, at *10 (E.D.N.Y. Mar. 13, 2022) (quoting *Bear Stearns*, 851 F. Supp. 2d at 763) ("Whether sufficient facts existed at [a particular] time is, by definition, a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage*."*); *Reckitt Benckiser*, 587 F. Supp. 3d at 84-85 ("At the pleading stage, the Court is unable to conclude that a reasonably diligent plaintiff would have discovered the facts constituting a violation at a point in time that would render plaintiffs' claims untimely."); *see also Lentell*, 396 F.3d at 168 (explaining that under the inquiry-notice standard - which is less demanding than the discovery rule applicable here, "whether a plaintiff had sufficient facts to place it on inquiry notice is "*often inappropriate for resolution on a motion to dismiss*"); *Fiore*, 416 F. Supp. 3d 306, 331 (S.D.N.Y. 2019) ("At the summary judgment stage, with the benefit of a developed factual record, Defendants may again raise the argument that some or all of the SEC's claims are time-barred.").

### 2. *None of Defendants' Cases Support the SOL Starting on February 28, 2018.*

*Merck* controls because Plaintiff's fraud claims arise under the Exchange Act. Accordingly, Defendants' reliance on cases interpreting the SOL under the Securities Act, which does not require scienter or loss causation, is fatal to their argument that the ***first*** alleged corrective

79

disclosure on February 28, 2018 started the SOL. *See Freidus v. Barclays Bank PLC*, 734 F.3d 132, 138 n. 2 (2d Cir. 2013) (refusing to consider *Merck* in suit alleging §§ 11, 12(a)(2), and 15 violations because the corrective disclosures constituted constructive notice under § 11); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d. Cir. 2011) (holding that the corrective disclosure date is the same as the constructive notice date for purposes of § 11's SOL); *Yaroni v. Pintec Tech. Holdings Ltd.*, 600 F. Supp. 3d 385, 395 (S.D.N.Y. 2022) (relying on *Amorosa*) (recognizing that "a plaintiff bringing claims under [§§ 11 and 15] need not plead scienter, reliance, or causation"); *In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 160 (D. Conn. 2020), *aff'd in part, rev'd in part*, 988 F.3d 157 (2d Cir. 2021) ("[T]he [§] 11 claim was not brought until [l]ead [p]laintiffs' filed their [a]mended [c]omplaint . . . which is more than a year after the 'first partial corrective disclosure' … 'when [l]ead [p]laintiffs had constructive notice of their claims.").

This distinction is critical because Securities Act claims are for strict liability and negligence, not fraud. *See In re Proshares Tr. II Sec. Litig.*, 839 F. App'x 649, 650 (2d Cir. 2021) ("The complaint asserts strict liability and negligence claims under . . . the Securities Act."); *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017) ("Section 12 is closely related to [§] 11 . . . which 'imposes strict liability on issuers and signatories, and negligence liability on underwriters,' for material misstatements or omissions in a registration statement"); *Yaroni*, 600 F. Supp. 3d at 395. Correspondingly, the SOL for Securities Act claims limits actions "to enforce any liability created under [§§ 11 or 12(2)(a)] unless brought within one year after the *discovery of the untrue statement or the omission*, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Accordingly, in Securities Act cases, a corrective disclosure date could serve as the "date on which the claim should have been discovered through reasonable diligence" because there is no need to

consider whether sufficient scienter facts exist for strict liability or negligence claims. *See Dentsply*, 2023 WL 2682905 at *10 ("The text of the statute plainly requires only discovery of the 'untrue statement or the omission' before the limitations period commences.").

Analyzing the SOL in this case based on Securities Act case law would betray the holding of *Merck*, which makes clear that a corrective disclosure does not start the limitations period as to fraud claims unless it reveals *facts establishing scienter*. *See Merck*, 559 U.S. at 650 (discovering a false statement "by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error. Hence, the statute may require 'discovery' of scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading."). Accordingly, for the SOL to begin running, the Court must find that as of the date of the corrective disclosure, Plaintiff either could adequately plead scienter or, by way of diligent investigation, could have learned sufficient facts to permit them to plead a viable showing of scienter. *See id.* at 648-50. Plaintiff could do neither until the final corrective disclosure on December 11, 2020.

The Securities Act cases Defendants do reference are factually distinguishable. Defendants cite *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 639 App'x 664, 667 (2d. Cir. 2016), for example, for the proposition that courts consider storm warnings when evaluating the SOL period, and a plaintiff need not discover everything about a fact to have sufficient information about that fact to plead it in a complaint. GD MTD at 41-42. But the plaintiff in *Gavin* alleged "significant" storm warnings and "strong circumstantial evidence" suggesting defendants' scienter. *See* 639 App'x at 667. *Gavin* rejected the argument that investors did not have enough information to plead scienter until defendants were deposed in their bankruptcy proceedings based on their consistent defaulting on debentures and representations that their intellectual property was worth over $10 million even

though they were starting the property from scratch. *Id.* at 668 ("Such a conflict between professed valuation and the company's public SEC filings was itself strong circumstantial evidence."). And additionally, at least one investor was aware that "[d]efendants had misrepresented facts when soliciting investors." *Id*. No such facts exist here. Plaintiff did not have enough information supporting scienter or loss causation to plead securities fraud by March 16, 2019. Indeed, instead of significant storm warnings and strong circumstantial evidence of securities fraud, investors were seeing assurances from the Sequential Defendants about the SEC investigation being immaterial and the Company's internal controls being effective. ¶¶ 11, 114, 121, 123, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23.

In addition, if the February 28, 2018 corrective disclosure was a "storm warning" and/or put putative Class Members on inquiry notice, the Court's analysis does not end there. For the SOL to commence, even if investors are on inquiry notice, they must be able to plead scienter with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss. *See Nomura*, 873 F.3d at 119, ("After *Merck*, we still assume a reasonable plaintiff on inquiry notice would conduct further investigation, but the limitations period begins to run ***only when***, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately"); *Gavin*, 639 F. App'x at 666-67 ("The [SOL] does not commence until 'the plaintiff has uncovered—or a reasonably diligent plaintiff would have uncovered—enough information about the defendant's knowledge or intent to satisfy this pleading standard.'") (citing *MBIA*, 637 F.3d at 175).

Similarly unavailing is Defendants' reliance on *Barclays PLC*, 750 F.3d at 233, and *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp.*, 902 F. Supp. 2d 329, 347 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of*

82

*Scotland Grp., PLC,* 783 F.3d 383 (2d Cir. 2015), for the proposition that the February 28, 2018 corrective disclosure revealed scienter. *See* Klein MTD at 12; Shmidman MTD at 7. The courts in those cases found that the underlying facts gave rise to scienter at the time of the corrective disclosure. But the court in *Barclays PLC* did not even mention the SOL, let alone analyze the correlation between the SOL and the corrective disclosures. 56 F. Supp. 3d at 557 (finding that a defendant's remarks during a conference call with analysts were inconsistent with the truth of his statements made just two days prior). And while the court in *Royal Bank* found plaintiff's claims untimely, that was due to the lack of "any specific new information that came to light on [the date defendants admitted to being involved in subprime securitizations for the first time] that it otherwise would not have been able to glean prior to that date." 902 F. Supp. 2d at 347. The court noted that weighing heavily in favor of "constructive notice" were the facts that the defendant company had detailed its "then-exposure to subprime assets on its own balance sheet and those it had taken on" before the critical date for the SOL, and that "when some of the largest banks in the world failed because of their exposure to securitized assets –it was common knowledge that these large banks had over-exposed themselves to lower quality assets." *Id.* In this case, as Defendants themselves point out, the Company had disclosed plausible non-fraud explanations for the impairment charge on February 28, 2018, the disclosure of the investigation on April 1, 2020, and the disclosure of the Wells Notice on August 14, 2020. GD MTD at 42; *see also* ¶¶ 11, 114, 121, 123, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23. Defendants thus made it impossible for investors to discover scienter with sufficient particularity to survive 12(b)(6) motion to dismiss, and neither February 28, 2018, April 1, 2020, nor August 14, 2020 can serve as the discovery date for SOL purposes. *See* ¶¶ 11, 114, 121, 123, 131, 148, 154, 194-96, 200, 208-09, 211-13, 215-17, 221-23.

## B. The Statute of Repose Does Not Bar Plaintiff's Claims.

The CohnReznick and Gibson Dunn Defendants raise arguments that Plaintiff's claims are time-barred by the five-year statute of repose. *See* CR MTD at 11; GD MTD at 40-43. The Gibson Dunn Defendants argue that because the Complaint adds for the first time nine of the ten Gibson Dunn Defendants,[42] all of whom could have been included in the original Complaint, Plaintiff's claims against them are time-barred due to Rule 15 not overcoming the five-year statute of repose. GD MTD at 42-43. The CohnReznick Defendants argue that Plaintiff's claims based on certain filings that they participated in[43] are barred by the five-year statute of repose. *See* CR MTD at 11. They also argue that Plaintiff cannot allege claims against CohnReznick for statements made after the last date it purchased Sequential securities, February 9, 2018, or made before November 14, 2017. *Id.* They are wrong. The claims against the CohnReznick and Additional Gibson Dunn Defendants in the Complaint relate back to the Original Complaint under Rule 15, and Plaintiff timely added them as defendants just over five months after learning about their involvement in the alleged fraud. In addition, the claims based on misstatements alleged from the Original Complaint were brought well within the five-year repose period and the claims based on scheme liability were not triggered until the scheme was completed on December 11, 2020.

### 1. The Claims Against the CohnReznick and Additional Gibson Dunn Defendants Relate Back to the Original Complaint, and Thus, They Were Timely Added as Defendants After Being Mistakenly Excluded.

"Where an amended pleading changes a party or a party's name, [Rule 15] requires, among other things, that 'the party to be brought in by amendment . . . knew or should have known that

---

[42] Wagenheim, Lops, Conn, Hanbridge, DiSanto, Sweedler, Hollander, Gossett, and Leonard are the Additional Gibson Dunn Defendants; Cooper was named in the Original Complaint.

[43] CohnReznick's audit opinion on the 2016 Audited Financial Statements filed on March 14, 2017. Sequential's 2017 10Qs filed on May 10, 2017, August 9, 2017, and November 13, 2017.

the action would have been brought against it, but for a mistake concerning the proper party's identity.'" *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010) (quoting Rule 15(c)(1)(C)). An amended complaint may relate back to the original complaint because:

> [t]hat a plaintiff knows of a party's existence does not preclude her from making a mistake with respect to that party's identity. A plaintiff may know that a prospective defendant—call him party A—exists, while erroneously believing him to have the status of party B. Similarly, a plaintiff may know generally what party A does while misunderstanding the roles that party A and party B played in the "conduct, transaction, or occurrence" giving rise to her claim. If the plaintiff sues party B instead of party A under these circumstances, she has made a "mistake concerning the proper party's identity" notwithstanding her knowledge of the existence of both parties. The only question under Rule 15(c)(1)(C)(ii), then, is whether party A knew or should have known that, absent some mistake, the action would have been brought against him.

*Id.* at 549. "This reading is consistent with the purpose of relation back: to balance the interests of the defendant protected by the [SOL] with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Id.* at 550. The Supreme Court further noted that "repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity." *Id.*

In this case, the CohnReznick and Additional Gibson Dunn Defendants "knew or should have known that an action would have been brought" against them because the Original Complaint had already been filed alleging the same scheme that involved them, and the SEC was investigating them for the same reasons. *See In re Bernard L. Madoff Inv. Sec. LLC*, 468 B.R. 620, 627 (Bankr. S.D.N.Y. 2012), *cert. denied sub nom. Citibank, N.A. v. Picard,* 212 L. Ed. 2d 217 (2022) ("[T]his 'requisite knowledge . . . typically is established' by the movant's demonstrating that there were allegations in the original complaint 'respecting a named party that, in fact, concern the originally unnamed party plaintiff seeks to add'"). The proper inquiry here therefore turns on whether there was a "mistake concerning the proper party's identity." Rule 15(c)(1)(C)(ii).

"A mistake about a party's identity in the context of Rule 15(c) can be either (1) a **factual** mistake, such that a party 'misapprehended the identit[y]' of a party to be added; or (2) a **legal** mistake, such that a party 'misunderstood the legal requirements of her cause of action.'" *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, No. 09 CIV. 2137 LTS MHD, 2010 WL 3239430, at *9 (S.D.N.Y. Aug. 17, 2010) (citing *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34, 36 (2d Cir. 1996)); *see also Roe v. Johnson*, No. 07-CV-2143 RJD RER, 2011 WL 8189861 (E.D.N.Y. Aug. 12, 2011), *report and recommendation adopted*, No. 07 CV 2143 RJD RER, 2012 WL 2575340 (E.D.N.Y. July 3, 2012) ("[T]he law in this Circuit is clear that the relevant mistake may be one of fact (misapprehension of the identity of the person a party wishes to sue) or one of law (misunderstanding of the legal requirements of a claim)"). "Even if a plaintiff knew of the unnamed party's existence, it made a 'mistake' for purposes of Rule 15 where the complaint makes 'allegations respecting a named party that, in fact, concern the originally unnamed party plaintiff seeks to add.'" *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 650 (S.D.N.Y. 2011), *aff'd in part sub nom. Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) (acknowledging *Krupski*'s holding, but, because it was an attempt by putative plaintiffs to intervene–ultimately finding the amended complaint did not relate back to the original complaint). "After *Krupski*, it is clear that a mistake 'concerning the proper party's identity' under Rule 15(c) includes lack of knowledge regarding the conduct or liability of that party." *Abdell v. City of New York*, 759 F. Supp. 2d 450, 457 (S.D.N.Y. 2010). Such a mistake "applies equally to cases where the 'mistake concerning the proper party's identity' results in the substitution or addition of defendants." *Roe*, 2011 WL 8189861 at *4.

Likewise, the Western District of New York recently considered the issue and found that Rule 15(c)(1)(C)(ii) applies when adding as well as substituting defendants. *See Ocasio v. City of*

*Canandaigua*, No. 18-CV-6712DGL, 2022 WL 17591639, at *8 n. 9 (W.D.N.Y. Dec. 13, 2022)

("I disagree with courts that have concluded that it is settled law in this Circuit that Rule

15(c)(1)(C)(ii) applies only to substitution and not addition of new defendants."). While the court

in *Oasio* held that Rule 15(c)(1)(C) precluded the amended complaint from relating back to the

original complaint based on the facts of the case, it did "envision" a court applying the relation

back doctrine to allow a plaintiff to add an additional defendant alongside the original defendant

where, for example:

> the timely-filed original complaint sues Defendant A for excessive force for kicking
> and punching the plaintiff, and the plaintiff learns after the expiration of the
> limitations period that although Defendant A kicked the plaintiff, it was Defendant
> B who punched the plaintiff. Under a strict construction that limits the rule to
> substitutions of parties, a motion to amend to add Defendant B would likely be
> denied. By contrast, a court which has not foreclosed relation back in the absence
> of substitution may arrive at a different outcome if the plaintiff can show that
> Defendant B knew at the time of the original complaint that he was the defendant
> who had kicked the plaintiff and that plaintiff was mistaken in attributing that
> conduct to Defendant A.

*Id.* The Gibson Dunn Defendants rely on an antitrust case for the contrary proposition that "Rule

15 does not override the [SOL] where, as here, '[t]he plaintiff has sued the right defendant, and

simply neglected to sue another defendant who might also be liable.'" GD MTD at 43 (quoting *In

re Vitamin C Antitrust Litig.*, 995 F. Supp. 2d 125, 129-31 (E.D.N.Y. 2014)). In a drastic attempt

to reject "additional party" cases altogether under Rule 15(c)(1)(C), the *Vitamin C* decision went

against both the *Krupski* and *Abdell* holdings and made the factual finding that "[i]n an 'additional

party' case like this one, there generally will be no 'mistake concerning' the proper party's

'identity.'" 995 F. Supp. 2d at 129 ("If the drafters of Rule 15 had meant to allow relation back in

this situation, they could have easily done so.").[44]

But as noted by another court analyzing Rule 15's relation back doctrine, the *Vitamin C* decision was "too restrictive and fails to apply the lessons of *Krupski*." *Leonard v. Gen. Motors L.L.C.*, 504 F. Supp. 3d 73, 92 (D. Conn. 2020). The court in *Leonard* allowed an amended complaint to relate back to an original complaint where plaintiff was not "aware that any additional defendants should have been sued when he filed the original complaint," had "mistakenly believed that suing [the original defendant] would suffice," and only added other defendants when their "*involvement only recently came to light*." *Id.* Allowing the amended complaint to relate back was appropriate because it furthered "the doctrine's goal of deciding claims on their merits without prejudicing the defendants." *Id.*

In this case, a putative Class Member with other counsel timely filed the Original Complaint on March 16, 2021, naming Sequential, Shmidman, Murray, Klein, and Cooper as Defendants. Original Complaint, ¶¶ 7-12. The Original Complaint was filed just over three months after the truth was fully revealed via the release of the SEC Complaint on December 11, 2020, which did not mention the CohnReznick or Additional Gibson Dunn Defendants' liability, wrongdoing, or involvement. Over a year later, on June 8, 2022, the SEC Orders against the CohnReznick Defendants were released, which indicated that based on the results of the SEC investigation, they were not innocent bystanders who were in the dark about the alleged fraud, but were active participants as Sequential's auditors. *See* CohnReznick Order; CohnReznick Partner Orders. The SEC Orders were released while Plaintiff was conducting its own investigation into the alleged misconduct, and were incorporated into the Complaint against the CohnReznick

---

[44] The court stated that "Rule(c)(1)(C) does not encompass just any mistake. It requires a mistake 'concerning **the proper party's identity**.' As a matter of plain language, this provision would appear to include only 'wrong party' cases, and not 'additional party' cases." *Id.*

Defendants on November 14, 2022.

Prior to the release of the SEC Orders on June 8, 2022, Plaintiffs could not have known information relating to the conduct or liability of the CohnReznick and Additional Gibson Dunn Defendants, since it was not public. Plaintiffs' lack of knowledge as to the CohnReznick and Additional Gibson Dunn Defendants' liability is a "mistake" in the context of the "proper party's identity" under Rule 15. *See Krupski*, 560 U.S. at 548 (defining "mistake" as an "error, misconception, or misunderstanding; an erroneous belief" based on Black's Law Dictionary 1092 (9th ed. 2009)); *Abdell*, 759 F. Supp. 2d at 457 (following *Krupski* in concluding" that a mistake 'concerning the proper party's identity' under Rule 15(c) includes lack of knowledge regarding the conduct or liability of that party"). Since there was a "mistake" as to the CohnReznick and Additional Gibson Dunn Defendants' identity at the time of the Original Complaint was filed, it was proper to add them as defendants in the Amended Complaint upon receiving information of their wrongdoing. *See Leonard*, 504 F. Supp. 3d at 92 (applying Rule 15 relation back doctrine to allow addition of new defendants "whose involvement only recently came to light"); *Roe*, 2011 WL 818986, at *4 (applying *Abdell*'s holding to the addition of defendants).

Where Plaintiff did not just neglect to sue another defendant who might also be liable, public policy and the interests of justice require a finding that the Complaint relates back to the Original Complaint. *Compare In re Vitamin C*, 995 F. Supp. 2d at 129, 131 (since "plaintiffs here made a tactical 'mistake' in the colloquial sense," applying relation back would "gut the policies underlying periods of limitations, because filing a complaint would effectively become an indefinite toll of the [SOL]"). Nor is Plaintiff trying to circumvent or toll the limitations period. Applying Rule 15's relation back doctrine in this case would serve the purpose of the doctrine "to accommodate the [SOL] policies that prevent stale claims from being litigated, and permit their

repose." *Id*. at 131; *see also Krupski*, 560 U.S. at 538 (recognizing that the relation back doctrine supports "the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits").

### 2. *Misstatements Alleged From the Original Complaint Are Timely.*

The CohnReznick and Gibson Dunn Defendants argue that "[u]nder the applicable statute of repose, claims based on statements made before November 14, 2017 are time-barred[,]" specifically those made on made on March 14, 2017, May 10, 2017, August 9, 2017, and November 13, 2017. CR MTD at 11; GD MTD at 40-41. The Original Complaint filed on March 16, 2021 contains the *same statements* that Defendants now argue are untimely. *See* Original Complaint, ¶¶ 22, 29, 32, 39. Since those statements formed the basis for the claims , providing Defendants notice well within the five-year statute of repose (March 16, 2016), no equitable tolling is required and thus, any policy concern of "an indefinite toll" is irrelevant. Indeed, allowing Plaintiff's claims based on those statements "furthers the doctrine's goal of deciding claims on their merits without prejudicing the defendants." *Leonard*, 504 F. Supp. 3d at 92.

The statements in the Original Complaint are timely, and whether the defendants named therein are liable for making them must be decided on the merits, even assuming *arguendo* that the Court agrees with the CohnReznick and Additional Gibson Dunn Defendants that the claims against them do not relate back. But again, dismissing the claims against them which are based on the statements in the Original Complaint, while keeping the same claims against the defendants named in Original Complaint, "would be a windfall" for the CohnReznick and Additional Gibson Dunn Defendants who "escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity" that the Supreme Court warned of in *Krupski*. *See* 560 U.S. at 550.

90

### 3. *Plaintiff's Scheme Liability Claims Against the CohnReznick and Additional Gibson Dunn Defendants Are Timely.*

Defendants argue that the statute of repose "may not be equitably tolled and is not subject to claims of a continuing violation." CR MTD at 11; *see also* GD MTD at 41 ("As this court has already held, [the statute of repose] is ironclad and cannot be extended by equitable tolling principles or continuing violation theories."). But in the wake of the Supreme Court expanding scheme liability under Rule10b-5 in *Lorenzo*, and within the context of third-party, non-maker defendants participating in a scheme, where the standard of proof is higher and the law is not settled as to when the "violation" under § 1658(b)(2) begins, Defendants' arguments fail.

"Courts within the Second Circuit have reached 'diametrically opposite conclusions' regarding whether the continuing violations doctrine applies in securities fraud cases." *Fiore*, 416 F. Supp. at 331. As such, "[t]here have been differing approaches within this circuit determining when the period of repose begins." *Hammer v. Reetz*, No. 16 CIV. 6590 (LLS), 2017 WL 946336, at *5 n. 2 (S.D.N.Y. Feb. 27, 2017). Some courts have held that a "violation" for purposes of § 1658(b) "is considered to have occurred on the date of the latest misrepresentation or omission alleged." *Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, 924 F. Supp. 2d 528, 537 (S.D.N.Y. 2013); *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324 (S.D.N.Y. 2012) ("These continuing misrepresentations mean that Plaintiffs' claims are not untimely, given the rule, adopted by the majority of courts in this Circuit, that the statute of repose 'first runs from the date of the last alleged misrepresentation regarding related subject matter.'"); *see also SEC v. Xia*, No. 21CV5350PKCRER, 2022 WL 17539124, at *13 (E.D.N.Y. Dec. 8, 2022) (holding that in "an integrated fraudulent scheme," § 2462's five-year SOL does not begin to run until after the scheme was completed). In addition, the statute of repose has been "calculated from the date of

commitment to the purchase or sale of security at issue, not when the misstatement or omission was made." *Hammer*, 2017 WL 946336 at *5 n. 2.

Arguing that the statute of repose runs from the first violation, Defendants rely on a case decided by this Court, which did not involve scheme liability claims against defendants who did not make the alleged misstatements: *Abu Dhabi Inv. Auth. v. Mylan N.V.*, No. 20-CV-1342 (JPO), 2021 WL 516310, at *3 (S.D.N.Y. Feb. 10, 2021). *See* GD MTD at 41; CR MTD at 11. The distinction between liability for misstatements and omissions under Rule 10b-5 (b) and scheme liability under Rule 10b-5 (a) and (c) is important in the context of determining when a "violation" occurs that prompts the statute of repose to start. *See Danske*, 11 F.4th at 105 ("Unlike the better-known subsection (b), [scheme liability] do[es] not require the defendant to make a misstatement or omission; they require only deceptive conduct."); *Xia*, 2022 WL 17539124, at *13 ("Whereas other parts of securities laws make it unlawful simply to utter or spread falsehoods, scheme liability 'hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement.'").

In *Lorenzo*, the Supreme Court held that dissemination of false or misleading statements may alone be enough to allege a scheme liability claim under Rule 10b-5 (a) and (c). *See* 139 S. Ct. at 1102. Since then, courts have recognized that *Lorenzo* "expanded" and "altered the scope of scheme liability," *SEC v. Sugarman*, No. 19CV5998, 2020 WL 5819848, at *7 n.8 (S.D.N.Y. Sept. 30, 2020), *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. CV166509ESCLW, 2020 WL 3026564, at *17 (D.N.J. June 5, 2020), and "forecloses" and "completely abrogate[s]" the rule set forth in related cases that scheme liability depends on conduct "that is distinct from an alleged misstatement." *See SeeThruEquity v. SeeThruEquity, LLC*, No. 18 CIV. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019).

The Original Complaint alleged a fraudulent scheme amongst the defendants named therein, and included the statements that formed the basis of that scheme. *See* Original Complaint. ¶¶ 22, 29, 32, 39, 64-65. After finding out about Defendants' involvement in the scheme following the release of the CohnReznick and CohnReznick Partner Orders, Plaintiff revised the Complaint in light of that new information, including expanding the scope of the scheme to include defendants who did not make the alleged misstatements and omissions. ¶¶ 46, 52, 343, 345, 347-48. Plaintiff kept the statements and claims from the Original Complaint, which was filed well within the five-year repose period on March 16, 2021, that Defendants now try to dismiss as untimely.[45] *See* Original Complaint, ¶¶ 22, 29, 32, 39. Even assuming, *arguendo*, that the Court agrees with Defendants that the Complaint does not relate back to the Original Complaint under Rule 15, the statute of repose should not begin on November 14, 2017, as Defendants urge. *See* CR MTD at 11; GD MTD at 40-41.

The statute of repose should start when Plaintiff last purchased Sequential securities on February 9, 2018, or a violation in the scheme last occurred on November 16, 2020.[46] *See Hammer*, 2017 WL 946336 at *5 n. 2 (utilizing the "date of commitment to the purchase or sale of security

---

[45] The same logic applies to the CohnReznick Defendants' argument that claims against CohnReznick for statements made after February 9, 2018, the last date Plaintiff purchased Sequential securities, are untimely. CR MTD p. 12-13. Those statements were timely pled in the Original Complaint, and again in the Complaint, causing Plaintiff and the rest of the Class loss when the truth about the statements was revealed.

[46] As this Court already held, the "alleged acts [in the scheme] were not isolated events; as alleged, they were part of a deliberate course of conduct continued for over a year." *Sequential*, 2021 WL 4482215 at *6. Since the CohnReznick Defendants and the Additional Gibson Dunn Defendants were directly involved in the "course of conduct" that "continued for over a year," even if the Court did not agree that the scheme alleged here continued until November 16, 2020, it should find that the statute of repose starts after the "deliberate course of [deceptive] conduct [which] continued for over a year" ended. *See In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216 (S.D.N.Y. 2020) (holding that scheme liability "is premised on deceptive conduct that is independent of misrepresentations or omissions."). That date would be February 28, 2018 when the Company came clean about the value of its goodwill, writing off all $304.1 million of it. ¶ 165.

at issue" as the proper start date for commencing the statute of repose); *Xia*, 2022 WL 17539124 at *13 (the "five-year [SOL] did not begin to run until after the scheme was completed–when the final sale of the EB-5 investments occurred"). No investor knew the fraud was so widespread that it involved Sequential's auditor and BOD members until the release of the CohnReznick and CohnReznick Partner Orders on June 8, 2022. Even if Plaintiff had filed an amended complaint that day, when Defendants' liability became known to the reasonable investor, Defendants' position would have the five-year statute of repose bar any claims based on pre-June 8, 2017 misstatements. Utilizing the date proposed by Defendants would allow similarly situated defendants to get away with securities fraud at the expense of an entire class of innocent investors. In the context of third-party, non-speaker defendants participating in a scheme to defraud investors, where the original complaint was timely and contains the same claims and statements as the amended complaint, the statute of repose period should start on the date of the last violation in the scheme, if the fraud could not have been known to plaintiffs, or the date of commitment to the purchase or sale of security at issue. Under either of these start dates, Plaintiff's claims are timely.

**IX.    Plaintiff Adequately Alleges Control Person Liability.**

Defendants argue that Plaintiff's §20(a) claims for control person liability fail. GD MTD at 38; CR MTD at 24-25; Klein MTD at 24-25; Shmidman MTD at 15-16; Murray MTD at 19-20. They are wrong. "In the Second Circuit, 'the control person provisions are broadly construed as they were meant to expand the scope of liability under the securities laws.'" *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.

Regarding the first prong, liability for § 20(a) violations "is derivative of liability for [§] 10(b) violations." *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 307 (S.D.N.Y. 2013). As explained above, Plaintiff has adequately pled §10(b) violations, and thus "the 'primary violation' element of [§] 20(a) is satisfied." *380544 Can., Inc. v. Aspen Tech., Inc.*, 544 F. Supp. 2d 199, 231 (S.D.N.Y. 2008); *see also Teva*, 432 F. Supp. 3d at 176.

As for the second prong, Defendants correctly state that "pleading defendant's officer or director status alone is not enough to establish that they exercised actual control over primary violators." GD MTD at 38-39; CR MTD at 22-23; Shmidman MTD at 16. "That said, however, 'whether a person is a controlling person is a fact-intensive inquiry and generally should not be resolved on a motion to dismiss.'" *Teva*, 432 F. Supp. 3d at 176. "A plaintiff can establish control by showing that the defendants were 'members of the core management team.'" *Id.* (quoting *In re Hi-Crush*, 2013 WL 6233561 at *27). In addition, "[c]orporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons." *Id.* Defendants here were in positions of authority and participated in the alleged misstatements, and thus, were control persons under § 20(a).[47] *Id.* (holding that plaintiffs sufficiently alleged control under § 20(a) with respect to a prior CEO and a prior SVP and COO by virtue of their positions of authority); *see also City of Westland Police and Fire Ret. Sys. v.*

---

[47] Wyss, Jackson, and Hilbert were controlling persons of CohnReznick by virtue of their executive positions with the ability to control and influence the decision-making and public statements made by CohnReznick. ¶¶ 373-75. At CohnReznick, Wyss is an engagement partner, Jackson is an engagement quality control review partner, and Hilbert is the Managing Partner of Assurance and National Director of Accounting who also served as the liaison between CohnReznick's auditors and its internal group of valuation specialists. ¶¶ 53-54. Likewise, the Sequential Defendants were controlling persons by virtue of their positions as members of Sequential's executive team and/or Board of Directors, who–as explained above–had direct and supervisory involvement in the day-to-day operations of the Company. ¶¶ 357-60; *see* ¶¶ 26-40 (describing each Sequential Defendants' background and position at the Company).

*MetLife, Inc.*, 928 F. Supp. 2d 705, 721 (S.D.N.Y. 2013) ("[When] a plaintiff alleges that the directors and officers participated in the alleged primary conduct, that is sufficient to state a claim for control person liability.").

For the third element of control liability, "district courts in the Second Circuit are split as to what, exactly, a 'culpable participation' allegation requires." *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016). Defendants here had the "power and influence to cause . . . fraudulent conduct," including the publication of false and misleading statements, which suffices for culpable participation. *In re Solucorp Indus., Ltd. Sec. Litig.*, No. 98CIV.3248(LMM) , 2000 WL 1708186, at *7 (S.D.N.Y. Nov. 15, 2000); *Fox v. First BanCorp*, Civ. No. 05-2148 (GAG), 2006 WL 4128534, at *8 (D.P.R. Nov. 6, 2006) ("[D]efendants signed annual and quarterly reports filed with the SEC which contained untrue statements and signed certifications attesting to the integrity of [the company]'s financial statements and internal controls . . . . These facts support an inference that defendants were culpable participants in the alleged fraud."). A defendant is "in some meaningful sense a culpable participant even though [he] [did] not meet the scienter requirements." *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 144 (D. Conn. 2021) (finding control liability based on allegations of (1) a confidential report showing that a company's business practices were unethical, (2) defendant CFO being aware of the general nature of company operations while expressly negating the report and affirming that earnings were attributed to lawful business practices to investors, and (3) his resignation after the audit committee's investigation into the potentially unethical and illegal sales practices was announced); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 415 ("[T]here is no required state of mind for a defendant's culpable participation" under [§] 20(a)."); *Carpenters Pension Tr. Fund of St. Louis, St. Clair Shores Police & Fire Ret. Sys. v. Barclays PLC*, 56 F. Supp. 3d 549, 560

96

(S.D.N.Y. 2014) ("[S]cienter is not an essential element of a [S]ection 20(a) claim," thus "neither Rule (9)(b) nor the PSLRA apply."). In addition, if Plaintiff has not alleged the requisite scienter–which it has–then at minimum, as in *Alexion*, Plaintiff has "they have stated with particularity facts that support a conclusion that [Defendants] [were], in some meaningful sense, a culpable participant in a fraud perpetrated by [Sequential and CohnReznick]." *Id.* at 145.

Finally, the Gibson Dunn Defendants are correct "a defendant cannot be held liable as both a primary violator and a controlling person" (GD MTD at 40), but "such alternative theories are permissible at the pleadings stage." *In re Alstom SA*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005).

## CONCLUSION

For the reasons set forth above, Defendants' Motions should be denied in its entirety. To the extent any parts of the Motions are granted, Plaintiff respectfully requests leave to amend.

Dated: May 25, 2023
New York, New York

Respectfully submitted,

**FREEDMAN NORMAND FRIEDLAND LLP**

*/s/ Ivy T. Ngo*
Ivy T. Ngo (*pro hac vice*)
ingo@fnf.law
Velvel (Devin) Freedman
vel@fnf.law
Constantine P. Economides
ceconomides@fnf.law
Brianna K. Pierce
bpierce@fnf.law
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131

Tel.: 786.924.2900
Fax: 646.392.8842

*Counsel for Lead Plaintiff CJD Property Finance Company, LLC and Lead Counsel for the Class*

**THE SCHALL LAW FIRM**
Brian Schall (*pro hac vice* forthcoming)

97

brian@schallfirm.com
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Tel.: 424. 303.1964

*Additional Counsel for Lead Plaintiff CJD*
*Property Finance Company, LLC*